UNITED STATES DISTRICT COURT

IN THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

THOMAS SZCZESNY,

Plaintiff,

-vs- No: 2:25-cv-12836-GAD-EAS

HON. GERSHWIN A. DRAIN

MAG. JUDGE ELIZABETH A. STAFFORD

CITY OF TROY, a municipal corporation; EVAN LEITHAUSER, in his personal and professional capacities; SCOTT ALLAN, in his personal and professional capacities; ALEJANDRO PARRA, in his personal and professional capacities; GAIL PARRA, in her personal and professional capacities, and BRIAN WARZECHA, in his personal and professional capacities.

Defendants.

_____________________________________________/

Pages 1 - 165.

The videotaped deposition of EVAN LEITHAUSER,
taken at 500 West Big Beaver Road,
Troy, Michigan,
commencing at 1:48 p.m.
Friday, August 7, 2026
before Ann L. Bacon CSR-1297.

VIDEOGRAPHER: MR. NEAL ROGERS



APPEARANCES:

MR. AARON R. MARTINEZ (P86228)
MR. JASON A. WAECHTER (P47651)
Law Offices of Jason A. Waechter
19080 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-4701
aaron@877-powerlaw.com
Appearing on behalf of the Plaintiff.

MS. JULIE QUINLAN DUFRANE (P59000)
Troy City Attorney's Office
500 West Big Beaver Road
Troy, Michigan 48084
(248) 524-3320
j.dufrane@troymi.gov
Appearing on behalf of Defendant City of Troy.



APPEARANCES, Continued:

MS. AMANDA P. WASKE (P81128)
MS. MARGARET T. DEBLER (P43905)
Rosati Schultz Joppich & Amtsbuechler, P.C.
27555 Executive Drive, Suite 250
Farmington Hills, Michigan 48331
(248) 489-4100
mdebler@rsjalaw.com
Appearing on behalf of Defendant Officers.



TABLE OF CONTENTS


| WITNESS | PAGE |
|---|---|
| EVAN LEITHAUSER | |
| Examination by Mr. Martinez | 8 |


EXHIBITS


| NUMBER | PAGE |
|---|---|
| Deposition Exhibit No. 1 (Deft. Leithauser's Responses to Plf's First Discovery Requests) | 19 |
| Deposition Exhibit No. 2 (Deft. Leithauser's Responses to Plf's Second Discovery Requests) | 151 |
| Deposition Exhibit No. 3 (Text Messages) | 90 |
| Deposition Exhibit No. 4 (Dispatch Recording) | 66 |
| Deposition Exhibit No. 5 (VC Vehicle Collision EVT-00000117-1) | 134 |
| Deposition Exhibit No. 6 (1/3/24 Memorandum) | 139 |

EXHIBITS, Continued:

| NUMBER | PAGE |
|---|---|
| Deposition Exhibit No. 7 (Bosch CDR Pre-Crash Data) | 60 |
| Deposition Exhibit No. 8 (11/12/20 Memo) | 116 |
| Deposition Exhibit No. 9 (4/20/22 E-mail) | 124 |



Troy, Michigan
Friday, August 7, 2026
1:48 p.m.
- - -

VIDEOGRAPHER: We are on the record. This is the video-recorded deposition of Evan Leithauser being taken in Troy, Michigan. Today is August 7th, 2026 and the time is 1:48 p.m. Would the attorneys please identify themselves and the court reporter please swear in the witness?

MR. MARTINEZ: Aaron Martinez for the Plaintiff.

MR. WAECHTER: Jason Waechter for the Plaintiff.

MS. DEBLER: Margaret Debler for the individual Defendants.

MS. DUFRANE: Julie Dufrane on behalf of the City of Troy.

MS. WASKE: Amanda Waske on behalf of the individual Defendants.

E V A N L E I T H A U S E R

was thereupon called as a witness herein, after having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:



MR. MARTINEZ: Let the record reflect this is the date and time set for the deposition of Evan Leithauser taken pursuant to Notice to be used for all purposes allowable under the Federal Court Rules of Civil Procedure.

EXAMINATION

BY MR. MARTINEZ:

Q. Good afternoon, Officer. My name is Aaron. I represent Tom Szczesny, the motorcyclist involved in a collision with you on September 22nd of 2023.
**A. Gotcha. Nice to meet you.**
Q. Likewise. If I refer to the incident, the crash or the accident, that's the collision I'm referring to.
**A. Understood.**
Q. Okay. You understand you're under oath today?
**A. Yes, sir, yes.**
Q. So the questions (sic) that you give today are going to be the same as if you were in court.
**A. Sure, yeah, absolutely.**
Q. Is there any reason that you can't give complete and truthful testimony today?
**A. No. No, sir.**
Q. We've got a court reporter here present. She's going to be making a record of everything that



we say today.
**A. Very good.**
Q. Even though you and I can see each other, nods of the head, shakes of the head don't come out as neatly on the record, so you'll need to give verbal answers to my verbal questions.
**A. Cool, very good, yep.**

MS. DEBLER: It's really important that you let Mr. Martinez finish his question before you answer even if you think you know where he's going, just so we get a nice clean record.

**THE WITNESS: Sure, yeah, absolutely.**

MS. DEBLER: Primarily for the court reporter, right?

**THE WITNESS: No worries.**

MS. DUFRANE: Or she'll come over and smack me on the head.

**THE WITNESS: No worries.**

MR. MARTINEZ: All right. Good.

Q. (Continuing, by Mr. Martinez) From time to time attorneys may make objections while we're here today. Unless an attorney specifically instructs you not to answer due to a privilege, you must still answer the question that I've asked, okay?

**A. Yes, sir.**

Q. If you need a break at any point in time, please let me know. I'm not here to hold you hostage. I just want to make sure that we can get the question that's pending at the time answered before we take a break.

**A. Very good.**

Q. All right. Could you just state your full name for the record?

**A. Evan Leithauser.**

Q. Sir, how are you currently employed?

**A. Police officer, City of Troy.**

Q. How long have you been with the City of Troy?

**A. It will be -- from my start date or contract date or what specifically date would you like?**

Q. The earliest date of your affiliation with the Troy Police Department.

**A. So they offered me the job right around July of 2014, and then I signed my contract in October and I started on the road in November.**

Q. Prior to joining the Troy Police Department, did you have any other law enforcement roles with any other police agency?

**A. No, sir.**

Q. Where did you attend the academy?



**A. Oakland.**

Q. Is that Oakland --

**A. Yeah, I'm sorry, Oakland Police Academy.**

Q. Is that at Oakland Community College?

**A. It is, yes.**

Q. Do you have any degrees or certificates?

**A. From the police academy?**

Q. In general.

**A. I do.**

Q. What are those?

**A. I have the police academy certificate and then I have a Bachelor's Degree from Oakland University.**

Q. Very good. Prior to joining the City of Troy, did you have any other law enforcement roles?

**A. No, sir.**

Q. All right. What did you review to prepare for your deposition today?

**A. Just meetings with my lawyers.**

Q. Did you review any documents or anything of that sort?

**A. I reviewed this right here. This is the only thing I think I reviewed here.**

Q. You're pointing to Exhibit 1?

**A. This is questions I was given. I'm sorry if I don't know the legal terms of the documents and**



**things.**

Q. That's okay. So the discovery requests we sent to you, you reviewed your responses?

**A. Right, mm-hmm.**

Q. Aside from your attorneys, did you discuss this matter or the testimony you would give with any other individual before coming today?

MS. DEBLER: Objection to form. You may answer.

**A. Can you say it one more time?**

Q. (Continuing, by Mr. Martinez) Yeah. So aside from your attorneys, I don't want to know about your conversations with them, but did you have any conversations with any other individual about the testimony you would provide here today?

**A. About the testimony, no. No, sir.**

Q. Prior to coming here today, have you discussed this incident with anybody other than your attorneys?

**A. I'm sure I have, yes.**

Q. Who do you think you've talked to about this?

**A. I mean it made its way through a lot of people at the department, my supervisors, probably people in my union and probably just in general, yeah, those kinds of people I would say.**



Q. Aside from your discovery responses, did you review the text messages that were produced in discovery to us?

**A. Text messages between whom?**

Q. Between you and I believe it's Michael Giordano?

**A. Yes, sir, I did review those.**

Q. Officer, do you have any concerns about sitting for this deposition today?

**A. No, sir.**

Q. At any point in time have you been concerned about sitting for a deposition pertaining to this incident?

**A. I mean not particularly concerned. I mean what do you mean by concerned?**

Q. What does that term mean to you?

MS. DEBLER: Objection, form. I think you have to define it for him.

**A. Yeah.**

Q. (Continuing, by Mr. Martinez) Concern, apprehensions, fears. Is there anything about sitting for this deposition that has given you discomfort or concern in any way? That's the best I can do for you.

**A. This particular deposition I would say not specifically, today's deposition, no. Once I**

**was made aware that we were having the deposition today, I didn't have any further concerns, no, sir.**
Q. You had concerns prior to that?
**A. I would say nothing more than just general concerns you would have in any situation.**
Q. All right. Since your start with the Troy Police Department since 2014, what assignments have you held?
**A. So I think it's technically the operations division. I've just been a patrol officer.**
Q. The entire time?
**A. The entire time.**
Q. What was your assignment then on September 22nd of 2023?
**A. That's the date of the crash? I was a patrol officer working afternoon shift.**
Q. Since being employed with the City of Troy Police Department, have you undergone any additional training other than what you've completed in the academy?
**A. They send us to trainings.**
Q. What trainings have you taken?
**A. So we do, I mean we do like yearly MCOLES required trainings. Everything I've done is set up by the training department. There's been**



**numerous ones. Anything specific you're --**
Q. Have you received any additional training on patrol vehicles operation or emergency vehicle operation?
**A. They send us to EVO training.**
Q. E-V-O?
**A. E-V-O, yes, emergency vehicle operations.**
Q. What is EVO training?
**A. Emergency vehicle operations to the best of my knowledge.**
Q. What does EVO training teach you as an officer?
**A. It's a refresher on vehicle operations, patrol vehicles. They set up cones and you drive the cones with an instructor. I'm not in charge of training. That's the best I can describe it.**
Q. I'm asking about your --
**A. Right, exactly, yeah, that's basically what it was. They set up cones and they have instructors there and they run you through obstacles.**
Q. Is that a classroom-based course?
**A. It's a very brief classroom-based and it's all out like in a parking lot and they set up like an obstacle course with cones for the vehicles.**
Q. Roughly how much time did you spend doing that course?



**A. I think it was -- I don't remember if it's a one or two-day course. You'd have to ask the training department, but I think they used to do it once every two years I think, but again, you're going to have to verify with the training department. I just go when they sign me up for it.**
Q. Did they teach you about speed at that course, the EVO training?
**A. I can't remember if they specifically addressed speed.**
Q. Did they teach you anything about emergency lights and sirens in that training?
**A. I'm sure they had points where we activated our emergency lights and sirens.**
Q. Do you recall that today?
**A. I recall doing the obstacle course with the emergency lights and sirens on the vehicles.**
Q. Do you recall them teaching you anything as it pertains to those emergency lights and sirens aside from the road test?
**A. Not specifically that I can tell you specifically they taught me this.**
MS. DEBLER: I'm just going to say this. I heard a really big sigh from the court reporter. I think it might help, Officer



Leithauser, if you let Mr. Martinez finish his question and then maybe take a breath or a pause.
**THE WITNESS: Oh, I'm sorry.**
MS. DEBLER: No, you're doing great.
**THE WITNESS: I lost the microphone.**
MS. DEBLER: I know you're trying to volunteer information and I know you're trying to be very expeditious, but we just want to make sure we don't talk over one another.
**THE WITNESS: Oh, I'm sorry. No problems.**
MS. DEBLER: No, you're good.
COURT REPORTER: It gives her a chance to object if she wants to.
**THE WITNESS: Oh, okay.**
MS. DEBLER: What she said.
Q. (Continuing, by Mr. Martinez) All right. So as part of your EVO training, did they teach you anything about operating an emergency vehicle at night?
**A. We only did the course during the day.**
Q. Have you ever been taught about how to operate an emergency vehicle at night?
**A. From my recollection, I don't remember ever getting any vehicle operation training at night.**
Q. Throughout any of the training that you've

Page 18

undergone as a law enforcement officer, either through the City of Troy or at the academy, did you take any course or receive any information about specifically motorcycles?
**A. Not from my recollection, no.**
Q. Anything in your training about visibility of motorcycles?
**A. Not that I can remember.**
Q. Did your training ever teach you about exceeding speed limits?
MS. DEBLER: Objection to form.
**THE WITNESS: Not sure what that means.**
MS. DEBLER: You may answer the question.
**THE WITNESS: Oh, okay. I apologize. I didn't know what that meant. Can you say it one more time?**
Q. (Continuing, by Mr. Martinez) Yeah. So I'm just looking to find out if anything in your training ever covered the act of exceeding speed limits perhaps when it's appropriate, when it may not be appropriate, things of that sort?
**A. I can't remember specifically, but I'm sure it probably was included in the EVO training.**
Q. Is there any aspect of your training that you can specifically recall here today?

Page 19

MS. DEBLER: Objection to form.
**A. I'm sorry. From the EVO training?**
Q. (Continuing, by Mr. Martinez) In general.
**A. Yeah, I remember a lot of aspects of trainings I went to.**
Q. And the trainings that you've gone to, aside from the EVO training that we've discussed, did anything train you or prepare you for how to operate an emergency or a vehicle at night with lights and sirens?
**A. I haven't, from my memory I haven't done any vehicle training at night.**
Q. Do you recall what your training taught you about the need for lights and sirens on a patrol vehicle?
**A. To activate them when needed.**
Q. And why are they needed?
MS. DEBLER: Objection to form and foundation.
**A. The siren makes, our siren emits an audible noise so it's easier to hear the vehicle coming and the lights are more visible.**
(Marked Exhibit No. 1.)
Q. (Continuing, by Mr. Martinez) I'm going to direct you to Exhibit 1 which you have in front of you.
**A. Sure.**

Page 20

Q. You've already told us a little bit about what this is. Can you just state it again what this exhibit is in front of you?
MS. DEBLER: Can we pull it out? These are all the exhibits.
**THE WITNESS: Is it? Okay.**
MS. DEBLER: I think you were just looking at the top one. So, Aaron, are you looking at the responses to the first discovery requests?
MR. MARTINEZ: Yes.
MS. DUFRANE: And that's Exhibit 1?
MR. MARTINEZ: Correct.
Q. (Continuing, by Mr. Martinez) I'll direct your attention to page seven of Exhibit 1.
**A. Mm-hmm.**
Q. Looking specifically at questions 21 and 22, as it pertains to the Troy Police Department policy, whether or not you were required to activate both lights and sirens when exceeding the speed limit. Do you see that?
**A. RFA EL-21?**
Q. Correct.
**A. Okay. Yeah, I see it here.**
Q. What was your response to that?

Page 21

**A. "Response: Defendant Leithauser denies this Request to Admit for the reason that it is untrue."**
Q. What is your understanding then of the Troy Police Department policy pertaining to use of emergency lights and sirens?
MS. DUFRANE: Objection to foundation.
**A. So you're to activate them -- specifically what part of the policy are you asking about?**
Q. (Continuing, by Mr. Martinez) Any part of the policy which governs use of emergency lights and sirens.
**A. Okay. So activate them when going to an emergency call, unless the call requires -- there's a few exceptions to it.**
Q. Okay. And what is your understanding of those exceptions?
**A. So if you need to have any kind of covert approach to the call, mostly things like that.**
Q. At any point in time with regard to your EVO training, were you ever provided with information regarding emergency lights being a warning to the public?
**A. I can't specifically remember anything stated to me like that.**
Q. Are you aware sitting here today that emergency

lights do provide warning to the public of an oncoming police car?
**A. I think that's generally understood that they do provide a warning.**
Q. And sitting here today, do you understand that sirens provide an additional notice to people regarding a police car oncoming?
**A. Yeah, I think so as well.**
Q. Why does speed matter based on your training and experience when another driver is trying to judge whether it's safe to turn?
MS. DEBLER: Objection, form and foundation.
**A. Why does speed matter? Can you rephrase that?**
Q. (Continuing, by Mr. Martinez) Sure. So speed as it pertains to your training and experience --
**A. Mm-hmm.**
Q. -- can affect perception, is that true?
MS. DEBLER: Objection to form and foundation.
**A. Affect perception how?**
Q. (Continuing, by Mr. Martinez) So something faster moves faster, right?
**A. That makes sense to me that something faster would move faster.**



Q. So a police vehicle that moves at a higher rate of speed, therefore, moves faster?
**A. I mean I'm not a physicist, but yeah, that makes sense to me.**
Q. Okay. And so if something moves faster, based on your training and experience as a law enforcement officer, does speed affect reaction time other people may have?
MS. DEBLER: Objection to form and foundation.
**A. It's up to other drivers on the road to judge speed every day when they drive. For instance, just an example, if you're merging on the freeway, you have to judge the speed to merge onto the freeway, and the freeway has all sorts of varying speeds.**
Q. (Continuing, by Mr. Martinez) We've heard the term used slick top patrol vehicle. Are you familiar with that term?
**A. I'm familiar with it.**
Q. What is your understanding of that term?
**A. Slick top just means that it doesn't have an external light bar. That's my understanding.**
Q. Is there any other aspect of a slick top vehicle that's different than a standard or a fully



marked patrol vehicle?
**A. Slick top just means it doesn't have an external light bar on the top of the vehicle.**
Q. Does speed and distance -- actually, I'll withdraw that question. Based on your understanding of the City of Troy's patrol vehicles, are there vehicles which are fully marked and light bars on top?
**A. There are. We do have those.**
Q. How much different variations of patrol vehicles are you familiar with?
**A. Just the ones we have.**
Q. And they are?
**A. We have a pickup truck. We have Chevrolet Suburbans or Tahoes. I don't know car makes all that well, but and then we have Ford Explorers and Dodge Chargers.**
Q. How many of those vehicles have you driven in your time with the Troy Police Department?
**A. I've only driven an Explorer and a Charger.**
Q. And the Charger was the kind of vehicle that you were driving on the day of this crash, correct?
**A. Yes, that's my primary -- Chargers are my primary assigned vehicle assigned by the department.**
Q. On the date of this crash, you were operating



patrol vehicle 931, is that right?
**A. 931 was my assigned vehicle.**
Q. That was going to be my next question. So 931 was always your vehicle?
**A. I was assigned to it.**
Q. Does anybody else ever drive 931?
**A. Yes.**
Q. Is it just dependent on the shift?
**A. A lot of times they'll assign alternating days off to a vehicle, so I'll have it one set of days off, then the next officer that has alternating days off will have it the other days, and then if nobody's driving it and it's available, anybody can drive it.**
Q. Understood. I want to take you back to the incident that we're here to discuss, September 22nd, 2023.
**A. Yes, sir.**
Q. What shift were you working that day?
**A. Afternoons, afternoon shift.**
Q. And what time period did that shift occur?
**A. At the time it was, I think it was 3:30 to 1:30, 3:30 p.m. to 1:30 a.m.**
Q. What time did you arrive for your shift that day?
**A. I usually get there right around three to put my**

**gear on.**
Q. And then the shift officially starts when?
**A. Three-thirty is roll call.**
Q. Take me through that shift. From the start of your shift up until this crash occurred, what were you doing?
**A. I couldn't tell you. Can't remember.**
Q. Do you recall where you were at any point in time prior to this crash?
**A. No, I'm sorry.**
Q. At some point in time a phone call or a dispatch call comes through for a minor personal injury accident. Do you recall that?
MS. DEBLER: Objection, form and foundation.
**A. I did get dispatched that night to an injury crash.**
Q. (Continuing, by Mr. Martinez) Take me through how the night went from there, from the time you got that call.
**A. From what I remember, I drove to the call and then that's when the collision occurred halfway en route to the call.**
Q. How far away from the call you were responding to were you when you received the dispatch?
**A. I think the call was at Livernois and Maple, if**



**I remember correctly, and so that would have been maybe a mile or so, mile and a half.**
Q. If the reports that we have from this matter indicate that the collision you were responding to was at Maple and Combermere, would you have any reason to dispute that?
**A. I wouldn't have any reason to dispute it, no. It's in that general area.**
Q. What did you understand about the urgency of the call you were responding to?
**A. There was a traffic crash with an injury and we had one officer who is a very junior officer who was either already on scene or dispatched on the way.**
Q. Who was the officer that was already on scene?
**A. James Lietzow.**
Q. What did you understand about whether this crash resulted from a pursuit?
**A. I don't remember anything about the crash. I didn't make it to the scene.**
Q. Do you know whether that collision involved a violent suspect?
**A. I don't remember.**
Q. Do you remember whether it was important to respond to that incident with silence?



**A. I don't remember.**
Q. What did you understand about your role as the second responding officer to the crash at Maple and Combermere?
MS. DEBLER: Objection to foundation.
**A. Can you be more specific?**
Q. (Continuing, by Mr. Martinez) What did you know that you were responding to? What was going to be your role when you arrived on scene at the Maple and Combermere collision?
**A. You don't -- it's hard to say because you don't really know. You don't really have all the facts until you get to the scene and what's really going on, so you kind of get there and fill in a role.**
Q. What facts did you have prior to -- en route to that collision?
**A. The only facts I had to act off of that I remember is that it was related to a main road and there was an injury involved and a very junior officer was going by himself with me also responding.**
Q. How did you come to be the officer that would be assisting in that collision?
MS. DEBLER: Objection, foundation.



**A. They generally dispatch calls. They try to, based on the area assignments, they try to group them together. Based on where the incident occurs, it's in a specific area, and then they'll try to dispatch the primary car that's assigned to that area and then a close related car, so it can be a car that's further away, but is assigned to the quadrant that's next to it, if that makes sense.**
Q. (Continuing, by Mr. Martinez) So there's a quadrant system that gets used?
**A. Mm-hmm, yes.**
Q. Which quadrant were you in on that night?
**A. I was assigned to the full, the lower half of the city, so both southern quadrants.**
Q. And the collision that occurred at Maple and Combermere, was that in which quadrant?
**A. So if it was at Maple and Combermere, that would have been the seven, we call it the seven area.**
Q. And, again, based on that information, do you know how far away you were from that call at the time that the dispatch call came in?
**A. If it was at Maple and Combermere, I would have been close within a mile I would think. Oh, I'm sorry, can you restate that? I apologize.**

Q. So at the time you started heading to Combermere --
**A. Oh, started heading. I apologize.**
Q. Essentially where did you leave from to head there?
**A. Okay. Yeah, I don't remember where I left from. I apologize. I thought you meant from when the incident occurred. I don't remember where I left from. I'm sorry.**
Q. At any point in time en route to the Maple and Combermere collision, did anybody instruct you not to use your emergency lights?
**A. Not that I can remember.**
Q. Did anybody instruct you not to use your sirens?
**A. Not that I can remember.**
Q. Did anybody instruct you to get to the collision going above 60 miles per hour?
**A. Not that I can remember.**
Q. All right. What route did you take to get to where, or to get going to Maple and Combermere?
**A. I only remember being westbound on Maple. I don't remember which turn I took prior to that.**
Q. Is there a particular reason you chose that route?
**A. It's just probably the most direct route if it's on Maple.**
Q. What do you remember about the traffic in that area on Maple?



**A. I can't specifically remember the traffic.**
Q. What do you remember about the lighting on Maple?
**A. From that night specifically, I can't remember, but I do work that area often, so it's --**
Q. What's your recollection then of it today?
**A. It's decently well-lit along the way, a normal main surface road.**
Q. What speed did you believe you were traveling to get to the Maple and Combermere collision?
MS. DEBLER: Objection to foundation and form. Like when?
Q. (Continuing, by Mr. Martinez) On the way to the Maple and Combermere crash, at any point in time along that route?
**A. I don't recall exactly any precise speed I was traveling at any point in time.**
Q. What do you remember about your lane position?
**A. I don't remember specifically which lane I was in.**
Q. How did your speed change during the drive to the Maple and Combermere collision?
**A. I can't remember specifics about the speed or driving.**
Q. Did you pass vehicles?
**A. Can't remember.**
Q. Did you drive near lane markings?



MS. DEBLER: Objection to form.
**A. What kind of lane markings?**
Q. (Continuing, by Mr. Martinez) Any.
**A. I assume I was in the lane driving.**
Q. I'm just trying to get an understanding of where you were.
**A. Westbound on Maple.**
Q. Okay. Did you drive between lanes at any point in time?
**A. Between lanes how?**
Q. Did you change lanes en route to the Maple and Combermere collision?
**A. I can't remember.**
Q. On the night of September 22nd, 2023, was your vehicle equipped with a mobile data computer or an MDC?
**A. Yes.**
Q. How do you typically use that device while you're on duty?
**A. I use it for police reports. I use it for LEIN entries, Secretary of State feed. I use it for my Axon camera system. I use it for things like that.**
Q. Is there a certain time in which an officer is supposed to use their MDC versus not?



**A. In what regard?**
Q. Are you allowed to use your MDC while you're driving?
**A. If there's -- I would assume if there's exigent circumstances where you need to run a plate or use it in the middle of a call.**
Q. Were there any exigent circumstances in this case on your way to Maple and Combermere?
**A. I can't remember specifically.**
Q. Do you carry a cell phone on you when you're on duty?
**A. I carry a work phone.**
Q. Do you carry a personal phone?
**A. I own a personal phone, but I don't use it on duty for anything related to work.**
Q. At any point in time did you use your phone while driving?
MS. DEBLER: Objection to form and foundation.
Q. (Continuing, by Mr. Martinez) On the way to the Maple and Combermere collision?
**A. Not that I can remember.**
Q. Did you look at your phone at any point in time on the way to the Maple and Combermere collision?
**A. While driving?**

Q. Correct.
**A. No, not that I can remember.**
Q. Did you have the radio on in your vehicle while you were en route to the Maple and Combermere collision?
**A. My police radio or the car radio?**
Q. Good distinction. The car radio.
**A. I can't remember.**
Q. At any point in time on the way to the Maple and Combermere collision, did you adjust any settings in your vehicle or on the radio?
**A. I can't remember.**
Q. Did you have to adjust the air-conditioning?
**A. I can't remember specifically.**
Q. At any point in time on the way to the Maple and Combermere collision, did you look away from the roadway?
**A. I can't remember, sir.**
Q. Was anything distracting you while you were on your way to the Maple and Combermere collision?
**A. Not that I can remember.**
Q. Are you claiming today that you were not distracted by phone, MDC, radio, computer or any other device on the way to the Maple and Combermere collision?



**A. I can't remember specifically, but I don't believe so.**
Q. All right. I'm going to draw your attention to Exhibit 1. I'm sorry. I need to find the specific page. I'm going to draw your attention to page 15. Your answer begins on page 14 of Exhibit 1, but continues on to 15.
**A. Okay.**
Q. There is some objections that your attorney has placed in there, but following that, can you read for me the answer begin with, "Without waiving these objections."
MS. DUFRANE: I'm sorry. Which number?
MR. MARTINEZ: Interrogatory No. 3 on page 14 and 15.
**A. You want me to read starting where, sir?**
Q. (Continuing, by Mr. Martinez) The last line on 14.
MS. DEBLER: Why don't you read 13, the question, and then you can read what he wants you to read.
MR. MARTINEZ: That works. Go ahead.
**THE WITNESS: Okay. Read, I'm sorry, you want me to read the question, which part?**
MS. DEBLER: He's asking you to read, like he's referring to Interrogatory No. 3 on



page 14. Take a look at that and then he's got a question for you.
**THE WITNESS: Okay. Read it out loud?**
MS. DEBLER: No, I mean just to yourself just so you know what he's asking about.
**THE WITNESS: You want me to read up to this point or read the whole thing?**
MS. DEBLER: I think you should read the whole thing up until Interrogatory No. 4, but --
MR. MARTINEZ: I would agree.
**A. Okay. All set, sir.**
Q. (Continuing, by Mr. Martinez) There is a lot of information in here.
**A. Yes, sir.**
Q. And it seems to be pretty detailed as to your account. First, do you recall reviewing this document, Exhibit 1?
**A. Exhibit 1, the whole packet here?**
Q. Correct.
**A. Yeah, I reviewed it.**
Q. And you had an opportunity to review this document in full before you signed it?
**A. Mm-hmm, yes, sir.**
Q. And the date of your signature on this is



reflected on page 20. I'll put on the record it was April 30th of 2026. Do you recall signing this document on that date?
**A. I do recall signing a document. I can't specifically say it was the 30th, but I'll take your word for it. That's fine.**
Q. So in this Answer to Interrogatory No. 3, looking on page 15, the second paragraph of your answer that's here, it indicates, "Answering further, immediately prior to the collision, I was looking straight ahead at the roadway, taking into account what was immediately in front of me, and what I could appreciate in my peripheral vision." Do you see that?
**A. I do.**
Q. What happened between April 30th and today that caused you to not recall that?
MS. DEBLER: Objection to form.
**A. I'm not sure what you're asking.**
Q. (Continuing, by Mr. Martinez) Well, throughout the first part of my questioning here today, the primary answer you've given is that you don't recall or that you don't know.
**A. Mm-hmm.**
Q. In your answers under oath here on page 15, you

make it very clear that under oath you were
looking straight ahead at the roadway.
MS. DEBLER: Objection to form and
foundation, mischaracterizes his prior testimony.
He was answering specific questions that you were
posing to him and they are not the same questions
that are posited by Interrogatory No. 5 subsections
(a) through (e), so I think it's a
mischaracterization.
MR. MARTINEZ: Interrogatory No. 5?
MS. DEBLER: Interrogatory No. 3, I'm
sorry, subsections (a) through (e). So you were
asking him specific questions. He was answering
specific questions here at your deposition.
They are not identical to this, so it's a form
and foundation objection and he did not tell you
that he did not have any memory as to whether he
was looking straight ahead.
Q. (Continuing, by Mr. Martinez) So you have that
memory of looking straight ahead?
**A. During which part? The original questioning was**
**en route to the crash. This was specifically**
**referencing the crash with the motorcyclist.**
Q. Sure.
**A. So it would be two different questions. That's**



**how I interpreted it.**
Q. Appreciate that. So the question again, from
the time you got onto Maple to the time you
interacted with Mr. Szczesny for the first time,
what were you doing?
**A. Traveling west on Maple.**
Q. And what speed were you traveling westbound on
Maple?
**A. I don't recall exactly which speed I was traveling.**
Q. Your answer goes on to further state that at the
very last sentence of that second paragraph, "I
did not expect Plaintiff to swerve into my lane
or turn in front of my vehicle, particularly
where he did not use a turn indicator to signal
his intention to turn left."
**A. Yes, sir.**
Q. Okay. So you see that right there?
**A. I do see it, yes.**
Q. Is that what you recall here today?
**A. Yes, I do recall that.**
Q. So your testimony is at no point in time did you
ever see a turn signal come off the motorcycle
of Thomas Szczesny?
**A. I don't recall ever seeing a turn signal.**
Q. So your testimony today is that your attention



was on the roadway?
**A. Yes, sir.**
Q. Nothing else that you would have been doing?
**A. Not that I can think of or recall.**
Q. Describe patrol vehicle 931 for me.
MS. DEBLER: Objection, form.
Q. (Continuing, by Mr. Martinez) As it existed on
September 22nd of 2023.
**A. It's a Dodge Charger.**
Q. What color was it?
**A. Black.**
Q. Was that a slick top?
**A. Yes, it was slick top.**
Q. Did it have a traditional roof light bar?
**A. It did not have a roof light bar, not a**
**traditional one, sir.**
Q. What kinds of markings did that vehicle have?
**A. It was fully marked with police logos, so Troy**
**Police on the sides, the logos, and then it had**
**an internalized light bar on the windshield and**
**I believe lights on the mirrors. I can't**
**remember specifically, but I believe that's it.**
Q. Sergeant Warzecha described the vehicle as being
low profile. Would you agree with that
characterization?



MS. DEBLER: Objection to foundation.
**A. No.**
Q. (Continuing, by Mr. Martinez) Why not?
**A. Because it's a sedan. It's a full-size American**
**sedan vehicle.**
Q. The markings on the vehicle, describe those for me.
**A. Troy Police logos.**
Q. What color were they?
**A. I can't remember specifically.**
Q. Do you know if those markings were visible from
the front at night?
MS. DEBLER: Objection to foundation.
**A. They're on the sides of the vehicles.**
Q. (Continuing, by Mr. Martinez) Is there any
markings on the front?
**A. Logo markings?**
Q. Any markings whatsoever on the hood or front of
patrol vehicle 931 as it existed on
September 22nd of 2023?
**A. I can't remember specifically --**
COURT REPORTER: As it existed what?
MR. MARTINEZ: On September 22nd of 2023.
MS. DEBLER: Let him finish so we can
get his whole question.
**THE WITNESS: I apologize.**

MS. DEBLER: In fairness to you as well.
COURT REPORTER: I did not hear your answer.
**THE WITNESS: What was the question again?**
(Reporter reads back question.)
**A. I can't remember specifically if it had hood markings.**
Q. (Continuing, by Mr. Martinez) Drawing your attention back to page 15 of Exhibit 1, in your first full paragraph that's listed there, it indicates, "Pursuant to Troy Police Department policy, at least two officers are required to respond to a motor vehicle injury accident in order to secure, process, and clear the scene." Do you see that?
**A. I do, yes, sir.**
Q. What policy are you referring to?
**A. I don't specifically know the policy off the top of my head, sir.**
Q. How do you know that that's the policy of the Troy Police Department?
**A. Because that's, the policy is that we're required to have two officers.**
Q. Who informed you of that policy?



**A. That's how I was trained in my field training program.**
Q. That paragraph goes on to indicate that you were aware that, "Only one officer was on the scene of the motor vehicle injury accident and, therefore, I was proceeding in an urgent manner." Do you see that?
**A. I do see that, yes, sir.**
Q. Urgent how?
**A. Going directly to the call without making any other stops.**
Q. So at any point in time when you were responding in an urgent manner, did you activate the emergency lights on your vehicle?
**A. I don't recall off the top of my head.**
Q. At some point in time were you made aware of whether or not your emergency lights and sirens were ever activated while you were responding to the Maple and Combermere crash?
**A. Made aware how, sir?**
Q. Through any information, person, report, reprimand at any point in time?
**A. While I was en route or after the fact?**
Q. While you were en route, while you were responding in an urgent manner as you say?



**A. Not that I can recall, sir.**
Q. What warning would other vehicles have had that you were urgently responding to a call?
MS. DEBLER: Objection to form and foundation.
**A. Warning as far as what, sir?**
Q. (Continuing, by Mr. Martinez) So what would have let other motorists on the road, on Maple Road on September 22nd of 2023 to know that you were responding urgently to a call?
MS. DEBLER: Same objection.
**A. I'm not sure I understand the question.**
Q. (Continuing, by Mr. Martinez) I'm not trying to stump you here. I'm trying to find out at any point in time how do people know that you're responding in an urgent manner to be able to adjust their own conduct accordingly?
MS. DEBLER: Objection to form and foundation.
**A. Did you define urgent? I don't remember like if urgent was defined specifically or how other people could know what their definition of urgent is. Also, it's a full-size American car with headlights.**
Q. (Continuing, by Mr. Martinez) So I'm looking to



apply the meaning of urgent that you used in your Interrogatories under oath. What did you mean by urgent?
MS. DEBLER: I think objection, asked and answered. I think he explained that he was driving a full-size vehicle with headlights. That's what he just said.
Q. (Continuing, by Mr. Martinez) Do the headlights have any bearing on your urgent manner of responding?
**A. I said -- you asked me urgent and I said I drove directly to the call.**
Q. What warning then do other people on the roadway have if you're going to a scene urgently if you don't have lights and sirens on?
MS. DEBLER: Objection to form and foundation, asked and answered. I think he said he was proceeding directly to the call in a vehicle that had headlights, I mean that's the answer.
Q. (Continuing, by Mr. Martinez) So then what warning would other people on the road, specifically Mr. Szczesny, have that you were responding urgently to a call?
MS. DEBLER: Objection, asked and

answered. He said he was driving the vehicle with headlights and driving directly to the call, so driving on the road with a vehicle with headlights I think is your answer.
Q. (Continuing, by Mr. Martinez) Is that true?
**A. I mean do I answer this okay?**
MS. DEBLER: You may.
**A. Urgent, I mean when I said urgent, I mean driving directly to the call. I don't know how other people would be warned that I was driving directly to the call.**
Q. (Continuing, by Mr. Martinez) But as you stated, you had headlights on your vehicle?
**A. My vehicle was equipped with headlights.**
Q. And were those headlights engaged?
**A. They're on automatic setting when I drive in the vehicle.**
Q. So in other terms, if your lights and your sirens aren't on, the only part of your vehicle that's letting anybody know you're on your way at night would be the headlights, right?
**A. Yes, headlights alert people.**
Q. Okay. So I will refer you to page, in Exhibit 1 still, RFA EL-2, 3 and 4. Do you see your answers there?



MS. DEBLER: What page are we on?
MR. MARTINEZ: Page four.
**THE WITNESS: I'm sorry, sir, one sec.**
MS. DEBLER: Three, four and five?
MR. MARTINEZ: Two, three and four.
**A. Okay. Yes, sir.**
Q. (Continuing, by Mr. Martinez) So at this point in time and at the time that you prepared your answers under oath to these discovery requests, you still had no idea if you were using your emergency lights and sirens?
**A. I'm sorry. Can you rephrase that?**
Q. You indicated in your answer that --
**A. Which one? I'm sorry, sir.**
Q. So as it pertains -- I'm sorry, I was looking at two, so three.
**A. Three, okay.**
Q. So three, you indicate in response to that, "Without waiving his objection to form and foundation of the request, Defendant Leithauser admits the emergency lights on his vehicle were not activated prior to the collision." Do you see that?
**A. Right here I see it, yes, sir.**
Q. Okay. What changed between April 30th and today



to where today you're uncertain if your emergency lights and sirens were activated, but yet you swore to it under oath in response to my questions here?
MS. DEBLER: I'm just going to object again to form and foundation. You're asking him different questions today than were posed in Requests for Admission 2, 3 and 4, and specifically three and four have to do with the intersection of Maple Road and Stephenson Road and so they are different questions and you're trying to make -- anyway, objection to form and foundation. You may answer the question insofar as you can.
MR. MARTINEZ: Thank you.
**THE WITNESS: You said answer?**
MS. DEBLER: Yeah, if you remember.
**A. From my understanding, maybe I misunderstood the first question, I thought you were saying at the time of the incident was I aware they were activated or not. That was the original question. When I answered these, then after from the time of the incident to when I answered these questions, I was made aware by everybody that told me about the crash that I didn't have**



**my lights on. That's what they told me.**
Q. (Continuing, by Mr. Martinez) And at no point in time prior to filling out these questions under oath did anybody make you aware that your lights and sirens were not on?
**A. Maybe this is where I'm misunderstanding. During the course of my travel to that call or after the call when they were doing all this, the investigation and everything?**
Q. So at any point in time --
**A. Maybe I don't understand. I apologize.**
Q. I'm asking you at any point in time initially were you aware that your lights and sirens were not on, and if I recall correctly, you stated you were not sure?
**A. Maybe I'm misunderstanding again because you said at any point in time and then you said initially. I'm not trying to hang up on that. I just, initially when I was initially driving to the call, you're asking at that moment did I know if my lights and sirens were on or did somebody tell me after the fact through the whole investigation that I didn't have them on? That's the part that I didn't understand.**
Q. Well, let's start at the time then. Put me in

the drivers seat with you.
**A. Okay.**
Q. What did you do on your way to the Maple and Combermere collision?
MS. DEBLER: Objection to form.
**A. I traveled westbound on Maple towards the call that I was going to, that I was dispatched to.**
Q. (Continuing, by Mr. Martinez) Did you turn your emergency lights and sirens on at any point in time en route to the Maple and Combermere crash?
**A. I don't believe I did, sir.**
Q. All right. I want you to walk me through the first moment before you saw Mr. Szczesny on the motorcycle. Where were you when you saw him for the first time?
**A. Traveling westbound on Maple.**
Q. Where?
**A. Somewhere in the area of Stephenson and Maple. I believe I just passed through the intersection.**
Q. And was that the first time that you saw that there was a motorcyclist?
MS. DEBLER: Objection to form.
**A. The first time that I was able to identify that it was a motorcyclist?**
Q. (Continuing, by Mr. Martinez) Correct.



**A. Right, yeah.**
Q. Where was your vehicle when you first identified that there was a motorcyclist in that left-turn lane to your left?
**A. Westbound on Maple, traveling westbound on Maple.**
Q. Where in the span of westbound on Maple?
**A. I can't specifically say exactly where.**
Q. You don't have a recollection of seeing the motorcyclist?
MS. DEBLER: Objection to form. Different question.
**A. That was a different question. Yes, sir. I apologize. You're saying where was my vehicle or did I see the motorcyclist?**
Q. (Continuing, by Mr. Martinez) Where was your vehicle --
**A. Westbound on Maple.**
Q. -- at the first time you saw the motorcyclist?
**A. Traveling westbound on Maple, sir.**
Q. What lane were you in?
**A. I can't remember specifically which lane I was in at the time.**
Q. Where was the motorcycle when you first saw it after crossing through the intersection of Stephenson and Maple?



**A. When I first identified that there was a motorcycle, it was in my lane.**
Q. How far away was he?
**A. I can't give you an exact distance, but you're asking for an approximation?**
Q. Let's do it this way. How many seconds before impact did you first realize that there was a motorcyclist turning left?
**A. And, again, I don't mean to be -- I feel like that's a different question because you said from the time I first saw him or the time he was turning left.**
Q. So let's just listen to the question.
**A. Yes, sir.**
Q. I'm not trying to trip you up. I'm trying to get an understanding of what you saw, what you perceived and whether you reacted. So the question is where were you, where was your vehicle positioned at the moment you first saw the motorcycle making a left turn?
**A. Traveling straight ahead westbound on Maple.**
Q. And where was your vehicle in relation to the surroundings in the driveway of the Shell?
**A. Best I can state, positioned forward driving westbound on Maple.**



Q. And how many seconds before impact were there when you made that realization there was a motorcyclist?
**A. I can't recall the exact amount of time it was, sir. I apologize.**
Q. What part of the motorcycle did you see first?
**A. The specific part of the motorcycle you're saying?**
Q. That was the question, yes.
**A. It was just the profile of the motorcycle. I saw the profile of a gentleman on a motorcycle in my lane, directly in my lane, canted at an angle.**
Q. Did you see the headlight of the motorcycle at any point in time prior to the collision?
**A. Prior to the collision, I do believe there was a headlight on the motorcycle.**
Q. Did you see a turn signal?
**A. I don't recall seeing a turn signal.**
Q. Did you see the motorcycle at any point in time when it was in the middle turn lane?
MS. DEBLER: Objection to form and foundation.
**A. I don't recall specifically seeing a motorcycle.**
Q. (Continuing, by Mr. Martinez) Do you know whether the motorcycle had been traveling

eastbound on Maple?
**A. I can't say for certain where the motorcycle came from prior to the collision.**
Q. Do you know whether the motorcycle came from the direction of Stephenson or from Rochester?
**A. I can't speak to where it came from prior.**
Q. What do you recall seeing in the moments before the collision with the motorcycle?
**A. From my recollection, I was just traveling westbound on Maple, and it was I mean normal. I don't know how else to state it, driving normally on Maple towards my call.**
Q. Driving normally?
**A. Nothing remarkable I should say, nothing out of the ordinary.**
Q. Okay. How do you define driving normally?
**A. I responded to thousands of calls and I mean I guess there is just over a long career, you just have a pattern of what feels like a normal flow of things and what doesn't. I've responded to thousands of calls that were unremarkable, nothing to really note from it, and again at the time I don't remember prior to it feeling any different or being any different.**
Q. Are you telling us that the way in which, the



manner in which you were operating your patrol vehicle at the time of the collision with Mr. Szczesny's motorcycle was your typical manner of operating a patrol vehicle?
**A. I'm saying that prior to the collision nothing seemed remarkable. It was a pretty unremarkable I guess course of events.**
Q. Was there anything limiting your perception of what was going on in front of you?
MS. DEBLER: Objection to form.
**A. Perception as in? Can you be more specific, sir?**
Q. (Continuing, by Mr. Martinez) What you can see, your perception.
**A. Anything physically limiting it?**
Q. Physically, mentally, emotionally?
**A. Nothing that I can recall.**
Q. So you did not see the motorcycle for the first time until sounds like just moments before the collision happened?
MS. DEBLER: Objection to form, foundation. I think he said he saw it when it was in his lane.
**A. Yes, sir, I remember seeing and being able to identify there was a motorcycle right before the collision right ahead of me in my lane.**



Q. (Continuing, by Mr. Martinez) And which lane were you in?
**A. I was in the westbound travel lanes of Maple.**
Q. That's a little different than previously when you testified that you didn't know which lane you were in. Do you recall giving that answer?
MS. DUFRANE: Objection to foundation. Westbound travel lanes.
**A. Westbound travel lanes, westbound on Maple.**
Q. (Continuing, by Mr. Martinez) When did you first decide to brake?
**A. Immediately seeing that he was in my lane.**
Q. What caused you to brake?
**A. Typical reaction to brake to try to avoid a collision.**
Q. How hard did you press the brake?
**A. I can't remember specifically how hard, but, you know, attempting to avoid a collision.**
Q. Where was the motorcycle when you first began braking?
**A. Directly in my lane.**
Q. Did you swerve?
**A. I did, I attempted to swerve.**
Q. Which direction?
**A. Away from the direction of the motorcycle.**



Q. So you turned which way?
**A. I cut the wheel to the left.**
Q. At what point in time did you cut the wheel to the left?
**A. Just prior to the moment of the collision.**
Q. Why did you swerve at that point?
**A. To attempt to avoid a collision.**
Q. What was your right foot doing before you braked?
**A. I can't speak to exactly what my right foot was doing.**
Q. Did you know when you released the accelerator?
**A. I mean I can't remember specifically.**
Q. Where did your vehicle strike the motorcycle?
MS. DEBLER: You mean location or part of the motorcycle? Form. Sorry.
Q. (Continuing, by Mr. Martinez) Let's do it first where was it physically?
**A. Where was both of our vehicles, the collision point?**
Q. Correct.
**A. Yeah, it was in my lane of Maple westbound.**
Q. And where about on the motorcycle did your vehicle strike it?
**A. I mean I didn't look into the crash afterwards. I don't know exactly where it struck**

**specifically on the motorcycle.**
Q. What happened after you made impact with the motorcycle?
**A. My vehicle continued off, veering off to the left the direction of which the vehicle was cut into, and then I went over up onto the curb to the left.**
Q. What happened to the motorcycle?
**A. I don't know exactly what happened after the moment of collision until I got to him, until I ran up to him. I can't tell exactly where it went.**
Q. At the time that you were braking when you were applying the brakes in your patrol vehicle, do you recall hearing tires screeching?
**A. No, I can't recall.**
Q. All right. Your vehicle comes to rest on the opposite side of the roadway. I believe it was in front of the HAP building, is that right?
**A. Yeah, it's a big complex.**
Q. Take me through what happened from there.
**A. From what I remember, I got out of my vehicle and ran across the road to check on the motorcyclist and I put out on the radio that there was a crash.**
Q. What did you put out on the radio specifically?



How did you identify the crash?
**A. I can't remember exactly what I said at this moment. I don't want to say anything incorrect. Verbatim I don't remember exactly what I said, but I call out a lot of things on the radio and usually there's a pattern to it, so --**
Q. What level of information do you need to provide to dispatch at that point in time after you've been involved in a collision?
**A. Me specifically or just any run that I'm dispatched to?**
Q. You specifically.
**A. That like a collision occurred, the location, and whether or not there is injuries.**
Q. Did you provide that information?
**A. I can't remember specifically if I did or not. I don't want to --**
Q. After you exited your patrol vehicle, did you end up seeing where the motorcycle came to rest?
**A. Yes, I remember that it was on the, near the north curb.**
Q. Of the entryway to the Shell?
**A. I can't remember if it was in the entranceway or not specifically, but it was in that general vicinity.**



Q. As you made your way over to where Mr. Szczesny was, did you observe where debris landed?
**A. I can't remember specifically where it was.**
Q. Do you remember seeing any debris at all?
**A. I can't remember specifically debris. I apologize.**
Q. At any point in time did you move any pieces of debris out of the roadway?
**A. I don't believe so. I generally don't do that.**
Q. At any point in time did you provide information to anybody else about debris location?
**A. I don't believe so.**
(Marked Exhibit No. 7.)
Q. (Continuing, by Mr. Martinez) Let me direct your attention, going a little bit out of order here, to Exhibit 7, an excerpt from the electronic data recorder from your patrol vehicle.
**A. Is that in here?**
MS. DEBLER: It's right here.
**THE WITNESS: Okay. I apologize.**
MS. DEBLER: So this is seven now?
MR. MARTINEZ: Yeah, we're going a little out of order.
**THE WITNESS: Do I have it in my packet as well?**
MS. DEBLER: I'll give you that one.



MS. DUFRANE: Seven?
MR. MARTINEZ: Yes, seven.
Q. (Continuing, by Mr. Martinez) Have you ever seen this document before?
**A. I don't know specifically if I've seen this one or not. I've only seen a document similar to this once before.**
Q. Has anybody ever explained to you what this document shows?
**A. They haven't explained specifically the details of this, no, just the general idea of what it was when it was handed to me.**
Q. Okay. So I'll direct your attention to what is the second page in this excerpt. At the bottom it is Bates stamped 180, page 18 of 45.
**A. Eighteen?**
Q. Yes.
**A. Okay. Yes, sir.**
Q. Do you see that column that indicates accelerator pedal percentage?
**A. Percentage, sir?**
MS. DEBLER: Four columns over.
**A. Oh, I'm sorry. Yes, sir, I see it.**
Q. (Continuing, by Mr. Martinez) Okay. Let me explain this a little bit. So that very first

column is the time.
**A. Okay.**
Q. In seconds prior to the collision with Mr. Szczesny, okay?
**A. Yes, sir.**
Q. All right. So let's look first at the speed, vehicle indicated. Do you see that column?
**A. Speed, vehicle indicated, third column in?**
Q. Correct.
**A. Yes, sir.**
Q. What was the fastest speed that you were going in the five seconds before you impacted Mr. Szczesny's vehicle according to this report?
MS. DEBLER: I'm just going to put a foundational objection on the record as to any questioning on Exhibit 7, but that way I'll be quiet and we can go ahead.
**A. Okay. Can ask you one more time, sir?**
Q. (Continuing, by Mr. Martinez) Sure. So based on that third column on page 18 of 45 here.
**A. Okay.**
Q. What was the fastest speed your patrol vehicle was going prior to the collision with Mr. Szczesny?
**A. I apologize for this, but I've never interpreted this data before, nor have any training on this,**



**so I don't really know how to interpret this document.**
Q. Okay. That's all right. So the good people at Bosch can help us out here. In that third column where it says speed vehicle indicated, do you see the parentheses there?
**A. I do, yes. Okay.**
Q. So there is parentheses miles per hour and then in brackets it's kilometers per hour?
**A. Yes, sir.**
Q. So we can deduce that this column three, the first number that's depicted is the miles per hour and the bracketed is the kilometers per hour. Do you see that?
**A. Yes, sir.**
Q. I know you don't have any specialized training on this, but based on what this report says that we obtained from Sergeant Warzecha, what was the fastest speed you were going in that five-second period before you collided with Mr. Szczesny?
**A. Again, I'm not trying to be difficult. So this is the seconds here, this is the five seconds?**
Q. Correct. So the first column shows you the five seconds, the third column shows you the speed.
**A. Okay. So this is saying this is five seconds**



**prior, is that what you're saying?**
Q. That's correct.
**A. Okay. So it says here in the third column 64, and then 63 after that.**
Q. And then at the point where you continue to drive, your speed according to this report remains at 63 miles an hour until approximately .6 seconds before the collision. Do you see that?
**A. Okay. Yes, sir, down here.**
Q. I understand .6 is the last entry that says 63 miles per hour.
**A. Okay. Yep, I see that.**
Q. So beginning at .5, what do we see the numbers there doing?
**A. Declining.**
Q. What is the lowest number on that chart?
**A. Fifty-three.**
Q. So based off of this report in the time five seconds prior to when you collided with Mr. Szczesny's vehicle, you were going 64 miles an hour before ultimately getting down to around 53?
**A. That's what the report is saying.**
Q. Is that what you see?
**A. Yeah, I mean I'm not disputing this. I have no training in this, so I don't know where this**



**came from.**
Q. Do you have any reason to dispute the accuracy of this report?
**A. I don't have any reason to dispute it because I'm not trained on it.**
Q. And then we see this would be one, two, three, four, five, the sixth column in, which says service brake. Do you see that?
**A. Yes, sir.**
Q. When is the first time, using the first column for time, does your service brake get initiated? When did it turn on?
**A. Minus 0.6.**
Q. So .6 seconds was the first time under a second is the first time you touched your brake?
**A. Sure, yeah, I'm not disputing this report. Like I said, I don't have any training on this.**
Q. So you indicated that you saw the motorcycle turning across your lane of travel.
MS. DEBLER: Objection to form.
Q. (Continuing, by Mr. Martinez) Based off of this report, is it fair for us to assume that it was .6 seconds before you noticed the motorcyclist was there?
MS. DEBLER: Objection, form and

foundation.
**A. From this report, just reading it, that would be from the time I was able to brake, not from the time I observed it, so I don't know if that's the same or not. I'm not trying to be disrespectful.**
Q. (Continuing, by Mr. Martinez) No, no, let's get into that. I think that's interesting. So there was a point in time where you observed the motorcycle but were not braking, is that right?
**A. Well, I think said before in my questioning that I braked when I saw that he was in my lane to avoid a collision.**
Q. Got it.
(Marked Exhibit No. 4.)
Q. (Continuing, by Mr. Martinez) Okay. I'm going to, and I apologize, everybody, I pre-marked these and I'm going to jump around a little bit. I'm going to play what's been marked for identification as Exhibit 4, which is the radio dispatch traffic recording, okay?
**A. Is it in here for me to get?**
MS. DUFRANE: He's going to play it.
MR. MARTINEZ: If you can't hear it, please let me know.
MS. DEBLER: Aaron, just as a matter of



housekeeping, you're not expecting the court reporter to type the recording, right?
MR. MARTINEZ: If it's audible for the court reporter, that would be good, but otherwise, no.
MS. DEBLER: Typically she'll just attach or reference it or we'll reference it.
MR. MARTINEZ: If you're able to, Madam Court Reporter.
(Recording playing.)
Q. (Continuing, by Mr. Martinez) Were you able to hear that fully?
**A. Yes, mm-hmm.**
Q. Okay. So you indicated to dispatch the very first call that was made relative to the crash with Mr. Szczesny was, "I just had a motorcycle turn in front of me." Why did you phrase it that way?
**A. I don't recall exactly why I phrased it that way, sir.**
Q. What were you intending to communicate to dispatch and the officers by framing it that way?
**A. I don't recall.**
Q. Did anything of that statement communicate your speed?



**A. Not from what I heard on there. I didn't hear anything about speed, sir.**
Q. From what you heard, did anything in that recording communicate anything to dispatch as to the status of your emergency lights?
**A. I didn't hear anything to that nature in that recording.**
Q. Did you hear anything in Exhibit 4 which communicated anything to dispatch about the status of your siren?
**A. I didn't hear anything in that recording about that.**
Q. Did anything in that recording communicate anything about whether your conduct may have contributed to this crash?
**A. In that recording I didn't hear anything like that, sir.**
Q. Your first report framed Tom's movement, correct?
**A. From that recording that I just heard, I'm not disputing that.**
Q. You didn't frame your speed or anything like that?
MS. DEBLER: Objection, asked and answered.
**A. From that recording that you're playing, I**



**didn't hear anything about speed.**
Q. (Continuing, by Mr. Martinez) So initially you indicated on the recording that you were at Maple and Rochester. Did you hear that?
MS. DEBLER: Objection, foundation.
**A. I didn't hear that. I'm sorry, sir.**
Q. (Continuing, by Mr. Martinez) Would you like to hear it again?
**A. If you want to play it, yeah, I have no issue with it.**
(Recording playing.)
Q. (Continuing, by Mr. Martinez) I'll pause it at 52 seconds. Did you hear it that time?
**A. I heard that clearly, yes, sir.**
Q. What led you to report this collision as occurring at Maple and Rochester?
**A. I don't recall at that moment what my mindset was on it, but sometimes it's very common for people to get their first location incorrect.**
Q. Where did the crash actually happen?
**A. Maple and Stephenson.**
Q. Did you ever clarify the location?
**A. I don't remember, sir.**
Q. I'm going to continue to play the recording starting at 52 seconds and I'll have some more

questions.
(Recording playing.)
Q. (Continuing, by Mr. Martinez) I'll pause it at one minute and 48 seconds. What do you remember -- well, I guess I should ask do you recall recording Mr. Szczesny's injuries as being a leg injury?
**A. I don't remember that from now, but I'm not disputing that's in the audio.**
Q. What had you observed about Mr. Szczesny prior to reporting his leg injury, as you put it?
**A. I just really remember like he was laying on, I think he was laying his back on the ground somewhere near the gas station entrance and his eyes were open.**
Q. Did you know whether he had any internal injuries at that point?
**A. I can't know the severity of his injuries.**
Q. Did you know whether he sustained pelvic injuries at that point?
**A. No, I have no idea, sir.**
Q. Did you know whether he sustained a bladder injury at that point?
**A. I have no idea, sir, the extent of his injuries**
Q. Did you know whether he had sustained a spinal injury at that point?



**A. No, sir, I didn't know anything about the extent of his injuries.**
Q. So at that point in time, you were not aware that his bladder was leaking urine into his torso?
MS. DEBLER: Objection to the form and foundation.
**A. No, I didn't know anything of the extent of his injuries at that time, sir.**
Q. (Continuing, by Mr. Martinez) Now, your quote when you reported that into dispatch, you said, "I think he just has a leg injury." What did you mean by "just"?
**A. From what I remember at the time, this is what I remember why I put it out that way is that he was talking to me and he was conscious and he didn't seem confused. I've been to a lot of calls when people have a head injury. Oftentimes they're not speaking clearly. I don't recall anything about him that was not speaking clearly to me and he said he had pain in his leg, so that's why I put it out there.**
Q. Have you ever been provided with any level of medical training?
**A. Yes, sir, I have.**
Q. What is the extent of the medical training



you've received?
**A. So we do through our training department assigns it, we do CPR training. We do how to apply bandages, tourniquets, things like that.**
Q. Is it just a first-aid kind of course?
**A. I would put it as first-aid with extra. We've done tourniquet training as well and some combat wound training, things like that, in case we have more severe like lacerations and things.**
Q. Are you trained or certified in any advanced life-saving protocols?
**A. As far as what kinds?**
Q. Those that are encompassed in advanced life-saving ALS training?
**A. I mean I'm not a trained medic.**
Q. So what medical training allowed you to report to dispatch that there was just a leg injury?
**A. Generally when we respond to crashes or there is a crash that happens, we're just trying to put out what information we have at the time so that they can at least brief the ambulance on what it is. It's just a general of what we have.**
Q. What did you report to dispatch about where the motorcycle was coming from?
**A. I don't recall exactly what I said, sir.**



Q. If the recording we were listening to indicates that you reported he turned right at Maple and Stephenson, does that ring a bell?
MS. DEBLER: Objection to form and foundation.
**A. Turned right you're saying?**
Q. (Continuing, by Mr. Martinez) Correct.
**A. I don't remember. I remember him turning left in front of me.**
MS. DUFRANE: Do you mean right the direction, or right in front of you?
MR. MARTINEZ: The quote was turned right at Maple and Stephenson.
MS. DEBLER: Well, let's listen to it then and then he can answer if you have questions.
MR. MARTINEZ: I'll pick up here at one minute 48 seconds.
(Recording playing.)
Q. (Continuing, by Mr. Martinez) I'll stop it right at 4:06. Do you recognize the voices that we were listening to?
**A. Most of them.**
Q. Who were the folks that you could identify?
**A. The dispatcher Shawn Flint.**
Q. Was there anybody else that you could identify?

Page 74

A. Not just from that clip that you just played. I couldn't tell who the other voice was. If I heard it again, maybe I'd be able to, but not just from that, I'm sorry.
Q. That's all right. So we agree though that your initial report to dispatch referenced the motorcycle's movement, right?
A. From what you played for me, I'm not disputing that, sir.
Q. Okay. When did you first give an account to somebody regarding your speed?
A. I don't recall specifically when.
Q. Do you recall any of the statements that you made on the scene that day?
A. Not specifically. Can't remember like detail of it, sir.
Q. Okay. Who did you speak with at the scene?
A. I spoke with Mr. Szczesny briefly is really the only guy I remember talking to.
Q. What did you say to him?
A. I asked him where he had pain at and I asked him, I think I asked him why he turned in front of me. I don't even remember what his response was at the time.
Q. Did he ever ask you how fast you were going?

Page 75

A. He might have. I believe he did ask me.
Q. And what did you tell him?
A. I can't remember specifically what I said. I don't want to give you like an inaccurate number. I don't remember specifically what I said on it.
Q. Did you speak with Sergeant Bowers?
A. He's a lieutenant now, but Sergeant Bowers at the time was my assigned sergeant that night.
Q. At what point in time did Bowers get to the scene?
A. I can't remember specifically when he got there.
Q. Rough time frame?
A. Probably pretty quickly. I mean I think he was at the station. It wasn't super far from there.
Q. A matter of minutes?
A. Yeah, minutes probably, if I had to guess.
Q. Would you say it is less than five minutes?
A. From the station? I think he was at the station. I can't say for certain where he was at.
Q. I was referencing is it under five minutes from the time the collision happened when Bowers arrived on scene?
A. I can't say for certain, sir.
Q. Did you speak to Bowers while you were there?
A. I can't remember specifically if I spoke to him or not on scene.

Page 76

Q. Did you speak with Alex Parra on scene?
A. I can't remember specifically if we spoke on scene or where we spoke.
Q. Take me through everything that you remember today --
A. Sure.
Q. -- from the time the collision happened to when you left the scene.
A. At the time the collision happened I checked on Mr. Szczesny. A bunch of units got there, a combination of officers and EMS. I went back to my patrol vehicle that was up on the curb to get my backpack and I believe I resecured my shotgun. It had somehow come loose from the mount and hit me in the head at some point and then I was driven back to the police station.
Q. What time were you driven back to the police station?
A. Okay. I can't remember the exact time, sir.
Q. Who drove you back to the police station?
A. I believe it was Officer Parra.
Q. Was it Alex Parra?
A. Alejandro.
Q. Alejandro. Some people refer to him as Alex?
A. Alex, yes, sir.

Page 77

Q. Did you speak with Alex Parra on the way back to the station?
A. I can't remember what we talked about, sir.
Q. But you recall speaking with him?
A. Not like specific conversation.
Q. At any point in time did you discuss with anybody on scene Mr. Szczesny?
MS. DEBLER: Objection to form.
A. I can't recall who I talked to on scene.
Q. (Continuing, by Mr. Martinez) So once you got back to the department, what happened next?
A. As far as what? Like overall?
Q. What transpired from there?
A. We kind of just stayed there until they gave me a PBT for a breath test, that's a preliminary breath test, and then they said that one of the, I think he was the acting lieutenant, possibly the midnights lieutenant said that per the order, I had to go get drug-tested, so they took me to Henry Ford in Sterling Heights.
Q. Which order was being referenced?
A. I don't know what specific order.
Q. At what point in time did you get to the hospital?
A. Just it wasn't too long after the crash, short time after.

Q. Can you put a time frame on that? I know you don't want to tell me a specific, but can you give me a range?
**A. I don't know specifically --**
MS. DEBLER: I'm going to just object to the form of the question in terms of "I don't want to tell you" suggests that he's being evasive.
**A. I'm sure it's documented somewhere on the form or something when we went into the hospital. I don't know exactly, sir.**
Q. (Continuing, by Mr. Martinez) At any point in time did you draft a report from this incident?
**A. Employee incident report, yes, sir.**
Q. When did you compile that report?
**A. I believe it was the following week. I can't remember a specific date.**
Q. Are you saying that it's a full seven days later or it just happened to be -- I think this occurred on a Friday.
**A. It was like the following work week. I don't remember what day.**
Q. Prior to drafting that report, did you speak to anybody about what you would put in that report?
**A. I don't recall having a specific conversation about what I put in it, no, sir.**



Q. Did you speak to Mike Giordano before drafting your report?
**A. About what was to go into the report or just in general?**
Q. In general.
**A. Yes, I did.**
Q. What did you discuss him?
**A. Not a whole lot. He was the union president at the time, so he just wanted to be in the loop on everything since it involved an employee.**
Q. When did you first make contact with Mike Giordano pertaining to this incident?
**A. I don't remember specifically exactly when I did, but relatively quickly after the crash occurred.**
Q. What did you discuss?
**A. I don't remember the specific conversation, but I think I messaged him. The only thing I remember specifically that night is about the drug test.**
Q. Have we covered every person who you spoke with about the incident between the time it occurred and when you prepared your report?
MS. DEBLER: Objection to form and foundation.
**A. I can't remember every person, sir. I apologize.**
Q. (Continuing, by Mr. Martinez) Do you know



Sergeant Bryan Eftink?
**A. I don't know him personally, sir, no.**
Q. Are you familiar with him in any way?
**A. The only other time I've ever heard his name is he was from my police academy in 2014.**
Q. How many times had you interacted with him?
**A. Since that day?**
Q. Prior to the crash.
**A. The only other time I've ever -- I don't recall personal interaction with him ever not employed at the police department have I ever had any interaction with him.**
Q. How many times had you met Bryan Eftink before this crash?
**A. I was never personally introduced to him, but I believe he was like a guest instructor at our academy for the UD-10 forms.**
Q. You never went up and introduced yourself or anything?
**A. I don't remember.**
Q. Have you ever texted with Bryan Eftink before this crash?
**A. No, sir.**
Q. Have you ever called him before this crash?
**A. No, sir.**



Q. Have you ever e-mailed him?
**A. No, sir.**
Q. Have you ever met with him in person?
**A. No, sir.**
Q. Since the crash, have you had any communications with him?
**A. Zero.**
Q. When did you first learn that Sergeant Eftink was involved in investigating this crash?
**A. I can't remember specifically when that name was first mentioned to me, just that Auburn Hills was doing the investigation.**
Q. Do you recall who told you that?
**A. Not specifically, not off the top of my head, no.**
Q. What did you understand Auburn Hills' role to be in the investigation?
**A. I mean at the time I just knew they were part of SOCCIT and I just figured that it was turned over to SOCCIT.**
Q. And SOCCIT is something that Troy is a member of, too?
**A. Yes, sir.**
Q. Did you understand whether any Troy officers had worked or trained with Auburn Hills officers before this incident?

A. **I don't have any idea of who people train with.**
Q. If somebody says the term independent investigation, what does that mean to you?
MS. DEBLER: Objection, foundation, form.
A. **Independent in what fashion?**
Q. (Continuing, by Mr. Martinez) I'm just asking you what that term means. If someone tells you that they're conducting an independent investigation, what does the term independent investigation mean to you?
A. **The people doing the investigation are not directly, I would say not directly related to who is being investigated.**
Q. The people being investigated are not involved?
MS. DEBLER: Objection to form and foundation.
A. **Directly associated I guess.**
Q. (Continuing, by Mr. Martinez) What does that mean to you?
A. **I don't know how to phrase that. Being associated?**
Q. Correct.
A. **You're talking about as related to our incident here?**
Q. Just in general, talking about independent investigations. I'm not trying to put words in



your mouth. I'm trying to figure out what your understanding is of associated with the investigation based on your definition today.
A. **I mean you could define that a bunch of ways. You know, for example, Auburn Hills is not our police department, nor do I work with them. I mean I don't think I've ever worked directly with Auburn Hills on anything, so it is an independent police department in that aspect, but they're still law enforcement, so I mean --**
Q. Do you know any officers who were employed at Auburn Hills on the date of this crash?
A. **Not personally, no, sir.**
Q. Are you familiar with any?
MS. DEBLER: Objection to form.
A. **I can't remember any of their names.**
Q. (Continuing, by Mr. Martinez) At any point in time did you speak directly with Sergeant Eftink after the crash?
A. **No, sir.**
Q. At any point in time were you called into a meeting with either your supervisor or command staff after this crash?
A. **Yes.**
Q. Tell me about that.



A. **Directly after the crash, Lieutenant Villerot, he's a midnights lieutenant, called me in and said that he would let me go home early, but we didn't discuss the crash.**
Q. Any other conversations?
A. **When we submitted the, I believe when we submitted the employee incident form the following week, and then we didn't really have any other -- they never interviewed me on it or anything.**
Q. When you say we, who are you referring to?
A. **In what fashion?**
Q. You said we submitted the employee incident form.
A. **Yeah, everything I do has to be approved by supervisors and things, so when I submit it, it then gets to the next supervisor and they have to check off on it and so on, so whenever I say we, it's just because all my forms have to go through somebody else.**
Q. Who assisted you in preparing your report?
MS. DEBLER: Objection to form, foundation.
Q. (Continuing, by Mr. Martinez) Your employee incident report?
A. **I don't remember specifically anybody assisting**



**with like the substance of it, but as far as pulling up the form and finding it in the computer, I haven't done a lot of them, so as far as pulling it up in the computer and saying it's in this file and this is how you have to fill it out, the structure of it, I haven't done one in a long time.**
Q. At any point in time after the crash, did you talk to anybody about a belief that Mr. Szczesny was at fault for this crash?
A. **I don't remember specifically discussing fault.**
Q. Did you discuss your in-car video or your body-worn camera with anybody?
A. **I can't remember specifically who I talked to about it off the top of my head, no, sir.**
Q. Did you ever ask anybody to relay information to Sergeant Eftink or Sergeant Warzecha on your behalf?
A. **I don't believe so, sir, no.**
Q. What was the extent of Mike Giordano's involvement post-crash?
A. **He was the union president, and so really he just wants to make sure like internally I'm treated due process by our own contract and stuff within the department. I don't think he**

Page 86

had anything to do with the investigation or anything else.
Q. Due process is important to your union?
A. As far as like following the union contract, yeah. The union wants us to make sure that they're involved on anything that involves an employee just so they can be aware of it.
Q. Because officers don't want there to be accusations made against them that may not have truth?
A. I mean sure, that makes sense to me.
Q. Did you ever have any contact with Sergeant Warzecha after this crash?
A. I remember somewhere in the station I did. I think he was the one that administered the PBT, but I don't want to say that for certain.
Q. Were you ever provided with any updates about the status of the investigation either internally or through Auburn Hills?
MS. DEBLER: Objection to form.
A. I never spoke directly to Auburn Hills about anything, and all my updates came from my captain in any official capacity. He said, he brought me in his office and he said this is where it's at.
Q. (Continuing, by Mr. Martinez) And what information

Page 87

was provided to you when he said this is where it's at?
A. I asked for updates on Mr. Szczesny's condition a lot, and then I asked for just overall status, like does anybody have any update on this? That's pretty much it really.
Q. Who would you ask those questions to though?
A. As far as like actual updates that would have information, I mean Captain Gobler was basically my pain point of contact.
Q. What information did Captain Gobler provide you with about the status of the investigation?
A. I mean not a whole lot really. I didn't get a lot of updates. I asked for updates and I didn't really get very many. They said it would be a long process. They didn't really have much information, and only when I turned in the employee incident form, that was really the only time we actually talked about any like numbers on anything.
Q. Were you ever placed off duty after this crash?
A. No, sir.
Q. After you submit --
MS. DEBLER: Other than the fact that he said he was able to go home early that night.

Page 88

A. Oh, yeah, I was given the option to go home early.
Q. (Continuing, by Mr. Martinez) And did you take that option?
A. Yeah, it was two hours until the end of my shift and they said I could go home early.
Q. So aside from that incident, was there any other time when you were placed off duty?
A. No, sir.
Q. Any time where you were on administrative leave?
A. No, sir.
Q. Any time where you put on desk duty?
A. No, sir.
Q. Did your assignments or your role with the Troy Police Department change in any way as a result of this accident?
A. No, sir.
Q. At any point in time did you search your phone for any communications with Sergeant Eftink?
A. No, sir, because I had no communication with him.
Q. Do you have his number in your phone?
A. No, sir.
Q. Did you search for any text messages pertaining to this incident?
MS. DEBLER: Objection to the form.
A. With Sergeant Eftink, no, sir.

Page 89

Q. (Continuing, by Mr. Martinez) In general any texts?
A. I searched for text messages only for Mr. Giordano, Michael Giordano.
Q. Are there other text messages where you discussed this incident or the aftermath?
MS. DEBLER: I'm just going to object to form. When you talk about your phone, do you mean his personal phone or his work phone or both.
Q. (Continuing, by Mr. Martinez) Let's do both.
A. I didn't have a work phone at the time I don't believe when we were issued them.
Q. So this would be your personal phone?
A. I only had one phone at the time, sir.
Q. Did you ever at any point in time search your personal phone for any text messages where you discuss or reference this incident, Mr. Szczesny, the investigation or any of the aftermath?
MS. DEBLER: Form and foundation.
A. With Mr. Giordano.
Q. (Continuing, by Mr. Martinez) So your search was limited to only information or text messages between you and Mr. Giordano?
A. Mr. Giordano was really my only contact other than Captain Gobler about anything related to the crash.

Q. Did you ever discuss this incident with anybody who was not a police officer?
**A. I don't recall specifically who I did or didn't do at the time.**
Q. So it's possible that you may have?
**A. I don't recall.**
(Marked Exhibit No. 3.)
Q. (Continuing, by Mr. Martinez) I'm going to direct your attention to what's been marked as Exhibit 3. I promise I'll fill in all the gaps.
**A. I don't have a marking on them. Is it this one?**
MS. DEBLER: I'll mark it for you then.
MR. MARTINEZ: So just for the record, this is CITY-0029 through CITY-0036.
**THE WITNESS: Okay.**
Q. (Continuing, by Mr. Martinez) Have you seen these documents before?
**A. Yeah, these looks like my text screen shots with Mr. Giordano.**
Q. Okay. How do you know that this is with Mr. Giordano?
**A. Because I screen shotted them.**
Q. Looking at CITY-0029, is there any indication on that this page that tells us you're speaking with Mr. Giordano?



**A. I mean I don't see his name on this page, no, sir.**
Q. Did you alter these text messages in any way?
**A. No, sir.**
Q. Did you crop anything out of these?
**A. No, sir. I try to get the best, like fit them all in.**
MS. DEBLER: Just for the record, the second page, CITY-0030, there is a PG on the top of his.
Q. (Continuing, by Mr. Martinez) That's what I was going to get at. So when you look at CITY-0029 and CITY-0030, what are the differences that you observe?
**A. Where are you referring to, sir?**
Q. If you look at the form of these two documents that I'm showing you right here.
**A. 0029 and 0030, yes, sir.**
Q. What is different about the way these two messages are presented?
MS. DEBLER: Objection to form.
**A. One has the little Apple tag thing at the top for the name.**
Q. (Continuing, by Mr. Martinez) And why would that not be included on CITY-0029?
MS. DEBLER: Objection, foundation.



For the record, one is a larger font or larger print.
**A. Yeah, they're just screen shots.**
Q. (Continuing, by Mr. Martinez) Correct. So is this the entire screen shot?
**A. I mean it looks like starting at September 25th an eight a.m.**
Q. So the question that I'm trying to get at here, sir, is as I go through these messages, CITY-0029, CITY-0031, CITY-0032, 33, 34, 35 and 36 --
MS. DEBLER: You forgot 0030.
Q. (Continuing, by Mr. Martinez) I wasn't looking at that one. I'm just trying to get a sense of whether or not you cropped any of these images before providing them to counsel.
MS. DEBLER: Objection, asked and answered.
**A. You're saying is there any other messages within the string of messages?**
MS. DEBLER: He's asking if you cropped them. If you understand what that means, you may answer the question.
**A. I don't understand exactly what you mean by cropped.**
Q. (Continuing, by Mr. Martinez) Do you have an



iPhone?
**A. I do.**
Q. And you've never heard of the cropping function on photographs?
**A. Like getting it to fit into the thing?**
Q. Cropping, you exclude certain parts.
MS. DEBLER: First of all, just listen to what he's asking you. Have you heard of the cropping function on an iPhone? I've never heard it of it.
**THE WITNESS: Yes, cropping to change the photo, yeah.**
MR. MARTINEZ: Counsel --
MS. DEBLER: No, that's reality, so I mean that's why I objected to form, but you may answer the question.
**A. Yeah, I've heard of cropping.**
Q. (Continuing, by Mr. Martinez) What I'm trying to get at is why on CITY-0029 is all of this information with the time, the 5G signal, the battery, the contact missing?
**A. Just a different screen shot. I don't understand what you're asking.**
Q. Did you take these screen shots?
**A. Yes, I screen shotted them.**

Q. How did you take the screen shots?
**A. You press the buttons and it screen shots.**
Q. What buttons do you press?
**A. I think it's the power button and then the volume down button.**
Q. What kind of phone do you have?
**A. IPhone 15.**
Q. So it's one of the more recent iPhones?
**A. I think it's like three years old or something, three or four. I can't remember when I got it.**
Q. So when you make your screen shots, do the screen shots you take with the functions you just described to me, they come out looking more like CITY-0030 or CITY-0029?
MS. DEBLER: Objection to form.
**A. I mean that's like the full one. That would be me getting the text messages that are pertinent to the crash.**
Q. (Continuing, by Mr. Martinez) Okay. All right. So we're getting somewhere. So the text message screen shots that you normally take look more like CITY-0030?
MS. DEBLER: Objection to form.
**A. Sure, yeah.**
Q. (Continuing, by Mr. Martinez) So if any of these



other text messages don't have the information that's in CITY-0030, what happened to it?
MS. DEBLER: Objection. You asked him for what was pertinent to this incident and that's what he screen shotted.
**A. Yeah, if anything was screen shotted out, it's personal conversations that have nothing to do with the crash, including one of them was about my mom's health.**
Q. (Continuing, by Mr. Martinez) And did you make the determination as to what would be cropped out of these photos?
**A. Yeah, everything that was sent over was anything that had to do with the crash that was pertinent, I sent over. Anything else was personal conversation mixed in about mountain-biking and my mom's health and things like that that were not about the crash.**
Q. So I will direct you to 0032. So there is some jumping around here that I've observed.
**A. Okay.**
MS. DEBLER: Objection to form.
Q. (Continuing, by Mr. Martinez) Looking at CITY-0032, what are the dates depicted on there?
**A. September 23rd, 2023.**



Q. Okay. And is that -- what's the significance of that date relative to this incident?
**A. I think that's the following day.**
Q. So looking at both 0032 and 0033, take me through what we are looking at.
**A. 0032 and 0033 you're saying?**
Q. Correct.
**A. Okay. Looks like I'm asking Mr. Giordano about the crash and the process. That was the night of right after the crash, 10:14 September 2022 (sic), and 0033 you said?**
Q. Correct.
MS. DEBLER: No -- yeah.
Q. (Continuing, by Mr. Martinez) It's 32 and 33.
**A. Okay. Let me see here. They're stapled out of order. Okay. And then this was the following day on the Saturday.**
MS. DEBLER: When you this, which number?
**A. I'm sorry, 0032 is the following day on the Saturday when we were discussing going mountain-biking, and then I asked for his status on his injuries.**
Q. (Continuing, by Mr. Martinez) Why did you feel the need to provide us with text messages regarding mountain-biking?



**A. No, it wasn't. I provided this one because they said anything to do with the crash and I asked about him, so I wanted to provide you with all of it.**
Q. I'm going to direct your attention to 0029 now. Again, I recognize these are out of order. The dates are not entirely clear.
**A. I gotcha.**
Q. So is it your testimony then that 0029, all of these text messages that we have been referencing are between you and Mr. Giordano?
**A. These are all with Mr. Giordano, yes, sir.**
Q. All right. Read for me what is being discussed in 0029.
**A. Okay. This was Gio, Giordano filling me in just on what was happening. I was telling him thank you for telling me. I've been anxious about it and I asked him if he watched the gas station video because he told me there was video from the Shell station that I had not seen, and I just tole him sorry to keep bothering you. We really didn't text that much before then.**
Q. So the initial text on 0029 that we see on September 25th, 2023 at eight a.m., the first message is, "Per Huck, no Axon dash cam is

available from the crash. Gas station video will be sent to MSP for time/distance analysis today and there their opinion should be back within a day or so." Do you see that?
**A. I do, yes, sir.**
Q. What was this in response to?
**A. I think he just -- so at eight a.m., I probably had just woken up to this as an update from him, so he probably had heard something overnight from somebody else, I don't know who, and then he was just telling me something.**
Q. And you did read into the record the fact that you mentioned, "Thank you for telling me." You left out the next part of that sentence. Can you read what that says?
MS. DEBLER: Objection, form, argumentative.
**A. "Do they have any initial ideas?"**
Q. (Continuing, by Mr. Martinez) Why were you asking that question?
**A. I think I'm pretty normal if you're involved in an incident like that to want to know information.**
Q. Were you concerned about anything at that point in time?
MS. DEBLER: Objection to form.



**A. I was concerned about a lot of things, yeah.**
Q. (Continuing, by Mr. Martinez) What were you concerned about?
**A. I had general concern mostly for Mr. Szczesny's condition and just also anxious about my job and things like that.**
Q. So in 0029 is there any request for information regarding Mr. Szczesny?
**A. In 0029, not in 29.**
Q. In 29, do you express any concern over your job with the Troy Police Department?
**A. Four texts down I say, "I don't want to lose my job."**
Q. Looking at 0030.
**A. Yes, sir.**
Q. Take me through what's being discussed here. First, can you identify the time, the date and time on which the conversation depicted on 0030 begins.
**A. Looks like -- I don't see a time stamp at the top, but I see down at the bottom just prior to January 22nd, but I don't know when that was sent or maybe was there a previous one? I don't see a time stamp on this one. I apologize.**
Q. Okay. So take me through the messages that you



send. You're the one in blue?
**A. I am, yes, sir.**
Q. So take me through what is being discussed here.
**A. Okay. So this was after I got my UPR.**
Q. And what is a UPR?
**A. Unsatisfactory, probably going to get the things wrong, but I think it's unsatisfactory performance rating or review or something like that and that was the conclusion of what command wrote about the incident for me.**
Q. So you indicate, "The only thing I really noticed in this discipline is that he mentions I had four previous times I've damaged a patrol vehicle." Do you see that?
**A. Yes, sir, I do see that text.**
Q. Was that your only take-away from the UPR?
**A. No, but that would be the only thing that really would apply to Mr. Giordano would be anything discipline-related because he was the union president, so other things don't really concern him.**
Q. As you go on to continue discussing this, what did you say?
**A. I told him that I thought that basically I was alluding to the fact that I thought that was**



**inaccurate in the UPR and that it makes me sound worse and that it would make me sound worse down the road if I was to be deposed on this, and I haven't had any other crashes, and the only thing is that we had to box people in, but that's for the commission of crimes and things, and he told me I could ask Clark about it because, honestly, Clark is the one that wrote it, so it would be between me and him and Gio said that since it was a UPR, it wasn't considered discipline and the union was not going to have anything to do with it, so we don't have anything further to talk about that. I just said I'll leave it alone because the union wasn't going to get involved, Giordano wasn't going to get involved, so that was it on that, so I just said, okay, I'll leave it alone.**
Q. Seems in that last blue text that's on 0030, that you had some feelings about why that may have been included. Can you see that?
**A. This last blue one here?**
Q. Correct, yeah. Explain that to me.
**A. Yeah, one second. Yes, sir.**
Q. Okay. What is it that you were intending with that message?

Page 102

A. **I mean reading it now, it sounds like I remember at the time is that maybe I just had some feelings about the way they wrote things up on guys in the past that weren't necessarily deserving and I just thought that's what it seemed like they were doing.**
Q. Did you feel like they were treating you unfairly?
A. **No, not unfairly, not specifically the whole command or the department by any means.**
Q. What did you mean by this statement, "It just seemed to me like they had to stamp the paperwork at the bottom with one last negative thing about me."
A. **Yeah, so I just -- there was sort of a pattern in the past of them it seemed like they liked to write stuff about employees that were not necessarily deserving and anything that had to do with discipline, although Guardian Trackings are not technically considered discipline, just using that so we understand that's what I mean.**
Q. What do they refer to?
A. **Guardian Trackings?**
Q. Yes.
A. **Guardian Tracking is like I don't -- I can't enter them, so I don't really know. It's for**

Page 103

**command to do that, but they have a combination of everything, so they put your awards in there. They put your communication stuff in there. They just put like random inspection stuff in there. They put letters from citizens in there. They put negative remarks, but our union doesn't consider it discipline, so it has everything in it.**
Q. How long have you owned an iPhone for?
A. **I don't remember exactly when I switched over from Samsung.**
Q. Are we talking years or months before this crash?
A. **I don't remember exactly when before I got the iPhone specifically how long. I've had it for a while, but I don't remember exactly when.**
Q. You're familiar with the functions of it?
A. **Sure, mostly.**
Q. Are you familiar where the functions in the messaging app where these Exhibit 3 originates from where text messages can be edited?
A. **No, I don't know how to edit. Oh, like if you misspell a word and go back in and change a spelling or something?**
Q. That can be one.
A. **That's the only time I've ever used that or know how to use that.**

Page 104

Q. Have you ever deleted a text message in this app?
A. **Not that I can remember.**
Q. How many text messages does your phone have?
A. **Total?**
Q. Yeah.
A. **I have no idea.**
Q. You've never deleted a message before ever?
A. **I don't remember ever deleting a text message.**
Q. So you've never at any point in time deleted any messages from your conversation with Mike Giordano before you provided these?
A. **Not that I remember.**
Q. So it's a possibility that it could have happened, but you just may not remember?
A. **It would be really unlikely. I don't think I've ever deleted messages from anybody.**
Q. What makes you say that?
A. **Because I have no reason to delete things.**
Q. So in your text with Giordano there's a mention where you're told at some point Auburn Hills is almost done. Do you recall that?
A. **Which page is that on?**
Q. I have to go back.
MS. DEBLER: 0031.
A. **Okay. Got it here, sir.**

Page 105

Q. (Continuing, by Mr. Martinez) Do you have any recollection of that before seeing this message here today?
A. **Any recollection of what?**
Q. So seeing the message that Auburn Hills is almost done.
A. **No, this is screen shotted from my texts.**
Q. Okay. So this one says, "Nate said Auburn Hills is almost done." Do you see that?
A. **Yes, sir.**
Q. Who is Nate?
A. **Captain Gobler. He's the point of contact I had with everything.**
Q. So Captain Gobler was apprising Mike Giordano about the updates as to Auburn Hills' investigation?
MS. DEBLER: Objection, foundation.
A. **I don't know exactly.**
Q. (Continuing, by Mr. Martinez) What do you think he meant by that?
MS. DEBLER: Objection, foundation. He can't testify to what's in somebody else's head.
Q. (Continuing, by Mr. Martinez) How did you interpret this message?
A. **That Captain Gobler was the point of contact**

A. between Auburn Hills and our department and Gio is our union rep, so they don't want us talking directly to command without either their presence or them talking to them. That's just how the union president works. He likes to be the intermediary on things like that. It's not even for my sake. It's for the sake of like the union and everybody.
Q. So in the gray message, which would be Giordano, right?
A. Yes, sir.
Q. So he goes on to say, "And everything looks like there is nothing to worry about." Do you see that?
A. Yes.
Q. What did you say in response to that?
A. I said, "Nothing to worry about in the sense that he will be at fault?" And then he didn't respond back, so then I just said, "It's okay. No problem, Mike. Sorry to even bother you about it."
Q. One last message I want to ask you about on 0033.
A. Yes, sir.
Q. At an unknown time between September 22nd, 2023 at 10:14 p.m. and September 23, 2023 at 2:29 a.m., you make a statement or you send a text rather



to Mr. Giordano stating, "They're trying to take my blood."
A. Yes, sir.
Q. Tell me about that.
A. So when we got back to the station, they said per general order you're supposed to -- originally they hadn't looked up the general order, that was my understanding, so they said you're supposed to go get a blood test as well after the PBT, and then they came back and said we're going to pull the actual general order itself and verify exactly what you have to do. Then Gio, Mr. Giordano was involved because he's the union president and anything that has to do with employees, we're supposed to notify him and he just has to be aware. So then they actually read, to my understanding they read the general order and it says take a urine sample, so I just did what I was ordered to do by Lieutenant Villerot.
Q. Was Mike Giordano physically present with you when he was conversing with other people about the general order?
A. I wasn't with Mr. Giordano at the time, no. I don't know where he was.



Q. So at any point in time were you subjected to a blood test after this collision?
A. No, sir, I was not subjected to a blood test.
Q. At any point in time did you become aware that Mr. Szczesny had been subjected to a blood test?
A. I don't remember. I wasn't involved in anything to do with the crash or the investigation.
Q. Did you ever have phone conversations with Mr. Giordano or did you just communicate with him through texts?
A. It was mostly just texts. I don't recall. I hardly ever use the phone call app on my thing, and anything that was actually related to the crash was with Captain Gobler with Giordano present. I think, again, that's just to make sure that the command is not asking me questions that they shouldn't or something. I don't know. I'm not in the union, so I don't know the whole function.
Q. Going back to the incident itself, what did you believe your speed was as you were traveling down Maple prior to the collision?
A. I don't recall or remember any specific speed.
Q. Nothing stood out to you at all?
A. No. No, sir.



Q. I'll represent to you that there's body-worn camera footage. I don't know which officer it was because it's not labeled on the video, but you're overheard telling Sergeant Bowers that you were going a little over 40. Do you recall saying that?
A. I don't recall off the top of my head saying that, sir. I apologize.
Q. Do you recall ever saying you were going under 40 for sure?
A. Not specifically I can't remember that, sir.
Q. Do you recall ever saying 40, 35 while on scene?
A. No, sir, I don't remember that specifically.
Q. As you sit here today, would it be fair for us to infer that your statements made at that time were based on what you truly believed?
MS. DEBLER: Objection to form and foundation.
A. I can't remember everything about what my statements were that night or my state of mind while making them.
Q. (Continuing, by Mr. Martinez) You wouldn't lie to Sergeant Bowers, would you?
MS. DEBLER: Objection, form.
A. No.

Q. (Continuing, by Mr. Martinez) So any statement that you're heard giving to him about your statement would be a statement that you would believe would be truthful. Is that fair?
**A. I would not --**
MS. DEBLER: Objection to form and foundation. You're suggesting it's either true or a lie and there's a myriad of possibilities in between.
Q. (Continuing, by Mr. Martinez) You wouldn't want to lie to Sergeant Bowers, right?
**A. No, I wouldn't lie to Sergeant Bowers.**
Q. As you sit here today, is there anything that you can tell us about what you were stating or what you were intending to convey when you made those statements?
MS. DEBLER: Objection to form.
**A. I wish I could. I wish I could. I don't remember, sir.**
Q. (Continuing, by Mr. Martinez) Have you ever experienced anything like this while you've been on --
MS. DEBLER: Objection to form, sorry, "like this."
Q. (Continuing, by Mr. Martinez) Have you ever



experienced anything like this collision with Mr. Szczesny at any point in time in your law enforcement career?
MS. DEBLER: Objection to form.
Q. (Continuing, by Mr. Martinez) Before or after this collision happened?
MS. DEBLER: Form.
**A. No, sir.**
Q. (Continuing, by Mr. Martinez) Is it fair to say that this is a pretty shocking incident for you?
**A. Sure, I think that's fair, yeah.**
Q. It was so shocking that as you sit here today, you remember almost nothing about it?
MS. DEBLER: Objection to form and foundation, mischaracterizes his testimony.
**A. I was almost three years ago. You're asking me to remember every specific detail from almost three years ago.**
Q. (Continuing, by Mr. Martinez) It's both general and specific that it appears we're having some disconnect on, so I'm just trying to get to the heart of --
**A. I apologize for the disconnect, sir.**
Q. If this event was so shocking, what has occurred since then which allows you to forget most of



what happened here?
MS. DEBLER: Objection to form and foundation, argumentative.
**A. I can't testify to what happened to me to get me to forget things over a three-year period. I don't understand that question, sir. I apologize.**
Q. (Continuing, by Mr. Martinez) I appreciate the apology. I'm trying to get to the heart of you don't remember the conversations you had, you don't remember what you were perceiving, you don't remember what statements you made or didn't make to some people at the scene or in the car on the way to the hospital or afterwards in your conversations with your command. I'm trying to get to the heart of, Officer, what is it that you do remember about this incident?
MS. DEBLER: I'm going to object to the form and the foundation. I think he's testified as to what he does remember. I think it's kind of an unfair question and I think it's argumentative.
**A. As far as what I remember, sir?**
Q. (Continuing, by Mr. Martinez) Yes.
**A. I remember being involved in a collision with Mr. Szczesny and striking my head in the process**



**and all the stuff that subsequently followed.**
Q. You denied medical attention, correct?
**A. I was evaluated at the station. I was given medical attention by the EMS at the police station.**
Q. What did they do to evaluate you?
**A. What from what I remember, vitals, and then they asked me about any injuries sustained.**
Q. And what did you tell them?
**A. I think I told them that I struck my head in there, but that I was refusing to go to the hospital and they took vitals, which checked out as stable.**
Q. Why did you refuse to go to the hospital if something hit your head?
**A. I didn't feel I needed to go to the hospital or be treated on the scene for that injury.**
Q. What gave you that belief?
**A. At the time I was 34 years old-ish and I knew myself well enough to know when I felt like I needed to go to the hospital and when I didn't.**
Q. In your time as a Troy police officer, how frequently do you exceed the speed limit without putting your lights and sirens on?
**A. I can't give an exact number to that, sir, because the calls come in randomly. I have no**

Page 114

**control over it of when I need to and when I don't. The speeds vary. It's a very intuitive job, so it's hard for me to put a number on it, sir.**
Q. Nothing since this incident has drawn your attention further to the speed at which you operate a patrol vehicle since?
MS. DEBLER: Objection to the form and foundation, mischaracterizes prior testimony.
**A. Can you rephrase that, sir?**
Q. (Continuing, by Mr. Martinez) I'm just trying to figure out you are in this incident with Mr. Szczesny where it ends up being determined that you're going as fast as 64 miles an hour in the five seconds before the collision happens, you strike somebody, you seriously injury somebody, and then nothing changes afterwards about how you view your conduct or what you do in your conduct behind the wheel?
**A. That's not true.**
MS. DEBLER: Objection to form and foundation.
Q. (Continuing, by Mr. Martinez) Tell me why it's not true.
**A. Nothing has changed you're saying, sir? I don't understand your question. You're telling me**

Page 115

**nothing changed?**
Q. That's what I'm trying to find out, Officer. You're not being very clear.
**A. No, you phrased it to me like you were telling me that nothing changed, like you were telling me that. Has nothing changed? That would be you're telling me that.**
Q. Has it?
**A. Or are you asking have I changed my behavior since then?**
Q. Have you changed your behavior since then?
MS. DEBLER: Okay. I'm going to object to the form of the question. Behavior is such a vague and ambiguous term, so I think you've got to be more specific.
Q. (Continuing, by Mr. Martinez) Have you changed your conduct while operating a patrol vehicle owned by the City of Troy since this crash happened?
MS. DEBLER: Same objection, objection to form.
**A. The only thing I can say is I do pay more attention to my speeds and to my light usage.**
Q. (Continuing, by Mr. Martinez) Okay. Can you tell us more about that?

Page 116

**A. I'm just more conscious of it.**
Q. I want to take you back to October of 2020. Were you involved in an incident in a Troy patrol vehicle at that time?
**A. Specifically that date I can't remember, but could you give me more information on the incident?**
Q. Sure.
(Marked Exhibit No. 8.)
Q. (Continuing, by Mr. Martinez) I'll direct your attention to Exhibit 8 that's been marked.
MS. DEBLER: I haven't marked it yet, so let me mark it.
MR. MARTINEZ: I can hand you what's been marked as Exhibit 8.
MS. DEBLER: That would be helpful. Can I see what it is so I can pull out the same page?
Q. (Continuing, by Mr. Martinez) I guess while Miss Debler is getting ready, so you testified that you're more conscious. Conscious how?
**A. I pay more attention to -- I would say I'm more, you know, I operate my vehicle in a more intentional manner when I check things.**
Q. In a manner that you didn't previously?
**A. No, just more it of it, right? After something**

Page 117

**like this happens and you're presented with numbers and data, you're more conscious to those things.**
Q. All right. So we've got Exhibit 8 in front of you. I'm just giving you an opportunity to look at it.
MS. DEBLER: It's a four-page exhibit, correct?
MR. MARTINEZ: Correct.
**A. Okay. I know what you're talking about here.**
Q. (Continuing, by Mr. Martinez) Tell me what it is we're talking about here.
**A. This looks like a crash I was involved in in 2020.**
Q. Tell me about this crash.
**A. From what I remember, I was turning left into a neighborhood. I was in the center turn lane traveling at a slow speed. A vehicle changed lanes into the passenger side rear near my rear tire and then they fled the scene and they side-swiped me.**
Q. What resulted from that incident as it pertains to how the Troy Police responded?
MS. DEBLER: Objection to form.
**A. How the whole department responded or --**
Q. (Continuing, by Mr. Martinez) Officer, so after

you were involved in this incident October 23rd, 2020, what happened?
MS. DEBLER: Objection, form.
Q. (Continuing, by Mr. Martinez) Were you questioned?
**A. I don't remember if I was questioned on it or not, sir.**
Q. Did you give a statement?
**A. I don't remember specifically if I gave a statement or not.**
Q. Were you issued a UPR as a result of that crash?
**A. This looks like I was issued a negative GT, which is not a UPR.**
Q. What's the difference to you?
**A. I don't really know the difference, sir, to be honest with you. From an administrative perspective, I don't know.**
Q. So as it pertains to this incident, there was a negative GT, which I believe stands for negative Guardian Tracking?
**A. Yes, sir, that does.**
Q. Okay. So as it pertains to this incident, what about your conduct was found to have warranted a negative GT?
MS. DEBLER: Take your time and read it.
Q. (Continuing, by Mr. Martinez) It may be helpful



to refer to the second page of the exhibit as well.
**A. Okay. What was the question on it, sir?**
Q. So following this incident, what about your conduct was found to have warranted a negative GT?
**A. From reading it, it sounds like failed to activate emergency lights and passed vehicle stopped in the left lane, I mean and I think that's why the negative GT was issued. I don't know the perspective of the lieutenant though, why he wrote it. He doesn't work here anymore.**
Q. So the failure to use emergency lights?
**A. According to what he's saying, that's what it reads like.**
Q. All right. Let's turn the page and go to page four of that document.
**A. Is it the Supervisor's Incident Investigation Report?**
Q. The one captioned Employee/Volunteer Incident Report.
**A. Oh, okay. Yes, sir.**
Q. Have you seen this form before?
**A. I've seen -- I mean I don't remember this one specifically, but this was the old incident forms we used prior to Axon.**
Q. Do you see the signature at the bottom?



**A. Yes, sir.**
Q. Is that your signature?
**A. It is.**
Q. Tell me what it is in this document that's being memorialized?
**A. It's like a very rudimentary kind of thing of where it happened, whether I was injured, what vehicle I was operating, and then they just ask you these questions about where you were trained and had you been previously instructed in use of equipment.**
Q. And what did you respond?
**A. That, yes, I had been previously instructed in the use of my equipment at the police academy and the Troy Police Department.**
Q. So prior to the incident that occurred in October of 2020, you had already been instructed on techniques to prevent accidents such as that?
MS. DEBLER: Objection to form and foundation.
**A. Well, I would disagree because I don't believe that the techniques would have prevented that crash. I disagree with the way it was worded. I disagree with the form and I disagree with the negative GT to begin with.**



Q. Why would you answer yes to those questions then?
**A. Because you can only choose yes or no on this. That's why I disagree with the structure of the form.**
Q. If you believe that you hadn't been trained on the techniques to prevent this type of accident because you believed that somebody else was at fault for that accident --
**A. Right.**
Q. -- why would you answer yes?
**A. So I answered yes because I believe that I was trained on what they were referring to in the GT and as well as like what they were saying I did in the crash. I was trained on the driving, so I agreed to the context of it and the way they structured it, but I don't agree that I was at fault in it or that anything I did would have come from my training or anything like that.**
Q. So the next question where you checked the box yes, "Have you previously been instructed on the use of this equipment," are you referring to emergency lights or the patrol vehicle generally?
**A. The way that it reads, it looks like city vehicle number 997, but in the academy I wouldn't have had that, so the general operation**

**of a police vehicle, yeah. That's how it reads to me.**
Q. The issue that ultimately Sergeant Galich, Lieutenant Wolfe and Captain Satterfield ultimately identified was your failure to use emergency lights and sirens, isn't that right?
MS. DEBLER: Objection to foundation.
**A. I don't know all the sergeants and lieutenants and captains that signed off on it or reviewed it, I can't speak to that, but in this it reads, that's what it reads like.**
Q. (Continuing, by Mr. Martinez) So at the time of the crash that occurred in October of 2020, you had been advised on how to operate a patrol vehicle safely?
**A. I mean that's broad, but I was, specifically on that date I was advised on how to operate a patrol vehicle safely, all around or pertaining to this?**
Q. As of that date, as of that date, you had had some kind of training about how to safely operate a patrol vehicle?
**A. Yes, I've had some kind of training.**
Q. And you've had some kind of training as of that date as to when it's appropriate to use



emergency lights and sirens?
**A. Yes.**
Q. And yet on that incident in October of 2020, you didn't use emergency lights and sirens in accordance with your training, isn't that right?
MS. DEBLER: Objection, form and foundation.
**A. Yes, I disagree with the way you phrased that. It wasn't in accordance to my training. I don't believe that given this situation and the way this crash happened, that I was required to use my lights and sirens. I disagreed with this to begin with. It wasn't challenged because we don't consider negative GTs as discipline, so it was not challenged, otherwise I would have challenged it.**
Q. (Continuing, by Mr. Martinez) You could have had it removed from your Guardian Tracking though, right?
**A. I could have, but I did not request for them to remove anything from my Guardian Tracking.**
Q. At any point in time have you requested to remove anything from your Guardian Tracking?
**A. I've never requested for anything to be removed from my Guardian Tracking specifically, no.**



(Marked Exhibit No. 9.)
Q. (Continuing, by Mr. Martinez) I'm going to draw your attention to what's been marked for identification as Exhibit 9, CITY-0037 at the bottom of it.
MS. DEBLER: Can you put nine on there for me?
**THE WITNESS: Yeah, of course. Anywhere on here?**
MS. DEBLER: Yeah, that's good.
Q. (Continuing, by Mr. Martinez) Tell me what it is we're looking at in Exhibit 9.
**A. This is an e-mail correspondence between me and my sergeant requesting to remove, or requesting the process of removing a written discipline from my file.**
Q. Okay. Are you drawing a distinction then between discipline and the Guardian Tracking system?
**A. Yes, sir.**
Q. Why did you ask for this to be removed, this incident that you're referencing in Exhibit 9 to be removed from your file?
**A. Because this was my only official discipline beyond Guardian Tracking, which are not challengeable. This is challengeable,**



**therefore, this can be removed after a certain amount of time, and also I disagreed with getting this discipline to begin with. I didn't want it in my file. I disagreed with it at the time, and so I requested the process of it, but I never followed through on it, nor did I ever send a letter to the chief, which is what's required.**
Q. So as it pertains to the negative GT that you disagree with --
**A. Yes, sir.**
Q. -- why did you never want that to be removed from your record, but you wanted this one to be?
**A. Well, because I guess my philosophy on it was that I didn't feel I was wrong in it and I didn't feel the need to remove it, so maybe it felt right to sign it.**
Q. At the time when you were at the incident scene and you had spoken to Mr. Szczesny, how far away from him were you?
**A. I was close. I can't give you an exact distance, but close.**
Q. Close as in the distance you and I are right now?
**A. I would say close enough to have a conversation and be able to hear him.**

Q. So it's possible you could have been further apart than you and I are currently?
**A. I can't say for certain the distance. Close enough to have a conversation.**
Q. Do you regard us as being close enough to have a conversation?
**A. Yes, sir.**
Q. Do you claim Mr. Szczesny was intoxicated at the time of the crash?
**A. I didn't have any indication or knowledge or anything like that of that nature.**
Q. Just being involved in a collision doesn't mean somebody is intoxicated based on your training and experience, right?
**A. A collision alone, no.**
Q. You always need something more, correct?
MS. DEBLER: Objection to form.
**A. You always need something more as far as to determine if they're intoxicated?**
Q. (Continuing, by Mr. Martinez) Correct.
**A. I would agree with that.**
Q. What kinds of things would you be looking for to determine if somebody is intoxicated based on your training and experience as a law enforcement officer?



MS. DEBLER: Objection to form and foundation. You're asking for a hypothetical since he testified he wasn't involved in investigating this.
Q. (Continuing, by Mr. Martinez) I'm just asking you to apply your knowledge and training.
**A. Sure, yeah, I can do that. So as far as related to just a crash, if I were to respond to a crash?**
Q. Correct.
**A. And I'm speaking with the driver of a crash?**
Q. Correct.
**A. I think you're looking for signs of intoxication, so, you know, glassy eyes, odor of intoxicants, slurred speech, things like that.**
Q. In the interactions that you had with Mr. Szczesny, did he exhibit any of those signs or symptoms?
**A. I never got close enough to him to smell his breath or anything like that for any kind of indication of intoxicants, but at the time I was not concerned. I was concerned with his injuries because when we get to a scene of a crash, we have sort of like a hierarchy of things that we prioritize and the first thing is injuries, so anything to do with investigating somebody for an OWI or anything along those**



**lines, that comes secondary to injuries. It's always injuries first, and then how is it, is it blocking the road or things like that, so I didn't get to that level to evaluate him.**
Q. In your discovery responses in Exhibit 1, you admitted, I'll just tell you.
**A. I don't have it in front of me.**
Q. You admitted that in June of 2023, about three months before this crash occurred, you were involved in a motor vehicle crash.
**A. I was, yes, sir.**
Q. Tell me about that.
**A. Okay. I was going to mountain bike trails somewhere in the area of Lake George and Clarkston Road. It was a four-way stop. I was in my personal vehicle. I had completely cleared the four-way stop and only the bed of my pickup truck was left, and a gentleman in his eighties rolled completely through the stop sign and hit the back passenger side of my pickup truck after I was almost entirely through the intersection after I stopped at the stop sign.**
Q. What happened after that?
**A. Very minor damage to both vehicles. He was from out of state. He didn't really know what to do,**



**so we decided we would call in to do a police report, so we called Oakland County Sheriff to come to the scene and do a police report.**
Q. And then what happened next?
**A. They gave us an incident number and I went mountain-biking and I never did anything with it. I didn't file a claim or anything like that.**
Q. Was anybody given a citation in that incident?
**A. I don't remember. I wasn't.**
Q. When was the first time that you saw that vehicle that hit you in June?
**A. The first time I saw it? So I had cleared the intersection. I wish I had like a four-way intersection diagram to show you, but I had cleared all the way through it and I saw him coming up to the stop sign and he was coming way too fast and he went right through the stop sign. I knew it was coming.**
Q. You had an opportunity to react?
**A. No, I didn't, no.**
Q. Did you ever report that incident to anybody at Troy Police?
**A. I don't remember if I did at the time, can't tell you for certain.**
Q. Based on your knowledge and understanding of the

Troy policies and procedures that you're required to follow, do you know if you were required to report it?
**A. I don't believe I would have been required to report that.**
Q. Why is that?
**A. Wasn't anything negative about it, just a standard civil nothing criminal in nature, motor vehicle accident that I was not at fault in.**
Q. Did any supervisor ever ask you about it?
**A. I can't remember if they did or not, sir.**
Q. Was there any kind of counseling or training or anything that resulted from you being involved in a collision in your personal vehicle?
**A. No, sir.**
Q. Did anyone discuss with you the incidents in both your personal vehicle and patrol vehicle in any way, shape or form prior to the collision with Mr. Szczesny?
MS. DEBLER: Objection, form and foundation. He testified he doesn't remember talking to anybody about -- just form and foundation. You may answer insofar as you can.
**A. I don't think anybody talked to me about my personal vehicle. You're talking with a patrol**



**vehicle, which incident are we talking about?**
Q. (Continuing, by Mr. Martinez) By the time we get to June 8th of 2023 --
**A. Yes.**
Q. -- you had been involved in three prior incidents where there was damage to a patrol vehicle, and then there was an incident involving your personal vehicle, so there were four incidents involving you and motor vehicles while you had been driving. At any point in time between June 8th of 2023 and September 22nd of 2023, did anybody from Troy Police sit you down and talk to you about these incidents?
**A. No, sir, not that I can remember.**
Q. What was the extent --
MS. DEBLER: Other than what he's already testified to, right? He's already testified to the 2020 incident.
MR. MARTINEZ: Sure.
**A. I'm sorry, maybe I misunderstood. That wasn't between June of 2023 and September of 2023.**
Q. (Continuing, by Mr. Martinez) Understood.
**A. Yeah, exactly.**
Q. So what was the extent of the counseling, if any, you received following the 2020 collision



where you were given the negative GT?
**A. The negative GT as far as I can remember would be the extent of the counseling.**
Q. That was it?
**A. Yeah, as far as I can remember.**
Q. Do you recall -- well, let me ask this. There are four incidents that were referenced in the UPR that came after the Szczesny crash, correct?
**A. Referencing the UPR, yes, they did reference four.**
Q. With the fourth being the Szczesny incident, the third one being the collision in 2020. What were the other two?
**A. So specifically I can't remember what those were, nor was I involved in any at-fault crashes. That's why I guess I said originally I disagreed with the wording on that in the text messages because I don't know why he would word it that he was involved in something that resulted in damage to the police vehicle. That's why I'm saying, the way they worded it made it sound like I was at fault in a bunch of crashes when that wasn't the case.**
Q. But I think the statement is that this is the fourth that you've been involved with.
**A. Right. Damage to a vehicle can be something as**



**simple as you run over a pothole and you're required to report any damage to a vehicle, you have to report it because then it has to go to the Department of Public Works and get inspected, so you have to report any damage. It can be as simple as a rock kicking up and breaking a windshield. Anything has to be reported because the vehicle has to be inspected per their policy. So once you document that you were involved in any kind of damage, regardless of how innocuous it was or even if somebody else was involved or not, it gets reported.**
Q. So is it your testimony that you did report those initial two incidents to somebody at Troy Police?
**A. I mean I must have. That's how they would have gotten ahold of any information pertaining to me damaging a vehicle.**
Q. Do you know whether a written report would have been made from the damage to those patrol vehicles?
**A. Generally we do write written reports for damage to police vehicles.**
Q. Did you receive a negative GT or a UPR or discipline of any kind stemming from either of those first two incidents?
**A. I can't remember, sir. I can't even tell you**

**when they happened.**
(Marked Exhibit No. 5.)
Q. (Continuing, by Mr. Martinez) Let me direct your attention to what's been marked as Exhibit 5.
**A. I shuffled them all over here. Is that it?**
MS. DEBLER: I'm not sure which one five is.
MR. MARTINEZ: That would the VC Vehicle Collision EVT 00000117-1.
**A. Okay.**
Q. (Continuing, by Mr. Martinez) The first four pages of this exhibit is an event 117-1, the last four pages of this exhibit pertains to the Employee and Supervisor Incident Report combined listed as event 117-2.
**A. Okay.**
Q. I'm looking at 117-2, the document Bates number at the bottom is 00259.
**A. I'm not seeing that number.**
MS. DEBLER: It's really small.
**A. Oh, here it is. I got it. Okay.**
Q. (Continuing, by Mr. Martinez) All right. What is it that we're looking at on that date?
MS. DEBLER: Objection, foundation.
**A. I'm not even -- this might be the Employee**



**Incident Report, but I've never seen it in this format. I've only seen it from the end of typing it on the Axon boxes, so this could be the printout of it, but, again, I don't have access to this stuff.**
Q. (Continuing, by Mr. Martinez) Okay. Take a look at the information that's provided here and I'll ask you some questions.
**A. Sure, yeah.**
Q. Probably most relevant is page 259 and then the very top of 260.
**A. Page 259, okay. I've got that and I've got 260, yes, sir.**
Q. So we see on 259 there is this Incident Overview. Do you see that?
**A. I do, yes, sir.**
Q. Does this information correspond with what you provided to the Axon box that you just referenced?
**A. The Axon -- oh, I'm sorry.**
MS. DEBLER: Objection to form. Are you referring to everything on 259?
MR. MARTINEZ: The Incident Overview.
MS. DEBLER: Okay.
**A. I mean this is the kind of information. Like I said, I haven't seen it in this format. We**



**don't have the end result of it. It's like a supervisor thing, but this is the kind of information I would have put in there.**
Q. (Continuing, by Mr. Martinez) Is this the information that you provided in your report following the September 2023 crash?
MS. DEBLER: Objection, foundation.
**A. Again, yeah, so the employee incident report is in the Axon standards and it has like boxes that you have to fill in. I don't have control over the format of it, but it does look like the type of information I would have put in there.**
Q. (Continuing, by Mr. Martinez) Do you dispute that the information contained in the incident overview is what you provided?
**A. So, again, I'm not familiar with this format here, but all of this looks like the kind of stuff I would put in here, so I'm not disputing that, no, sir.**
Q. So under Incident Details on 259, that's a series of questions. Do you see that?
**A. Yes, sir.**
Q. One of which is, "Were you injured?"
**A. Yes, sir.**
Q. What is the response listed?



**A. I put no, sir.**
Q. The next question asks, "Was first-aid given?" Do you see the answer there?
**A. I do.**
Q. And what is the answer?
**A. No.**
Q. Does that conflict with your statement earlier about being evaluated by EMTs at the police department?
**A. It does not.**
Q. Okay. Why not?
**A. Because this was several days later and I didn't have any injury from it then at that point, so I when I'm completing this several days later, I was fine. I didn't need any follow-up and I was wasn't given any first-aid.**
Q. Understood. The second to last question, so there's a couple there at the bottom. It talks about the vehicle number, equipment, all of that stuff. The question I'm going to draw your attention to is, "Have you been previously instructed on the techniques to prevent this type of accident?" And you responded what?
**A. No.**
Q. Why did you put that?

**A. Because I've never been given any training specifically regarding motorcycles and how to evade them when they're in your lane, so because this is an ambiguous question, that's the only way to answer it correctly.**
Q. Your UPR from the September 2023 crash found you responsible for what violation?
**A. I'm not -- I'd have to see my UPR again if I can reference it.**
Q. Sure.
MS. DEBLER: Do you have that?
**THE WITNESS: Yeah, I've got it right here.**
MS. DEBLER: Does it have a number on it?
**THE WITNESS: That's not it.**
MR. MARTINEZ: Here, let's do this it this way. Do you have Exhibit 6? Is that readily available?
MS. DEBLER: I don't think you've marked it.
MR. MARTINEZ: Six is going to be the memorandum dated January 3rd, 2024.
MS. DEBLER: So this is what I think he's referring to.
MR. MARTINEZ: It's the same information



contained essentially in five, but we can discuss six.
**THE WITNESS: Okay. No problem.**
(Marked Exhibit No. 6.)
**A. So this is my UPR?**
Q. (Continuing, by Mr. Martinez) Is that --
**A. Yeah, it's my UPR, yep.**
Q. Okay. So this says that it was prepared by Lieutenant Clark?
**A. Yeah.**
Q. He's the one that issued you your UPR?
**A. Yes.**
Q. So looking at the second page of this document right above where it says Axon Standard Events and it gives the 117, do you see that? It's the very last thing on the page.
**A. Yes, sir, right here. I got it at the bottom.**
Q. Right above that it says, "Unsatisfactory Performance Report (UPR) issued for policy violation." What is the policy violation?
**A. It says, "Failure to use emergency lights and sirens when responding to an authorized emergency."**
Q. They didn't find you responsible for being unable to evade a motorcycle, did they?
**A. I don't think that would be a violation. I**



**don't understand the phrasing of it, but I don't think that would be a violation.**
Q. So the UPR here was not issued because you failed to evade a motorcycle, right?
MS. DEBLER: Objection to foundation. You're not the one who issued it, but --
**A. I didn't issue it and the way it works from my interpretation of it is that they're issuing a UPR for me failing to use my lights and sirens when responding to an authorized emergency.**
Q. (Continuing, by Mr. Martinez) And the failure to use emergency lights and sirens was the same violation you were found responsible for to receive a negative GT back in the October of 2020 crash, isn't that right?
MS. DEBLER: Objection to foundation.
**A. They both were worded that way, but, again, I disagreed with that because that wasn't related to this.**
Q. (Continuing, by Mr. Martinez) So when you stated that you had never been provided with any, you know, training -- let me see what the exact wording is. That you were not provided with or previously instructed on techniques to prevent this type of accident, your answer no wouldn't



be true, would it?
MS. DEBLER: Objection, foundation and form.
**A. Again, I don't understand the question. I wasn't trained on how to evade an unavoidable collision with somebody that swerves in front of you.**
Q. (Continuing, by Mr. Martinez) That's not what they found you responsible for, was it?
MS. DEBLER: Objection to form, argumentative. I think he's explained it.
Q. (Continuing, by Mr. Martinez) With respect, Officer, it's clear as mud to me because in 2020 I thought it was pretty clear that they had to instruct you and you were given a negative GT because you failed to use emergency lights and sirens. I get you dispute it, but do you dispute that that occurred?
MS. DEBLER: Objection to form, foundation and it mischaracterizes the testimony. I don't think he ever told you that he was instructed in 2020.
Q. (Continuing, by Mr. Martinez) What was your negative GT for in 2020?
**A. My understanding of the negative GT was that it was a few different factors. The negative GT,**

**the way that it was read to me, that I read it, they said it was a totality of a couple different things, so specifically was it the lights and sirens? I don't know if it was specifically that, but that was part of it from their perspective.**
Q. You've got my six or, I'm sorry, my eight.
A. **I have the six. I do have eight somewhere here. Yes, I do have it.**
Q. Okay. So looking at the first page, second to last paragraph there, read that for me.
A. **This looks like it was written by the lieutenant. "I have spoken with Leithauser and advised him of the need to activate his emergency equipment** when violating the motor vehicle code (improper passing) and his need to be more defensive when traveling down the LTR passing numerous vehicles in the left thru lane. He was also counseled on the need to immediately stop, activate emergency equipment and contact the other motorist in order to minimize the likelihood of that motorist fleeing the scene of the accident."
Q. So you were counseled after the 2020 incident to use your emergency equipment when violating the Motor Vehicle Code?



A. **I don't specifically remember the counseling, but I'm not disagreeing that that's what it reads here.**
Q. And then after the 2023 crash, again, you received only a UPR this time that told you you need to activate the emergency equipment for the same reasons, right?
A. **But my interpretation of it was not for the same reason.**
Q. Okay. Tell me about your interpretation of it.
A. **Okay. So one speed was, they were saying that speed was a factor. This other one speed was not a factor.**
Q. Is that all the reasons why you believe it's different?
A. **Well, no, but, again, I said I disagreed with the first one to begin with. It was their interpretation from the events from an outside perspective that day.**
Q. So from their outside perspective that day in 2020, they told you and counseled you, specifically Lieutenant Wolfe, that you need to activate your emergency equipment when violating the Motor Vehicle Code, right?
MS. DEBLER: Objection to foundation.



A. **Sure, I mean that's how it reads here.**
Q. (Continuing, by Mr. Martinez) And in the 2020 incident, the violation of the Motor Vehicle Code was improper passing?
A. **That's what it reads like in here.**
Q. Based on how you review Exhibit 6, I'll give you a moment to read it if you need to.
A. **Which part of six?**
Q. Looking at the front page.
A. **Yes, sir.**
Q. What was it that -- what violation of the Motor Vehicle Code did they find you responsible for in this UPR memo, Exhibit 6?
A. **Are you referring to here, page two, unsatisfactory performance report issued for policy violation?**
Q. I'm referencing the part of it directly above the underlined text on the first page, Bates number 263, where it says, "It is the policy of this department that no officer shall operate a motor vehicle without exercising due care and caution for the safety of the public." Do you see that?
A. **I'm trying to find where you're at, sir.**
MS. DEBLER: Right here.
A. **Oh, okay. Yes, sir. Gotcha, yep.**



Q. (Continuing, by Mr. Martinez) All right. And then it goes into Michigan Vehicle Code Speed Limitations 257.632. We learned in the deposition with Lieutenant Shuler that this is the information that was provided by Lieutenant Clark in the context of your conduct during the September 2023 crash, okay?
A. **Okay.**
Q. So that section, they copied and pasted it right here for us. "The speed limitation set forth in this chapter," meaning the speed limit law, "shall not apply to vehicles when operated with due regard for safety under the direction of the Police when traveling in emergencies." Following me so far?
A. **I am, yes, sir.**
Q. "This exemption shall apply only when the driver of the vehicle while in motion sounds an audible signal by bell, siren or exhaust whistle as may be reasonably necessary or when the vehicle is equipped with at least one lighted lamp displaying a flashing, oscillating or rotating red or blue light visible under normal atmospheric conditions from a distance of 500 feet to the front of such vehicles, unless the nature of the mission

requires that a law enforcement Officer travel without giving warning to suspected law violators." Are you following me with that?
**A. Yes, sir.**
Q. Is that your understanding of what the law requires you to do when operating a patrol vehicle?
**A. With some exemptions, but I do understand this, yes, sir.**
Q. Okay. So they go on to the next page, this section Emergency Vehicle Operation 257.603 indicates, "Traffic regulations, government vehicles, authorized emergency vehicles, workers upon surface of highways," and they give us an excerpt of section (c)(3) from that statute.
**A. Yes, sir.**
Q. It indicates, "The driver of an authorized emergency vehicle may: Exceed the prime facie speed limits so long as he does not endanger life or property." Is it clear to you from reading Exhibit 6 that the department took issue with your lack of lights and sirens in the September 2023 crash?
**A. I'm not disputing it. The way it reads to me is that Lieutenant Clark took issue with it.**



Q. And it is still the emergency lights and sirens that was at issue after you had been previously counseled by Lieutenant Wolfe in 2020 about the same thing, correct?
MS. DEBLER: Objection to form and foundation.
**A. The circumstances were different in both events.**
Q. (Continuing, by Mr. Martinez) My question is is it still the same basis that you did not use lights and sirens in both of those incidents?
**A. In both of those incidents, I'm not disputing that they are referencing not using lights and sirens.**
Q. And in September of 2023, they actually issued you a UPR about it?
**A. For this event they issued me a UPR.**
Q. And in the October of 2020 incident, you received a negative GT?
**A. I did receive a negative GT.**
Q. Did you change anything about how you conducted yourself behind the wheel of a Troy Police Department vehicle after you received that negative GT in 2020?
MS. DEBLER: Objection to form and foundation. He's already answered that question



over and over again.
MR. MARTINEZ: I asked him about the 2023 incident.
MS. DEBLER: Well, you asked him have you changed anything since this incident about your behavior and about your driving and he answered the question.
MR. MARTINEZ: So now I've moved back in time. We're looking at 2020.
MR. WAECHTER: Stop. The objection is noted. I move for an answer.
MS. DEBLER: You don't get to move. One person, one counsel for Plaintiff gets to speak. You don't get to place objections.
MR. WAECHTER: I can place an objection on the record.
MS. DEBLER: No, you cannot.
MR. WAECHTER: Your speaking objections I object to.
MS. DEBLER: First of all, I am not doing speaking objections. I've been very polite and only one counsel for Plaintiff may issue objections or may do anything to any question. You don't get to.
MR. MARTINEZ: I will then place the



objection on the record as to the speaking objections pursuant to Lipian versus University of Michigan.
MS. DEBLER: Okay. We've heard this before. I understand that.
MR. MARTINEZ: L-i-p-i-a-n versus University of Michigan. The purpose of a Rule 30 deposition is to place the objection on the record and then allow the witness to answer it provided unless a privilege is properly asserted.
MS. DEBLER: And again, first of all, privilege is not the only reason why a witness does not have to answer something during a discovery deposition. The other reason is when it's not discoverable, and I'm not even saying that that's what's going on here. What I'm saying is it's been asked and answered and that is a perfectly permissible objection, because I would really like you to move on. We've been here for almost three hours now.
MR. MARTINEZ: I'm getting close. If the witness can be allowed to answer this question, it would move us along a lot faster.
MS. DEBLER: Why don't we have Madam Court Reporter read back the question?

Page 150

(Reporter reads back question.)
Q. (Continuing, by Mr. Martinez) And the negative GT referencing the 2020 collision.
**A. I mean I'm always training, learning more stuff and adapting the way I do things.**
Q. How?
**A. I'm always trying to improve. It's a generalized question, so am I changing things? Sure, it could be from where I put equipment in the car to how I where equipment on myself. I mean it's a generalized statement, but I'm always changing things when I learn new stuff, so I mean I'm always learning new stuff and changing things.**
Q. There was nothing that you took from that 2020 incident that you believe would have prevented the 2023 crash?
**A. Nothing I took from the 2020 that would -- again, they're different circumstances, so I don't believe that they were -- I think the circumstances were different enough that I don't think you can relate the two.**
Q. Appreciate the commentary. I'll direct your attention to Exhibit 2.
MS. DEBLER: Move to strike that as argumentative and rude.

Page 151

(Marked Exhibit No. 2.)
Q. (Continuing, by Mr. Martinez) Still referring you to Exhibit 2.
**A. I'm not sure which one that is, sir.**
Q. This would be Defendant Evan Leithauser's Response to Plaintiff's Second Discovery Requests. Did you have an opportunity to review these discovery requests -- or responses rather?
MS. DEBLER: Objection to form. When?
**A. Let me take a look and see what these are. These are the second round of questions?**
Q. (Continuing, by Mr. Martinez) Correct.
**A. Yes, I reviewed these, sir.**
Q. And that signature on the second to last page, that would be yours?
**A. Yes, that's my signature and then the notary's signature.**
Q. And that is your certification under oath that the information you provided in Exhibit 2 was true and accurate to the best of your knowledge, information and believe?
**A. Mm-hmm.**
Q. Yes?
MS. DEBLER: Is that a yes?
**A. Yes, to the best of my knowledge, yes.**

Page 152

Q. (Continuing, by Mr. Martinez) The same question as it pertains quickly to page 20 of Exhibit 1. Is this your signature, sir?
**A. Here?**
Q. I can hand that to you.
**A. That one?**
Q. So this is Exhibit 1 now.
**A. Oh, Exhibit 1.**
Q. I can just hand this to you, page 20 of Exhibit 1.
**A. Yes, this is my signature here and that's our notary's signature there.**
Q. Similarly in that, that is your certification under oath that the information you provided in those discovery responses was true, accurate and complete to the best of your knowledge and belief?
**A. To the best of my knowledge, sure.**
Q. Did you have anyone in the Troy Police Department who you believed was looking out for you after this crash?
MS. DEBLER: Objection to form.
**A. No, not specifically, no.**
Q. (Continuing, by Mr. Martinez) You didn't believe Giordano was?
MS. DEBLER: Objection to form.
**A. No, I believe that Giordano's interests were**

Page 153

**looking out for the union as a whole. There is always sort of a rift between the union and the command to make sure that everything is followed per our contract, so I don't believe his thing was to look out for me personally, no, sir.**
Q. Did you have any other union steward who you consulted with aside from Mike Giordano?
**A. I can't remember off the top of my head. Alejandro Parra was a union steward at the time, but he was with me during the urine drug test.**
Q. Do you believe he was there in his capacity as a union representative?
**A. Capacity as a union representative? I mean possibly. I'm not on the union, so I don't know what they're required to attend and what they're not, but I didn't have a vehicle to drive myself to the hospital, so somebody had to take me and he was just on the shift that night.**
Q. Are you a member of the Detroit Police Officers Association?
**A. Yes, I'm an officer.**
Q. Did you did you feel supported by the Troy Police Department after this incident?
MS. DEBLER: Objection to form.
MS. DUFRANE: Join.

A. **Support in what fashion?**
Q. (Continuing, by Mr. Martinez) In any fashion. Did you feel you were provided any assistance or support or anything to help you move past this incident?
MS. DEBLER: Objection to form.
MS. DUFRANE: Same, join.
A. **I mean after the incident, I just wanted to return to work and they allowed me to return to work, so I didn't really require much follow-up on it.**
Q. (Continuing, by Mr. Martinez) Is your job important to you?
A. **Very important.**
MS. DEBLER: Objection to form.
A. **Sorry. It's very important to me, sir.**
Q. (Continuing, by Mr. Martinez) Why is that?
A. **For a multitude of reasons.**
Q. Such as?
A. **It's my livelihood. I'm good at it. I think I do a good job. I think I've done a lot of good for the city.**
MR. WAECHTER: Let's take a break and go off the record for a brief moment and return in five minutes.



VIDEOGRAPHER: We are going off the record at 4:31 p.m.
(Recess 4:31 p.m. to 4:43 p.m.)
VIDEOGRAPHER: We are back on the record at 4:43 p.m.
Q. (Continuing, by Mr. Martinez) Officer, as we sit here today, tell me what has stuck with you the most about the September 2023 crash.
A. **It was not a good day, you know, I don't know how to say it. There is a guy that took serious injuries from it. As a cop, like I go to a lot of things where people get traumatic injuries or, you know, mental health problems and all that kind of stuff, like I don't ever want to see anybody in that kind of condition, you know, so like at the end of the day, all this other stuff aside, it was an accident and we're two guys that didn't want to meet each other that night that way and it sucks that somebody came in with an injury, so I don't know how else to say that.**
Q. This was an accident?
A. **Yeah.**
Q. Accidents happen?
A. **True.**



Q. You bear some responsibility for it, yes?
MS. DEBLER: Objection to form and foundation.
A. **I can't speak to the responsibility for the crash. I didn't investigate the UD-10 or the crash investigation, so I can't speak to that.**
Q. (Continuing, by Mr. Martinez) It was unreasonable for you to go 60 miles an hour down Maple Road at night without lights and sirens, yes?
MS. DEBLER: Objection to form and foundation.
A. **Well, I didn't know how fast I was going. I was only ever told a number after the fact and I was only ever told that the number was recorded through my car's, I think it was called a black box, so this was all told to me after the fact. At the time I didn't know how fast I was going.**
Q. (Continuing, by Mr. Martinez) As you went through the intersection of Maple and Stephenson going between 63 and 64 miles per hour, you didn't notice anything about the way your car was moving that gave you an indication that you were going too fast?
MS. DEBLER: Objection to form an foundation.



A. **I didn't know how fast I was going at the time.**
Q. (Continuing, by Mr. Martinez) You should have had lights and sirens on, yeah?
A. **Depending on as far as what circumstance, the nature of the call?**
Q. As you were driving above the prime facie speed limit.
A. **Well, again, driving above the speed limit doesn't, I mean aside from that, driving above the speed limit by itself, if it was a different call hypothetically, you switch the call up for something else that is in the statute, would it then not be too fast? I don't understand the phrasing of it I guess. So those speeds, given that it was under something that was under the exemption and the exact same scenario and same situation, would you change the nature of the call, then the speeds wouldn't be too fast?**
Q. But the exemption, as Lieutenant Clark put in his report or in his UPR memorandum, "Shall only apply when the driver of the vehicle sounds an audible signal or displays flashing, oscillating or rotating red and blue lights," yes?
A. **So my interpretation of that is he's referring to the nature of the call I was going to. I**

can't speak to what Lieutenant Clark's mindset is on that, but you would have to ask him that, but I believe he was referring to the nature of the call, because the speed itself, if you change the nature of the call, wouldn't necessarily be unsafe in those conditions.
Q. Do you believe that officers are allowed to go above the speed limit in their patrol vehicles whenever they want?
A. I don't believe that.
Q. Do you believe that the law requires that when you're responding to an emergency call, that you need to have lights and sirens activated when you go above the speed limit?
A. With exemptions.
Q. What are the exemptions?
A. I think we stated already, but generally when you need to be covert about things.
Q. Was this an incident -- I'm sorry.
A. I apologize. When you're trying to be less conspicuous when you're driving.
Q. Was this the kind of incident that required you to be less conspicuous?
A. Driving to a personal injury crash, I wouldn't need to be given just that nature of the call, no.



Q. In other terms there was no need for you to be less conspicuous, yes?
A. As far as not activating lights and sirens? There wouldn't be a need for that in this case for that nature of the call.
Q. So on the other side of that coin then, you probably should have had your lights and sirens activated since you were going above the speed limit, yes?
A. As I said before, I wasn't aware I was traveling those speeds. They told me I was.
Q. Is that an exemption in the law is if you're unaware?
A. I don't see an exemption in the that says unaware specifically, no, sir.
Q. So, therefore, you should have had lights and sirens on to be in compliance with the law that Lieutenant Clark cited?
A. Okay. But if I didn't have lights and sirens on, then most likely I didn't think I was going that fast.
Q. Do you agree though, now knowing what you know, that you were going too fast in the circumstances?
MS. DEBLER: Objection to form and foundation.



A. Well, at the time I didn't know how fast I was going. It was only told to me after the fact through investigation through other people determining it, so --
Q. (Continuing, by Mr. Martinez) And what did that do? What was your impression when you finally found out just how fast you were going?
A. Well, my immediate impression was I wanted to know the source of the speed and the only time that I was ever told, or the only source I was ever given was the internal computer on my car, which I don't have any training on, so all they did was say this is how fast you were going according to the data in your car. I don't have any training on that, so I trust my co-workers or whoever did the data analysis who told me these numbers are competent at their job, so I'm not disputing that, however, I was assigned that car. I know that that car was not the most reliable car. It was on its second engine from my awareness, so my immediate reaction was, okay, if they're telling me that, I trust them in their word, but that's my only source is the black box. I didn't have any firsthand knowledge to say I knew that I was speeding because I



didn't know how fast I was going.
Q. In your patrol vehicle did you have the standard speedometer or was it digital?
A. I think it might have both the speedometer and a digital gauge. I don't know for certain in that vehicle at the time.
Q. If you could go back in time, what would you do differently?
A. I mean related to this crash or in life?
Q. As it pertains to this crash, sir.
A. I mean in hindsight there is a million things you could do, but I don't think that's how it works.
Q. So you would do nothing differently?
A. Be more cognizant of checking my speedometer to see where I'm at.
Q. Anything else?
A. Depending on my speed in this given scenario with what call I was responding to, if I was surpassing it, then I would sound an audible alarm and siren, if I was surpassing the speed limit.
Q. Do you doubt that you were surpassing the speed limit?
A. I don't know if I was or not.

Q. Do you except any responsibility for what occurred in this crash with Mr. Szczesny?
MS. DEBLER: Objection to form and foundation.
**A. Responsible for what part of it, sir?**
Q. (Continuing, by Mr. Martinez) Do you have any responsibility whatsoever for the fact that the accident occurred?
MS. DEBLER: Objection to form and foundation.
**A. From my perspective, which is only the actual crash itself, because I didn't investigate it, no knowledge of the crash report or anything like that, I had no involvement in the investigation on it at all. I have written almost 600 UD-10s on my own in my career. I thought that he was at fault. I thought that he failed to yield. I thought that given if you change the scenario of it where I was going to any other call that was an exemption of the same speed, that it was not an unsafe speed nor was I handling the vehicle unsafely, and I felt that he failed to yield for me. After the fact, when they told me this was your speed, I said if I was doing those speeds, per the nature of the**



**call I should have either had my lights and sirens on or I should have been traveling closer to the speed limit.**
Q. (Continuing, by Mr. Martinez) Is that the responsibility that you accept for this crash occurring?
**A. Well, it's my responsibility going forward, yeah, to you know --**
Q. We're talking about September 22nd of 2023.
**A. Again, I can't speak to what I would do in hindsight per se.**
Q. Looking back on it, there is nothing -- you did everything flawlessly that night?
**A. I didn't say that. That's untrue.**
Q. Tell me what you mean --
MS. DEBLER: Objection, asked and answered. He told you he answered it.
**A. Based on the information I had after the fact, the data I had after the fact, I told you that if those numbers were true, I would have done the things I stated to you.**
MR. MARTINEZ: All right. I have nothing further at this time.
MS. DUFRANE: No questions.
MS. DEBLER: No questions.



VIDEOGRAPHER: This concludes today's deposition. We are off the record at 4:52 p.m.
(Deposition concluded at 4:52 p.m.)



STATE OF MICHIGAN)
)
COUNTY OF MACOMB )

I, Ann L. Bacon, a Notary Public in and for the above county and state, do hereby certify that the witness, whose attached deposition was taken before me in the entitled cause on the date, time and place hereinbefore set forth, was first duly sworn to testify to the truth, and nothing but the truth; that the testimony contained in said deposition was reduced to writing in the presence of said witness by means of stenography; that said testimony was thereafter reduced to written form by mechanical means; and that the deposition is, to the best of my knowledge and belief, a true and correct transcript of my stenographic notes so taken.

I further certify that the signature to and the reading of the deposition by the witness was waived by counsel for the respective parties hereto; also, that I am not of counsel to either party or interested in the event of this case.

Ann L. Bacon, Notary Public, Macomb County
Acting in Oakland County
My commission expires: 6/29/29

**(**

**(a)** 38:8,12
**(c)(3)** 146:15
**(e)** 38:8,12

**0**

**0.6** 65:13
**00000117-1** 134:9
**00259** 134:18
**0029** 91:17 97:5,9,14,23 99:7,9
**0030** 91:17 92:11 99:14,18 101:18
**0031** 104:24
**0032** 95:19 96:4,6,19
**0033** 96:4,6,11 106:21

**1**

**1** 5:11 11:23 19:22,24 20:12,15 35:4,7 36:18,19 42:10 46:23 128:5 152:2,7,8,9
**1/3/24** 5:24
**10:14** 96:10 106:24
**11/12/20** 6:6
**116** 6:5
**117** 139:15
**117-1** 134:12
**117-2** 134:15,17
**124** 6:7
**13** 35:18
**134** 5:21
**139** 5:23
**14** 35:6,15,17 36:1
**15** 35:6,7,15 37:8,25 42:10 94:7
**151** 5:14
**18** 61:15 62:20
**180** 61:15
**19** 5:11
**19080** 3:5
**1:30** 25:22,23
**1:48** 2:4 7:3,8

**2**

**2** 5:14 48:8 150:23 151:1,3,19
**20** 37:1 152:2,9
**2014** 10:19 14:7 80:5
**2020** 116:2 117:13 118:2 120:17 122:13 123:3 131:18,25 132:11 140:15 141:12,21,23 142:23 143:21 144:2 147:3,17,23 148:9 150:3,14,17
**2022** 96:10
**2023** 8:10 14:14 25:17 32:14 40:8 41:19,22 44:9 95:25 97:24 106:23,24 128:8 131:3,11,12,21 136:6 138:6 143:4 145:7 146:23 147:14 148:3 150:16 155:8 163:9
**2024** 138:22
**2026** 2:5 7:2,8 37:2
**21** 20:17
**22** 20:17
**22nd** 8:10 14:13 25:17 32:14 40:8 41:19,22 44:9 99:22 106:23 131:11 163:9
**23** 106:24
**23rd** 95:25 118:1
**248 355-4701** 3:7
**248 489-4100** 4:8
**248 524-3320** 3:15
**250** 4:6
**257.603** 146:11
**257.632** 145:3
**259** 135:10,12,14,21 136:20
**25th** 92:6 97:24
**260** 135:11,12
**263** 144:18
**27555** 4:6
**29** 99:9,10
**2:29** 106:24

**3**

**3** 5:17 35:14,25 37:7 38:11 46:24 48:8 90:7,10 103:18
**30** 149:7
**30th** 37:2,5,16 47:25
**32** 96:14
**33** 92:10 96:14
**34** 92:10 113:18
**35** 92:10 109:12
**36** 92:10
**3:30** 25:22,23
**3rd** 138:22

**4**

**4** 5:19 36:9 46:24 48:8 66:14,19 68:8
**4/20/22** 6:8
**40** 109:5,10,12
**45** 61:15 62:20
**48** 70:4 73:17
**48075** 3:6
**48084** 3:14
**48331** 4:7
**4:06** 73:20
**4:31** 155:2,3
**4:43** 155:3,5

**4:52** 164:2,3

### 5

**5** 5:21 38:7,10 64:13 134:2,4

**500** 2:2 3:13 145:24

**52** 69:13,25

**53** 64:21

**5G** 93:20

### 6

**6** 5:23 64:8,10 65:14,23 138:17 139:4 144:6,13 146:21

**60** 6:3 30:15 156:8

**600** 162:16

**63** 64:4,7,10 156:20

**64** 64:3,20 114:13 156:20

**66** 5:19

### 7

**7** 2:5 6:3 7:2 60:12,15 62:16

**7th** 7:8

### 8

**8** 5:5 6:5 116:8,10,14 117:4

**8th** 131:3,11

### 9

**9** 6:7 124:1,4,12,21

**90** 5:17

**931** 25:1,2,3,6 40:5 41:18

**997** 121:24

### A

**a.m.** 25:23 92:7 97:24 98:7 106:24

**Aaron** 3:2 7:11 8:8 20:8 66:25

**aaron@877-powerlaw.com** 3:8

**absolutely** 8:20 9:12

**academy** 10:25 11:3,7,11 14:20 18:2 80:5,17 120:14 121:24

**accelerator** 57:11 61:20

**accept** 163:5

**access** 135:5

**accident** 8:13 26:13 42:14 43:5 88:15 121:6,8 130:9 137:23 140:25 142:22 155:17,22 162:8

**accidents** 120:18 155:24

**accordance** 123:5,9

**account** 36:17 37:12 74:10

**accuracy** 65:2

**accurate** 151:20 152:14

**accusations** 86:8

**act** 18:19 28:18

**acting** 77:17

**activate** 19:15 20:20 21:7,12 43:13 119:6 142:14,19 143:6,22

**activated** 16:13 43:18 47:22 48:2,21 158:13 159:8

**activating** 159:3

**actual** 87:8 107:11 162:11

**adapting** 150:5

**additional** 14:19 15:2 22:6

**addressed** 16:9

**adjust** 34:10,13 44:17

**administered** 86:14

**administrative** 88:9 118:15

**Admission** 48:8

**Admit** 21:2

**admits** 47:21

**admitted** 128:6,8

**advanced** 72:10,13

**advised** 122:14,17 142:13

**affect** 22:18,21 23:7

**affiliation** 10:16

**aftermath** 89:5,17

**afternoon** 8:8 14:16 25:20

**Afternoons** 25:20

**agency** 10:23

**agree** 36:11 40:24 74:5 121:16 126:21 159:22

**agreed** 121:15

**ahead** 35:21 37:11 38:2,18,20 52:21 55:25 62:17

**ahold** 133:16

**air-conditioning** 34:13

**alarm** 161:21

**Alejandro** 76:23,24 153:9

**alert** 46:22

**Alex** 76:1,22,24,25 77:1

**allowable** 8:4

**allowed** 33:2 72:16 149:22 154:9 158:7

**alluding** 100:25

**ALS** 72:14

**alter** 91:2

**alternating** 25:9,12

**Amanda** 4:3 7:19

**ambiguous** 115:14 138:4

**ambulance** 72:21

**American** 41:4 44:23

**amount** 53:4 125:2

**Amtsbuechler** 4:5

**analysis** 98:2 160:16

**angle** 53:12

**Ann** 2:6

**answering** 37:9 38:5,13

**answers** 9:6 37:25 46:25 47:9

**anxious** 97:17 99:5

**anymore** 119:10

**apologize** 18:14 29:25 30:2,5 41:25 49:11 51:13 53:5 60:5,19 62:24 66:16 79:24 99:24 109:8 111:23 112:6 158:20

**apology** 112:8

**app** 103:18 104:1 108:12

**APPEARANCES** 3:1 4:1

**Appearing** 3:9,17 4:10

**appears** 111:20

**Apple** 91:21

**apply** 45:1 72:3 100:18 127:6 145:12,17 157:21

**applying** 58:13

**apprehensions** 13:20

**apprising** 105:14

**approach** 21:18

**approved** 84:14

**approximately** 64:7

**approximation** 52:5

**April** 37:2,16 47:25

**area** 27:8 29:2,4,6,19 30:25 31:4 50:18 128:14

**argumentative** 98:17 112:3,21 141:10 150:25

**arrive** 25:24

**arrived** 28:9 75:21

**asks** 137:2

**aspect** 18:24 23:24 83:9

**aspects** 19:4

**asserted** 149:10

**assign** 25:9

**assigned** 24:24 25:2,5 29:6,8,14 75:8 160:18

**assignment** 14:13

**assignments** 14:7 29:2 88:13

**assigns** 72:2

**assistance** 154:3

**assisted** 84:20

**assisting** 28:24 84:25

**Association** 153:20

**assume** 32:4 33:4 65:22

**at-fault** 132:14

**atmospheric** 145:23

**attach** 67:7

**attempt** 57:7

**attempted** 56:23

**attempting** 56:18

**attend** 10:25 153:15

**attention** 20:15 35:3,5 39:25 42:10 60:14 61:13 90:9 97:5 113:2,4 114:5 115:23 116:10,21 124:3 134:4 137:21 150:23

**attorney** 9:22 35:9

**Attorney's** 3:12

**attorneys** 7:9 9:21 12:5,12,19

**Auburn** 81:11,15,24 83:5,8,12 86:18,20 104:20 105:5,8,15 106:1

**audible** 19:19 67:3 145:18 157:22 161:20

**audio** 70:8

**August** 2:5 7:2,8

**authorized** 139:22 140:10 146:13,17

**automatic** 46:16

**avoid** 56:14,18 57:7 66:12

**awards** 103:2

**aware** 14:1 21:25 43:4,16,20 48:20,24 49:4,13 71:3 86:7 107:16 108:4 159:10

**awareness** 160:21

**Axon** 32:22 97:25 119:24 135:3,18,19 136:9 139:14

B

**Bachelor's** 11:12

**back** 25:15 42:6,10 70:12 76:11,16,17,20 77:1,11 98:3 103:21 104:23 106:18 107:5,10 108:20 116:2 128:20 140:14 148:8 149:25 150:1 155:4 161:7 163:12

**backpack** 76:13

**Bacon** 2:6

**bandages** 72:4

**bar** 23:23 24:3 40:14,15,20

**bars** 24:7

**based** 22:9 23:5 24:5 29:2,3,20 62:19 63:17 64:18 65:21 83:3 109:16 126:13,23 129:25 144:6 163:18

**basically** 15:17 87:9 100:24

**basis** 147:9

**Bates** 61:15 134:17 144:17

**battery** 93:21

**bear** 156:1

**bearing** 45:9

**Beaver** 2:2 3:13

**bed** 128:17

**began** 56:19

**begin** 35:11 120:25 123:13 125:3 143:17

**beginning** 64:13

**begins** 35:6 99:19

**behalf** 3:9,17 4:10 7:17,19 85:18

**behavior** 115:9,11,13 148:6

**belief** 85:9 113:17 152:15

**believed** 109:16 121:7 152:18

**bell** 73:3 145:19

**big** 2:2 3:13 16:24 58:19

**bike** 128:13

**bit** 20:1 60:14 61:25 66:17

**black** 40:11 156:15 160:24

**bladder** 70:21 71:4

**blocking** 128:3

**blood** 107:2,9 108:2,3,5

**blue** 100:1 101:18,21 145:22 157:23

**body-worn** 85:13 109:1

**bosch** 6:4 63:4

**bother** 106:19

**bothering** 97:21

**bottom** 61:14 99:21 102:12 119:25 124:5 134:18 137:18 139:17

**Bowers** 75:6,7,9,20,23 109:4,23 110:11,12

**box** 101:5 121:19 135:18 156:16 160:24

**boxes** 135:3 136:9

**bracketed** 63:13

**brackets** 63:9

**brake** 56:11,13,14,16 65:8,11,15 66:3

**braked** 57:8 66:11

**brakes** 58:13

**braking** 56:20 58:12 66:9

**break** 10:2,6 154:23

**breaking** 133:6

**breath** 17:2 77:15,16 127:18

**briefly** 74:18

**broad** 122:16

**brought** 86:23

**Bryan** 80:1,13,21

**building** 58:18

**bunch** 76:10 83:4 132:21

**button** 94:4,5

**buttons** 94:2,3

### C

**call** 21:13,18 26:3,11,12,19,20, 22,23,25 27:10 29:19,21,22 33:6 43:10 44:3,10 45:12,18,24 46:3, 9,11 49:7,8,20 50:6 54:12 59:5 67:15 108:12 129:1 157:5,11,18, 25 158:4,5,12,25 159:5 161:19 162:20 163:1

**called** 7:22 80:24 83:21 84:2 129:2 156:15

**calls** 29:1 54:17,21 71:17 113:25

**cam** 97:25

**camera** 32:22 85:13 109:2

**canted** 53:11

**capacity** 86:22 153:11,13

**captain** 86:22 87:9,11 89:24 105:12,14,25 108:14 122:4

**captains** 122:9

**captioned** 119:18

**car** 22:2,7 24:15 29:5,7 34:6,7 44:23 112:13 150:9 156:21 160:11,14,19,20

**car's** 156:15

**care** 144:20

**career** 54:18 111:3 162:16

**carry** 33:10,12,13

**case** 33:8 72:8 132:22 159:4

**caused** 37:17 56:13

**caution** 144:21

**CDR** 6:4

**cell** 33:10

**center** 117:16

**certificate** 11:11

**certificates** 11:6

**certification** 151:18 152:12

**certified** 72:10

**challengeable** 124:25

**challenged** 123:13,15,16

**chance** 17:12

**change** 31:19 32:11 88:14 93:11 103:21 147:20 157:17 158:5 162:19

**changed** 47:25 114:24 115:1,5,6, 9,11,16 117:17 148:5

**changing** 150:8,11,13

**chapter** 145:11

**characterization** 40:25

**charge** 15:14

**Charger** 24:20,21 40:9

**Chargers** 24:17,23

**chart** 64:16

**check** 58:22 84:17 116:23

**checked** 76:9 113:11 121:19

**checking** 161:15

**Chevrolet** 24:14

**chief** 125:7

**choose** 121:2

**chose** 30:21

**circumstance** 157:4

**circumstances** 33:5,7 147:7 150:18,20 159:23

**citation** 129:8

**cited** 159:18

**citizens** 103:5

**city** 3:12,17 7:18 10:12,13 11:13 14:17 18:2 24:6 29:15 115:18 121:23 154:22

**CITY-0029** 90:14,23 91:11,24 92:9 93:19 94:14

**CITY-0030** 91:8,12 94:14,22 95:2

**CITY-0031** 92:10

**CITY-0032** 92:10 95:23

**CITY-0036** 90:14

**CITY-0037** 124:4

**civil** 8:5 130:8

**claim** 126:8 129:7

**claiming** 34:22

**clarify** 69:22

**Clark** 101:7,8 139:9 145:6 146:25 157:19 159:18

**Clark's** 158:1

**Clarkston** 128:15

**classroom-based** 15:20,21

**clean** 9:11

**clear** 38:1 42:15 97:7 115:3 141:12,13 146:20

**cleared** 128:17 129:12,15

**clip** 74:1

**close** 29:6,24 125:21,22,23,24 126:3,5 127:17 149:21

**closer** 163:2

**co-workers** 160:15

**code** 142:15,25 143:24 144:4,12 145:2

**cognizant** 161:15

**coin** 159:6

**College** 11:4

**collided** 63:20 64:19

**collision** 5:22 8:10,13 26:21 27:4,21 28:10,17,24 29:16 30:9, 14 31:9,20 32:12 33:21,24 34:5, 10,16,20,25 37:10 47:22 50:4 53:14,15 54:3,8 55:2,5,19,25 56:15,18 57:5,7,18 58:10 59:9, 13 62:3,23 64:8 66:12 69:15 75:20 76:7,9 108:2,22 111:1,6 112:24 114:14 126:12,15 130:14,18 131:25 132:11 134:9 141:5 150:3

**color** 40:10 41:8

**column** 61:19 62:1,7,8,20 63:5, 11,23,24 64:3 65:7,10

**columns** 61:22

**combat** 72:7

**Combermere** 27:5 28:4,10 29:17, 18,23 30:1,9,18 31:9,13,20 32:12 33:8,21,24 34:4,10,16,20, 25 43:19 50:4,10

**combination** 76:11 103:1

**combined** 134:14

**command** 83:22 100:9 102:9 103:1 106:3 108:16 112:14 153:3

**commencing** 2:4

**commentary** 150:22

**commission** 101:6

**common** 69:18

**communicate** 67:21,24 68:4,13 108:9

**communicated** 68:9

**communication** 88:19 103:3

**communications** 81:5 88:18

**Community** 11:4

**competent** 160:17

**compile** 78:14

**complete** 8:21 152:15

**completed** 14:20

**completely** 128:16,19

**completing** 137:14

**complex** 58:19

**compliance** 159:17

**computer** 32:15 34:23 85:3,4 160:11

**concern** 13:19,22 99:4,10 100:20

**concerned** 13:10,13,14 98:23 99:1,3 127:20

**concerns** 13:7 14:2,3,5

**concluded** 164:3

**concludes** 164:1

**conclusion** 100:9

**condition** 87:3 99:5 155:15

**conditions** 145:23 158:6

**conduct** 44:17 68:14 114:17,18 115:17 118:22 119:4 145:6

**conducted** 147:20

**conducting** 82:8

**cones** 15:13,14,18,23

**conflict** 137:7

**confused** 71:16

**conscious** 71:15 116:1,20 117:2

**considered** 101:11 102:19

**conspicuous** 158:21,23 159:2

**consulted** 153:7

**contact** 79:11 86:11 87:10 89:23 93:21 105:12,25 142:20

**contained** 136:14 139:1

**context** 121:15 145:6

**continue** 64:5 69:24 100:22

**continued** 4:1 6:1 58:4

**continues** 35:7

**continuing** 9:20 12:11 13:19 17:16 18:17 19:3,23 20:14 21:9 22:15,22 23:17 26:17 28:7 29:10 31:12 32:3 33:20 35:17 36:13 37:20 38:19 40:7 41:3,14 42:9 44:7,13,25 45:8,21 46:5,12 47:7 49:2 50:8,25 51:15 53:24 55:12 56:1,10 57:16 60:13 61:3,24 62:19 65:21 66:6,15 67:11 69:2, 7,12 70:3 71:9 73:7,19 77:10 78:11 79:25 82:6,18 83:17 84:23 86:25 88:2 89:1,9,20 90:8,16

91:10,23 92:4,12,25 93:18 94:19,25 95:10,23 96:14,23 98:19 99:2 105:1,19,23 109:22 110:1,10,20,25 111:5,9,19 112:7,23 114:10,22 115:16,24 116:9,18 117:11,25 118:4,25 122:12 123:17 124:2,11 126:20 127:5 131:2,22 134:3,11,22 135:6 136:4,13 139:6 140:11,20 141:7,11,22 144:2 145:1 147:8 150:2 151:2,12 152:1,22 154:2, 12,17 155:6 156:7,18 157:2 160:5 162:6 163:4

**contract** 10:14,19 85:24 86:4 153:4

**contributed** 68:15

**control** 114:1 136:10

**conversation** 77:5 78:24 79:16 95:16 99:18 104:10 125:24 126:4,6

**conversations** 12:13,14 84:5 95:7 108:8 112:9,14

**conversing** 107:22

**convey** 110:15

**Cool** 9:7

**cop** 155:11

**copied** 145:9

**correct** 20:13,23 24:22 34:1 36:20 50:25 57:20 62:9 63:23 64:2 68:18 73:7 82:21 92:4 96:7, 12 101:22 113:2 117:8,9 126:16, 20 127:9,11 132:8 147:4 151:12

**correctly** 27:1 49:14 138:5

**correspond** 135:17

**correspondence** 124:13

**counsel** 92:15 93:13 148:13,22

**counseled** 142:18,23 143:21 147:3

**counseling** 130:12 131:24 132:3 143:1

**County** 129:2

**couple** 137:18 142:2

**court** 7:10 8:5,19,24 9:13 16:24 17:12 41:21 42:2 67:1,4,9 149:25

**covered** 18:19 79:19

**covert** 21:17 158:18

**CPR** 72:3

**crash** 8:12 14:15 24:22,25 26:5, 9,16 27:11,17,19 28:3 31:13 38:22,23 43:19 48:25 50:10 57:24 58:24 59:1 67:15 68:15 69:20 72:19 77:24 79:14 80:8, 14,22,24 81:5,9 83:12,19,23 84:1,4 85:8,10 86:12 87:21 89:25 94:18 95:8,14,18 96:9,10 97:2 98:1 103:11 108:7,14 115:18 117:13,14 118:10 120:23 121:14 122:13 123:11 126:9 127:8,10,22 128:9,10 132:8 136:6 138:6 140:15 143:4 145:7 146:23 150:16 152:19 155:8 156:5,6 158:24 161:9,10 162:2, 12,13 163:5

**crashes** 72:18 101:4 132:14,21

**crimes** 101:6

**criminal** 130:8

**crop** 91:4

**cropped** 92:14,20,24 95:11

**cropping** 93:3,6,9,11,17

**crossing** 51:24

**CSR-1297** 2:6

**curb** 58:6 59:21 76:12

**cut** 57:2,3 58:5

## D

**damage** 128:24 131:6 132:19,25 133:2,5,10,19,20

**damaged** 100:13

**damaging** 133:17

**dash** 97:25

**data** 6:4 32:15 60:16 62:25 117:2 160:14,16 163:19

**date** 8:2 10:14,15,16 14:15 24:25 36:25 37:3 78:16 83:12 96:2 99:17 116:5 122:17,20,25 134:23

**dated** 138:22

**dates** 95:24 97:7

**day** 17:20 23:12 24:22 25:19,24 74:14 78:21 80:7 96:3,17,19 98:4 143:19,20 155:9,16

**days** 25:9,11,12,13 78:17 137:12, 14

**Debler** 4:4 7:15 9:8,13 12:8 13:16 16:23 17:4,6,11,15 18:11,13 19:1,17 20:4,7 22:12,19 23:9 26:14 28:5,25 31:10 32:1 33:18 35:18,24 36:4,8 37:18 38:3,11 40:6 41:1,12,23 42:1 44:4,11,18 45:4,16,25 46:7 47:1,4 48:5,17 50:5,22 51:10 53:21 55:10,20 57:14 60:18,20,25 61:22 62:14 65:20,25 66:25 67:6 68:23 69:5 71:5 73:4,14 77:8 78:5 79:22 82:4,15 83:15 84:21 86:19 87:24 88:24 89:6,18 90:12 91:7,20,25 92:11,16,20 93:7,14 94:15,23 95:3,22 96:13,18 98:16,25 104:24 105:17,21 109:17,24 110:6,17,23 111:4,7,14 112:2,17 114:7,20 115:12,20 116:11,15, 19 117:7,23 118:3,24 120:19 122:7 123:6 124:6,10 126:17 127:1 130:20 131:16 134:6,20, 24 135:20,23 136:7 138:11,14, 19,23 140:5,16 141:2,9,18 143:25 144:24 147:5,24 148:4, 12,17,20 149:4,11,24 150:24 151:9,24 152:20,24 153:24 154:6,15 156:2,10,24 159:24 162:3,9 163:16,25

**debris** 60:2,4,5,7,10

**decently** 31:6

**decide** 56:11

**decided** 129:1

**Declining** 64:15

**deduce** 63:11

**Defendant** 3:17 4:10 21:1 47:20 151:5

**Defendants** 7:16,20

**defensive** 142:16

**define** 13:17 44:20 54:16 83:4

**defined** 44:21

**definition** 44:22 83:3

**deft** 5:12,15

**Degree** 11:12

**degrees** 11:6

**delete** 104:18

**deleted** 104:1,7,9,16

**deleting** 104:8

**denied** 113:2

**denies** 21:1

**department** 10:17,21 12:23 14:7, 18,25 16:3,6 20:18 21:4 24:19, 24 42:12,22 72:2 77:11 80:11 83:6,9 85:25 88:14 99:11 102:9 106:1 117:24 120:15 133:4 137:9 144:19 146:21 147:22 152:18 153:23

**dependent** 25:8

**Depending** 157:4 161:18

**depicted** 63:12 95:24 99:18

**deposed** 101:3

**deposition** 2:1 5:11,14,17,19,21, 23 6:3,5,7 7:6 8:2 11:17 13:8,11, 21,24,25 14:1 38:14 145:4 149:8,14 164:2,3

**describe** 15:15 40:5 41:6

**deserving** 102:5,17

**desk** 88:11

**detail** 74:15 111:17

**detailed** 36:16

**details** 61:10 136:20

**determination** 95:11

**determine** 126:19,23

**determined** 114:12

**determining** 160:4

**Detroit** 153:19

**device** 32:18 34:24

**diagram** 129:14

**difference** 118:13,14

**differences** 91:12

**differently** 161:8,14

**difficult** 63:21

**digital** 161:3,5

**direct** 19:23 20:14 30:22 60:13 61:13 90:9 95:19 97:5 116:9 134:3 150:22

**direction** 54:5 56:24,25 58:5 73:11 145:13

**directly** 43:10 45:12,18 46:2,9,11 53:11 56:21 82:12,17 83:7,18 84:1 86:20 106:3 144:16

**disagree** 120:21,23,24 121:3 123:8 125:10

**disagreed** 123:12 125:2,4 132:15 140:18 143:16

**disagreeing** 143:2

**discipline** 100:12 101:11 102:18, 19 103:7 123:14 124:15,18,23 125:3 133:23

**discipline-related** 100:19

**discomfort** 13:22

**disconnect** 111:21,23

**discoverable** 149:15

**discovery** 5:13,16 12:2 13:1,3 20:9 47:9 128:5 149:14 151:6,8 152:14

**discuss** 12:5 25:16 77:6 79:7,15 84:4 85:12 89:16 90:1 130:16 139:2

**discussed** 12:17 19:7 89:5 97:13 99:16 100:3

**discussing** 85:11 96:20 100:22

**dispatch** 5:20 26:11,24 29:1,5,22 59:8 66:20 67:14,21 68:4,9 71:10 72:17,23 74:6

**dispatched** 26:16 27:13 50:7 59:11

**dispatcher** 73:24

**displaying** 145:21

**displays** 157:22

**dispute** 27:6,7 65:2,4 136:13 141:16,17

**disputing** 64:24 65:16 68:20 70:8 74:8 136:18 146:24 147:11 160:18

**disrespectful** 66:5

**distance** 24:4 52:4 125:22,23 126:3 145:24

**distinction** 34:7 124:17

**distracted** 34:23

**distracting** 34:19

**division** 14:10

**document** 36:18,23 37:3,4 61:4, 6,9 63:2 119:15 120:4 133:9 134:17 139:13

**documented** 78:8

**documents** 11:19,25 90:17 91:15

**Dodge** 24:17 40:9

**doubt** 161:23

**draft** 78:12

**drafting** 78:22 79:1

**draw** 35:3,5 124:2 137:20

**drawing** 42:9 124:17

**drawn** 114:4

**drive** 4:6 15:13 23:12 25:6,14 31:19,25 32:8 46:16 64:6 153:16

**driven** 24:18,20 76:16,17

**driver** 22:10 127:10 145:17 146:17 157:21

**drivers** 23:11 50:1

**driveway** 52:23

**driving** 24:22 25:13 31:22 32:4 33:3,17,25 45:6 46:1,2,3,9,10 49:19 52:24 54:11,13,16 121:14 131:10 148:6 157:6,8,9 158:21, 24

**drove** 26:20 45:11 76:20

**drug** 79:18 153:10

**drug-tested** 77:19

**due** 9:23 85:24 86:3 144:20 145:13

**Dufrane** 3:11 7:17 9:16 20:12 21:6 35:13 56:7 61:1 66:22 73:10 153:25 154:7 163:24

**duly** 7:23

**duty** 32:19 33:11,15 87:21 88:7, 11

E

**e-mail** 6:8 124:13

**e-mailed** 81:1

**E-V-O** 15:6,7

**earlier** 137:7

**earliest** 10:16

**early** 84:3 87:25 88:1,5

**easier** 19:20

**eastbound** 54:1

**edit** 103:20

**edited** 103:19

**Eftink** 80:1,13,21 81:8 83:18 85:17 88:18,25

**Eighteen** 61:16

**eighties** 128:19

**EL-2** 46:24

**EL-21** 20:22

**electronic** 60:15

**else's** 105:22

**emergencies** 145:14

**emergency** 15:3,7,9 16:11,14,17, 19 17:18,22 19:9 21:5,10,13,21, 25 30:10 43:14,17 47:11,21 48:2 50:9 68:5 119:6,11 121:22 122:6 123:1,4 139:21,22 140:10,12 141:15 142:14,19,24 143:6,23 146:11,13,18 147:1 158:12

**emits** 19:19

**emotionally** 55:15

**employed** 10:11 14:17 80:10 83:11

**employee** 78:13 79:10 84:7,13, 23 86:7 87:18 134:14,25 136:8

**Employee/volunteer** 119:18

**employees** 102:16 107:15

**EMS** 76:11 113:4

**EMTS** 137:8

**en** 26:22 28:16 30:8 32:11 34:4 38:22 43:23,24 50:10

**encompassed** 72:13

**end** 59:19 88:4 135:2 136:1 155:16

**endanger** 146:19

**ends** 114:12

**enforcement** 10:22 11:14 18:1 23:7 83:10 111:3 126:25 146:1

**engaged** 46:15

**engine** 160:20

**enter** 102:25

**entire** 14:11,12 92:5

**entrance** 70:13

**entranceway** 59:23

**entries** 32:21

**entry** 64:10

**entryway** 59:22

**equipment** 120:11,14 121:21 137:19 142:14,20,24 143:6,23 150:9,10

**equipped** 32:15 46:14 145:21

**essentially** 30:3 139:1

**evade** 138:3 139:24 140:4 141:5

**evaluate** 113:5 128:4

**evaluated** 113:3 137:8

**Evan** 2:1 5:4 7:6 8:3 10:10 151:5

**evasive** 78:7

**event** 111:24 134:12,15 147:16

**events** 55:7 139:14 143:18 147:7

**EVO** 15:5,8,11 16:8 17:17 18:23 19:2,7 21:19

**EVT** 134:9

**EVT-00000117-1** 5:22

**exact** 52:4 53:4 76:19 113:24 125:21 140:22 157:16

**Examination** 5:5 8:6

**examined** 7:25

**exceed** 113:22 146:18

**exceeding** 18:9,19 20:20

**exceptions** 21:14,16

**excerpt** 60:15 61:14 146:15

**exclude** 93:6

**Executive** 4:6

**exemption** 145:17 157:16,19 159:12,14 162:20

**exemptions** 146:8 158:15,16

**exercising** 144:20

**exhaust** 145:19

**exhibit** 5:11,14,17,19,21,23 6:3, 5,7 11:23 19:22,24 20:3,12,15

35:4,7 36:18,19 42:10 46:23 60:12,15 62:16 66:14,19 68:8 90:7,10 103:18 116:8,10,14 117:4,7 119:1 124:1,4,12,21 127:16 128:5 134:2,4,12,13 138:17 139:4 144:6,13 146:21 150:23 151:1,3,19 152:2,7,8,9

**exhibits** 6:1 20:5

**exigent** 33:4,7

**existed** 40:7 41:18,21

**exited** 59:18

**expect** 39:12

**expecting** 67:1

**expeditious** 17:8

**experience** 22:10,16 23:6 126:14,24

**experienced** 110:21 111:1

**explain** 61:25 101:22

**explained** 45:5 61:8,10 141:10

**Explorer** 24:20

**Explorers** 24:16

**express** 99:10

**extent** 70:23 71:1,7,25 85:20 131:15,24 132:3

**external** 23:23 24:2

**extra** 72:6

**eyes** 70:14 127:13

## F

**facie** 146:18 157:6

**fact** 43:23 49:22 87:24 98:12 100:25 156:13,16 160:2 162:7, 23 163:18,19

**factor** 143:12,13

**factors** 141:25

**facts** 28:13,16,18

**failed** 119:5 140:4 141:15 162:18,23

**failing** 140:9

**failure** 119:11 122:5 139:21 140:11

**fair** 65:22 109:14 110:4 111:9,11

**fairness** 42:1

**familiar** 23:19,20 24:11 80:3 83:14 103:15,17 136:16

**Farmington** 4:7

**fashion** 82:5 84:12 154:1,2

**fast** 74:25 114:13 129:17 156:12, 17,23 157:1,13,18 159:21,23 160:1,7,13 161:1

**faster** 22:23,24,25 23:2,5 149:23

**fastest** 62:11,22 63:19

**fault** 85:10,11 106:17 121:8,17 130:9 132:21 162:17

**fears** 13:20

**Federal** 8:5

**feed** 32:21

**feel** 52:9 96:23 102:7 113:15 125:15,16 153:22 154:3

**feeling** 54:23

**feelings** 101:19 102:3

**feels** 54:19

**feet** 145:24

**felt** 113:19 125:17 162:22

**field** 43:1

**Fifty-three** 64:17

**figure** 83:1 114:11

**figured** 81:18

**file** 85:5 124:16,22 125:4 129:7

**fill** 28:15 85:6 90:10 136:10

**filling** 49:3 97:15

**finally** 160:6

**find** 18:18 35:4 44:14 115:2 139:23 144:12,23

**finding** 85:2

**fine** 37:6 137:15

**finish** 9:9 17:1 41:23

**first-aid** 72:5,6 137:2,16

**firsthand** 160:24

**fit** 91:5 93:5

**five-second** 63:19

**flashing** 145:22 157:22

**flawlessly** 163:13

**fled** 117:19

**fleeing** 142:22

**Flint** 73:24

**flow** 54:19

**folks** 73:23

**follow** 130:2

**follow-up** 137:15 154:10

**font** 92:1

**foot** 57:8,9

**footage** 109:2

**Ford** 24:16 77:20

**forget** 111:25 112:5

**forgot** 92:11

**form** 12:8 13:16 18:11 19:1,17 22:12,19 23:9 26:14 31:11 32:1 33:18 37:18 38:3,15 40:6 44:4, 18 45:16 47:19 48:6,12 50:5,22 51:10 53:21 55:10,20 57:15 65:20,25 71:5 73:4 77:8 78:6,8 79:22 82:4,15 83:15 84:7,13,21 85:2 86:19 87:18 88:24 89:7,18 91:15,20 93:15 94:15,23 95:22 98:16,25 109:17,24 110:6,17,23 111:4,7,14 112:2,18 114:7,20 115:13,21 117:23 118:3 119:21 120:19,24 121:4 123:6 126:17 127:1 130:18,20,22 135:20 141:3,9,18 147:5,24 151:9 152:20,24 153:24 154:6,15 156:2,10,24 159:24 162:3,9

**format** 135:2,25 136:11,16

**forms** 80:17 84:18 119:24

**forward** 52:24 163:7

**found** 118:22 119:4 138:6 140:13 141:8 160:7

**foundation** 19:18 21:6 22:13,20 23:10 26:15 28:5,25 31:10 33:19 38:4,16 41:1,12 44:5,19 45:17 47:20 48:6,13 53:22 55:21 56:7 66:1 69:5 71:6 73:5 79:23 82:4, 16 84:22 89:18 91:25 105:17,21 109:18 110:7 111:15 112:3,18 114:8,21 120:20 122:7 123:7 127:2 130:21,23 134:24 136:7 140:5,16 141:2,19 143:25 147:6, 25 156:3,11,25 159:25 162:4,10

**foundational** 62:15

**four-page** 117:7

**four-way** 128:15,17 129:13

**fourth** 132:10,24

**frame** 68:21 75:11 78:1

**framed** 68:18

**framing** 67:22

**freeway** 23:13,15

**frequently** 113:22

**Friday** 2:5 7:2 78:19

**front** 19:24 20:3 37:13 39:13 41:11,15,17 55:9 58:18 67:17 73:9,11 74:22 117:4 128:7 141:6 144:9 145:24

**full** 10:8 29:14 36:23 42:11 78:17 94:16

**full-size** 41:4 44:23 45:6

**fully** 23:25 24:7 40:18 67:12

**function** 93:3,9 108:19

**functions** 94:12 103:15,17

G

**Galich** 122:3

**gaps** 90:10

**gas** 70:13 97:18 98:1

**gauge** 161:5

**gave** 77:14 113:17 118:8 129:5 156:22

**gear** 26:1

**general** 11:8 12:24 14:4 19:3 27:8 59:24 61:11 72:22 79:4,5 82:24 89:1 99:4 107:6,7,11,17, 23 111:19 121:25

**generalized** 150:7,11

**generally** 22:3 29:1 60:8 72:18 121:22 133:20 158:17

**gentleman** 53:10 128:18

**George** 128:14

**Gio** 97:15 101:9 106:1 107:13

**Giordano** 13:5 79:1,11 89:3,19, 22,23 90:19,21,25 96:8 97:11, 12,15 100:18 101:15 104:11,19 105:14 106:9 107:1,13,21,24 108:9,14 152:23 153:7

**Giordano's** 85:20 152:25

**give** 8:18,21 9:5 12:6 52:4 60:25 74:10 75:4 78:3 113:24 116:6 118:7 125:21 144:6 146:14

**giving** 56:6 110:2 117:5 146:2

**glassy** 127:13

**Gobler** 87:9,11 89:24 105:12,14, 25 108:14

**good** 8:8 9:2,7,19 10:7 11:13 17:11 34:7 63:3 67:4 124:10 154:20,21 155:9

**gotcha** 8:11 97:8 144:25

**government** 146:12

**governs** 21:10

**gray** 106:9

**great** 17:4

**ground** 70:12

**group** 29:2

**GT** 118:11,18,23 119:4,8 120:25 121:12 125:9 132:1,2 133:22 140:14 141:14,23,24,25 147:18, 19,23 150:3

**GTS** 123:14

**Guardian** 102:18,22,24 118:19 123:18,21,23,25 124:18,24

**guess** 54:18 55:7 70:5 75:15 82:17 116:18 125:14 132:15 157:14

**guest** 80:16

**guy** 74:19 155:10

**guys** 102:4 155:18

H

**half** 27:2 29:14

**halfway** 26:21

**hand** 116:13 152:5,9

**handed** 61:12

**handling** 162:22

**hang** 49:18

**HAP** 58:18

**happen** 69:20 155:24

**happened** 37:16 55:19 58:2,8,9, 20 75:20 76:7,9 77:11 78:18 95:2 104:14 111:6 112:1,4 115:19 118:2 120:7 123:11 128:23 129:4 134:1

**happening** 97:16

**hard** 28:11 56:16,17 114:3

**head** 9:4,17 30:3 42:20 43:15 71:17 76:15 81:14 85:15 105:22 109:7 112:25 113:9,14 153:8

**heading** 30:1,2

**headlight** 53:13,16

**headlights** 44:24 45:6,8,19 46:2, 4,13,14,15,21,22

**health** 95:9,17 155:13

**hear** 19:20 42:2 66:23 67:12 68:1,6,8,11,16 69:1,4,6,8,13 125:25

**heard** 16:24 23:17 68:1,3,19 69:14 74:3 80:4 93:3,8,10,17 98:9 110:2 149:4

**hearing** 58:14

**heart** 111:22 112:8,15

**Heights** 77:20

**held** 14:8

**helpful** 116:15 118:25

**Henry** 77:20

**hierarchy** 127:22

**higher** 23:1

**highways** 146:14

**Hills** 4:7 81:11,24 83:5,8,12 86:18,20 104:20 105:5,8 106:1

**Hills'** 81:15 105:15

**hindsight** 161:11 163:11

**hit** 76:14 113:14 128:20 129:11

**hold** 10:3

**home** 84:3 87:25 88:1,5

**honest** 118:15

**honestly** 101:8

**hood** 41:17 42:7

**hospital** 77:23 78:9 112:13 113:11,13,15,20 153:17

**hostage** 10:3

**hour** 30:15 63:8,9,13,14 64:7,11, 21 114:13 156:8,20

**hours** 88:4 149:20

**housekeeping** 67:1

**Huck** 97:25

**hypothetical** 127:2

**hypothetically** 157:11

**I**

**idea** 47:10 61:11 70:20,23 82:1 104:6

**ideas** 98:18

**identical** 38:15

**identification** 66:19 124:4

**identified** 51:2 52:1 122:5

**identify** 7:9 50:23 55:24 59:1 73:23,25 99:17

**images** 92:14

**immediately** 37:10,12 56:12 142:19

**impact** 52:7 53:1 58:2

**impacted** 62:12

**important** 9:8 27:24 86:3 154:13, 14,16

**impression** 160:6,8

**improper** 142:15 144:4

**improve** 150:7

**in-car** 85:12

**inaccurate** 75:4 101:1

**incident** 8:12 12:18 13:12 25:16 27:25 29:3 30:6 48:20,23 78:12, 13 79:12,20 81:25 82:22 84:7, 13,24 87:18 88:6,23 89:5,16 90:1 95:4 96:2 98:22 100:10 108:20 111:10 112:16 114:4,11 116:3,6 117:21 118:1,17,21 119:3,16,18,23 120:16 123:3 124:21 125:18 129:5,8,21 131:1, 7,18 132:10 134:14 135:1,14,22 136:8,14,20 142:23 144:3 147:17 148:3,5 150:15 153:23 154:5,8 158:19,22

**incidents** 130:16 131:6,9,13 132:7 133:14,24 147:10,11

**included** 18:23 91:24 101:20

**including** 95:8

**incorrect** 59:3 69:19

**independent** 82:2,5,8,9,24 83:9

**indication** 90:23 126:10 127:19 156:22

**indicator** 39:14

**individual** 7:16,20 12:7,14

**infer** 109:15

**information** 17:7 18:3 21:20 29:20 36:14 43:21 59:7,15 60:9 72:20 85:16 86:25 87:9,11,17 89:21 93:20 95:1 98:22 99:7 116:6 133:16 135:7,17,24 136:3, 5,12,14 138:25 145:5 151:19,21 152:13 163:18

**informed** 42:25

**initial** 74:6 97:23 98:18 133:14

**initially** 49:12,18,19 69:2

**initiated** 65:11

**injured** 120:7 136:23

**injuries** 59:14 70:6,16,17,19,23 71:2,8 96:22 113:7 127:21,24 128:1,2 155:11,12

**injury** 26:12,16 27:11 28:20 42:14 43:5 70:6,10,22,25 71:11, 17 72:17 113:16 114:15 137:13 155:20 158:24

**innocuous** 133:11

**inspected** 133:4,8

**inspection** 103:4

**instance** 23:12

**instruct** 30:9,12,14 141:14

**instructed** 120:10,13,17 121:20 137:22 140:24 141:21

**instructor** 15:14 80:16

**instructors** 15:18

**instructs** 9:23

**intending** 67:21 101:24 110:15

**intention** 39:15

**intentional** 116:23

**interacted** 39:4 80:6

**interaction** 80:10,12

**interactions** 127:15

**interesting** 66:7

**interests** 152:25

**intermediary** 106:6

**internal** 70:15 160:11

**internalized** 40:20

**internally** 85:23 86:18

**interpret** 63:1 105:24

**interpretation** 140:8 143:8,10,18 157:24

**interpreted** 39:1 62:24

**Interrogatories** 45:2

**Interrogatory** 35:14,25 36:9 37:7 38:7,10,11

**intersection** 48:10 50:19 51:24 128:22 129:13,14 156:19

**interviewed** 84:9

**intoxicants** 127:13,19

**intoxicated** 126:8,13,19,23

**intoxication** 127:12

**introduced** 80:15,18

**intuitive** 114:2

**investigate** 156:5 162:12

**investigated** 82:13,14

**investigating** 81:9 127:4,24

**investigation** 49:9,23 81:12,16 82:3,9,10,11 83:3 86:1,17 87:12 89:17 105:16 108:7 119:16 156:6 160:3 162:15

**investigations** 82:25

**involved** 8:9 27:21 28:20 59:9 79:10 81:9 82:14 86:6 98:21 101:15,16 107:13 108:6 112:24 116:3 117:13 118:1 126:12 127:3 128:10 130:13 131:5 132:14,18,24 133:10,12

**involvement** 85:21 162:14

**involves** 86:6

**involving** 131:8,9

**iphone** 93:1,9 94:7 103:8,13

**iphones** 94:8

**issue** 69:9 122:3 140:7 146:21,25 147:2 148:23

**issued** 89:11 118:10,11 119:8 139:11,19 140:3,6 144:15 147:14,16

**issuing** 140:8

**J**

**j.dufrane@troymi.gov** 3:16

**James** 27:16

**January** 99:22 138:22

**Jason** 3:3,4 7:13

**job** 10:18 99:5,10,13 114:2 154:12,21 160:17

**join** 153:25 154:7

**joining** 10:21 11:13

**Joppich** 4:5

**judge** 22:11 23:11,14

**Julie** 3:11 7:17

**July** 10:18

**jump** 66:17

**jumping** 95:20

**June** 128:8 129:11 131:3,11,21

**junior** 27:12 28:21

**K**

**kicking** 133:6

**kilometers** 63:9,13

**kind** 21:17 24:21 28:14 32:2 72:5 77:14 94:6 112:19 120:6 122:21,23,24 127:18 130:12 133:10,23 135:24 136:2,17 155:14,15 158:22

**kinds** 12:25 40:17 72:12 126:22

**knew** 81:17 113:18 129:18 160:25

**knowing** 159:22

**knowledge** 15:10 126:10 127:6 129:25 151:20,25 152:15,16 160:24 162:13

**L**

**L-I-P-I-A-N** 149:6

**labeled** 109:3

**lacerations** 72:9

**lack** 146:22

**Lake** 128:14

**lamp** 145:21

**landed** 60:2

**lane** 31:17,18,25 32:2,4 39:12 51:4,20,21 52:2 53:11,20 55:22,25 56:1,5,12,21 57:21 65:19 66:11 117:16 119:7 138:3 142:18

**lanes** 32:8,10,11 56:3,8,9 117:18

**larger** 92:1

**law** 3:4 10:22 11:14 18:1 23:6 83:10 111:2 126:24 145:11 146:1,2,5 158:11 159:12,17

**lawyers** 11:18

**laying** 70:11,12

**leaking** 71:4

**learn** 81:8 150:12

**learned** 145:3

**learning** 150:4,13

**leave** 30:3 88:9 101:14,17

**led** 69:15

**left** 30:4,7 39:15 51:4 52:8,12,20 57:2,4 58:5,7 73:8 76:8 98:14 117:15 119:7 128:18 142:18

**left-turn** 51:3

**leg** 70:6,10 71:11,20 72:17

**legal** 11:25

**LEIN** 32:20

**Leithauser** 2:1 5:4 7:7 8:3 10:10 17:1 21:1 47:20 142:13

**Leithauser's** 5:12,15 151:5

**letter** 125:7

**letters** 103:5

**letting** 46:20

**level** 59:7 71:22 128:4

**lie** 109:22 110:8,11,12

**Lietzow** 27:16

**lieutenant** 75:7 77:17,18 84:1,2 107:19 119:9 122:4 139:9 142:12 143:22 145:4,5 146:25 147:3 157:19 158:1 159:18

**lieutenants** 122:8

**life** 146:20 161:9

**life-saving** 72:11,14

**light** 23:23 24:3,7 40:14,15,20 115:23 145:23

**lighted** 145:21

**lighting** 31:2

**lights** 16:12,14,17,19 19:10,14, 21 20:20 21:5,10,21 22:1 30:10 40:21 43:14,17 45:15 46:18 47:11,21 48:2 49:1,4,13,21 50:9 68:5 113:23 119:6,11 121:22 122:6 123:1,4,12 139:21 140:9, 12 141:15 142:3 146:22 147:1, 10,12 156:9 157:3,23 158:13 159:3,7,16,19 163:1

**likelihood** 142:21

**likes** 106:5

**Likewise** 8:12

**limit** 20:21 113:22 145:11 157:7, 8,10 158:8,14 159:9 161:22,24 163:3

**limitation** 145:10

**Limitations** 145:3

**limited** 89:21

**limiting** 55:8,14

**limits** 18:10,19 146:19

**lines** 128:1

**Lipian** 149:2

**listed** 42:11 134:15 136:25

**listen** 52:13 73:14 93:7

**listening** 73:1,21

**livelihood** 154:20

**Livernois** 26:25

**location** 57:14 59:13 60:10 69:19,22

**Logo** 41:16

**logos** 40:18,19 41:7

**long** 10:13 54:18 77:24 85:7 87:16 103:8,13 146:19

**looked** 107:7

**loop** 79:9

**loose** 76:14

**lose** 99:12

**lost** 17:5

**lot** 12:22 15:22 19:4 25:9 36:13 59:5 71:16 79:8 85:3 87:4,13,14 99:1 149:23 154:21 155:11

**loud** 36:3

**low** 40:24

**lower** 29:14

**lowest** 64:16

**LTR** 142:17

**M**

**Madam** 67:8 149:24

**made** 12:22 14:1 43:16,20 48:24 53:2 58:2 60:1 67:15 74:14 86:9 109:15 110:15 112:11 132:20 133:19

**main** 28:19 31:7

**make** 9:21 10:4 17:8 27:20 38:1 48:12 49:4 79:11 85:23 86:5 94:11 95:10 101:2 106:25 108:15 112:12 153:3

**makes** 19:19 22:24 23:3 24:15 29:9 86:10 101:1 104:17

**making** 8:25 43:10 52:20 109:21

**manner** 43:7,13,25 44:16 45:9 55:1,4 116:23,24

**Maple** 26:25 27:5 28:3,10 29:16, 18,23 30:8,18,19,23,25 31:2,9, 13,20 32:7,11 33:8,21,24 34:4,9, 15,20,24 39:3,6,8 43:19 44:8 48:10 50:3,6,10,16,18 51:5,6,17, 19,25 52:21,25 54:1,10,12 56:3, 9 57:21 69:4,16,21 73:2,13 108:22 156:8,19

**Margaret** 4:4 7:15

**mark** 90:12 116:12

**marked** 19:22 24:1,7 40:18 60:12 66:14,18 90:7,9 116:8,10,11,14 124:1,3 134:2,4 138:20 139:4 151:1

**marking** 90:11

**markings** 31:25 32:2 40:17 41:6, 10,15,16,17 42:8

**Martinez** 3:2 5:5 7:11 8:1,7 9:9, 19,20 12:11 13:19 17:1,16 18:17 19:3,23 20:11,13,14 21:9 22:15, 22 23:17 26:17 28:7 29:10 31:12 32:3 33:20 35:14,17,21 36:11,13 37:20 38:10,19 40:7 41:3,14,22 42:9 44:7,13,25 45:8,21 46:5,12 47:2,5,7 48:15 49:2 50:8,25 51:15 53:24 55:12 56:1,10 57:16

60:13,21 61:2,3,24 62:19 65:21 66:6,15,23 67:3,8,11 69:2,7,12 70:3 71:9 73:7,12,16,19 77:10 78:11 79:25 82:6,18 83:17 84:23 86:25 88:2 89:1,9,20 90:8,13,16 91:10,23 92:4,12,25 93:13,18 94:19,25 95:10,23 96:14,23 98:19 99:2 105:1,19,23 109:22 110:1,10,20,25 111:5,9,19 112:7,23 114:10,22 115:16,24 116:9,13,18 117:9,11,25 118:4, 25 122:12 123:17 124:2,11 126:20 127:5 131:2,19,22 134:3, 8,11,22 135:6,22 136:4,13 138:16,21,25 139:6 140:11,20 141:7,11,22 144:2 145:1 147:8 148:2,8,25 149:6,21 150:2 151:2,12 152:1,22 154:2,12,17 155:6 156:7,18 157:2 160:5 162:6 163:4,22

**matter** 12:6 22:9,14 27:3 66:25 75:14

**MCOLES** 14:23

**MDC** 32:16,25 33:2 34:23

**mdebler@rsjalaw.com** 4:9

**meaning** 45:1 145:11

**means** 18:12 23:22 24:2 82:7 92:21 102:9

**meant** 18:15 30:5 105:20

**medic** 72:15

**medical** 71:23,25 72:16 113:2,4

**meet** 8:11 155:18

**meeting** 83:22

**meetings** 11:18

**member** 81:20 153:19

**memo** 6:6 144:13

**memorandum** 5:24 138:22 157:20

**memorialized** 120:5

**memory** 19:11 38:17,20

**mental** 155:13

**mentally** 55:15

**mention** 104:19

**mentioned** 81:11 98:13

**mentions** 100:12

**merge** 23:14

**merging** 23:13

**message** 94:20 97:25 101:25 104:1,7,8 105:2,5,24 106:9,21

**messaged** 79:17

**messages** 5:18 13:2,4 88:22 89:2,4,15,21 91:2,19 92:9,18,19 94:17 95:1 96:24 97:10 99:25 103:19 104:3,10,16 132:16

**messaging** 103:18

**met** 80:13 81:3

**Michael** 13:5 89:3

**Michigan** 2:3 3:6,14 4:7 7:1,7 145:2 149:3,7

**microphone** 17:5

**middle** 33:6 53:20

**midnights** 77:18 84:2

**Mike** 79:1,11 85:20 104:10 105:14 106:19 107:21 153:7

**mile** 3:5 27:2 29:24

**miles** 30:15 63:8,12 64:7,11,20 114:13 156:8,20

**million** 161:11

**mind** 109:20

**mindset** 69:17 158:1

**minimize** 142:21

**minor** 26:12 128:24

**Minus** 65:13

**minute** 70:4 73:17

**minutes** 75:14,15,16,19 154:25

**mirrors** 40:21

**mischaracterization** 38:9

**mischaracterizes** 38:4 111:15 114:8 141:19

**missing** 93:21

**mission** 145:25

**misspell** 103:21

**misunderstanding** 49:6,16

**misunderstood** 48:18 131:20

**mixed** 95:16

**mm-hmm** 12:4 20:16 22:17 29:12 36:24 37:24 67:13 151:22

**mobile** 32:15

**mom's** 95:9,17

**moment** 49:20 50:13 52:19 57:5 58:10 59:3 69:17 144:7 154:24

**moments** 54:7 55:18

**months** 103:11 128:9

**motion** 145:18

**motor** 42:14 43:5 128:10 130:8 131:9 142:15,25 143:23 144:3, 11,20

**motorcycle** 39:22 50:14 51:23 52:2,20 53:6,7,9,10,13,16,19,23, 25 54:2,4,8 55:3,17,24 56:19,25 57:13,15,22 58:1,3,8 59:19 65:18 66:9 67:16 72:24 139:24 140:4

**motorcycle's** 74:7

**motorcycles** 18:4,7 138:2

**motorcyclist** 8:9 38:23 50:21,24 51:3,9,14,18 52:8 53:3 58:23 65:23

**motorist** 142:20,22

**motorists** 44:8

**mount** 76:14

**mountain** 128:13

**mountain-biking** 95:16 96:21,25 129:6

**mouth** 83:1

**move** 22:25 60:6 148:11,12 149:19,23 150:24 154:4

**moved** 148:8

**movement** 68:18 74:7

**moves** 22:23 23:1,2,5

**moving** 156:22

**MSP** 98:2

**mud** 141:12

**multitude** 154:18

**myriad** 110:8

**N**

**names** 83:16

**Nate** 105:8,11

**nature** 68:6 126:11 130:8 145:25 157:5,17,25 158:3,5,25 159:5 162:25

**NEAL** 2:8

**neatly** 9:5

**necessarily** 102:4,17 158:6

**needed** 19:15,16 113:15,20

**negative** 102:12 103:6 118:11, 18,23 119:4,8 120:25 123:14 125:9 130:7 132:1,2 133:22 140:14 141:14,23,24,25 147:18, 19,23 150:2

**neighborhood** 117:16

**nice** 8:11 9:11

**night** 17:19,22,24 19:9,12 26:16, 18 29:13 31:3 32:14 41:11 46:21 75:8 79:18 87:25 96:9 109:20 153:18 155:19 156:9 163:13

**nobody's** 25:13

**nods** 9:3

**noise** 19:20

**normal** 31:6 54:10,19 98:21 145:23

**north** 59:21

**notary's** 151:16 152:11

**note** 54:22

**noted** 148:11

**notice** 8:3 22:6 156:21

**noticed** 65:23 100:12

**notify** 107:15

**November** 10:20

**number** 5:10 6:2 35:13 63:12 64:16 75:4 88:20 96:18 113:24 114:3 121:24 129:5 134:17,19 137:19 138:14 144:18 156:13,14

**numbers** 64:13 87:19 117:2 160:17 163:20

**numerous** 15:1 142:17

**O**

**Oakland** 11:1,2,3,4,12 129:2

**oath** 8:16 37:25 38:1 45:2 47:9 48:3 49:4 151:18 152:13

**object** 17:13 48:5 78:5 89:6 112:17 115:12 148:19

**objected** 93:15

**objection** 12:8 13:16 18:11 19:1, 17 21:6 22:12,19 23:9 26:14 28:5,25 31:10 32:1 33:18 37:18 38:3,16 40:6 41:1,12 44:4,11,18 45:4,16,25 47:19 48:12 50:5,22 51:10 53:21 55:10,20 56:7 62:15 65:20,25 68:23 69:5 71:5 73:4 77:8 79:22 82:4,15 83:15 84:21 86:19 88:24 91:20,25 92:16 94:15,23 95:3,22 98:16,25 105:17,21 109:17,24 110:6,17, 23 111:4,14 112:2 114:7,20 115:20 117:23 118:3 120:19 122:7 123:6 126:17 127:1 130:20 134:24 135:20 136:7 140:5,16 141:2,9,18 143:25 147:5,24 148:10,15 149:1,8,18 151:9 152:20,24 153:24 154:6, 15 156:2,10,24 159:24 162:3,9 163:16

**objections** 9:21 35:9,12 148:14, 18,21,23 149:2

**observe** 60:2 91:13

**observed** 66:4,8 70:9 95:20

**obstacle** 15:23 16:16

**obstacles** 15:19

**obtained** 63:18

**occur** 25:21

**occurred** 26:5,21 29:16 30:6 59:13 78:19 79:14,20 111:24 120:16 122:13 128:9 141:17 162:2,8

**occurring** 69:16 163:6

**occurs** 29:4

**October** 10:19 116:2 118:1 120:17 122:13 123:3 140:14 147:17

**odor** 127:13

**offered** 10:18

**office** 3:12 86:23

**officer** 8:8 10:12 13:7 14:10,16 15:11 16:25 18:1 23:7 25:11 27:12,15 28:3,21,23 32:24 43:4 76:21 90:2 109:2 112:15 113:21 115:2 117:25 126:25 141:12 144:19 146:1 153:21 155:6

**officers** 4:10 42:13,24 67:22 76:11 81:23,24 83:11 86:8 153:19 158:7

**Offices** 3:4

**official** 86:22 124:23

**officially** 26:2

**Oftentimes** 71:17

**old-ish** 113:18

**oncoming** 22:2,7

**open** 70:14

**operate** 17:21 19:9 114:6 116:22 122:14,17,22 144:19

**operated** 145:12

**operating** 17:18 24:25 55:1,4 115:17 120:8 146:6

**operation** 15:3,4 17:24 121:25 146:11

**operations** 14:9 15:7,9,12

**opinion** 98:3

**opportunity** 36:22 117:5 129:19 151:7

**opposite** 58:17

**option** 88:1,3

**order** 42:15 60:14,22 77:19,21,22 96:16 97:6 107:6,8,11,18,23 142:21

**ordered** 107:19

**ordinary** 54:15

**original** 38:21 48:21

**originally** 107:7 132:15

**originates** 103:18

**oscillating** 145:22 157:22

**overheard** 109:4

**overnight** 98:9

**overview** 135:15,22 136:15

**OWI** 127:25

**owned** 103:8 115:18

**P**

**P.C.** 4:5

**p.m.** 2:4 7:3,8 25:23 106:24 155:2,3,5 164:2,3

**P43905** 4:4

**P47651** 3:3

**P59000** 3:11

**P81128** 4:3

**P86228** 3:2

**packet** 36:19 60:23

**pages** 134:12,13

**pain** 71:20 74:21 87:10

**paperwork** 102:12

**paragraph** 37:8 39:11 42:11 43:3 142:11

**parentheses** 63:6,8

**parking** 15:22

**Parra** 76:1,21,22 77:1 153:9

**part** 17:17 21:8,9 35:23 37:21 38:21 46:19 49:24 53:6,7 57:14 81:17 98:14 142:5 144:8,16 162:5

**parts** 93:6

**pass** 31:23

**passed** 50:19 119:6

**passenger** 117:18 128:20

**passing** 142:16,17 144:4

**past** 102:4,15 154:4

**pasted** 145:9

**patrol** 14:10,15 15:3,12 19:14 23:18 24:1,6,10 25:1 40:5 41:18 55:1,4 58:13 59:18 60:16 62:22 76:12 100:13 114:6 115:17 116:4 121:22 122:14,18,22 130:17,25 131:6 133:19 146:6 158:8 161:2

**pattern** 54:19 59:6 102:14

**pause** 17:2 69:12 70:3

**pay** 115:22 116:21

**PBT** 77:15 86:14 107:10

**pedal** 61:20

**pelvic** 70:18

**pending** 10:5

**people** 12:22,24,25 22:6 23:8 44:15,22 45:13,22 46:10,22 63:3 69:19 71:17 76:24 82:1,11,14 101:5 107:22 112:12 155:12 160:3

**perceived** 52:17

**perceiving** 112:10

**percentage** 61:20,21

**perception** 22:18,21 55:8,11,13

**perfectly** 149:18

**performance** 100:8 139:19 144:15

**period** 25:21 63:20 112:5

**peripheral** 37:14

**permissible** 149:18

**person** 43:21 79:19,24 81:3 148:13

**personal** 26:12 33:13,14 80:10 89:8,12,15 95:7,15 128:16 130:14,17,25 131:8 158:24

**personally** 80:2,15 83:13 153:5

**perspective** 118:16 119:9 142:6 143:19,20 162:11

**pertaining** 13:11 21:4 79:12 88:22 122:18 133:16

**pertains** 16:19 20:18 22:16 47:15 117:21 118:17,21 125:9 134:13 152:2 161:10

**pertinent** 94:17 95:4,14

**PG** 91:8

**philosophy** 125:14

**phone** 26:11 33:10,12,13,14,16, 23 34:23 88:17,20 89:7,8,10,12, 13,15 94:6 104:3 108:8,12

**photo** 93:12

**photographs** 93:4

**photos** 95:12

**phrase** 67:17 82:20

**phrased** 67:19 115:4 123:8

**phrasing** 140:1 157:14

**physically** 55:14,15 57:17 107:21

**physicist** 23:3

**pick** 73:16

**pickup** 24:14 128:18,20

**pieces** 60:6

**place** 148:14,15,25 149:8

**Plaintiff** 3:9 7:12,14 39:12 148:13,22

**Plaintiff's** 151:6

**plate** 33:5

**play** 66:18,22 69:9,24

**played** 74:1,8

**playing** 67:10 68:25 69:11 70:2 73:18

**Plf's** 5:13,16

**point** 10:2 13:10 21:19 26:8,11 30:8 31:13,16 32:8 33:16,23 34:9,15 36:7 39:21 43:12,16,22 44:15 47:7 49:2,10,12,17 50:9 53:14,19 57:3,6,19 59:8 60:6,9 64:5 66:8 70:16,19,22,25 71:3 75:9 76:15 77:6,23 78:11 83:17, 21 85:8 87:10 88:17 89:14 98:23 104:9,20 105:12,25 108:1,4 111:2 123:22 131:10 137:13

**pointing** 11:23

**points** 16:13

**police** 10:12,17,21,23 11:3,7,11 14:7,18 20:18 21:4 22:2,7 23:1 24:19 32:20 34:6 40:18,19 41:7 42:12,22 76:16,17,20 80:5,11 83:6,9 88:14 90:2 99:11 113:4, 21 117:22 120:14,15 122:1 129:1,3,22 131:12 132:19 133:14,21 137:8 145:14 147:21 152:17 153:19,23

**policies** 130:1

**policy** 20:19 21:4,8,10 42:13,18, 19,21,23,25 133:9 139:19,20 144:15,18

**polite** 148:22

**posed** 48:7

**posing** 38:6

**posited** 38:7

**position** 31:17

**positioned** 52:19,24

**possibilities** 110:8

**possibility** 104:13

**possibly** 77:17 153:14

**post-crash** 85:21

**pothole** 133:1

**power** 94:4

**Pre-crash** 6:4

**pre-marked** 66:16

**precise** 31:15

**preliminary** 77:15

**prepare** 11:16 19:8

**prepared** 47:8 79:21 139:8

**preparing** 84:20

**presence** 106:4

**present** 8:24 107:21 108:15

**presented** 91:19 117:1

**president** 79:8 85:22 100:20 106:5 107:14

**press** 56:16 94:2,3

**pretty** 36:16 55:6 75:12 87:6 98:21 111:10 141:13

**prevent** 120:18 121:6 137:22 140:24

**prevented** 120:22 150:15

**previous** 99:23 100:13

**previously** 56:4 116:24 120:10, 13 121:20 137:21 140:24 147:2

**Primarily** 9:13

**primary** 24:23 29:5 37:22

**prime** 146:18 157:6

**print** 92:2

**printout** 135:4

**prior** 10:21 11:13 12:17 14:3 26:9 28:16 30:20 37:10 38:4 47:22 49:3 53:14,15 54:3,6,23 55:5 57:5 62:3,23 64:1,19 70:9 78:22 80:8 99:21 108:22 114:8 119:24 120:16 130:18 131:5

**prioritize** 127:23

**privilege** 9:23 149:10,12

**problem** 106:19 139:3

**problems** 17:10 155:13

**Procedure** 8:5

**procedures** 130:1

**proceeding** 43:6 45:18

**process** 42:15 85:24 86:3 87:16 96:9 112:25 124:15 125:5

**produced** 13:2

**profile** 40:24 53:9,10

**program** 43:2

**promise** 90:10

**properly** 149:10

**property** 146:20

**protocols** 72:11

**provide** 12:15 22:1,4,6 59:7,15 60:9 87:11 96:24 97:3

**provided** 21:20 71:22 86:16 87:1 97:1 104:11 135:7,18 136:5,15 140:21,23 145:5 149:9 151:19 152:13 154:3

**providing** 92:15

**public** 21:22 22:1 133:4 144:21

**pull** 20:4 107:11 116:16

**pulling** 85:2,4

**purpose** 149:7

**purposes** 8:4

**pursuant** 8:3 42:12 149:2

**pursuit** 27:18

**put** 25:25 37:1 49:25 58:23,25 62:14 70:10 71:14,21 72:6,19 78:1,23,25 82:25 88:11 103:2,3,4,5,6 114:3 124:6 136:3,12,18 137:1,25 150:9 157:19

**putting** 113:23

**Q**

**quadrant** 29:8,11,13,17

**quadrants** 29:15

**question** 9:9,24 10:5 17:2 18:13 24:5 25:3 35:19,23 36:2 39:2 41:24 42:4,6 44:12 48:13,19,22 51:11,12 52:10,13,18 53:8 78:6 92:8,22 93:16 98:20 112:6,20 114:25 115:13 119:2 121:19 137:2,17,20 138:4 141:4 147:8,25 148:7,24 149:23,25 150:1,8 152:1

**questioned** 118:4,5

**questioning** 37:21 38:21 62:16 66:10

**questions** 8:18 9:6 11:24 20:17 38:5,6,13,14,25 48:4,7,11,24 49:3 70:1 73:15 87:7 108:16 120:9 121:1 135:8 136:21 151:11 163:24,25

**quickly** 75:12 79:14 152:2

**quiet** 62:17

**QUINLAN** 3:11

**quote** 71:9 73:12

**R**

**radio** 34:3,6,7,11,23 58:23,25 59:5 66:19

**ran** 58:11,22

**random** 103:4

**randomly** 113:25

**range** 78:3

**rate** 23:1

**rating** 100:8

**react** 129:19

**reacted** 52:17

**reaction** 23:7 56:14 160:21

**read** 35:11,16,18,19,20,22,23,24 36:3,6,7,8 97:13 98:12,15 107:17 118:24 142:1,11 144:7 149:25

**readily** 138:18

**reading** 66:2 102:1 119:5 146:21

**reads** 42:6 119:13 121:23 122:1,10,11 143:3 144:1,5 146:24 150:1

**ready** 116:19

**reality** 93:14

**realization** 53:2

**realize** 52:7

**rear** 117:18

**reason** 8:21 21:2 27:6,7 30:21 65:2,4 104:18 143:9 149:12,14

**reasons** 143:7,14 154:18

**recall** 16:15,16,18 18:25 19:13 26:8,13 31:15 36:17 37:2,4,17,23 39:9,19,20,24 40:4 43:15 44:1 49:14 53:4,18,23 54:7 55:16 56:6 58:14,15 67:19,23 69:17 70:5 71:18 72:25 74:12,13 77:4,9 78:24 80:9 81:13 90:3,6 104:21 108:11,23 109:5,7,9,12 132:6

**receive** 18:3 133:22 140:14 147:19

**received** 15:2 26:24 72:1 131:25 143:5 147:18,22

**recent** 94:8

**recess** 155:3

**recognize** 73:20 97:6

**recollection** 17:23 18:5 31:5 51:8 54:9 105:2,4

**record** 7:5 8:1,25 9:5,11 10:9 37:1 62:15 90:13 91:7 92:1 98:12 125:13 148:16 149:1,8 154:24 155:2,5 164:2

**recorded** 156:14

**recorder** 60:16

**recording** 5:20 66:20 67:2,10 68:4,7,11,13,16,19,25 69:3,11,24 70:2,5 73:1,18

**red** 145:22 157:23

**refer** 8:12 46:23 76:24 102:21 119:1

**reference** 67:7 89:16 132:9 138:9

**referenced** 74:6 77:21 132:7 135:18

**referencing** 38:23 75:19 97:11 124:21 132:9 144:16 147:12 150:3

**referring** 8:14 35:25 42:18 84:11 91:14 121:12,21 135:21 138:24 144:14 151:2 157:24 158:3

**reflect** 8:1

**reflected** 37:1

**refresher** 15:12

**refuse** 113:13

**refusing** 113:10

**regard** 21:19 33:1 126:5 145:13

**regulations** 146:12

**relate** 150:21

**related** 28:19 29:6 33:15 82:12,22 89:24 108:13 127:7 140:18 161:9

**relation** 52:22

**relative** 67:15 96:2

**relay** 85:16

**released** 57:11

**relevant** 135:10

**reliable** 160:20

**remains** 64:7

**remarkable** 54:14 55:6

**remarks** 103:6

**remember** 16:1,9 17:23 18:8,22 19:4 21:23 26:7,20 27:1,19,23, 24 28:1,19 30:4,6,11,13,16,19, 20,24 31:1,2,3,17,18,21,24 32:13 33:9,22 34:2,8,12,14,18, 21 35:1 40:22 41:9,20 42:7 44:20 48:17 51:21 54:23 55:23 56:17 57:12 58:21 59:2,4,16,20, 23 60:3,4,5 69:23 70:4,7,11 71:13,14 73:8 74:15,19,23 75:3, 5,10,24 76:2,4,19 77:3 78:16,21 79:13,16,17,24 80:20 81:10 83:16 84:25 85:11,14 86:13 94:10 102:1 103:9,12,14 104:2, 8,12,14 108:6,23 109:11,13,19 110:19 111:13,17 112:9,10,11, 16,19,22,24 113:6 116:5 117:15 118:5,8 119:22 129:9,23 130:11, 21 131:14 132:2,5,13 133:25 143:1 153:8

**remove** 123:21,23 124:14 125:16

**removed** 123:18,24 124:20,22 125:1,12

**removing** 124:15

**rep** 106:2

**rephrase** 22:14 47:12 114:9

**report** 43:21 62:13 63:17 64:6, 18,22 65:3,16,22 66:2 68:18 69:15 72:16,23 74:6 78:12,13, 14,22,23 79:2,3,21 84:20,24 119:17,19 129:2,3,21 130:3,5 133:2,3,5,13,18 134:14 135:1 136:5,8 139:19 144:15 157:20 162:13

**reported** 71:10 73:2 133:7,12

**reporter** 7:10 8:24 9:14 16:25 17:12 41:21 42:2,6 67:2,4,9 149:25 150:1

**reporting** 70:10

**reports** 27:3 32:20 133:20

**represent** 8:9 109:1

**representative** 153:12,13

**reprimand** 43:22

**request** 21:2 47:20 99:7 123:20

**requested** 123:22,24 125:5

**requesting** 124:14

**requests** 5:13,16 12:2 20:10 47:9 48:8 151:6,8

**require** 154:10

**required** 14:24 20:19 42:13,24 123:11 125:8 130:2,3,4 133:2 153:15 158:22

**requires** 21:13 146:1,6 158:11

**resecured** 76:13

**respect** 141:11

**respond** 27:25 42:14 72:18 106:18 120:12 127:8

**responded** 54:17,20 117:22,24 137:23

**responding** 26:23 27:4,10 28:3, 8,22 43:12,18,25 44:3,10,16 45:10,24 139:22 140:10 158:12 161:19

**response** 20:25 21:1 47:18 48:3 74:23 98:6 106:15 136:25 151:5

**responses** 5:12,15 12:3 13:1 20:9 128:5 151:8 152:14

**responsibility** 156:1,4 162:1,7 163:5,7

**responsible** 138:7 139:23 140:13 141:8 144:12 162:5

**rest** 58:16 59:19

**restate** 29:25

**result** 88:14 118:10 136:1

**resulted** 27:18 117:21 130:13 132:18

**return** 154:9,24

**review** 11:16,19 13:2,6 36:22 100:8 144:6 151:7

**reviewed** 11:21,22 12:3 36:21 122:9 151:13

**reviewing** 36:17

**RFA** 20:22 46:24

**rift** 153:2

**ring** 73:3

**road** 2:2 3:5,13 10:20 16:20 23:11 28:19 31:7 44:8 45:22 46:3 48:10 58:22 101:3 128:3,15 156:8

**roadway** 34:17 37:11 38:2 40:1 45:13 58:17 60:7

**Rochester** 54:5 69:4,16

**rock** 133:6

**ROGERS** 2:8

**role** 28:2,9,15 81:15 88:13

**roles** 10:22 11:14

**roll** 26:3

**rolled** 128:19

**roof** 40:14,15

**Rosati** 4:5

**rotating** 145:22 157:23

**Rough** 75:11

**Roughly** 15:24

**round** 151:11

**route** 26:22 28:16 30:8,17,21,22 31:14 32:11 34:4 38:22 43:23,24 50:10

**rude** 150:25

**rudimentary** 120:6

**Rule** 149:7

**Rules** 8:5

**run** 15:19 33:5 59:10 133:1

**S**

**safe** 22:11

**safely** 122:15,18,21

**safety** 144:21 145:13

**sake** 106:7

**sample** 107:18

**Samsung** 103:10

**Satterfield** 122:4

**Saturday** 96:17,20

**scenario** 157:16 161:18 162:19

**scene** 27:13,15,20 28:9,13 42:15 43:4 45:14 74:14,17 75:9,21,25 76:1,3,8 77:7,9 109:12 112:12 113:16 117:19 125:18 127:21 129:3 142:22

**Schultz** 4:5

**screeching** 58:14

**screen** 90:18,22 92:3,5 93:22,24,25 94:1,2,11,12,21 95:5,6 105:7

**search** 88:17,22 89:14,20

**searched** 89:2

**seat** 50:1

**sec** 47:3

**secondary** 128:1

**seconds** 52:6 53:1 62:3,12 63:22,24,25 64:8,19 65:14,23 69:13,25 70:4 73:17 114:14

**Secretary** 32:21

**section** 145:9 146:11,15

**secure** 42:15

**sedan** 41:4,5

**send** 14:21 15:5 100:1 106:25 125:7

**sense** 22:24 23:4 29:9 86:10 92:13 106:16

**sentence** 39:11 98:14

**September** 8:10 14:13 25:17 32:14 40:8 41:19,22 44:9 92:6 95:25 96:10 97:24 106:23,24 131:11,21 136:6 138:6 145:7 146:23 147:14 155:8 163:9

**sergeant** 40:23 63:18 75:6,7,8 80:1 81:8 83:18 85:17 86:11 88:18,25 109:4,23 110:11,12 122:3 124:14

**sergeants** 122:8

**series** 136:21

**service** 65:8,11

**set** 8:2 14:24 15:13,18,22 25:10 36:12 145:10

**setting** 46:16

**settings** 34:11

**severe** 72:9

**severity** 70:17

**shakes** 9:4

**shape** 130:18

**Shawn** 73:24

**she'll** 9:16 67:6

**Shell** 52:23 59:22 97:20

**Sheriff** 129:2

**shift** 14:16 25:8,19,20,21,24 26:2,4,5 88:4 153:18

**shocking** 111:10,12,24

**short** 77:24

**shot** 92:5 93:22

**shotgun** 76:13

**shots** 90:18 92:3 93:24 94:1,2,11,12,21

**shotted** 90:22 93:25 95:5,6 105:7

**show** 129:14

**showing** 91:16

**shows** 61:9 63:23,24

**shuffled** 134:5

**Shuler** 145:4

**sic** 8:18 96:11

**side** 58:17 117:18 128:20 159:6

**side-swiped** 117:20

**sides** 40:19 41:13

**sigh** 16:24

**sign** 16:6 125:17 128:19,22 129:16,18

**signal** 39:14,22,24 53:17,18 93:20 145:19 157:22

**signature** 36:25 119:25 120:2 151:14,16,17 152:3,10,11

**signed** 10:19 36:23 122:9

**significance** 96:1

**signing** 37:2,4

**signs** 127:12,16

**silence** 27:25

**similar** 61:6

**Similarly** 152:12

**simple** 133:1,6

**sir** 8:17,23 10:1,11,24 11:15 12:16 13:6,9 14:2 25:18 34:18 35:16 36:12,15,24 39:16 40:2,16 42:17,20 43:8,20 44:1,6 47:3,6,14,24 50:11 51:12,19 52:14 53:5 55:11,23 61:18,21,23 62:5,10,18 63:10,15 64:9 65:9 67:20 68:2,17 69:6,14,23 70:20,23 71:1,8,24 72:25 74:9,16 75:22 76:19,25 77:3 78:10,13,25 79:24 80:2,23,25 81:2,4,22 83:13,20 85:15,19 87:22 88:8,10,12,16,19,21,25 89:13 91:1,3,5,14,17 92:9 97:12 98:5 99:15 100:2,15 101:23 104:25 105:10 106:11,22 107:3 108:3,25 109:8,11,13 110:19 111:8,23 112:6,22 113:24 114:3,9,24 118:6,14,20 119:2,20 120:1 124:19 125:11 126:7 128:11 130:11,15 131:14 133:25 135:13,16 136:19,22,24 137:1 139:17 144:10,23,25 145:16 146:4,9,16 151:4,13 152:3 153:5 154:16 159:15 161:10 162:5

**siren** 19:19 68:10 145:19 161:21

**sirens** 16:12,14,17,19 19:10,14 20:20 21:5,11 22:6 30:12 43:17 45:15 46:19 47:11 48:2 49:5,13, 21 50:9 113:23 122:6 123:1,4,12 139:22 140:9,12 141:16 142:4 146:22 147:1,10,13 156:9 157:3 158:13 159:3,7,17,19 163:2

**sit** 109:14 110:13 111:12 131:12 155:6

**sitting** 13:7,11,21 21:25 22:5

**situation** 14:5 123:10 157:17

**sixth** 65:7

**slick** 23:18,22,24 24:2 40:12,13

**slow** 117:17

**slurred** 127:14

**smack** 9:17

**small** 134:20

**smell** 127:17

**SOCCIT** 81:18,19,20

**sort** 11:20 18:21 102:14 127:22 153:2

**sorts** 23:15

**sound** 101:1,2 132:20 161:20

**sounds** 55:18 102:1 119:5 145:18 157:21

**source** 160:9,10,23

**southern** 29:15

**Southfield** 3:6

**span** 51:6

**speak** 54:6 57:9 74:17 75:6,23 76:1 77:1 78:22 79:1 83:18 122:10 148:14 156:4,6 158:1 163:10

**speaking** 71:18,19 77:4 90:24 127:10 148:18,21 149:1

**specialized** 63:16

**specific** 15:1 28:6 29:4 35:5 38:5,13,14 53:7 55:11 77:5,22 78:2,16,24 79:16 108:23 111:17, 20 115:15

**specifically** 9:22 10:15 13:25 16:9,21,22 18:4,22,25 20:17 21:7,23 31:1,3,18 33:9 34:14 35:1 37:5 38:22 40:22 41:9,20 42:7,19 44:21 45:23 48:9 51:7, 21 53:23 56:17 57:12 58:1,25 59:10,12,16,24 60:3,5 61:5,10 74:12,15 75:3,5,10,24 76:2 78:4 79:13,18 81:10,14 84:25 85:11, 14 90:3 102:8 103:13 109:11,13 116:5 118:8 119:23 122:16 123:25 132:13 138:2 142:3,4 143:1,21 152:21 159:15

**specifics** 31:21

**speech** 127:14

**speed** 16:7,10 18:10,19 20:21 22:9,14,15 23:2,7,12,14 24:4 31:8,15,19,21 39:7,9 62:6,8,11, 22 63:5,19,24 64:6 67:25 68:2, 21 69:1 74:11 108:21,23 113:22 114:5 117:17 143:11,12 145:2, 10,11 146:19 157:6,8,10 158:4, 8,14 159:8 160:9 161:18,21,23 162:21,24 163:3

**speeding** 160:25

**speedometer** 161:3,4,15

**speeds** 23:16 114:2 115:23 157:14,18 159:11 162:25

**spelling** 103:22

**spend** 15:24

**spinal** 70:24

**spoke** 74:18 75:24 76:2,3 79:19 86:20

**spoken** 125:19 142:13

**stable** 113:12

**staff** 83:23

**stamp** 99:20,24 102:11

**stamped** 61:15

**standard** 23:25 130:8 139:14 161:2

**standards** 136:9

**stands** 118:18

**stapled** 96:15

**start** 10:14 14:6 26:4 49:25

**started** 10:20 30:1,2

**starting** 35:16 69:25 92:6

**starts** 26:2

**state** 10:8 20:2 32:21 39:10 52:24 54:11 109:20 128:25

**stated** 21:23 46:12 49:14 140:20 158:17 163:21

**statement** 67:24 102:10 106:25 110:1,3 118:7,9 132:23 137:7 150:11

**statements** 74:13 109:15,20 110:16 112:11

**stating** 107:1 110:14

**station** 70:13 75:13,17 76:16,18, 20 77:2 86:13 97:18,20 98:1 107:5 113:3,4

**status** 68:5,10 86:17 87:4,12 96:21

**statute** 146:15 157:12

**stayed** 77:14

**stemming** 133:23

**Stephenson** 48:10 50:18 51:25 54:5 69:21 73:3,13 156:19

**Sterling** 77:20

**steward** 153:6,9

**stood** 108:24

**stop** 73:19 128:15,17,19,22 129:16,17 142:19 148:10

**stopped** 119:7 128:22

**stops** 43:11

**straight** 37:11 38:2,18,20 52:21

**strike** 57:13,23 114:15 150:24

**striking** 112:25

**string** 92:19

**struck** 57:25 113:9

**structure** 85:6 121:3

**structured** 121:16

**stuck** 155:7

**stuff** 85:25 102:16 103:3,4 113:1 135:5 136:18 137:20 150:4,12, 13 155:14,17

**stump** 44:14

**subjected** 108:1,3,5

**submit** 84:15 87:23

**submitted** 84:6,7,13

**subsections** 38:7,12

**subsequently** 113:1

**substance** 85:1

**Suburbans** 24:15

**sucks** 155:19

**suggesting** 110:7

**suggests** 78:7

**Suite** 4:6

**super** 75:13

**supervisor** 83:22 84:16 130:10 134:14 136:2

**Supervisor's** 119:16

**supervisors** 12:23 84:15

**support** 154:1,4

**supported** 153:22

**supposed** 32:25 107:6,9,15

**surface** 31:7 146:14

**surpassing** 161:20,21,23

**surroundings** 52:23

**suspect** 27:22

**suspected** 146:2

**sustained** 70:18,21,24 113:7

**swear** 7:10

**swerve** 39:12 56:22,23 57:6

**swerves** 141:6

**switch** 157:11

**switched** 103:9

**swore** 48:3

**sworn** 7:23

**symptoms** 127:16

**system** 29:11 32:22 124:18

**Szczesny** 8:9 39:4,23 45:23 50:13 60:1 62:4,23 63:20 67:16 70:9 74:18 76:10 77:7 85:9 89:16 99:8 108:5 111:2 112:25 114:12 125:19 126:8 127:15 130:19 132:8,10 162:2

**Szczesny's** 55:3 62:13 64:20 70:6 87:3 99:4

**T**

**tag** 91:21

**Tahoes** 24:15

**take-away** 100:16

**taking** 37:12

**talk** 17:9 85:9 89:7 101:13 131:13

**talked** 12:21 77:3,9 85:14 87:19 130:24

**talking** 71:15 74:19 82:22,24 103:11 106:2,4 117:10,12 130:22,25 131:1 163:9

**talks** 137:18

**taught** 16:22 17:21 19:13

**teach** 15:11 16:7,11 17:17 18:9

**teaching** 16:18

**technically** 14:9 102:19

**techniques** 120:18,22 121:6 137:22 140:24

**telling** 54:25 97:16,17 98:11,13 109:4 114:25 115:4,5,7 160:22

**tells** 82:7 90:24

**Ten** 3:5

**term** 13:15 23:18,19,21 82:2,7,9 115:14

**terms** 11:25 46:18 78:6 159:1

**test** 16:20 77:15,16 79:18 107:9 108:2,3,5 153:10

**testified** 7:25 56:5 112:18 116:19 127:3 130:21 131:17,18

**testify** 105:22 112:4

**testimony** 8:22 12:6,15,16 38:4 39:21,25 97:9 111:15 114:8 133:13 141:20

**text** 5:18 13:2,4 88:22 89:2,4,15, 21 90:18 91:2 94:17,20 95:1 96:24 97:10,22,23 100:15 101:18 103:19 104:1,3,8,19 106:25 132:16 144:17

**texted** 80:21

**texts** 89:1 99:12 105:7 108:10,11

**thing** 11:22 36:7,9 79:17 91:21 93:5 100:11,17 101:5 102:13 108:12 115:22 120:6 127:23 136:2 139:16 147:4 153:4

**things** 12:1 18:21 21:18 32:22 54:20 59:5 72:4,8,9 84:15 95:17 99:1,6 100:6,20 101:6 102:3 104:18 106:6 112:5 116:23 117:3 126:22 127:14,23 128:3 142:3 150:5,8,12,13 155:12 158:18 161:11 163:21

**Thomas** 39:23

**thought** 30:5 48:19 100:24,25 102:5 141:13 162:17,18

**thousands** 54:17,21

**Three-thirty** 26:3

**three-year** 112:5

**time** 7:8 8:2 9:20 10:2,5 12:10 13:10 14:11,12 15:24 18:16 21:19 23:8 24:19 25:21,22,24 26:9,11,18 29:22 30:1,8 31:13, 16 32:9,24 33:16,23 34:9,15

39:3,4,21 43:12,16,22 44:15 47:8 48:20,23 49:3,10,12,17,25 50:10,15,20,23 51:18,22 52:11 53:4,14,19 54:23 55:2,18 57:3 58:12 59:8 60:6,9 62:1,18 64:18 65:10,11,14,15 66:3,4,8 69:13 71:3,8,13 72:20 74:24 75:8,9,11, 20 76:7,9,17,19 77:6,23,25 78:1, 12 79:9,20 80:4,9 81:17 83:18, 21 85:7,8 87:19 88:7,9,11,17 89:10,13,14 90:4 93:20 98:24 99:17,18,20,24 102:2 103:24 104:9 106:23 107:24 108:1,4 109:15 111:2 113:18,21 116:4 118:24 122:12 123:22 125:2,5, 18 126:9 127:19 129:10,12,23 131:2,11 143:5 148:9 153:9 156:17 157:1 160:1,9 161:6,7 163:23

**time/distance** 98:2

**times** 25:9 80:6,13 100:13

**tire** 117:19

**tires** 58:14

**today** 7:7 8:16,18,22 9:1,22 11:17 12:7,15,17 13:8 14:2 16:15 18:25 21:25 22:5 31:5 34:22 37:16,21 39:19,25 47:25 48:1,7 76:5 83:3 98:3 105:3 109:14 110:13 111:12 155:7

**today's** 13:25 164:1

**told** 20:1 48:25 49:1 81:13 97:19 100:24 101:7 104:20 113:9 141:20 143:5,21 156:13,14,16 159:11 160:2,10,16 162:24 163:17,19

**tole** 97:21

**Tom** 8:9

**Tom's** 68:18

**top** 20:8 23:18,22,24 24:2,3,8 40:12,13 42:19 43:15 81:14 85:15 91:8,21 99:21 109:7 135:11 153:8

**torso** 71:4

**Total** 104:4

**totality** 142:2

**touched** 65:15

**tourniquet** 72:7

**tourniquets** 72:4

**Tracking** 102:24 118:19 123:18, 21,23,25 124:18,24

**Trackings** 102:18,22

**traditional** 40:14,16

**traffic** 27:11 30:24 31:1 66:20 146:12

**trails** 128:13

**train** 19:8 82:1

**trained** 43:1 65:5 72:10,15 81:24 120:9 121:5,12,14 141:5

**training** 14:19,25 15:2,5,8,11,15 16:3,5,8,12 17:17,24,25 18:6,9, 18,23,24 19:2,7,12,13 21:20 22:9,16 23:6 43:1 62:25 63:16 64:25 65:17 71:23,25 72:2,3,7,8, 14,16 121:18 122:21,23,24 123:5,9 126:13,24 127:6 130:12 138:1 140:22 150:4 160:12,15

**trainings** 14:21,22,24 19:4,6

**transpired** 77:13

**traumatic** 155:12

**travel** 49:7 56:3,8,9 65:19 146:1

**traveled** 50:6

**traveling** 31:8,16 39:6,7,9 50:16 51:5,19 52:21 53:25 54:9 108:21 117:17 142:17 145:14 159:10 163:2

**treated** 85:24 113:16

**treating** 102:7

**trip** 52:15

**Troy** 2:3 3:12,14,17 7:1,7,18 10:12,13,17,21 11:13 14:6,17 18:2 20:18 21:3 24:19 40:18 41:7 42:12,22 81:20,23 88:13 99:11 113:21 115:18 116:3 117:22 120:15 129:22 130:1 131:12 133:14 147:21 152:17 153:22

**Troy's** 24:6

**truck** 24:14 128:18,21

**true** 22:18 46:5 110:7 114:19,23 141:1 151:20 152:14 155:25 163:20

**trust** 160:15,22

**truth** 7:23,24 86:9

**truthful** 8:22 110:4

**turn** 22:11 30:20 39:13,14,15,22, 24 50:8 52:20 53:17,18,20 65:12 67:17 117:16 119:14

**turned** 57:1 73:2,6,12 74:22 81:18 87:17

**turning** 52:8,12 65:19 73:8 117:15

**two-day** 16:2

**type** 67:2 121:6 136:11 137:23 140:25

**typical** 55:3 56:14

**typically** 32:18 67:6

**typing** 135:3

U

**UD-10** 80:17 156:5

**UD-10S** 162:16

**ultimately** 64:21 122:3,5

**unable** 139:24

**unavoidable** 141:5

**unaware** 159:13,15

**uncertain** 48:1

**undergone** 14:18 18:1

**underlined** 144:17

**understand** 8:16 22:5 27:9,17 28:2 44:12 49:11,24 64:10 81:15,23 92:21,23 93:23 102:20 112:6 114:25 140:1 141:4 146:8

149:5 157:13

**understanding** 21:3,15 23:21,23 24:5 32:5 48:18 52:16 83:2 107:8,17 129:25 141:24 146:5

**understood** 8:15 22:3 25:15 131:22 137:17

**unfair** 112:20

**unfairly** 102:7,8

**union** 12:24 79:8 85:22 86:3,4,5 100:19 101:11,15 103:6 106:2,5, 8 107:14 108:18 153:1,2,6,9,12, 13,14

**units** 76:10

**University** 11:12 149:2,7

**unknown** 106:23

**unreasonable** 156:7

**unremarkable** 54:21 55:6

**unsafe** 158:6 162:21

**unsafely** 162:22

**unsatisfactory** 100:6,7 139:18 144:14

**untrue** 21:2 163:14

**update** 87:5 98:8

**updates** 86:16,21 87:3,8,14 105:15

**UPR** 100:4,5,16 101:1,10 118:10, 12 132:8,9 133:22 138:6,8 139:5,7,11,19 140:3,9 143:5 144:13 147:15,16 157:20

**urgency** 27:9

**urgent** 43:6,9,13,25 44:16,20,21, 23 45:1,3,9,11 46:8

**urgently** 44:3,10 45:14,24

**urine** 71:4 107:18 153:10

**usage** 115:23

V

**vague** 115:14

**variations** 24:10

**vary** 114:2

**varying** 23:16

**VC** 5:22 134:8

**veering** 58:4

**vehicle** 5:22 15:3,7,9,12 17:18, 22,24 19:9,12,14,20 23:1,18,24 24:1,3,21,24 25:1,2,4,10 32:15 34:3,11 39:13 40:5,17,23 41:5,6, 18 42:14 43:5,14 45:6,19 46:1,3, 13,14,17,19 47:21 51:2,13,16 52:19,22 55:2,4 57:13,23 58:4,5, 13,16,21 59:18 60:16 62:7,8,13, 22 63:5 64:20 76:12 100:14 114:6 115:17 116:4,22 117:17 119:6 120:8 121:22,24 122:1,15, 18,22 128:10,16 129:11 130:9, 14,17,25 131:1,7,8 132:19,25 133:2,8,17 134:9 137:19 142:15, 25 143:24 144:3,12,20 145:2,18, 20 146:7,11,18 147:22 153:16 157:21 161:2,6 162:22

**vehicles** 15:3,13,23 16:17 24:6,7, 10,18 31:23 41:13 44:2 57:18 128:24 131:9 133:19,21 142:17 145:12,25 146:13 158:8

**verbal** 9:6

**Verbatim** 59:4

**verify** 16:5 107:12

**versus** 32:25 149:2,6

**vicinity** 59:25

**video** 85:12 97:19 98:1 109:3

**video-recorded** 7:6

**view** 114:17

**Villerot** 84:1 107:20

**violating** 142:15,24 143:23

**violation** 138:7 139:20,25 140:2, 13 144:3,11,15

**violators** 146:3

**violent** 27:22

**visibility** 18:6

**visible** 19:21 41:10 145:23

**vision** 37:14

**vitals** 113:6,11

**voice** 74:2

**voices** 73:20

**volume** 94:5

**volunteer** 17:7

W

**Waechter** 3:3,4 7:13 148:10,15, 18 154:23

**waiving** 35:12 47:19

**walk** 50:12

**wanted** 79:9 97:3 125:13 154:8 160:8

**warned** 46:10

**warning** 21:21 22:1,4 44:2,6 45:13,22 146:2

**warranted** 118:22 119:4

**Warzecha** 40:23 63:18 85:17 86:12

**Waske** 4:3 7:19

**watched** 97:18

**ways** 83:4

**week** 78:15,20 84:8

**well-lit** 31:6

**west** 2:2 3:5,13 39:6

**westbound** 30:19 32:7 39:7 50:6, 16 51:5,6,17,19 52:21,25 54:10 56:3,8,9 57:21

**whatsoever** 41:17 162:7

**wheel** 57:2,3 114:18 147:21

**whistle** 145:19

**windshield** 40:20 133:7

**withdraw** 24:4

**woken** 98:8

**Wolfe** 122:4 143:22 147:3

**word** 37:6 103:21 132:17 160:23

**worded** 120:23 132:20 140:17

**wording** 132:16 140:23

**words** 82:25

**work** 31:4 33:12,15 78:20 83:6 89:8,10 119:10 154:9,10

**worked** 81:24 83:7

**workers** 146:13

**working** 14:16 25:19

**works** 35:21 106:5 133:4 140:7 161:13

**worries** 9:15,18

**worry** 106:13,16

**worse** 101:2

**wound** 72:8

**write** 102:16 133:20

**written** 124:15 133:18,20 142:12 162:15

**wrong** 100:7 125:15

**wrote** 100:10 101:8 102:3 119:10

**Y**

**yearly** 14:23

**years** 16:4 94:9 103:11 111:16, 18 113:18

**yield** 162:18,23