UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

THOMAS SZCZESNY,

Plaintiff,

-vs- Case No. 2:25-cv-12836-GAD-EAS
Hon. Gershwin A. Drain

CITY OF TROY, a municipal corporation, EVAN LEITHAUSER, in his personal and professional capacities, SCOTT ALLAN, in his personal and professional capacities, ALEJANDRO PARRA, in his personal and professional capacities, GAIL PARRA, in her personal and professional capacities, and BRIAN WARZECHA, in his personal and professional capacities,

Defendants.
_____________________________________/

The Videotape Deposition of BRIAN WARZECHA, taken before me, Theresa L. Roberts, Certified Shorthand Reporter (CSR-4870) and Notary Public in and for the County of Oakland, at 27555 Executive Drive, Suite 250, Farmington Hills, Michigan, noticed for 9 o'clock a.m.

APPEARANCES:

For the Plaintiff: LAW OFFICES OF JASON A. WAECHTER
By: Aaron R. Martinez, Esq. (P86228)
19080 W. Ten Mile Road, 2nd Floor
Southfield, Michigan 48075
(248) 355-4701
aaron@877powerlaw.com

APPEARANCES CONTINUING:

For the Defendant City of Troy: TROY CITY ATTORNEY'S OFFICE
By: Julie Q. Dufrane, Esq. (P59000)
500 W. Big Beaver Road
Troy, Michigan 48084
(248) 524-3320
jdufrane@troymi.gov

For Defendant Officers: ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, P.C.
By: Margaret T. Debler, Esq. (P43905)
27555 Executive Drive, Suite 250
Farmington Hills, Michigan 48331
(248) 489-4100
mdebler@rsjalaw.com



I N D E X


| | PAGE |
|---|---|
| Direct Examination by Mr. Martinez | 4 |
| Cross-Examination by Ms. Debler | 195 |
| Cross-Examination by Ms. Dufrane | 198 |
| Redirect Examination by Mr. Martinez | 210 |
| Recross Examination by Ms. Debler | 214 |


E X H I B I T S


| | DESCRIPTION | PAGE |
|---|---|---|
| Deposition Exhibit No. 1 | Bosch CDR Report | 124 |
| Deposition Exhibit No. 2 | Jan 9, 2024 Written Report | 171 |
| Deposition Exhibit No. 3 | Text Messages | 195 |
| Deposition Exhibit No. 5 | January 3, 2024 Email Chain | 202 |
| Deposition Exhibit No. 6 | January 9, 2024 Email | 204 |


(Exhibits attached)



Farmington Hills, Michigan
Friday, July 31, 2026
(At about 9:10 a.m.)

__ __ __

THE VIDEOGRAPHER: Good morning. We are now on the record. The time is 9:10 a.m. on July 31, 2026. This begins the videotaped deposition of Sergeant Brian Warzecha taken in the matter of Thomas Szczesny versus the City of Troy, et al, Case Number 225 CV-12836-GAD-EAS. We are taking this deposition at the offices of Rosati Schultz Joppich and Amtsbuechler, P.C. in Franklin -- in Farmington Hills, Michigan. My name is Chris Regner, I'm your videographer for today representing Hanson Renaissance Reporting and Video.

Counsel, will you please state your name and whom you represent, after which the court reporter will swear in the witness.

MR. MARTINEZ: Aaron Martinez on behalf of the plaintiff, Tom Szczesny.

MS. DEBLER: Margaret Debler on behalf of Troy police officers Brian Warzecha, Gail Parra, Alex Parra, Scott Allan, and Evan Leithauser.

MS. DUFRANE: And I'm Julie Dufrane representing the City of Troy.



B R I A N W A R Z E C H A

having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified upon his oath as follows:

MR. MARTINEZ: Let the record reflect this is the date and time set for the deposition of Sergeant Brian Warzecha taken pursuant to notice to be used for all purposes allowable under the Federal Rules of Civil Procedure.

DIRECT EXAMINATION

BY MR. MARTINEZ:

Q. Good morning, Sergeant. We had an opportunity to briefly meet.
**A. Yep.**
Q. I'm Aaron. I represent Mr. Szczesny, the motorcyclist that was involved in the collision with Officer Leithauser back on September 22, 2023.
**A. Okay.**
Q. We're here to do a deposition today. Have you ever given a deposition before?
**A. Yes.**
Q. Okay, about how many times have you done that?
**A. Mostly civil crash -- crashes, probably 25 times.**
Q. So you understand a little bit of the lay of the land here. We're obviously, we're taking a record

with our court reporter present here today. So even though you and I can see each other, nods of the head, shakes of the head don't always come out well on the record. So I'm going to ask you to give verbal answers today when you respond and allow me to finish my question before you give those answers; is that fair?

**A. Yeah.**

Q. All right. Additionally, if you don't understand any of my questions, it wouldn't be the first time that's happened to me. Feel free, ask me to rephrase, I will do my best to do that for you, all right?

**A. Sounds good.**

Q. And if you need a break at any point today, please feel free to say so, we can take a break at any point in time. I just want to make sure that you answer any question that's pending at that time, all right?

**A. Okay. Yep.**

Q. Okay. From time to time the attorneys may make objections on the record today. Unless your attorney specifically instructs you on the basis of a -- or specifically instructs you not to answer on the basis of a privilege, I will ask that you still



provide an answer for us, today, okay?

**A. Okay.**

Q. All right. Is there any reason why you would be unable to give truthful testimony in this matter today?

**A. No.**

Q. All right. So as far as the depositions that you've done previously, is it fair to assume that you've done those in your capacity as a law enforcement officer?

**A. Yes.**

Q. Have you ever testified in criminal cases?

**A. Yes.**

Q. Roughly about how many?

**A. We do -- I mean, I would think -- I'm trying to -- because I do traffic so then informal I would say is not. But a formal I'd say would be a criminal matter possibly. And then fifty, a hundred. I don't -- I don't -- I really don't know.**

Q. Total?

**A. Yeah, I guess. I mean I've been in traffic for a long time, so I do a lot of informals. But, you know, I do get involved in domestics and A and B stuff like that too. And I've testified in those cases, so it's going to be a wild guess on my end.**



Q. Have you ever testified in an OWI case?

**A. Yes.**

Q. A drunk driving case or a drug driving cases, right?

**A. Yes.**

Q. Have you ever testified about the standardized field sobriety tests?

**A. Yes.**

Q. I'm assuming since you're in the traffic division, you've testified as to traffic crashes before?

**A. Yes.**

Q. Have you ever testified about emergency vehicle operations?

**A. Not that I can recall.**

Q. Have you ever testified about Troy Police policies or procedures before?

**A. No.**

Q. Have you ever been treated as an accident reconstruction witness in any court or deposition?

**A. Treated as an accident reconstruction witness? Not that I can recall. I don't think so.**

Q. What is it that you did to prepare for our deposition today?

**A. Just reviewed my reports, my paperwork and things that I needed to be prepared -- I thought I needed to be prepared.**



Q. And how long before today did you start preparing?

**A. When I first -- when I was first notified probably about this lawsuit. So eight months ago, a year. I don't remember how long ago I was notified.**

Q. All right, so aside from your report that you indicated that you reviewed, is there anything else document-wise, videos, photos that you reviewed?

**A. Yes.**

Q. Okay. And what did you review?

**A. I would have reviewed photos from the scene. I probably watched some body -- or some -- yeah, either bodycam or in-car camera footage probably. And that would have been the day of most likely.**

Q. Okay. So just so I'm clear, you reviewed the body camera footage of yourself or of other officers?

**A. It would have been other officers. I don't recall exactly if I did or I didn't, but a lot of times that's one of the things we use that's at our disposal and we use that, so...**

Q. Do you know roughly how many videos you ended up reviewing?

**A. I do not.**

Q. Is it fair to say under ten?

**A. Oh, yeah.**

Q. All right. Aside from your able counsel sitting

next to you, did you speak with anybody about the testimony you would give today?

**A. Can you be more specific?**

Q. Just as -- as part of your preparation, did you speak with anybody to help prepare you for today?

**A. Yes.**

Q. Who did you speak with?

**A. I spoke with other officers involved in this and then also Sergeant Eftink from Auburn Hills.**

Q. When did those conversations take place?

**A. Over the years. I mean since this happened, there have been several conversations between me and Sergeant Eftink and the officers, they're in my unit, we're all -- we work together, so there have been conversations over the years.**

Q. In terms of preparing for today, those conversations where you indicated that you've spoken to the other officers named in the complaint and Sergeant Eftink, those conversations, when did those occur?

**A. Those were around when our initial first deposition, the written deposition. What is it, a couple months ago.**

MS. DEBLER: Do you mean the discovery requests?

**THE WITNESS: Yes. Sorry.**



BY MR. MARTINEZ:

Q. All right. So when did each of those conversations like roughly happen? So was it -- it was around the time that you were completing the discovery responses or --

**A. No.**

Q. -- when you became aware of them?

**A. When we found out we were being -- going to have to answer these questions.**

Q. What did you discuss with each of the folks that you've named?

**A. Just trying to remember what we did. It's been a long time, so...**

Q. So it was something you would reach out to Officer Leithauser and you would discuss the incident to prepare for today?

**A. He's the one guy I didn't talk to --**

Q. All right.

**A. -- about when -- when we found out about the deposition.**

Q. So then that means you probably spoke to Officer Allan, Scott Allan?

**A. Yeah, yeah.**

Q. You would have spoken with Officers Gail Parra and Alejandro Parra?



**A. Yes.**

Q. Did you speak with them together or separately?

**A. Separately.**

Q. Do you recall what you spoke to those officers about?

**A. Not specifically.**

Q. Did you speak with Sergeant Bowers about this incident to prepare for today?

**A. About this incident?**

Q. Correct.

**A. No.**

Q. Did you speak with anyone from Troy Command, anybody higher up in the police department, to prepare for today?

**A. No.**

Q. Aside from Sergeant Eftink, did you speak with anyone else from Auburn Hills Police Department?

**A. No.**

Q. Did you speak with anyone affiliated with SOCCIT? And for the benefit of the court reporter, that's S-O-C-C-I-T, the Southeast Oakland County Crash Investigation Team; is that right?

**A. Yes.**

Q. Okay, did you speak with anybody from SOCCIT?

MS. DEBLER: Just for the record it's



SOCCIT.

MR. MARTINEZ: SOCCIT, good to know.

**THE WITNESS: Are you referring to at the scene or after?**

BY MR. MARTINEZ:

Q. To prepare for today.

**A. Oh, no.**

Q. Did you speak with anyone from the Troy IT or tech departments?

**A. No.**

Q. Did you speak with anyone from the Troy city attorney's office to prepare for today?

**A. No.**

Q. Anybody from the prosecutor's office that you spoke with to prepare for today?

**A. No.**

Q. Did anyone in any of the conversations that you've listed tell you what testimony that they expected from you?

**A. No.**

Q. Did you tell them what testimony you would provide?

**A. No.**

Q. Did anybody tell you what topics to avoid talking about?

**A. No.**

Page 14

Q. All right. So have we identified every person that you've spoken with to prepare for today?
**A. I believe so, yes.**
Q. We've covered every document you've reviewed?
**A. Yeah, just my report, yeah.**
Q. Okay, all right. Walk me through your law enforcement career from the beginning. What was the first agency you worked for?
**A. So when I graduated from the academy, I was hired by the Wolverine Lake Police Department. That was on a part-time basis, and at the same time I was also hired by the City of Northville Police Department; that was also on a part-time basis. So I worked both of those jobs from Sep -- May of '96 when I graduated until September of 1996.**
Q. Where did you graduate from?
**A. The Wayne County Regional Police Training Academy.**
Q. Prior to joining the police academy, did you have any sort of post high school education?
**A. Yes.**
Q. Where did you attend?
**A. Wayne State University.**
Q. Did you receive a degree there?
**A. Yes.**
Q. And what was that degree in?

Page 15

**A. Bachelor of Science in criminal justice.**
Q. All right, so you started, you graduated in 1996?
**A. From the academy, yes.**
Q. From the academy, began working at the police agencies --
**A. Yeah.**
Q. -- that you mentioned, Wolverine Lake and Northville. What happened from there, where did you go?
**A. In September of 1996, I got my first full-time police job, and that was with the South Lyon Police Department. So I resigned from the two part-time jobs, took the full-time job with South Lyon. I worked there for four years, almost -- almost to the day, four years, and I resigned from there because I was hired by the Troy Police Department in September of 2000.**
Q. And you've been with the City of Troy ever since?
**A. Yes.**
Q. Any -- any breaks to go anywhere else in the meantime?
**A. No.**
Q. What positions have you held as a law enforcement officer or what rankings have you held as an officer with the Troy Police Department?

Page 16

**A. Well, the rankings were just -- I was a police officer, and then I was promoted to sergeant.**
Q. Around when were you promoted?
**A. September of 2021.**
Q. All right. What have -- or what duties have you had as an officer in all of your capacities with the Troy Police Department from the time that you began?
**A. I've had a lot.**
Q. Okay, let's go through them.
**A. Well, I started out with road patrol. Then I -- several years into my career, I put in for the traffic safety unit, so I was traffic safety officer for many years. I was field training officer for about 18 years. I'm an SFST -- well, I was an SFST certified instructor, a drone operator. I've done all my crash investigation training, crash reconstruction, an EDR operator or I guess -- I don't know if they call it an operator, but the CDR -- what people call the black box, airbag control modules basically in cars. So I -- I can download and read those reports. And let's see, that's probably about it I think.**
Q. Have you ever been assigned to a training position like as in you are the one training other officers in the city of Troy?

Page 17

**A. Not in the city of Troy.**
Q. Okay, elsewhere?
**A. Yes.**
Q. Where at?
**A. At the Oakland -- I'm sorry, the Macomb Police Academy.**
Q. Okay. Is that something that you've done in your capacity as a law enforcement officer in any of these agencies or is that something in addition?
**A. It was within my capacity as within the City of Troy. We have recruits that -- our recruits would go there, so we like to have our guys be instructors there if we could. So there was an opening for -- to be an instructor, and I was.**
Q. So you had indicated that you attended the Wayne County Police Academy?
**A. Yes.**
Q. When did you start attending that academy?
**A. That was in January of 1996, I went from January to May.**
Q. What did that academy teach about traffic enforcement?
**A. I mean we were taught traffic laws, but I don't think -- it was very brief, and then we also were -- did emergency vehicle operation. That was very**

**brief as well. Everything was brief, it was just touching on everything.**

Q. Do you recall what they spoke to you or what they trained you about with the emergency vehicle operations?

**A. I don't remember specifically. I mean, I'm assuming it's the same stuff we're learn -- we're doing now. But I mean I just remember being in a car with an instructor and telling us -- you know, I remember specifically we talked about tunnel vision, which is a big thing and speeds and, you know, just different things that can kind of get out of control if you're not -- if you're not paying attention.**

Q. Okay. Describe for me what tunnel vision is, what is that term?

**A. It's where you're so focused on one thing that you're not seeing everything else that's around you.**

Q. Is that a concern that can sometimes arise when you're operating an emergency vehicle?

**A. It could, yes.**

Q. What did they teach in the academy about evidence preservation in an investigation?

**A. I don't even remember. Sorry.**

Q. That's okay. And this is a good point. So if there's any question I ask you where you don't know



an answer, saying "I don't know" is totally fine if it's truthful, okay?

**A. Okay.**

Q. All right, so since the academy I gather from what you've mentioned that you have undergone additional training post academy; is that fair?

**A. Yes.**

Q. Okay.

**A. Constantly.**

Q. And I believe we had some -- some certificates of other trainings that you've done, mainly in the area of accident investigation; is that fair?

**A. Yes.**

Q. Okay. What other trainings have you done aside from what they taught you in the academy?

**A. Trainings that weren't taught in the academy?**

Q. Just courses that you took that were not in the academy.

**A. I mean, almost everything. I mean there were -- there's updates that we do, but almost everything outside of the academy, I mean.**

Q. So I know we were provided with several certificates.

**A. Okay.**

Q. Looks like you had completed the police alcohol and



drug enforcement seminar through Michigan State University?

**A. Yes.**

Q. You completed the Bosch certification back in 2016?

**A. Yes.**

Q. And that was through the Institute of Police Technology and Management?

**A. Yes.**

Q. You completed the event data recorder use and traffic crash reconstruction in 2016?

**A. Yes.**

Q. I have several certificates from the Public Service Institute at Macomb Community College. Looks like you completed accident investigation one through five at that institution?

**A. Yes.**

Q. Looks like you did those in around 20 -- or, I'm sorry, 2005?

**A. Yes.**

Q. And it looks like you completed several of the courses through the Michigan State University Highway Traffic Safety Programs through -- through their division; is that right?

**A. Yes.**

Q. How far did you get in the Michigan State program?



**A. Everybody does it different. Like some people do individual classes and then you get, oh, this is accident investigation one, this is accident investigation two. So it went from the original Macomb 1 to MSP, which was accident investigation one and two, those were two weeks. When I was ready to take accident reconstruction, MSP was kind of out of the picture, so I took it with Benchmark, LLC. So that was a two-week accident reconstruction class. That should be in there as well.**

Q. Yeah, it looks like you did a couple courses, accident investigation one through five, with Professor Lee at Michigan State?

**A. Yes. He wasn't actually a professor, but he was head of the unit, I believe.**

Q. Understood. And then it looks like we've got some Michigan State Police certificates. You completed ARIDE training. Tell me about that.

**A. Advanced Roadside Impaired Driving Enforcement. So it's just what to look for. Looking for, you know, someone in the car or a motorcycle, looking for certain signs that might indicate that they've been intoxicated or impaired in some way.**

Q. How does that training coincide with your training from the National Highway Traffic Safety

Administration on field sobriety testing?
A. **So with -- they -- the sobriety testing, they focus solely on the SFST which is Standardized Field Sobriety Test. And then the ARIDE gives you -- you do do a little snippet of refresher for the SFSTs, but it's more about detecting, seeing, watching what people are doing. Seeing if they're pos -- they could possibly be impaired.**
Q. Looks like -- I believe you already had mentioned this, but we do have a certificate here. You yourself were an instructor of the SFSTs, the field sobriety tests?
A. **I was.**
Q. Looks like you could --
A. **That has since been expired -- it's been expired. Every two you have to update it. And I wasn't using it anymore because I got promoted, so it's expired now.**
Q. Looks like that training, yeah, would have happened back in 2008; does that sound right?
A. **Yeah. As long as you're getting your stuff and over -- and then you do your two week -- you do a refresher every two years, then you're still certified, but I stopped doing that.**
Q. Okay, so does that mean that you were just no longer



able to instruct on the Standardized Field Sobriety Test or you yourself cannot administer the field sobriety test?
A. **Just instruct.**
Q. All right. It looks like we've got another certificate from Oakland County MADD, potentially, Mothers Against Drunk Driving. There was a NHTSA, N-H-T-S-A, DWI detection and standard field sobriety training program. Looks like that was completed -- actually there's not a date on this one. Do you recall when you completed that?
A. **I don't even recall.**
MS. DUFRANE: There's a November 12, 2004 here. Oh, sorry, 2004.
MR. MARTINEZ: Oh, yes, it's right there, hidden on the seal.
**THE WITNESS: 2004?**
MR. MARTINEZ: Yeah, November 12, 2004.
MS. DEBLER: Do you want him to follow along with this or no?
MR. MARTINEZ: I'm almost done with these. I'm just going through them quickly.
BY MR. MARTINEZ:
Q. And then, yeah, there was the additional courses that you mentioned through Benchmark Traffic



Services, LLC, where you were trained in technical traffic crash investigations, traffic crash reconstruction; is that right?
A. **Yes.**
Q. And then there was a final course where you were trained on how to use Microsoft Excel for traffic crash reconstruction?
A. **Yes.**
Q. Okay. Aside from the courses that we've just covered, is there any other training that you have done in any other area pertaining to crash investigations or police procedures?
A. **No, that's -- that's it. That's what I provided. That's what I had, yeah.**
Q. Okay. All right. What was your role at Troy Police Department in September 2023?
A. **I was the traffic safety unit sergeant.**
Q. Is that a typical shift that you have to take or is that a varying schedule?
A. **It's a day-shift schedule.**
Q. Were you working on September 22, 2023?
A. **I was working that day, yes.**
Q. Okay. And that would have been in the morning?
A. **Yes.**
Q. Did there come a point in time where you were called



in to respond to a crash that occurred?
A. **Yes.**
Q. Okay. How were you notified about a crash?
A. **Most likely it was -- I don't remember exactly, but most likely at the time we had a system called code red, and it was how people were notified of things off duty. So they would send a code red message, it would come in as a phone call and a message. That was most likely at the time, that's what we used and that's most likely how it came. And then I called dispatch, asked them what was going on, they told me. And then I said okay, see if you -- who responds, because you respond to the code red. So eventually I was told who was responding and went from there, so...**
Q. At the time that you spoke with dispatch, what information did they provide you about the crash?
A. **I don't remember specifically, but usually the information I ask for is where is it at, and I'm sure they told me it was a department employee, but I don't recall specifically.**
Q. Would you have been in a supervisory role at that point in time when you got the call?
A. **When I got the call, not necessarily. I would take over the supervisor role when I get to the scene.**

**So even though there might be a higher ranking officer there, I would be the one who would take over the scene.**
Q. When you arrive on scene and assume supervisory control, who was it that you were supervising at that point?
**A. People who were at the scene and everybody who was there.**
Q. Any officer that shows up would then be essentially under your command?
**A. Yes.**
Q. All right. So with regard to the officers that were on the scene, had you worked with any of them in the past?
**A. Yes.**
Q. How often had you worked with Officer Leithauser before the crash?
**A. Officer Leithauser, I worked with him -- when he first got hired, I was his training officer for six weeks. So we worked in that capacity. We did work on the same shift for -- on the same afternoon shift for a while. I don't know how long that was, but we did work in the same shift probably until I got promoted in September of 2021, that's when I left the afternoon shift.**



Q. So for about a six-week period when Officer Leithauser was brought on to Troy Police Department, you were his FTO?
**A. One of his FTOs, yes.**
Q. His field training officer?
**A. Yes, field training officer.**
Q. What is the dynamic? What happens when an officer goes through the field training officer program or is being mentored by an FTO?
**A. Depends on what phase. There's three different phases, so it depends on what phase he's in -- phase they're in, determines on what they do. So each phase adds more and more to their plate until they're able to show that they can perform everything on their own.**
Q. Did you work with Officer Leithauser through each of those phases?
**A. No.**
Q. Which phase did you work with him on?
**A. Half of phase two, because his current FTO at the time couldn't finish out the phase. So I took him for two weeks in phase two and then for the last -- and then four weeks of phase three.**
Q. What gets discussed or trained during those phases?
**A. So we have a task book. So each phase you learn**



**different things. So depending on what's in that task book, you have to finish those tasks for that phase. So I don't have it in front of me. I don't know exactly what tasks were there for end of phase two and phase three, but we have to -- we focus on those tasks for that phase.**
Q. Okay. I know you may not know exactly which phase each assignment or task falls into, but can you speak generally about the kinds of things that are discussed and trained through the FTO program?
**A. I mean every aspect of the job. I mean, it's -- I mean, you're -- everything that we do, everything that we're responsible for we -- is a task in the book. I mean it's -- I don't know how to -- it's a lot.**
Q. Is it a part of the FTO's job to train the younger officers or the newer officers on specific Troy Police Department policies?
**A. Yes.**
Q. How often did you and Officer Leithauser work the same shift after he became a full police officer?
**A. If I knew when he got hired, his hire date, I would know that. We would have been on the same afternoon shifts. I remember he was on an afternoon shift pretty much the whole time, I don't -- he may have**



**been on midnights for a short time. But our days off wouldn't have been the same. Because of seniority, I probably worked with him one day a week, even though we were on the same shift during that time. So whatever his hire date was until probably September of 2021, we worked together periodically.**
Q. So -- and again, I should have mentioned this in the beginning. Whenever I refer to "the crash," I'm referring to the crash involving Officer Leithauser and Mr. Szczesny on September 22nd.
**A. Okay, yep.**
Q. All right. How often had you worked with Officer Scott Allan before the crash?
**A. We didn't start working together because I was on the afternoon, he was on days. We didn't start working together until I took over as a sergeant in traffic, because he was in traffic at the time. So over the years he had been there probably just as long as I had, but we -- I don't think we worked together all that much. I was always afternoons. I think he was always days.**
Q. So you and Officer Allan have roughly both been with the Troy Police Department for about 25 years?
**A. Yeah, he's been a lot longer because he started as a**

**service aide. So he was a service aide, that counts towards his city time, but I think he was there before me as a service aide.**
Q. At any point in time did you have a supervisory role of Officer Allan?
**A. Yes.**
Q. Okay. How long did that occur for?
**A. Since I took over in the traffic unit in September of 2021.**
Q. How often had you worked with Officer Alejandro Parra before the crash?
**A. Same type of situation. He was on afternoons after he finished the FTO program, so I worked with him on and off during that time. Once I was -- once I took over as a traffic safety sergeant, I didn't work with him directly anymore.**
Q. And about when did that occur?
**A. September of 2021.**
Q. How often had you worked with Officer Gail Parra before the crash?
**A. Same type of situation. She was in and out of different units. I would say we probably worked on shift occasionally together and then again when I took over in September of 2021 as the sergeant in traffic, she was already part of the unit.**



Q. Did the frequency which you worked with all of these officers, did that change after the crash?
**A. No.**
Q. Did your relationship with any of them change after the crash?
**A. No.**
Q. And I believe you did indicate that you obviously had discussed the crash with these officers after it occurred; is that right?
**A. Yeah, in some form, yeah.**
Q. Okay. What -- what was generally the topic of those conversations?
**A. Mainly did we get everything done, who -- you know, when everything's done, you'd have to compile all the information. So I have to make sure that we get all that and put it together for whatever it's going to be used for. So that's typically, we come back to work -- sometimes we come back to work the next day and do it. In this case, we didn't -- I didn't come back to work until Tuesday. At that point, they all would have been there, and it's just compiling and getting everything together.**
Q. How long does that process typically take to compile and get everything together?
**A. It depends. You could have a road officer who**



**didn't write their supplemental report, which they're required to do. And they may be off for the next three days or be on vacation, and so we might be waiting for that information.**
Q. Do you have an independent recollection of how long that process took with regards to this crash?
**A. I do not.**
Q. At any point in time, did you discuss this lawsuit with any of those officers?
**A. Yeah, it came up wondering why.**
Q. Okay. And take me through those conversations.
**A. It's just we were all just scratching our heads wondering what was going on, and so...**
Q. And was this a conversation that happened with all of you together or was this one that you had this conversation several times?
**A. No. No, I think it was probably independently. I mean, we don't -- I mean we all work together, but depending on guys take time off or they're in training and stuff. So I couldn't say if we were all together at the same time or not.**
Q. Was it a shock to you that Officer Leithauser was named in this lawsuit?
**A. That was not, no.**
Q. It was more so just the rest of you where there was



some confusion?
**A. Yes.**
Q. All right. So in your own words what does a police sergeant do at the Troy Police Department?
**A. It depends what role you hold. So there's sergeants -- there's a road patrol sergeant, there's -- then there's sergeants in each special units, depending what the unit is, that's what you're -- what you're responsible for.**
Q. Is it fair to say, though, that in each of the units, a sergeant does have a supervisor or supervisory role over the officers working beneath them?
**A. Yes, he's responsible for -- yes, for them.**
Q. And I believe you indicated your focus is on the road patrol, you're the road patrol sergeant?
**A. No, I'm a traffic safety sergeant.**
Q. I'm sorry. A traffic safety sergeant, okay.
**A. Yes.**
Q. What are the main responsibilities of the traffic safety sergeant during a normal shift?
**A. Just over -- overseeing -- just like any other sergeant. Overseeing your unit, but we are -- we do different things. Like we're -- we're focused on taking crash and writing -- taking crashes, writing**

**tickets, addressing citizens' concerns about, you know, areas that are, you know, speeders or red lights. We also -- I was -- you know, we are responsible for our radar trailers, so we make sure they get put out and moved around occasionally.**

**We're responsible for sometimes engineering. People call and say there's an issue with this traffic light at Rochester and Big Beaver, and it's not cycling proper. So we'll go out there and look at it, we'll contact the road commission, say this is what's going on. So it's mainly focused all towards traffic-related issues.**

Q. So effectively, you are responsible for overseeing traffic responses, traffic safety during the course of your shift?

**A. Yes.**

Q. Whatever that may be?

**A. Right, correct.**

Q. How does a sergeant's role differ from a lieutenant's role within the Troy PD?

**A. Lieutenant is more of an administrative role. So every sergeant has to answer to a lieutenant. But most cases the lieutenant has no idea what's going on.**

Q. Okay. What kinds of decisions does a sergeant make



without calling a lieutenant?

**A. Almost every decision.**

Q. Are there any kinds of decisions that do require the input or sign-off of the lieutenant or a command officer?

**A. Yes.**

Q. What are those?

**A. Any -- well, we're required to notify them if things happen and they should be aware. We do mainly that by running like shift reports at the end of the day. That goes -- they go out to the lieutenants and above, so they can see what's going on. So, you know, I don't -- I don't really -- I may interact with my lieutenant, but I'll tell him, hey, this is going on. He's like, okay. You know, it's just like it's --**

Q. You have a lot of autonomy over the shift it sounds like.

**A. Yes.**

Q. What type of information gets put into those shift reports?

**A. It's just something that the -- you don't want people to be surprised by something. So if something major -- if a major -- we call it a major incident happens, something I think everyone needs**



**to know happens, so they're not blindsided by the media or whatever, and then that goes in our shift reports.**

Q. Did this crash that we're here for involve a shift report?

**A. Yes.**

Q. Do you recall what you said in your shift report about this incident?

**A. I don't remember specifically, but in all of my shift reports when I do do them, it's just date, time, a brief description of what happened and just so everyone's aware.**

Q. Do those shift reports just go to the lieutenants or do they go elsewhere within the department?

**A. They go -- I take that back. It goes from sergeant and above. So they go from the searg -- all the sergeants can see them, lieutenants, captains and chief.**

Q. So I know we talked generally about what may occur on a traffic safety shift. How does a sergeant supervise officers during that shift? Because I'm assuming there are officers that are spread all over --

**A. Yes.**

Q. -- the city at the time of that shift. How do you



supervise those officers?

**A. They do their own thing. Like I'm there, I get a lot of calls from them asking questions and things. But mainly they're out there doing their thing. They're -- you're getting dispatched to runs, we have guys that are commercial motor vehicle enforcement officers. They're out there doing the commercial motor vehicle stuff. So I pretty much leave them alone. I let them do their thing. If they have issues, they call me. If I hear or see a scene that I think I need be at, I go. So, but I trust -- I trust these guys.**

Q. Is there anything specific that a sergeant does in the traffic safety division to mentor less experienced officers?

**A. Yeah, I'm responsible to make sure they're getting their training in. So -- and then also, I'm big on specialty things. I'm always telling the guys, hey, are you interested in doing like the Bosch CDR stuff or are you interested in being a commercial motor vehicle. And if they are, it's my job to facilitate getting them trained up in that stuff.**

Q. How would a sergeant correct an officer who does something wrong?

**A. Depends on the severity of it. So it could start as**

**something easily as counseling which happens, you know, quite often. And it can go up to a Guardian Tracking which is just a document -- a written documentation or it can go all the way up to suspension or even termination, depending on what it is.**

Q. While you've been a sergeant at the Troy Police Department, have there been situations where you have put a Guardian Tracking report together for an officer's conduct?

**A. Yes.**

Q. Okay. Tell me about that, what do you recall?

**A. I do it every month for their video reviews. So I have to do random video reviews of all of their in-car cameras. So every month I have to review at least three of each one. Then I have to put into Guardian Tracking for each of them if it was -- if everything was proper, the conduct was proper and they did everything right. I do good things, you know, they go above and beyond in a situation or a scene, I just put a positive one, there's all kinds of categories, but I'll do a positive and sometimes a negative.**

**But a Guardian Tracking is -- I should go back a little bit. I cannot give out discipline.**



**It has to be a lieutenant or above. So Guardian Tracking is as high as I can go, and that's just a written documentation.**

Q. So you effectively start the process, the disciplinary process, and you hand it off to a higher ranking lieutenant?

**A. Yep, it goes up the chain, yeah.**

Q. Do you recall an example that you can share about when you've had to initiate a Guardian Tracking report for a lieutenant or to a lieutenant?

**A. It's not necessarily for a lieutenant. It's just for their record and then everyone can see it. The Guardian Tracking is different than if there was an investigation that was going to result in termina -- or in discipline. Those are two different things. The Guardian Tracking is just a system where you can go in and look at it and see good and bad, and then there's -- so that typically wouldn't be where you would initiate like discipline process.**

Q. What is the most recent example you can share about when you've had to initiate the disciplinary process for an officer?

MS. DEBLER: I'm going to object. I think this kind of goes beyond the scope of discovery. Discovery in a Federal Court case



requires it to be reasonably calculated to lead to admissible evidence or it at least has to be related to a claim or defense. And I have concerns, Aaron, that you're going to be asking him questions to share about Guardian Tracking with respect to officers that have nothing to do with this case. And I don't think that that is any way related to the claims of defenses in this case.

MR. MARTINEZ: And I'll just respond on the record obviously counsel can place the objection. I have not heard that there's been an assertion of privilege, so I will expect the answer today. We have a pending Monell claim against the City of Troy which does go to the culture of the entire department, and so therefore I do believe that it would be relevant. Additionally, I'll place on the record Rule 30 under the Federal Rules of Civil Procedure require that objections not be argumentative or suggestive, and I do think that perhaps that objection is getting close. So again, I think we can move forward today --

MS. DEBLER: Oh, Aaron, that was not either argumentative or suggestive. That was very polite. And I think our video record will demonstrate that.



MR. MARTINEZ: Fair enough. That's okay. I just -- I believe it's just a little suggestion.

MS. DEBLER: Just so you know though the Federal Rules of Civil Procedure still apply, and it's not relevant to any claim or defense. What he's done to initiate Guardian Tracking as to some other officer that's not involved in this case. That is not in any way germane to your Monell claim.

MR. MARTINEZ: I believe it is. Are you instructing the officer not to answer?

MS. DEBLER: Well, I am not. I'm going to take it question by question. I'm just giving you a little bit of a caution in a very polite way.

MS. DUFRANE: I'm going to join Ms. Debler's objection. I'm also going to suggest that if any reference to discipline is part -- part deliberative -- under the deliberative process, there would be a privilege under the deliberative process. So I think the witness needs to be cautioned if he he's going to start talking about other officers in the Troy PD as Ms. Debler said who aren't involved with this lawsuit in any way, shape or form, so...

MR. MARTINEZ: Okay.

THE VIDEOGRAPHER: Ms. Debler, could you

mic up if you're going to --

MS. DEBLER: Oh, sure. Do you have a microphone?

COURT REPORTER: Officer, slow down.

MS. DEBLER: Sorry.

THE VIDEOGRAPHER: Thank you. I just want to make sure that we get it all down on the record.

**THE WITNESS: Okay, sorry.**

THE VIDEOGRAPHER: I think I caught that through the other mic, but if you want to repeat anything.

MS. DEBLER: Yeah, you're doing great, just if -- for the court reporter, just if you could speak more slowly.

**THE WITNESS: I'll try.**

BY MR. MARTINEZ:

Q. So the question that was asked is could you tell me about a recent example where you've initiated disciplinary action against an officer?

**A. I wouldn't initiate -- I guess I'm kind of confused on the question. There's -- it doesn't necessarily mean there's going to be discipline. There's a potential for discipline. Everything that we do we have to -- it has to be -- there's a process that**



**has to be done to clear or not clear the officer. So just because something's initiated does not mean it's going to result in discipline.**

Q. Understood. I'm just asking about the initiation.

**A. So the most recent one was one of my traffic guys, not involved in this, was try to stop a vehicle the other day and it fled. And the vehicle fled, so it was a flee and allude. Per our policy, I have to initiate the start of the process, and it's called standards. So we call it SIs. So I start that, but that doesn't mean he's going to be disciplined. It's just, hey, this happened and this falls into the category so we have to investigate it. So my job is to investigate that and then submit it up the chain.**

Q. Understood. What is the most recent example you can share about an emergency vehicle operation where you've had to again initiate, not saying there was an outcome, but where you've initiated that review?

**A. Probably about two years ago, another officer in my unit backed into another vehicle, so I had to initiate an SI on that as well.**

Q. Okay. Did you initiate any reviews in the last five years pertaining to lights and siren use by an officer?



**A. I don't believe so.**

Q. Any reviews that have been initiated by you as it pertains to vehicle speed of an officer?

**A. No, not that I can recall.**

Q. All right. So I just want to make sure I'm clear. Okay. So like I -- when I think of the term "issues," how I'll use it today, I'm talking officer performance problems, policy violations, report writing violations, driving concerns, things of that sort. Would that fall under your purview as a supervisor of the traffic safety division?

**A. If it involved one of my traffic safety officers, yes.**

Q. Okay. What kinds of those issues are handled just through a conversation, verbal warnings or corrections?

**A. Quite a few. But I mean it -- it's so broad. I mean, we get -- I'll get a call of a citizen complaining that an officer they said, oh, they ran a red light. Okay. So I'll look at their video, do whatever, and then that would just be something verbal. But it's very broad.**

Q. So there may be circumstances where correction is given to an officer that would not necessarily be documented?



**A. Yes.**

Q. What kinds of issues such as those we've discussed would be documented?

MS. DEBLER: Objection to form and foundation.

**THE WITNESS: Which? I guess I just don't -- I'm not sure on the question.**

BY MR. MARTINEZ:

Q. Okay. So as we've defined, I'm defining issues --

**A. Yes.**

Q. -- as I'm speaking to fairly broadly, but you can tell me if it needs to be narrowed here. I'm referencing officer performance problems, policy violations, violations of Troy Police Department policy. Report writing problems. Perhaps when a report is either missing information, maybe it has too much information, equipment problems, maybe an officer is not upkeeping their equipment up to the standards of the Troy Police Department; citizens' complaints as you've mentioned or any other kind of conduct that may require correction, okay, I'm intentionally being broad about this. So I'm asking what of those categories would end up being documented?

MS. DEBLER: Objection to form and

foundation.
THE WITNESS: **It would be anything -- it would be -- like I mentioned, if they got into a crash, did you -- you know, people -- guys hit curbs and cause damage. Anytime there's damage to a car of any kind, that would be documented. It's -- you know, performance issues, if it's more than just a minor issue. We get a lot of complaints by citizens that are unfounded. Just because they upset them, most of time it's because they got a ticket and their -- and they want to say the officer was rude or disrespectful.**
**Those aren't documented on paper, those are just discussions I have with them. Because a lot of times they're unfounded.**
Q. Which kinds of issues do end up getting elevated to command staff, lieutenant or higher?
A. **Well if there's an SI that's generated, then again, it's -- we -- there's a lot of things. I mean we don't -- we pretty much start an SI for -- for most things. It's hard to say. I mean I don't want to say because the minor things, there's not one started. But where does it start? I mean if there's a policy violation that we talked about, if there's a crash, if guys miss court, that's been**



**happening lately for some reason. That wouldn't necessarily be SI, but that would be documented in the file.**
Q. And I'm sorry, what does SI stand for?
A. **It's a -- well, it's a standards investigation, so it's where there's some sort of potential violation.**
Q. Something -- a violation -- or potential violation that just needs to be investigated --
A. **Yeah.**
Q. -- to determine if it has merit or not?
A. **Yes. And like I said, fleeing and allude. Nothing the officer did wrong, but because of the fleeing and allude, we have to start the standards and I have to start investigating to make sure that the officer did everything right.**
Q. Which kinds of issues or SI's ultimately get entered into a personnel or tracking or internal affairs type system?
A. **All of them, they're all kept.**
Q. Okay. Is there a period of time in which they're kept?
A. **Forever, for as long as you're an employee and after. I don't know how long they keep after, but...**
Q. I understand that it's probably a spectrum here that



we're talking about. So if you need to provide me multiple points here, I'm happy to understand it.
What happens when an officer violates a written policy of the Troy Police Department?
MS. DEBLER: Objection to foundation.
THE WITNESS: **And again, it depends. It depends on the violation.**
BY MR. MARTINEZ:
Q. Take me through. What -- what violations would result in what kinds of outcomes?
MS. DEBLER: Objection to foundation. You may answer in so far as you know.
THE WITNESS: **Just like I mentioned, missing court's been a big thing lately. That is a violation, a Guardian Tracking violation. The officer that's involved in a fleeing and alluding, that's one. Any type -- we have about 123 general orders, so any violation of a general order.**
BY MR. MARTINEZ:
Q. What types of things are covered in the general orders that you speak about? I know 120 is a lot. But insofar as we sit here today, nothing has been provided to us, so I don't know what it is you speak about?
MS. DUFRANE: That's not true, Aaron.



You have a whole bunch of our general orders.
MR. MARTINEZ: I don't believe I have. I'll think about it.
MS. DUFRANE: Yeah.
BY MR. MARTINEZ:
Q. In any event, could you explain a little bit about --
MS. DEBLER: I'm going to object -- I'm going to object to the foundation of the question. And also again I think you need to -- to confine your -- your questions to something that's relevant to a claim or defense in this matter. You've alleged some claims, a lot of them, it's a long complaint. But the questioning of this witness with respect to policies, should be germane to the policies that relate to the claims that you're making, not any policy of the Troy Police Department. That's not fair game. That's not within the purview of discovery.
BY MR. MARTINEZ:
Q. Officer, you're a sergeant with the Troy Police Department, correct?
A. **Yes.**
Q. Part of your role is to enforce the policies of the Troy Police Department to the officers under your

control, correct?
A. **Yes.**
Q. Okay. So you do have an understanding of what the Troy Police Department policies, procedures and general orders require?
A. **Yes.**
Q. Okay. So as it pertains to a driving policy, what sorts of things are you looking at in the context of the general orders to be able to supervise and enforce those policies? What is it that you look for?
A. **I'm not -- I don't look for anything. Things are brought to my attention. So our general order for emergency vehicle operation is quite lengthy and there's -- you know, it just spells out what the requirements are while driving a police car.**
Q. Okay. And tell me, what are those requirements?
A. **You have to abide by all traffic laws. There's exceptions under the state law that you can exceed the posted speed limit, so those are in there. And it's just -- it's just a long policy about operating a motor vehicle.**
Q. Tell me about those exceptions that are in the Troy general orders and public policies that you spoke of?



A. **You're allowed to exceed the prima facie speed limit under certain circumstances. One would be if you are responding to an emergency run. One would be if you are trying to pace or catch up to a traffic -- potential traffic violator.**
Q. Okay. What constitutes an emergency under that policy that you enforce?
A. **Our -- they list some specifically and they also say, they get kind of generic say anything you feel is -- requires an immediate response. So ambulance requests of any kind, you know, injury crashes, you know aggravated crimes like domestic, murder, kidnapping, any of those could require that type of response.**
Q. Does the policy, as you understand it, provide a spectrum of, you know, if somebody needs an ambulance but it's more precautionary rather than somebody who's bleeding with a serious injury; is there any -- any difference in the policy as to that?
MS. DEBLER: Objection to form.
**THE WITNESS: Our dispatch weeds those out. So if somebody calls and said I need an ambulance but I don't need an officer, then the dispatchers will determine if an officer's response**



**is required. So they will put a run in saying there's an ambulance request, but there is no officer required. If they do dispatch an officer, then their response is -- I can't speak for everybody, but their response should be lights and sirens.**
BY MR. MARTINEZ:
Q. So in a situation where there's an officer, they speak to someone who's perhaps been involved in a minor fender bender and the officer gets on scene and then somebody asks to be checked out for an ambulance -- or by an ambulance. Does that constitute an emergency?
A. **Not for us. That would be for the ambulance.**
Q. What officially happens when an officer in the traffic safety division -- well, I guess first let me back up. Is there a general order or policy in the Troy Police Department regarding use of in-car and body-worn cameras?
A. **Yes.**
Q. What does that policy generally say?
A. **That you are required to have your bodycam on you while you're in uniform and on shifts, and it has to be in a record mode when you're interacting with the public.**



Q. Okay. What happens when an officer violates that camera policy? Is that typically a verbal correction or is that something that gets written?
A. **It would probably be a verbal correction in the beginning. If it continues to happen, then it would probably escalate from there.**
Q. Is there ever a situation where those verbal corrections get memorialized in any way, shape or form?
A. **What do you mean by memorialized?**
Q. So in the sense of, okay, I've got officer -- just making up a name, Officer Smith, who -- who I've had to correct him a dozen times on his camera use, and I have -- I've given him verbal warnings and now maybe it's getting escalated. At any point in time prior to that escalation, do those verbal warnings get written down or recorded anywhere?
MS. DEBLER: Objection to foundation.
**THE WITNESS: They're not required to, but most of the time if it were me, I would mention those in -- that they were given warnings.**
BY MR. MARTINEZ:
Q. Who would you mention that to?
A. **In my write-up.**
Q. Understood. That would be in the shift report that

you --
A. **No, that would be in the Guardian Tracking.**
Q. Understood, okay. All right. As far as, you know, from your standpoint as a sergeant, what is it that accountability looks like for the officers under your command?
MS. DEBLER: Objection to foundation and form.
**THE WITNESS: My accountability?**
BY MR. MARTINEZ:
Q. The accountability that you enforce.
A. **Oh.**
Q. How do you hold the officers that you supervise accountable, is probably a better way to say it?
MS. DEBLER: Objection to form.
**THE WITNESS: We have expectations in our unit. So I hold them to those expectations.**
BY MR. MARTINEZ:
Q. And what is the source of those expectations?
A. **The source is -- I mean it's just something that we've always had. Who actually drafted it or came up with it, I couldn't tell you. It's just -- expect each unit, when you apply for a unit, you are told what the expectations are, everyone has them.**
Q. Does that come from one of the general orders that



you spoke of or a policy?
A. **The general orders do, yes. But they do state that, but not as detailed.**
Q. What would be the expectations then that you would hold an officer in the traffic safety division to?
A. **That they're taking the crashes, that they're writing tickets, that they're -- we have things called directed patrol. So people will call, like I mentioned earlier, and say this red light is horrendous, people are running it all day. I make sure they're doing the directed enforcements on their downtime. I assign follow-up to crashes to the guys all the time. So make sure that they're getting their hit-and-run crashes completed and they're writing reports where they should be and stuff like that.**
Q. Is there an expectation that the officers under your supervision be truthful?
A. **Yes.**
Q. Transparent and honest?
A. **Yes.**
Q. All right. So when a sergeant arrives at a serious crash scene like the one we're here for, what is it that you do first?
A. **My job is to make sure everything is -- gets done,**



**somebody's assigned to do something and everything's covered.**
Q. Okay. Do you have to be the one that delegates those tasks or does that typically occur before you arrive?
A. **There are certain tasks that are delegated before I get there most likely. But when I get there, there's certain tasks that I know that have to get done, that a regular road patrol sergeant wouldn't know.**
Q. What types of tasks?
A. **That would be doing the GPS stick or the total station, photographs if we don't have an evidence tech available, then we have -- we're all trained in photography, getting those done. Impounding of the cars if need be, talking to witnesses. But a lot of times, you know, some of that stuff is already done.**
Q. Is evidence preservation a part of those tasks?
A. **Yes.**
Q. How does a sergeant decide what evidence needs to be protected or preserved?
MS. DEBLER: Objection to form. You mean in his capacity, sergeant in the traffic safety division?
MR. MARTINEZ: Correct.



MS. DEBLER: Okay.
**THE WITNESS: I'm sorry, say the question again.**
BY MR. MARTINEZ:
Q. Yeah, so as a sergeant in the traffic safety division, when you arrive on to a scene, how do you decide or determine what evidence needs to be preserved?
A. **It's -- we just know from our training. I mean we have a checklist that we use sometimes that reminds us of things, but don't really need that because we all know what needs to get done and what's important and what isn't.**
Q. As it pertains to this crash, what evidence did you determine was important to preserve?
A. **It's no different than any other crash we have. It's -- we preserve the scene and any -- you know, the vehicles, any markings on the roadways, witnesses again, photographs. Everything -- it's always the same. So it's not any -- this is no different than any other crash of a similar type.**
Q. So when you talk about preserving the scene, what does that mean?
A. **Making sure people aren't driving through it or walking. You know, we don't like people on the**

Page 58

scene that aren't supposed to be there. They don't know what they're doing. Usually we leave the road patrol officers on the outside of the scene to block it in. The guys who know what's important and what's not are there at the scene -- in the scene.
Q. So they would want to preserve debris fields, they would want to take note of skid marks, things of that sort?
A. Yes.
Q. Because preserving the scene is important why?
A. To make sure it's not tampered with or it's not altered in any way.
Q. How does altering a scene affect your investigation?
A. I mean it could. It doesn't necessarily affect it, but it could.
Q. In what ways could it?
A. It depends what it is. If it's just a piece of debris and someone kicks it, that might not be important. But if it's a vehicle, a specific location and someone moves the vehicle, that could be important.
Q. Is there ever a time when a sergeant in the traffic safety division would decide whether a specialized team or another division would need to be called to the scene?

Page 59

A. Yeah, yes.
Q. Okay. What are some examples of that?
A. If we don't have enough -- if we don't have enough traffic guys to work a scene, and there's many things to do, we will call in an evidence tech, a specialized, you know, someone trained in evidence recovery and photography, so we call them in to do that for us. Because we have other people that can do that, but we don't have other people except for us who can actually look at the scene and say and know that, hey, this skid mark is important or this over here is important.
So we do -- we would call -- a lot of times the evidence tech is already there by the time I get there, if I'm not on -- if I'm not responding from the station. I'm responding somewhere else.
Q. Was there an evidence tech that was called to the scene for this crash?
A. I believe there was an evidence tech. I don't remember who.
Q. Do you have a recollection of if that evidence tech arrived before or after your arrival to the scene?
A. Oh, it would have been before.
Q. How does a sergeant in the traffic safety division coordinate with patrol officers, investigators, EMS

Page 60

and command staff while the scene is ongoing, while it's fluid?
A. My main objective when I get there is to find out what's been done and what's going on. Hey, what happened, you know, where is -- you know, hey, where is the driver of this car, where is this person, where are our witnesses. And once we identify that, did anybody get statements from the witness? Yep, I got those statements. Okay, anybody get pictures, yes. Anybody -- you know, do we have any -- you know, if it's a cell phone involved or something, we think it might be distracted driving. Hey, did someone grab the cell phone really quick. I mean just different things.
Q. What would a sergeant in your shoes do if you arrive to a scene and find out evidence had been moved before your arrival?
A. There's nothing I can do about it. I would find out what it is, and it should be documented if I knew.
Q. So it would be documented in the report itself that you became aware such and such piece of, you know, evidence was moved?
A. Not necessarily -- it depends what it is. Like I said, if someone kicks a piece of plastic, that's not important. But I've never been involved in a

Page 61

situation where that has been the case, where something so egregious happened that it affected anything.
Q. So if people started moving vehicle parts and vehicle debris from the scene of the crash, putting it onto the curb, would that be something that would require being written in a report?
A. Not necessarily.
Q. Okay, why is that?
A. Again, it depends what it is. If it's just -- if it's a fender or -- the most important thing are the markings on the roadway and the final rest of the cars. If we have it all documented with pictures, and like we all have body cams. If it's all documented in that way, that's not -- then it doesn't really matter. We prefer it not to be moved, but if it does happen, then no, it wouldn't necessarily be in the written report. Because if it's been documented already, then it eventually has to be moved.
Q. What is the reason why you would prefer it not be moved?
A. We just like to see it as is.
Q. And why is that?
A. Just to kind of get our -- to do our investigation,

**see where things are at, and make sure we -- everything's photographed before it's moved and everything's documented properly.**
Q. Because as an accident investigator, you can gain information and insights into the crash itself by knowing where debris was?
**A. It depends on the debris, yes, it's possible.**
Q. What kinds of debris would it depend on?
**A. Like for -- like I said, if we're talking just plastic pieces from a car or even like a battery from the car, all that stuff doesn't matter a whole lot. A pedestrian crash where someone's shoes ended up, that's very important because usually the shoes are right where they got hit, so that would be important.**
Q. So you base impact location based on something like shoes rather than debris from a vehicle?
**A. You can't -- no, you can't say that specifically. It -- in -- again, every situation is different. It depends. I'm not saying that every pedestrian crash, the shoes are where the impact was, but that could be something that's important.**
Q. While you have been a sergeant in the Troy Police Department, how many officer-involved crashes have you responded to?



**A. Well, this would be one and then everything -- a dozen maybe, ten.**
Q. Over what period of time?
**A. Well, I've been a sergeant since September of 2021, so it's been five years.**
Q. Any of those officer-involved collisions, did they involve any of the individuals named in this complaint, being Officers Leithauser, Allan, either of the Officers Parra or even yourself?
**A. Yes.**
Q. Okay. Who else has been involved in an officer-involved collision while you've been a sergeant?
**A. Officer Allan and officer -- I don't know if he's named in this, Officer Hunter. Was he named in this? No, okay. So Officer Allan.**
Q. Okay. What do you know about the collision involving Officer Allan?
**A. He backed into a vehicle. He was trying to catch up to the violator; he was stopped on the roadway, and he backed up to the -- used a turnaround and he backed into a vehicle.**
Q. Are you aware of any other officer-involved collisions during your entire time with the Troy Police Department, aside -- not just when you were a sergeant, but prior to that?
**A. Have I re -- I'm aware of or I responded to?**
Q. You're aware of?
**A. Others. Crashes happen all the time.**
Q. Any that you've responded to prior to becoming a sergeant?
**A. Yeah, probably. Because I would -- being a part of the traffic safety unit, I would be responsible for taking the crash.**
Q. Any that you have responded to involving, again, any of the officers that I've listed being involved in this incident?
**A. Just Officer Allan, the one I spoke of. I believe that's it.**
Q. Did you have any role in responding to the 2020 collision involving Officer Leithauser in a patrol vehicle?
**A. 2020?**
Q. Correct.
**A. Not that I recall.**
Q. Okay. How are officer-involved incidents typically reported up the chain?
**A. Well, the off -- the sergeant on scene -- the sergeant who is responsible for that shift would have to notify up the chain. There would most**



**likely be a shift report and not -- and like I said, not everything -- not everything would require an investigation to be started. If it's just a minor fender bender, then it's just docu -- just the documentation that goes -- it would be the shift report and then just notifying. I would have to notify my lieutenant.**
Q. When you are made aware of an officer-involved collision, does that also initiate an SI?
**A. In most cases but not always.**
Q. What cases would it result in an SI?
**A. Wouldn't or would?**
Q. Would?
**A. Would? Anything other than a minor. So if an officer strikes a pole in our parking lot, we have a sallyport that we park under and there's lots of poles, and guys seem to hit those. That wouldn't be an SI. But if an officer hit a citizen's car, that would be an SI.**
Q. In a more serious officer-involved collision, what information is expected to go up the chain perhaps more quickly or more time sensitivity?
MS. DEBLER: Objection to form.
**THE WITNESS: Really nothing different. It's just you would notify the duty officer in that**

**case.**

BY MR. MARTINEZ:

Q. Is there ever a role, as the traffic safety sergeant, where you would need to update information about an officer involved collision, whether it was minor or major?

**A. Update? Not necessarily. Because if we're doing our SI, that's all in there.**

Q. So that -- that part of it, the SI investigation is really where most of the fact-finding occurs from that point in time?

**A. Yes.**

Q. You don't have traffic safety officers trying to do investigations of officer-involved incidents?

**A. Not typically, no.**

Q. Who is it that typically oversees or conducts the SI's?

**A. Ultimately the chief. He has the final say.**

Q. Is the chief typically hands-on in those investigations, or is it something where he's just overseeing and perhaps a lieutenant or a sergeant is taking the lead?

**A. It starts with the sergeant, always starts it, unless the sergeant's involved and the lieutenant starts it. But how it goes from there and what the**



**process is I'm not involved in, so I don't know.**

Q. Are you aware of whether or not any SI occurred pertaining to Officer Leithauser's involvement in this crash?

**A. There should have been one, but I wasn't involved in it.**

Q. All right, as a sergeant, I understand part of what your function is, as you indicated, is responding to citizen complaints; is that fair?

**A. That could be one of them, yes.**

Q. What is your understanding of the term "community policing"?

**A. It's just getting out there being with the public, addressing their needs, being available, being seen.**

Q. How does the Troy Police Department, to your understanding, try to build trust with the community?

**A. We're transparent for sure. And there's -- we -- every time someone contacts -- we have different ways that people, citizens can contact the Troy Police Department. We have -- you know, we have portals, we have email addresses they can respond to. So anytime anything comes through a portal and it's related to traffic safety, it comes to me. And I decide hey, am I going to call this person or am I**



**going to assign it to one of my officers to look into. But everything is addressed.**

Q. Ultimately the -- the concern is making sure the community trusts the work that the Troy Police Department does; is that fair?

**A. Yes.**

Q. What role do you believe following policy, the policies in general, orders the Troy Police Department plays in building that trust?

MS. DEBLER: Objection to form.

**THE WITNESS: Sorry, one more time.**

BY MR. MARTINEZ:

Q. So in terms of following policy, how do you believe that falls into or how does that impact that goal of building trust with the community?

MS. DEBLER: Same objection.

**THE WITNESS: Well, I don't think the community has any idea what our policies are.**

BY MR. MARTINEZ:

Q. From your standpoint as a sergeant who helps to enforce and supervise these policies, why are they in place?

MS. DEBLER: Objection to foundation.

**THE WITNESS: To make sure everybody's doing the right thing -- doing things the way it's**



**supposed to be done. And there's a clear-cut, hey, this is how we should be doing this.**

BY MR. MARTINEZ:

Q. And why is that important?

**A. Consistency and I guess you're talking about community policing so the public knows that we're doing it right.**

Q. Do you believe that there's anything, I mean, secretive about the Troy Police Department policies or general orders?

**A. No.**

Q. That's stuff that the general public can have access to and understand and know about?

MS. DEBLER: Objection to form and foundation.

MS. DUFRANE: Same, join.

**THE WITNESS: They could.**

BY MR. MARTINEZ:

Q. So I want to try to understand how you applied your training to this investigation. Obviously you've gone through several courses of accident investigation. Which of the areas that we discussed in your training do you use most often?

MS. DEBLER: Objection, foundation and form.

**THE WITNESS: In this capacity, probably none of it. My job is not to be doing those tasks, it's to make sure that people are doing the tasks. I'm not doing them myself.**
BY MR. MARTINEZ:
Q. Understood. Okay. When you did your training with the MSU Highway Traffic Safety Program, what did it teach you about recognizing physical evidence from a crash scene?
MS. DEBLER: Objection to form.
**THE WITNESS: And there's a lot there. I mean there's different aspects of it. But basically, we look -- they taught us about, you know, markings on the pavement, tire marks, you know, offset angles, crush, drag factor, velocity; all those different things are discussed in those classes.**
BY MR. MARTINEZ:
Q. Did it teach you anything about sketching accident scenes?
**A. We had a -- yeah, we had a class on sketching. That's in the first -- the very first part of their accident investigation.**
Q. What about measuring?
**A. Measuring's kind of gone by the wayside, but that**



**was something that we were taught, yes.**
Q. Okay. Is it because of advancements in technology that measurement is not really a main thing that you do?
**A. Yes.**
Q. What do you do in place of physically measuring?
**A. We use a total station, a GPS stick, and now we have a drone that's capable of doing that.**
Q. In 2023, did you have any of those items available at your disposal at the time of this crash?
**A. Yes.**
Q. Which ones did you have?
**A. The GPS stick and the total station.**
Q. The drone is recent then?
**A. Yes, last couple years, yes.**
Q. Okay. How is it that you -- well, I guess, let me ask, did you use the total station or GPS stick in this crash accident investigation?
**A. I did not.**
Q. Did you assign somebody to do that?
**A. Yes.**
Q. Do you recall who you assigned to do that?
**A. I don't off the top of my head.**
Q. Going back to your courses at MSU, what did those courses teach about making speed determinations?



**A. Well, there's formulas and there's -- you have to have certain criteria. You don't have to have the -- all the parts together to figure out the speed. So there's different ways of doing it. You can do a time-distance analysis. Some have to do with, you know, the -- well, they all have to do with the drag factor and distance and things like that. So it's pretty similar, but there's different ways of doing it.**
Q. Did you or someone under your supervision make a speed determination from this crash?
**A. No.**
Q. Why not?
**A. Because we were not doing the investigation.**
Q. Have you ever taken a course specifically focused on investigation of motorcycle crashes?
**A. Not specifically, no.**
Q. Okay. So you've never taken the MSU accident investigation, I believe it's either 8 or 9 pertaining to motorcycle investigations?
**A. I believe it's 8. And, yes -- no -- and I no, I have not taken it.**
Q. Have you ever gotten any training specifically on debris fields in motorcycle crashes?
**A. Not that I can recall.**



Q. Have you ever taken a training on motorcycle rider ejection?
**A. No.**
Q. Have you taken any training involving motorcycle sliding or post impact movement of the vehicle?
**A. Not specifically for motorcycle.**
Q. Have you ever taken training on motorcycle visibility, or sometimes it's called conspicuity?
**A. Not that I recall.**
Q. So based on your training and experience, we've talked generally about debris, but what kinds of physical evidence matters at a serious crash scene?
MS. DEBLER: Objection to form.
**THE WITNESS: It depends to the extent of the investigation. So if things that are important like we always document, like I said, tire marks, gouge marks, you know, witnesses saying -- you know, telling us where vehicles were at. You know, looking for yaw marks for -- and again, final rest of the vehicles, things like that.**
BY MR. MARTINEZ:
Q. What's the difference between a gouge mark, a yaw mark and a skid mark?
**A. A gouge mark is a gouge into the actual pavement. A yaw mark is a -- it's when the vehicle is rotating,**

Page 74

but if the tires are still spinning, so you get a striations that are kind of an angle. And then the third one was what?
Q. Skid mark, yaw marks.
A. Skid marks is just -- yeah, that would be if like a car was just braking or usually at the point of impact, you'll get a quick skid mark that tells you, yep this is where -- and usually it gouges there as well, and that will tell you kind of where the point of impact was.
MS. DEBLER: Can you spell yaw for the reporter.
THE WITNESS: Yaw? Y-A-W.
BY MR. MARTINEZ:
Q. What information can an investigator obtain by looking at debris in a roadway?
A. Well it's not just debris, you would have to use that to put everything together. But usually the point of impact can -- you can get that from those -- you can get speed determinations, depending on how long a yaw mark is and usually angles. By final rest you can get angles, which way cars are coming in or which way vehicles were coming.
Q. When you were on scene of this crash, what did you note or observe about any skid marks, yaw marks or

Page 75

gouge marks?
A. Nothing personally that I -- that I did. And I may have looked for them, but I can't recall. That wouldn't have been my job to collect that evidence.
Q. Do you recall who you assigned to collect that evidence at the scene?
A. It would be whoever was doing the GPS sticker total station.
Q. Okay. But in other words, it -- the physical evidence, whether it's through the marks on the roadway, the debris, where the vehicles ultimately end up, that's all information that an investigator can use as a part of the traffic investigation?
A. Possibly, yes.
Q. So they can use that as objective evidence that they could test alongside somebody's statements that they make?
A. Yeah, yes.
Q. I want to pivot here to talk about your understanding of the NHTSA, SFSTs and OWI investigations. You've taken several courses through the years on this, correct?
A. It's been a while, but yes.
Q. Okay. What can you tell me about what NHTSA requires for an OWI investigation?

Page 76

A. Specifically they refer to SFST, which is the Standardized Field Sobriety Test. So those are implemented so every officer in the state of Michigan does the test the same way.
Q. In other words, they are standardized across the board?
A. The SFST's are standardized, yes.
Q. Even before you get to the SFST's, NHTSA breaks it down into phases; is that right?
A. If you're telling me, possibly.
Q. Okay, is that your recollection of your training?
A. I don't recall that specifically, the phases.
Q. Okay. Do you recall from your training something known as the vehicle in motion phase?
A. Oh, yes.
Q. Okay.
A. Sorry.
Q. So is it jogging your memory a little bit?
A. Yes.
Q. Okay. So those are what I'm referencing.
A. Yes.
Q. What can you tell me about those?
A. Well the vehicle in motion is going to be what you observe. Is there swerving, is there somebody who is, you know, having trouble maintaining a lane, are

Page 77

they making a wide turn, are they tailgating, are they speeding, are they slowing down? So those are all parts of the vehicle in motion.
Q. Okay. And that's just supposed to encompass general observations of a person's driving?
A. Yes.
Q. Why is that important?
A. Well it -- first you have to identify if there might be a potential problem. So I mean, is it -- if the car's driving straight and not doing anything wrong, then there's -- you kind of just move on from it.
Q. After the vehicle in motion phase, what comes next?
A. I believe -- I'm hoping you'll remind me.
Q. So I -- I think you would go to the personal contact phase.
A. Okay, personal contact, yes.
Q. Okay.
A. So you'd make the traffic stop at that point.
Q. Yes. So at that point in time, an officer would have identified some reason to have suspicion to pull somebody over, maybe they've witnessed a traffic infraction; is that right?
A. Yes.
Q. Okay. And at that point, the goal is to make contact with that driver and further the

investigation?
A. **Yes.**
Q. You're not making an arrest decision at the time of starting the personal contact phase most of the time, right?
A. **Correct.**
Q. Why is that?
A. **Because you have to gather your evidence.**
Q. So in other words, you need more than just suspicion that someone could be intoxicated?
A. **Yes.**
Q. What kinds of things are you trained to look for during that personal contact phase?
A. **Disheveled clothing, slurred speech, glassy watery eyes, maybe they've vomited on themselves, urinated themselves, admissions.**
Q. Is there ever a point in time when those two phases are not able to be completed?
A. **Yes.**
Q. Give me an example.
A. **A crash and the person's incapacitated and maybe already in the ambulance or already at the hospital.**
Q. Okay. So in terms of when a traffic crash occurs, what is it or how is the procedure then modified to do an OWI investigation as NHTSA requires?



A. **You can't -- most of the time if you are in a crash where someone is incapacitated or being tended to by the paramedics or on a stretcher already, you cannot do sobrieties. So you wouldn't have your sobrieties. Potentially you could get a PBT, which is a preliminary breath test result from that. But you could still detect odor of intoxicants, you can detect glassy watery eyes, maybe if they're disheveled. Again, if they urinated or vomited on themselves. Those are all things that you would look for as well.**
Q. And I understand, your training is actually somewhat more advanced than perhaps a typical road officer because you also have ARIDE training, correct?
A. **I do and most of our officers do.**
Q. Oh, that's good, okay. So tell me about the ARIDE training and what they teach you and how that's different than what NHTSA teaches you?
A. **It's not much different. It's pretty much, that's what you're being taught. And then at the end you do a refresher for the standardized field sobriety test.**
Q. Okay. So in ARIDE training, do they teach you how to detect signs of impairment by things other than alcohol?



A. **Yes.**
Q. Okay.
A. **To a certain extent.**
Q. Okay, what's the extent of what they teach you?
A. **They're teaching you basically for alcohol. If you get a PBT result that is zeros, then you kind of have to pivot to okay, it's something more than -- or something other than alcohol. But there's obviously, impairment there; then you have to kind of -- you know, maybe you're looking for prescriptions or evidence that they've been smoking marijuana or some other type of drug.**
Q. So you would need -- so let's say you administer somebody a PBT that comes back zero. What is it that you're looking for, signs and symptoms or indicators that would lead you to take that next step into doing a drug investigation?
A. **Well, up until that point, you suspected they were impaired by something. So when you find out it's not alcohol, then you might start asking questions, hey, did you take anything? You know, are you on any prescription medications you shouldn't be taking while you're driving or, you know, if you're taking any illegal drugs.**
**Sometimes they'll make admissions, other**



**times they won't. Sometimes, you know, the car door is open and you'll see, you know, pills sitting on the seat or in the console or somebody made a statement, yeah, I saw them driving back there; they were all over the road.**
Q. So in a situation where you have no bad driving reported, there's no obvious signs of impairment by alcohol, is it typical or reasonable to then move to that next step and do a further investigation into drugs?
MS. DEBLER: Objection to foundation.
**THE WITNESS: It could be.**
BY MR. MARTINEZ:
Q. What is it that you would be looking for in that situation?
A. **The things I just mentioned previously.**
Q. Okay. Obviously, each indicator of impairment is not the same for each drug that's -- that you're trained about; is that correct?
A. **That's correct, I'm not trained as a drug recognition expert.**
Q. Okay, that's good to know. Thank you. All right, so then once you've gone through the vehicle in motion phase, you've gone through the personal contact phase, what is that next phase that you get

to?
**A. The arrest decision.**
Q. Okay. At what point in time -- I guess let me back up -- are you performing the field sobriety test?
**A. During that second phase.**
Q. Okay. All right. Yeah, I understood it always as the third phase is that pre-arrest screening phase, and that would be when you would do the SFST's. Are you trained differently?
**A. No, that's -- that's probably accurate.**
Q. What observations are officers trained to look for during the Standardized Field Sobriety Test?
**A. They specify specific clues of each of the SFST's.**
Q. Okay. What are the SFST's?
**A. They are the nystagmus.**
Q. Describe that for me.
**A. So you're looking for involuntary jerking of the eyes in three different ways. One is lack of smooth pursuit, one is onset prior to 45 degrees, and one is at maximum deviation.**
Q. How do you measure 45 degrees when performing the Horizontal Gaze Nystagmus Test?
**A. We're taught it's off the shoulder.**
Q. So in other words, you would be holding a stimuli up to somebody, whether it be a pen, a pencil or what



have you, it just has to be an object, correct?
**A. Yes.**
Q. You ask them to look at the tip and then you move it?
**A. Yes.**
Q. Okay. Now how many passes are you doing looking for each clue?
**A. Two for each eye.**
Q. Okay. So, for example, so you said the lack of smooth pursuit, you would be doing four passes to look for clues in each eye?
**A. Yes.**
Q. And then once you get to that 45 degrees, which you indicated you measure out to the shoulder, what is it that you look for there?
**A. Once you get to the -- where you -- the 45 degree mark, you hold it steady for several seconds looking for the eyes to be jerking back and forth.**
Q. And then what is different between 45 degrees and maximum deviation?
**A. I'm sorry, that was maximum deviation.**
Q. The shoulder is maximum deviation?
**A. No, maximum deviation is all the way out. But that's where you're holding and looking for the jerking. The onset prior to 45 degrees is as you're**



**bringing it across, you're looking for the eye to jerk as it's going across.**
Q. It's kind of bumping along --
**A. Yes.**
Q. -- the whites of the eye?
**A. Correct.**
Q. Do you agree with me that the NHTSA training does not regard the SFST's as pass/fail?
**A. That's correct.**
Q. What is it that you understand the test to be requiring or looking for?
**A. Clues.**
Q. Okay. How many clues ultimately tell you whether or not someone is showing sufficient signs of impairment?
**A. If I remember correctly, I believe eight is the standard.**
Q. Is it eight for all three tests or is it eight just for the one?
**A. Eight for all.**
MS. DEBLER: Aaron, we've been going on with this for a long time. There were no field sobriety tests given Mr. Szczesny at the scene. I don't see how any of this is relevant to any claim or defense in this matter. I understand and I've



given you a really long leash here, but are we going to be moving on soon?
MR. MARTINEZ: Once we're finished talking about the OWI investigation which is, of course, something that my client was charged with following this incident.
MS. DEBLER: I understand that. But we've gone through the field sobriety test and all that, and I think we're -- everybody's got it on a body camera and we know that he wasn't administered any field sobriety test, right?
MR. MARTINEZ: Sure. But I think it is important to understand especially how a Troy police officer and the sergeant overseeing those officers would conduct an investigation involving an allegation of OWI.
MS. DEBLER: I do not agree with that.
MR. MARTINEZ: That's understood.
MS. DEBLER: But we will let you go a little bit farther.
MR. MARTINEZ: Appreciate it, thank you.
MS. DUFRANE: I'm going to join the objection as well and remind you, Mr. Martinez, that Sergeant Warzecha did not do this invest -- do the investigation. He oversaw the investigation. He

did not do it.
MR. MARTINEZ: Everybody's objection is on the record, thank you.
COURT REPORTER: Can we take a break? I've got to go to the bathroom.
MR. MARTINEZ: Oh, sure, yeah. Let's take a -- let's go off the record. We don't need to torture our court reporter.
THE VIDEOGRAPHER: Please stand by. The time is now 10:39, and we are off the record.
(A brief recess was taken)
THE VIDEOGRAPHER: The time is now 10:48 and we're back on the record.
MR. MARTINEZ: All right. Before I continue with the questioning of Sergeant Warzecha, I just want to clarify on the record Ms. Dufrane and I took the opportunity on the break to try to figure out the documents.
I was under the impression I had not received some of the documents that she was supplementing. Looks like there may have been an issue on our end in terms of downloading them. So I just want to make sure that's clear on the record. And thank you, Ms. Dufrane, for helping me through that.



MS. DUFRANE: Yeah.
BY MR. MARTINEZ:
Q. All right. Officer, where we had left off, I don't have too many more questions on this, I'm going to try to get through them as fast as I can, with regards to how these OWI investigations are conducted from your training and experience. I think just to quickly summarize, you know, officers are trained to observe specific tasks in the tests, correct?
**A. Yes.**
Q. Okay. And they are trained to look for specific clues within those tests?
**A. Yes.**
Q. And it's from those tests that you're able to derive a decision about whether or not you believe you have probable cause that somebody is intoxicated?
**A. Yes.**
Q. Okay. Part of the test as well involves looking at the subject to medically clear them; are you familiar with that?
**A. Yes, there's certain -- you look at the eyes, yes.**
Q. Okay. What is it that you can tell from that medical clearance that you have to do from looking at somebody's eyes?



**A. Well, it's not what you can tell, it's what you suspect. And if you have like a resting nystagmus, that could mean that there may be some type of head injury.**
Q. So in a situation such as this crash where somebody was involved in a pretty serious crash; their head may have been impacted, that would be an individual who may not be, for lack of a better term, eligible to receive the field sobriety test for that reason?
**A. Not necessarily just that reason alone. You'd have to have -- just because they hit their head doesn't mean that they would not be eligible for. Obviously, if you're incapacitated or you have broken bones or something, you wouldn't be able to -- be eligible for that.**
Q. In your training and experience in OWI investigations and the Standardized Field Sobriety Tests, are you taught that the mere fact that a crash occurred proves intoxication?
**A. No.**
Q. Why not?
**A. Because you have to have supporting evidence.**
Q. Crashes can happen for many reasons?
**A. Yes.**
Q. What nonintoxication reasons can cause a crash based



on your training and experience?
MS. DEBLER: Objection to form.
**THE WITNESS: I mean, any type of bad driving, speeding, running red lights, driving in the wrong lane.**
BY MR. MARTINEZ:
Q. Inattentiveness?
**A. Yeah, not paying attention.**
Q. Distraction?
**A. Yes.**
Q. Failing to yield?
**A. Yes.**
Q. Sober drivers can cause crashes as well?
**A. Yes.**
Q. In some situations, a sober police officer may cause a crash?
**A. Yes.**
Q. Officer Leithauser was involved in this crash, correct?
**A. Yes.**
Q. That fact alone does not mean that Officer Leithauser was intoxicated, correct?
**A. Correct.**
Q. The fact that Mr. Szczesny was involved in a crash did not by itself prove he was intoxicated, correct?

A. **Correct.**
Q. All right. I want to pivot and talk generally about -- some people call it the mobile data computer or the mobile data terminal. What's the terminology you use?
A. **MDC, so mobile data computer.**
Q. Okay. What MDC system was used in the Troy Police Department vehicles around the time of this crash?
A. **Just laptop computers. I guess I don't even know what brand they are.**
Q. Okay, that's fair enough. What information or communication generally happens on these devices? What are their functions?
A. **Our dispatch runs, letting us know what's going on, you know, what information we have. So anything dispatched gets -- goes in the -- onto the screen and it gets sent to us. You can run individuals, vehicles, people; you know, check for warrants, write tickets, do crashes.**
Q. So that would be part of like the law enforcement investigation network, the LEIN system?
A. **Yes, we have LEIN on there, yes.**
Q. Okay. Is LEIN the same thing as running Secretary of State records?
A. **No.**



Q. So officers are able to view the call information on that screen?
A. **We have a CAD system. So that we have four different programs that we have up and running at the same time. They all do different things.**
Q. Is there specific training that officers under your supervision receive on how to use the MDC?
A. **Special training outside a regular police officer, or --**
Q. Just training generally?
A. **Yeah, we're all trained in the use of computer and we have to abide by certain guidelines and rules depending on what we're using.**
Q. What types of guidelines and rules are in place?
A. **Well, to run LEIN, you have to be a certified police officer and you have to take a test every year and pass that test to be able to use LEIN.**
Q. Is there any other guidelines in place?
A. **Oh yeah, guidelines about using your MDC while you're driving and things like that, yes.**
Q. What are those guidelines, tell me about that?
A. **Specifically, I don't know the wording specifically, but it's recommended not to use your MDC while you're driving, but it's almost impossible. I mean you're constantly getting updates on the run you're**



**going to and things like that. You can't -- you can't stop every time and read what they sent to your screen.**
Q. Understood. What are officers taught or trained about avoiding that distraction? How do you balance the need to get where you're going versus receiving the information from the MDC?
A. **And there's really no -- there's really no special training. It's just you're told, you know, it's discouraged to use it while you're driving. But again, we all know that it's impossible to do this job without that.**
Q. So in other words, there's no specific training about, hey, this is the manner in which you should read the MDC while you're driving, there's no safe way?
A. **Correct.**
Q. What are officers taught or told about typing on the MDC while driving?
A. **It falls under the same category.**
Q. Okay. Just in that they need to ensure that they can do it safely?
A. **Correct.**
Q. You know I think we -- we agree, I think, generally those guidelines are probably in place because a



driver not looking straight ahead is not giving their full attention to the roadway?
A. **Correct.**
Q. And that's where potentially the issue could come where a driver, who is using the MDC, may end up being distracted?
A. **Could be.**
Q. A driver who is reading or typing into the MDC may miss what is there to be seen in front of them in that situation?
A. **Potentially, yes.**
Q. And if an officer is driving above the speed limit, they would have an even greater need to keep their attention on the road in that situation?
A. **I guess you could say that with speeds increasing, yes.**
Q. Okay. All right. Let's talk about SOCCIT, let me get that correct. So, S-O-C-C-I-T, SOCCIT.
A. **Yes.**
Q. What is SOCCIT?
A. **SOCCIT is just basically a collaboration between several police departments to get together. It was started to save money. Departments were hurting, they didn't have money, they couldn't afford to have their guys come out on overtime and investigate**

these scenes. So the thought was -- and this was done between the chiefs of the departments. They came up with, hey, why don't we have like -- I guess you'd be like a task force or some sort of collaboration where we're all trained, we all have the same training.

So why not call an officer from another department who is already on duty and getting paid to come and take pictures or run the GPS stick or the total station, and that way you're not paying one of your guys on overtime. It doesn't preclude you from calling in your guys on overtime if you need them. But it's like hey, this -- well, he's trained the same way he's trained, why can't -- and he's already here, why can't we just use him. So it was just a collaboration between six departments, I think.

Q. It's a pretty close-knit collaboration?
A. I wouldn't say close-knit, but we do train together so we all are on the same page.
Q. How often does that training occur?
A. Four times a year.
Q. What is involved with that training?
A. We take turns hosting the training, and the host department is responsible for whatever the topics



are going to be for the day.
Q. So as I understand it, SOCCIT is a collaboration between Troy PD, Auburn Hills PD, Birmingham PD, Bloomfield Hills, Bloomfield Township?
A. Yes.
Q. Am I missing any?
A. We've had -- there's been times where the Oakland County Sheriff's Department has come into our training, but we have not -- we don't have a relationship with them under SOCCIT.
Q. Okay.
A. But they have been to our SOCCIT meetings.
Q. Are they there to train or are they there to learn?
A. To learn. It's like a topic that they're interested in and they heard about; and, hey, can we come in. If we have a speaker coming in about a certain topic, they'll be, hey, we'd be interested, can we come to your training? We're like, yeah, you can come to our training.
Q. What topics typically get covered in a SOCCIT training?
A. Everything related to crashes. So we're always -- we do SFST training; we do training on our total station, our GPS stick, and our drones about every time we do that.



MS. DEBLER: Did you say drones?

THE WITNESS: Drones, yes. We have people come in from MDOT, Michigan Department of -- the road commission, a lot of people from the road commission come in and just talk about different things. We have the -- last time -- well recently, we had the railroad police, because we have railroad tracks that run through Birmingham and our jurisdiction. So they give us information how we handle a train crash or a drunk conductor or something like that. So it's very broad but it's all specific to crash investigation.

BY MR. MARTINEZ:
Q. How long has SOCCIT existed as this collaboration?
A. I want to say 2009 because I remember it was around 2008, 2009 and everything was going bad where departments didn't have any money, we were trying to figure out how to save. I want to say it was around that time.
Q. How long have you been involved with SOCCIT?
A. Pretty much that entire time. There was a -- so I was part of the traffic safety unit when SOCCIT was put together. There was a time when our traffic safety unit was disbanded. I was no longer a part of the traffic safety unit, but I was considered the



traffic specialist because I had all the training. So my responsibilities were back on the road, but then I had additional responsibilities of being a crash investigator when needed.
Q. Is it common that officers affiliated with SOCCIT have the similar background training that you have, that we've discussed with MSU and these other institutions?

MS. DEBLER: Objection, foundation.

THE WITNESS: It should be that type of training. But like I said, MSU hasn't been doing it for a long time and then Benchmark is out of business. So it's -- it's similar, yes, but not necessarily the same agencies putting it on.

BY MR. MARTINEZ:
Q. Understood. I guess what I'm getting at is I'm trying to figure out is it expected that an officer who becomes involved with SOCCIT has at least some functional knowledge on an accident investigation from somewhere?
A. I mean that depends on the department. If a department promotes an officer into their traffic safety unit, it's up to their department to make sure they're trained. And at what point they either are trained or are getting trained, it's up to them.

Q. Who are the Troy officers involved with SOCCIT?
A. **That would be -- currently, we've had a lot because people come and go and stuff like that, but currently it's Officer Allan, Officer Huck, Officer Hunter, Officer Shearer, Officer Magraw and Officer Beether.**
Q. I'm sorry to have to make you do it. Can you give me first names?
A. **Okay. So Scott Allan, Ken Hunter, Chris Huck, Jake Shearer, Nicholas Beether and Jacob Magraw.**
Q. Is Gail Parra involved with SOCCIT?
A. **Not now.**
Q. Was she at one point?
A. **Yes.**
Q. How often does Troy change the officers involved with SOCCIT?
A. **It depends on the officer itself. If the officer wants out of the unit, they have to put in at least four years. If they want out of the unit, they can request to be taken out at the next bump. But usually the only time you come out of traffic is if you're taking on another role. So I got out of traffic when I got promoted. And then Officer Parra, she wanted to go be a community services officer, so she left traffic to go to**



**community services. And very rarely does anybody in the traffic unit want out for no reason. I mean it's a good unit to be in.**
Q. Has SOCCIT largely remained comprised of the same officers throughout the time that you've been involved, or has there been a lot of turn over?
A. **It depends on the department, but there seems to be a lot of turn over. In my experience usually officers that are in special units are the ones that are more motivated to get promoted and do different things, so we see a lot of movement. But there's no -- I can't require Bloomfield Hills to have their guys have certain training; it's not my role.**
Q. Who is in charge of SOCCIT?
A. **There's really nobody in charge. I mean each department has a representative. So I represent our department in SOCCIT, and then all the other departments have their specific people. And most of them are sergeants or above.**
Q. So as the person responsible for being -- or for representing Troy in SOCCIT, does that mean that you are the one that gets the call if they say, hey, Troy PD, we need some help for this crash?
A. **If it's our crash or another department?**
Q. If another department is calling you for assistance.



A. **So no, they -- the other department will contact our dispatch. Our dispatch then -- well, if we have anybody working who in that capacity at the time, whatever supervisor is on duty would be the one to make that decision.**
Q. What policies and procedures, if any, are in place for SOCCIT.
A. **So SOCCIT does have guidelines. They have guidelines that are -- there's probably a 40-page document of guidelines. It's just suggestions on how it should be run. It just tells you if you have a car crash with one fatality, you should have five investigators. If you have a -- you know, five fatalities, should you know. Whatever it is, there's just guidelines but it's -- you don't have to follow the guidelines. It's not recommended or required to be part of the unit. It's just a suggestion that came up. I'll say this should be a good idea. If we do it, this is how it should be done.**
Q. Who decides those policies or procedure or guidelines as you said?
A. **I was not involved in that process when they started it. Like I said, it was started by the chiefs of the departments. And who was tasked with that, I**



**don't know.**
Q. Do you know who would typically hold on to a copy of those guidelines?
A. **We all have a copy of the guideline.**
Q. So I know you indicated that SOCCIT typically trains four times a year, like roughly quarterly?
A. **Yes.**
Q. Are there other occasions where SOCCIT members or investigators get together to meet?
A. **Other than at a crash scene, no.**
Q. What kinds of crashes will trigger SOCCIT involvement?
A. **If there's a potential for a serious injury or a fatality.**
Q. And who makes that determination?
A. **It would be the department.**
Q. Okay, so whichever department is making the call out for assistance would be the one that decides?
A. **Yes, that's correct.**
Q. How long have you known Sergeant Bryan Eftink?
A. **Probably -- I think when I met him -- I knew him -- because we used to do the traffic -- we would be -- we were in some traffic crash training together back in the day. So I don't know if I knew him that well. So probably 2006, if I'm guessing, 2007.**

Q. How did you first meet him?
A. **Probably in a crash training.**
Q. Had you worked with him in any capacity before this crash?
A. **No. Well, yes, we've worked scenes together, yes.**
Q. Roughly about how many times?
A. **Maybe half a dozen.**
Q. Had you ever done any training with him prior to this crash?
A. **Like I said, when you have traffic safety officers, you're typically seeing the same people. What training I had with Bryan outside of SOCCIT, if I did, I don't know, but I think that's how we met originally because he's from a neighboring department. He was in the training, and that's kind of how I remember meeting him.**
Q. Are you guys close enough where you text each other, call each other on a regular basis or anything of that sort?
A. **No. It's always work related.**
Q. Okay. Can you share any insight as to why Auburn Hills was selected ultimately as the investigator for this crash?
A. **That wasn't my -- that wasn't my decision.**
Q. Who typically makes that decision?



A. **In this case it was our chief.**
Q. Does SOCCIT have any protocols or procedures in place for identifying which agency should be called --
A. **No.**
Q. -- to assist?
A. **No.**
Q. So you can't tell me why Auburn Hills was selected over Birmingham, for example?
A. **Well, I was involved in the decision, but I wasn't my -- my only decision.**
Q. Okay, what was the extent of your involvement?
A. **Making suggestions. There was several people on this meeting, and there was several ideas thrown around.**
Q. Who was in this meeting?
A. **It was the chief, the IA lieutenants.**
Q. Can you give me names?
A. **Oh, chief is Josh Jones. The IA lieutenant would have been Frank Shuler. Captain Nate Gobler was in that meeting because he heads our investigations. Myself and I want to say Captain Giorgi, because he was the road patrol captain, I believe. Mike Giorgi, I believe, was in there as well.**
Q. What was discussed in this meeting?



A. **How we should -- what would she do with this -- how should we -- there was discussion -- should we do the investigation or should we outsource it to somebody else? And it was quickly determined that we were not going to do it ourselves.**
Q. When did this meeting take place?
A. **Tuesday, the 26th of September.**
Q. Where did this occur at?
A. **It was in the chief's conference room in the police department.**
Q. Was there any concern shared in that meeting by any attendee, as to the impact this crash could have on the Troy Police Department?
MS. DEBLER: Objection to form and foundation.
**THE WITNESS: I believe there was some concern. That's why we decided not to conduct it ourselves.**
BY MR. MARTINEZ:
Q. What was the concern shared?
A. **I don't remember specifically.**
Q. As far as -- since you've been a sergeant, has Troy or SOCCIT ever called in the Michigan State Police for a crash investigation?
A. **No.**



Q. Has -- in that same time period, has SOCCIT ever called in the Oakland County Sheriff's office to assist with an investigation?
A. **Not to my knowledge.**
Q. Based on your training and experience, independent of SOCCIT, what typically does an, quote/unquote, emergency look like for a police officer?
MS. DEBLER: Objection to form.
**THE WITNESS: Just any emergency?**
BY MR. MARTINEZ:
Q. Yeah, yeah, you can feel free to give me examples if that's helpful.
A. **I guess I'm not understanding where --**
Q. There are emergency situations that officers encounter?
A. **Yes.**
Q. When I say that term, emergency situations, what comes to mind?
A. **An injury, a death, something that requires immediate response for protection of life or property.**
Q. Okay. So it really is summarized an emergency is a threat to life or property?
A. **That's part of it, yes.**
MS. DEBLER: I think he said -- he said

injury too.
BY MR. MARTINEZ:
Q. Okay, what other part of it?
**A. Injury.**
Q. Injury?
**A. Yeah, and just the -- just the requirement that we get there in a timely fashion to protect people who can't protect themselves.**
Q. And obviously, you know, again, these situations are not static, you know, they're probably on a spectrum; is that fair?
**A. Oh, yeah.**
Q. So, you know, I know they have to -- the use of force continuum sort of thing that officers get trained on when they use use of force. Is there anything, a continuum or some sort of guideline, that gets applied to determining what is an emergency response and what kind of response is needed to address it?
**A. Nothing about what is -- what type of response is needed, but we have listed in our general orders what an emergency is. And that's basically what I said.**
Q. Is there ever a distinction in that emergency, that definition of emergency, you know, if an injury --



if I have just a little cut on my finger, is that the same thing as if I've lost an eye?
**A. No. But we don't always know -- all we know is we get a dispatch if we're referring to a property damage -- or a property injury crash, or a personal injury crash, I most times don't know what the injuries are. They call out, say -- it's a -- we call it a PI that requires an emergency response. If they come back and say, you know, Star, which is our ambulance service responding for a sore neck. Then it's up to the officer to determine if they should or shouldn't continue to respond in an emergency fashion.**
Q. Understood.
**A. So but we don't know -- most of the time, we don't know what the injuries are.**
Q. So if an officer arrives, they are able to assess the scene, and then they determine that an incident is a minor PI incident. Does that qualify as an emergency?
MS. DEBLER: Objection, form and foundation.
**THE WITNESS: It could, still, it depends. But there's no requirement for the officers still responding. They use their**



**discretion.**
BY MR. MARTINEZ:
Q. That may affect the level of the injury or severity of the injury may affect the urgency at which another officer or assistance is needed at a scene?
MS. DEBLER: Objection to form and foundation.
**THE WITNESS: It could. I mean I know the way I respond, but not everybody responds the way I do. So I can't speak for them.**
BY MR. MARTINEZ:
Q. As far as how you respond, tell me about that.
**A. Well, if I -- that situation, if I was responding lights and sirens to that type of incident and then someone came on the radio who was on scene and said hey, this is just a -- they just hurt their finger or their rib hurts, you know. Me personally, you know, most likely would probably shut down.**
Q. Do the policies and procedures or general orders that -- that you are part of supervising and enforcing, is there any distinction in those policies as to the level of urgency or the way that an officer should conduct themselves in response to those different situations?
**A. It's pretty black and white. It's either emergency**



**or not. It's not like the fire department where they tell them what level they should respond. We are -- it's either an emergency or it's not.**
Q. That's helpful because that was kind of how I was thinking of it in my head. I know they have different alarms that they can use to signify that. So as far as the police department is concerned, somebody shows up, they assess the scene, and then they make a determination from there?
**A. Yes.**
Q. Does the level of urgency of an officer responding to an incident change if there is already another officer on scene under the policies you enforce?
**A. It would depend. It could. It doesn't always have to.**
Q. Okay. Tell me more about that.
**A. Just because an officer -- if an officer calls out on scene and he may -- he could say I have three cars involved and I got one complaining of a cut finger, that doesn't mean that everybody there is not suffering from a more major emergency. So it all depends. But if it's a one-car crash, it's a rollover, the driver is out of the car, talking, walking, they're fine, then in that case I would shut down and just, you know, respond in a less**

**emergent fashion.**
Q. In a situation where an officer arrives on scene to a minor fender bender and there is a precautionary call for an ambulance to arrive to the scene, the ambulance arrives, is there any other urgency that an un -- a secondary assisting officer would need to have when responding to that scene?
MS. DEBLER: Objection to foundation.
**THE WITNESS: And again, that depends. One thing that you don't -- you're not looking at is where is the crash? We need -- cars blocking the roadway here and here, we've got to prevent people from driving through, to protect -- not necessarily to protect, preserve evidence at that point, but to protect people. So yes, it's very possible that it's -- that that officer should be getting there in a timely fashion just because the injury may not be severe. They should get there to help block the scene, keep cars from driving through because usually there's people and witnesses walking all over the place.**
BY MR. MARTINEZ:
Q. Based on your experience and knowledge of the policies that you supervise, is there a difference between getting there in a timely fashion versus



getting there in an emergent fashion?
**A. Is there a difference between emergent and a timely? Well, yeah.**
Q. Okay. How would you draw the difference or the distinction rather?
**A. Well there's times that we are -- we are driving in an emergent -- or in a timely manner, but we don't necessarily have our lights and sirens on. In my experience, sometimes you're better off without them because people freak out when they see lights and sirens. They stop in the middle of the road and things like that, but there would be -- there could be a time where someone's trying to get there in a timely manner and they wouldn't have their emergency lights on.**
Q. Okay. And that would be a situation though where they were following the speed limit?
**A. It depends.**
Q. What does it depend on?
**A. It depends on the circumstances again. There's nothing that says an officer can't exceed the posted speed limit if they're trying to get somewhere. I mean is he getting -- he has to explain why.**
Q. Who does he have to explain to?
**A. Well, I mean it depends on how far it goes. If it's**



**just me saying hey, I saw you doing this, maybe it's just a conversation between the two of us. But if it's the chief that sees it happening and comes to me, and says, hey, I want to know why he was doing that, then it goes a little bit farther. So it all depends. There's nothing in this job that's black and white. It's every situation is different.**
Q. So there's -- there's it -- it -- to get to it, there's no policy, procedure, guideline or general order that you're aware of that requires that an officer going above the speed limit has to use their lights and sirens?
**A. There are certain situations where it states that they don't have to use their lights and sirens.**
Q. What are those situations?
**A. One would be a B and E in progress.**
Q. A breaking and entering?
**A. Yes, a breaking and entering in progress where getting there quietly is more important there and then getting there, you know, with your lights and sirens blaring and scaring that person off.**
Q. Based on your knowledge and experience of the Troy Police policies, procedures, general orders and guidelines, was there any reason for Officer Leithauser to avoid using his lights and



sirens in this incident?
MS. DEBLER: Objection to form and foundation.
MS. DUFRANE: Join.
**THE WITNESS: If you're speaking to policy, there's -- I don't know, I can't answer that.**
BY MR. MARTINEZ:
Q. You enforce the policies, right?
**A. Yeah, but I -- you asked me for anything specific in the policy. And not that I know of.**
Q. Okay. In the course of your investigation or at least, you know, the time you were on scene, did you come to learn what call Officer Leithauser was responding to?
**A. At some point, I learned. I couldn't tell you at what point -- I mean, it's probably one of the first questions I had, hey, where was he going, but that wasn't my concern.**
Q. This would have been something you learned on scene?
**A. Most likely, yeah.**
Q. Okay. Do you recall how you may have found out that information?
**A. I'm sure just from somebody. Usually when I get to the scene, I get briefed on what's going on. So I'm**

**sure someone told me.**
Q. Who briefed you in this situation?
**A. I believe it was Sergeant Parker, he was on scene, and I believe -- I believe it was Sergeant Parker, I think. But I can't remember specifically.**
Q. And when you were briefed on the incident, what did you learn the nature of the call he was responding to to be?
**A. I believe I just remember them saying he was responding to an injury accident.**
Q. You had no other context other than that?
**A. Not that I can recall, no.**
Q. Did anybody share with you the reported severity in that crash?
**A. The other --**
Q. The other crash. The one that he was responding to?
**A. I found out eventually, yeah. But again, I don't know -- at that point, I probably didn't know because I don't think they even knew.**
Q. Do you know how long after you were at this scene, whether it's hours or days later, that you would have gotten additional context?
**A. I mean, most likely by the time I went home that day, but I don't -- I couldn't say for sure.**
Q. Did you know whether or not EMS was already on scene



of the incident Officer Leithauser was responding to?
MS. DEBLER: Objection to foundation and form.
**THE WITNESS: Yeah, I don't remember.**
MS. DEBLER: Aaron, I don't want to break your flow. I just want to let you know, at 11:30 I just have to take a five-minute break. I have another deposition starting in different conference room. I need to say hello to my witnesses.
MR. MARTINEZ: Yeah, no problem. I'll try to keep an eye on the clock here.
BY MR. MARTINEZ:
Q. Okay. Sergeant, what does the term "slick-top vehicle" mean to you?
**A. That would be a patrol vehicle without a light bar.**
Q. Okay. Are there any other names for that kind of vehicle?
**A. Sometimes you call them like a UC car, an undercover car, but it's not really an undercover car. But slick-top is typically what we refer to is as.**
Q. Why does the police department use a slick-top vehicle?
**A. Mainly there -- in my experience, they've been used for traffic safety vehicles to kind of keep a low**



**profile, so you're not giving away your location. And you want to see the people how they're moving without you being there.**
Q. Slick-top vehicles are generally low profile vehicles?
**A. Lower, yes, where all the lights are typically inside the vehicle; none are outside the vehicle.**
Q. Are there slick-top vehicles that are more like sedan style versus SUV style, or do you have both at the department?
**A. We don't have very many anymore. So traffic safety cars used to all be slick-tops. And those were Chargers -- we had Chargers -- I don't remember if -- I don't think we had any Explorers at the time. The Explorers that we got all had light bars on them, so yeah, I think it just would been the Chargers that I can remember.**
Q. Okay. So I know we indicated that they're lower profile. How is a slick-top vehicle different from a fully marked police vehicle?
**A. The only difference would be that there's no light bar, and the markings on the vehicle depending on the department, may be more subdued.**
Q. Slick-top vehicles are equipped with a siren?
**A. Yes.**



Q. Do you know whether the vehicle that Officer Leithauser was operating constitutes a slick-top car?
**A. I don't remember. I know it was a Charger. I honestly don't remember.**
Q. I believe there was an indication, I think by Officer Palm, to one of the witnesses that it was a slick-top vehicle. Do you have any reason to dispute that?
**A. Well, it's possible. We had some, so it's possible.**
Q. Is it fair to say that when a slick-top vehicle is traveling fast, warning becomes more important?
MS. DEBLER: Objection to form.
**THE WITNESS: I couldn't answer that. I don't know.**
BY MR. MARTINEZ:
Q. We just said that the vehicle's lower profile, right?
**A. Yeah, but it still has lights and a siren.**
Q. Okay.
**A. So lights are inside, like in the visors and around it, except for on the roof.**
Q. Okay. So we've got a darker vehicle with subdued markings?
**A. Not necessarily.**

Q. Okay, how would you characterize it then?
**A. It depends on -- that we -- not all slick-tops had subdued graphics. So that one I think had regular police markings on it, if you're referring to the Evan Leithauser crash.**
Q. Okay. So describe for me, what's the difference between regular police markings versus not?
MS. DEBLER: I'm going to object to the form of the question and also the foundation of the question. I mean are you talking about what's the difference between Troy Police, slick-top vehicles and regular police vehicles or just generally police vehicles' distinction?
MR. MARTINEZ: We're talking about the vehicles available to the Troy Police Department.
BY MR. MARTINEZ:
Q. So the slick-top vehicles, which you say may be undercover type vehicles with no light bar and lower profile, you say that it was fully marked or it could be fully marked. I'm trying to just understand is there a slick-top UC vehicle that has full markings of the police department or is it --
MS. DEBLER: I was just going to object to form and foundation.
MR. MARTINEZ: Okay, I can give you a



continuing objection for form and foundation.
MS. DEBLER: Yeah, okay. And here's my what -- everything. I'm not sure he testified that this was an undercover vehicle. I think maybe ask him what the Troy -- you go ahead and ask the question. I'll just object if it's objectionable. Go ahead.
MR. MARTINEZ: If it's something helpful we can move it along.
MS. DEBLER: Okay. I was going to suggest asking him what the Troy slick-top vehicles that he recalls at the time, specifically the Chargers, looked like.
**THE WITNESS: Right, so if it was a Charger in this case that particular year, that car was not a traffic safety unit car, so that would have been assigned to the road patrol. All road patrol cars have full markings, but not all have light bars.**
BY MR. MARTINEZ:
Q. Now when you make a distinction as a vehicle having full markings, what does that entail? What does that look like?
**A. So it's our full -- it's the full marking down the side of the car. At the time, I'm trying to**



**remember -- we changed our markings recently. But it would have been a stripe down the side. I believe that one would have been a yellow and a white stripe. They would have had the Troy Police within that on both sides and fully visible, reflective.**
Q. Do any of the vehicles that you're speaking about have black lettering on black paint, reflective perhaps but still black on black?
**A. Within our department?**
Q. Yes.
MS. DEBLER: Currently now or then?
BY MR. MARTINEZ:
Q. We could talk about then, but I would like to know now as well.
**A. From what I can recall, now we have none. We have cars that have subdued graphics, but it's not black on black.**
Q. How do you define subdued?
**A. It's just more of a -- it's the same color scheme, but it's just more of like a matte finish as opposed to like a brighter and reflective -- it's still reflective, but it's like a more of a matte finish.**
Q. What is your understanding of the general law enforcement purpose behind having subdued graphics



on a police vehicle?
**A. I'm not aware of anything that says you can't.**
Q. That's not my question.
**A. Oh.**
Q. What's the purpose? Why would you have a vehicle?
**A. Oh, just -- just to be -- again, things have changed over the years recently. But there was a time where you didn't want people to know it was a police car.**
Q. Okay.
**A. That was usually for traffic enforcement purposes.**
Q. When you arrived on the scene for this crash, what did you learn or what did you know about Maple Road's lane configuration? How is the road laid out?
**A. It's just a regular straight roadway with a slight incline at that -- in that area.**
Q. Okay, how many lanes in each direction, things of that sort?
**A. It would be two eastbound, two westbound, a left-turn lane and at some points there are turn lanes.**
Q. Okay. So there would be two westbound, two eastbound and then that continuous middle left-turn lane?
**A. Yes.**

MR. MARTINEZ: Margaret, would it help you to take a break now? I'm going to probably get into the EDR stuff and that may take a sec?
MS. DEBLER: Let me -- yes, let's take a break for five minutes. The witnesses are supposed to be here at 11:30.
MR. MARTINEZ: Okay.
THE VIDEOGRAPHER: Please stand by. The time is now 11:27 and we are off the record.
(A brief recess was taken)
THE VIDEOGRAPHER: The time is 11:41 and we are back on the record.
BY MR. MARTINEZ:
Q. Sergeant, I want to pivot to talking a little bit about the EDR, which I know you referenced briefly before. Can you tell me again what an EDR is?
**A. It's a vehicle report of a -- there are different types of modules, but in most cases, it's the airbag control module.**
Q. Okay. What is the difference between an EDR and an electronic data recorder and an ACM?
**A. ACM specifically refers to the Airbag Control Module.**
Q. Okay.
**A. And the ECM is just the kind of generic term, it could refer to any of them.**



Q. What kinds of data are you trained that gets stored in either of those?
**A. It depends on -- it depends on the head. The data that's on those devices is up to the manufacturer of the vehicle. There's no law. There is only one thing that's in place for any type of guidance, and that's -- it's called a Rule of 49. And all that says is that if you're going to have this device in a vehicle, it has to at least do speed, RPMs, brake light, braking and one other minor thing. It's like five things. But that's the only thing that has any guidance whatsoever.**
**So those devices are for the manufacturers, not for us. It's just Bosch now has the ability to do whatever they do, and we're able to get that information.**
Q. And you've been trained for quite some time in how to do the downloads and inspections through the Bosch software; is that right?
**A. Yes, I don't do quite as many as I used to, but yes.**
Q. Did you perform one on this crash?
**A. No.**
Q. Do you know who did on this crash?
**A. I believe that would have been the Auburn Hills Police Department.**



(Deposition Exhibit Number 1 was marked for identification)
BY MR. MARTINEZ:
Q. Okay. I'm going to hand you what's been marked for identification as Exhibit 1. Can you tell me what this is?
**A. This is the CDR crash retrievable report from Bosch.**
Q. Okay. There is a user that is listed in the top table there. Can you tell me what that says?
**A. Yeah, I was mistaken, that was me.**
Q. Okay.
**A. So I did do this one.**
Q. Okay. So we're on the same page, this would have been a download that you performed?
**A. Let me see here. It has the VIN -- they don't identify it by vehicle, they identify it by VIN, so I'm assuming this is the patrol vehicle.**
Q. Yeah. Is it common for motorcycles to have electronic data recorders?
**A. They do not.**
Q. Okay, so then you --
**A. To my knowledge, they do not.**
Q. You have no recollection of extracting anything from -- like electronic data recorder data from Mr. Szczesny's motorcycle?



**A. We don't have the ability to. And I don't even know if that ability exists. My understanding is when I was trained that there was no way to download any motorcycle information like they do for cars.**
Q. What equipment is generally needed to be able to perform an EDR inspection and create the report as you have in front of you?
**A. So we have two different modules. There's -- so the module is what you hook up between your computer and the vehicle's airbag control module, and then it does its magic. So I don't know how it does it, but it deciphers information and puts it on a form that we can understand.**
Q. When you go through training on doing an extraction using the Bosch software, what is it that they cover in that training?
**A. Well, there's two classes. One is they train you how to get the information either through the DLC, which is diagnostic link connector, which is under the steering wheel. If there's some sort of interruption between the battery, the fuse box and that link, then you have to go directly to the modules. You can do it. Then you would have to either connect directly to the module while it's in**

**the vehicle or you can take the module out and do a direct to module.**

Q. And there's an abbreviation that's used in this -- what I'll call a report that mentions CDR. What does that stand for?

A. **Crash data recorder. Or I'm sorry, receiver. Oh, I'm sorry, crash data retrieval. Sorry.**

Q. Crash data retrieval, okay. All right. And I think we covered that it's a Bosch software that ends up interpreting the data that comes from the EDR?

A. **Proprietary software, yes.**

Q. Did anybody assist you in performing this inspection?

A. **I believe, I -- you know, we don't typically don't put two names on here, but I believe -- I can't say for sure. Either Officer Hunter or Officer Gail Parra would have assisted me just because they're both also certified.**

Q. Understood. So it looks like obviously it has on the first page there, crash date of 9-22-23, which would be the crash that we're talking about today. And it looks like the EDR data imaging date would have been on September 25, 2023.

A. **Uh-huh, yes.**

Q. Is that information in that CDR file information, is



that manually inputted by you or is that automated in the system?

A. **Yes, several boxes here are put in by us and then other ones are automatic. So the VIN, there's two ways to do the VIN. You can either basically ask the software to get the VIN for you. And if it doesn't get the VIN, then you have to manually put it in yourself. So it's like 50/50, sometimes it does, sometimes it doesn't. That second box we do -- we put in, the third box we put the report number, and then we do the dates. Everything else looks like it is prepopulated through the software.**

Q. Was the vehicle that you pulled this data from secured in some way, shape or form?

A. **Yes.**

Q. Where was that done?

A. **We have a secure lot at our department of public works.**

Q. It's my understanding, you probably know a lot more about this than I do, that these EDR's, we can call it the black box, are sometimes kind of up in the engine compartment somewhere or at least it's not -- it's not as simple as opening up a gas, you know, tank, putting the gas in. It's kind of obscured, they're obstructed?



A. **Correct. It's at -- it's in the center mass of the vehicles. Wherever the center mass is, that's where it's attached, and it has to be attached to the frame.**

Q. Do you have to pull that box off of the vehicle in order to be able to perform the inspection to get this report?

A. **There's three screws you have to undo --**

Q. Okay.

A. **-- to get it off.**

Q. And then from there what happens? Take me through the process.

A. **Then we take that, we immediately write the VIN on the actual -- because it's not on it, so we write the VIN on it with a marker, a permanent marker. We take that back to the police department and typically download it right away if we have a way of doing it. The cables, each module has different cables. It's very expensive to own all of the cables. So we don't always have all of them. So a lot of times we would either buy it or we will borrow it from either Oakland County Sheriff's Department or Michigan State Police.**

Q. Is there ever a circumstance where the data provided by the EDR would be inaccurate or unreliable?



A. **Not in my -- not that I know of.**

Q. In other words, the data that's put on here comes directly from the data stored by the vehicle?

A. **Correct.**

Q. All right. Where is the EDR for this vehicle today?

A. **It would be -- it should be in our property, our property room.**

Q. I believe since the time this crash occurred, the vehicle that Officer Leithauser was driving has since been sold. Would that black box have gone back onto that vehicle prior to sale or is that not something you're involved with?

MS. DEBLER: Objection, foundation.

**THE WITNESS: It would not been put back on the car. I've never put one back on a car.**

BY MR. MARTINEZ:

Q. All right. Is there any document, you know, notes, automated reports, anything of that sort that documents the chain of custody of that EDR box?

A. **It would -- in our report, we put in there that it's part of the property and where it's been stored, yes. It's assigned a property number. Where this box is, it should be in property.**

Q. On a typical crash -- well, first let me back up. How many times have you done an EDR inspection

throughout your entire career?
A. I think I was certified in 2016. Like how many reports have I run?
Q. Correct.
A. Maybe 25 I think.
Q. So aside from you, Officer Gail Parra, and I think there was another name you indica --
A. Ken Hunter.
Q. And Ken Hunter, are there any other individuals at the Troy Police Department that you're aware of having the certifications, training or credentials to be able to do an EDR inspection?
A. At that time or now?
Q. At that time.
A. No.
Q. All right. So once a report gets pulled from the vehicle -- I guess once it -- well, how long does it take to generate that report?
A. Once you hook it up and all the connections and you initiate the extraction, it usually takes three minutes.
Q. So it's pretty quick?
A. Pretty quick. I mean, some are longer than others, but I would say on average maybe three to five minutes.



Q. And then whether or not it is longer or shorter, is that dependent on, as you said, whatever the manufacturer, the data they record in that box?
A. I don't have any personal knowledge, but I would imagine depending on how long the report is, yeah.
Q. That's fair enough. I don't need you to speculate, so if you don't know you can say that.
A. I don't know.
Q. Yep. So once you pull this report, do you review it?
A. Oh, I looked at it, yeah. I looked at it, yes.
Q. What is it that you typically look for when you review one of these reports?
A. There's several things you have to -- first you have to make sure that this is from the crash. So the first thing I look at is key strokes. So it gives you a key stroke at time of incident and a key stroke at time of extraction of the data. So if those key strokes aren't -- if they don't make sense, then the chances of this being from that particular incident are in question.
Q. Could you go through the report in front of you and possibly point out to us what page we would find that information you just referenced?
A. Let's see here. They all look different, so --



Q. I will say this is one of the longer ones I've seen.
A. Yeah. Okay, ignition cycle on page 8 of 45. Near the top, second one down it says ignition cycles at -- no, it says ignition cycle download. So that would be at the time of download the ignition cycles were 6206.
Q. What does that mean?
A. That means there were six thousand two hundred and six ignition cycles for the life of the car at that point.
Q. Okay. So that's not the same as like RPM.
A. No, it's just the key went this many times, 6,206 over the lifespan of the car.
Q. Okay. And that's what you look for to determine whether or not this vehicle was involved in the crash you're investigating?
A. Well we have to compare it to the key strokes -- we have to compare it to the key strokes at the time of the incident. So you do the download to compare to the time of the incident --
Q. Okay.
A. -- or at the incident, so we have to continue to change pages here. And if you go down on the next page, 9, that top section near the bottom says ignition cycles crash. So that's the ignition



cycles at the time of crash. So you have 6,205. So you compare the download, 6,206, to the crash, 6,205, and there's one key stroke. So that tells you that this report was from that incident because the key stroke, there's only one in between.
And then people are going to ask, why was there one in between. It could have been Evan turned it off maybe, it could have been -- we always tell the tow truck driver, but it could have been the tow truck driver going there and trying turning it. But it doesn't affect anything.
Q. Understood.
A. So if this key stroke was a hundred key strokes off, then we'd have to question, hey, is this even part of this crash.
Q. Got it. So the act of turning the ignition on is one; the act of turning it off would be another?
A. I believe so, yes.
Q. All right. Staying on this page 9, there is in the very top table that we're looking at, there's a mention of safety belt status. Tell me about that.
A. That's supposed to tell you if the occupants are wearing their seatbelts.
Q. Okay. And that would be at the time of the event?
A. Of this incident, yeah.

Q. Okay. So by looks of it, it appears to state that both the driver and the outboard front passenger were not buckled, is that your assessment as well?
A. **Correct. There is no -- there was no passenger. It was probably detecting his equipment bag on the seat, that's why it said that. Because typically it wouldn't give you a nonoccupant. But it probably detected some weight on the seat, and that's why it says a passenger. But, yeah, it's showing that he was not wearing a seat belt.**
Q. And someone may -- may be familiar with that. I know, for example, when I get into my wife's car, you know, if I sit down, a light comes on her dashboard saying passenger airbag is on. Do you know if that's the same system that would register that information in this report?
A. **I don't know.**
Q. Okay, fair enough. There is mention on here of delta-v. I'm sure that's been covered in some of the training you've experienced. Can you tell me what delta-v is?
A. **Delta-v is a change in velocity.**
Q. Okay. So essentially the rate at which someone, their vehicle is no longer moving?
A. **Or either accelerating or decelerating. So it could**



**go either way.**
Q. What does the delta-v typically tell you as an accident crash investigator about an event?
A. **Well, it's just another thing to confirm. If you're seeing a high delta-v or a delta-v that shows that the car was decelerating or slowing down rapidly, then that was another indicator that, yep, this is -- you know this could be from the incident as well.**
Q. And that could be -- well, I guess you tell me. Could that be from somebody slamming on the brakes or is that just from somebody impacting something?
A. **So it all depends on how the vehicle is designed to start the events. So these events are not running all the time. There is -- at some point something tells the vehicle, okay, start recording now. So some cars, it's an airbag deployment; some cars it's the -- there's sensors in the bumpers. Some cars it has to do with the G-forces. So it all depends how this car is designed, and I don't -- I couldn't tell you what was the trigger on here.**
**But I don't know for sure what the trigger was. But I know they're moving more towards G-forces now and not the deployment of airbags.**
Q. All right, still looking at page 9 of this report, I'm about midway down that top table where it says



"event number." And the result there is two. What does that signify?
A. **So it's telling you that it recorded -- it recorded two events.**
Q. What constitutes an event?
A. **Well, it's something that triggers. There's that trigger that it triggers. So it could be an impact with a car and then maybe it goes off and hits a tree, that could be a second impact. And again it all depends, some manufacturers, as soon as it records one event, it locks the ACM. Some allow it to collect as many events as there are.**
Q. So moving down two lines on that same table, it now -- looking at time from event one to two in seconds, and it looks like there was greater than five seconds between those two events.
A. **Right, because the recorder only records five seconds pre and five seconds post crash. So I think that's the max that it can do.**
Q. Would it be a reasonable interpretation of that data to say that the first event was the impact of the patrol vehicle with Mr. Szczesny, and then perhaps the impact of the patrol vehicle with the HAP sign or the curb on the opposite side of the road where Leithauser's vehicle came to rest?



MS. DEBLER: Objection to foundation.
**THE WITNESS: I would have to say, yes, it was one of those things, yes.**
BY MR. MARTINEZ:
Q. Okay. All right. So take me through the rest of this report here. I know there's a lot of charts. I'm looking now at page 11. What is it that this -- these two graphs here are telling us?
A. **So this is what they call a crash pulse, so you have your longitude and your latitude. This one records both directions, longitude and latitude. So this is telling you here, it's showing you a steady and then at the point where you see it dipping down here, is where the impact was. And the chart is self-explaining. You have miles per hour and you have seconds prior to.**
Q. Okay. And now in this case when we read as the most recent event, because there are two events, this chart is probably telling us that second impact with the patrol vehicle?
MS. DEBLER: Objection to foundation.
**THE WITNESS: No. This should be the first event. It usually goes first event and then second event.**
MR. MARTINEZ: Okay.

THE WITNESS: But I guess I'd have to look a little bit closer.
BY MR. MARTINEZ:
Q. Yeah. No, please do. I just -- I want to make sure we're understanding this.
A. That's another thing, these reports all look different. Sometimes they specify, they'll say right on each page it's event one or event two. So this is event number one.
Q. And when you get to what you're looking for, if you could just tell us what page number you're looking at?
A. I'm looking for where it's telling me what the event number is for this one. Okay, yeah, so this first one is the second event, this first one that we're looking at.
Q. Okay. Where it says most recent event --
A. Yeah.
Q. -- that's referencing event number two?
A. If you go back to page 9, that top section, right above where we talked about the greater than five seconds, it says event number two. So that would be the second event, whenever the second event was, and that's what this is.
Q. Got it.



MS. DEBLER: And when you say this, you mean -- can you give --
THE WITNESS: The crash pulse is what we're looking at.
MS. DEBLER: Which page --
THE WITNESS: Page 11.
MS. DEBLER: Okay.
BY MR. MARTINEZ:
Q. All right, so as far as -- let's see. Where in this report can we find information pertaining to event one?
A. So if you keep flipping pages here -- let's see. Looks like page 22.
Q. Got it.
A. The top section about halfway down, says event number and it says one. So this would most likely be event one.
Q. Okay, so where it says first prior event here on page 22, we see similar charts to what we were looking at previously?
A. Yes.
Q. I do note, so now here, as it pertains to this event, it says safety belt status for driver is buckled?
A. Yes.



Q. Okay. And that's more consistent, perhaps, with that initial impact?
A. Yes.
Q. All right. In this report, are you able to determine what speed Officer Leithauser was operating prior to that collision with the motorcycle?
A. It does give you a readout here of speed.
Q. Once you get there --
A. Starting at page 25 through looks like 29. So you get your -- the time, the delta-v, longitude and latitude.
Q. Can you just tell me which page number?
A. Oh, I'm sorry.
MS. DEBLER: Can you give us the Bates number?
THE WITNESS: The 190.
MS. DEBLER: Okay. Is 190 25 or 45 on yours?
THE WITNESS: Twenty-six.
MR. MARTINEZ: Twenty-six.
MS. DEBLER: Okay. I was going to say -- I was going to say because he was referring to 25, okay. So you're on 190, which is 26.
THE WITNESS: Kind of small. My eyes are going bad.



MS. DEBLER: That's okay.
BY MR. MARTINEZ:
Q. Okay. So this chart that we're looking at, Bates stamp 190, it's page 26 of 45 on the report, this is where it tells you speed, you say?
A. It starts -- yeah, it gives you -- it gives you -- it starts to give you speed and at what time in milliseconds.
Q. Okay. What information are you typically looking for when you see this chart for the longitudinal crash pulse?
A. Well for this one, you're looking at the speed at impact typically is what you're looking for.
Q. And is speed at impact, is that zero milliseconds in the time?
A. Well, no -- well, yeah, it goes -- no, it goes five seconds prior and five seconds after. So zero milliseconds would be the start, and then it goes through -- I don't know why they do milliseconds, but then it goes through -- and there's different columns too. There's three columns on each page.
Q. Okay. Let's jump ahead. Let's go to 195 is the Bates stamp. It's page 31 of 45 on the report. And this one may help us explain it a little bit better.

A. **Page 195?**
Q. Yes.
A. **Okay.**
Q. So again this one mentions pre-crash data for that first prior event that we were discussing.
A. **Correct.**
Q. And this appears to give us that five seconds before that you referenced?
A. **Yes.**
Q. Okay. So take me through. The five seconds that we have on this page here, what information do you gather from this chart?
A. **Well there's a lot of information here. But mainly we're looking at the speed, the accelerator pedal and then the throttle and usually the brake is what we're looking at here.**
Q. Okay. So it looks like at five seconds prior to the event, the accelerator pedal was 100% pressed; is that a fair reading?
A. **Yes, that's what it says, yeah.**
Q. Okay. The engine throttle, it indicates, is 89%. Are you able to tell us what the difference is between those?
A. **The accelerator pedal would be the position of the pedal itself, and the throttle I believe would be**



**similar to the RPM's. But I guess I couldn't say for sure. The -- just the percent that your -- that it's telling it to do -- to go.**
Q. Okay. So based off of -- actually, let me see here. Sorry, I'm looking for the one spot here. Ultimately there was a finding in one of the reports which said that they determined Officer Leithauser was traveling approximately 60 to, I believe, 64 miles an hour in the moments before the crash. Do you see that data reflected in this report anywhere?
MS. DEBLER: Objection to foundation. Thank you. Take your time too.
MR. MARTINEZ: Yeah, yeah, yeah, please.
**THE WITNESS: I do not see it in here for some reason.**
BY MR. MARTINEZ:
Q. I'm looking here at page -- Bates stamped 182. It's 18 of 45.
A. **182. Go all the way back. Okay, yeah, this is it here, yeah.**
Q. Okay. So the most recent event that's recorded in the data recorder has the vehicle five seconds before the event traveling at 64 miles an hour; do you see that?



A. **Yes. You know, I think the other stuff was the post crash, that's why I was -- wasn't seeing what I thought I was seeing. Yes.**
Q. Okay. And then it looks like from 4.9 seconds through .6 seconds prior to the event, the vehicle continues to travel at 63 miles an hour?
A. **That's what this reflects, yes.**
Q. And then beginning at .5 seconds, we see that the engine throttle is now down to three, accelerator pedal is zero and the vehicle begins going at 62 miles an hour and then .4, 61 miles an hour; .3, 58 miles per hour; 2, 57 miles per hour and then .1 before the crash is at 53?
A. **Correct.**
MS. DUFRANE: Those are negative, minus .2.
BY MR. MARTINEZ:
Q. Yes, so that would be interpreted as the time before the event?
A. **Yes.**
Q. When you see the accelerator pedal at 0% but the vehicle traveling between 63 miles per hour, 64 miles per hour, what does that tell you as a crash investigator?
A. **That there's no longer being -- any pressure being**



**applied to the accelerator pedal.**
Q. So, in other words, the vehicle is probably coasting at that point for that time?
A. **Yeah.**
Q. And then we see that again, it looks like at -- so first that occurs at minus five seconds to minus 4.5 seconds, and then we see that again at minus .6 seconds through the moment of the event?
MS. DEBLER: Objection to foundation.
BY MR. MARTINEZ:
Q. Is that a fair reading of that?
A. **That's what it's showing, yes.**
Q. Okay. All right, is there any other data that for your purposes as a crash investigator, you look at this report and rely on?
A. **The service brake is usually something we look at as well.**
Q. Okay. Where can we find that?
A. **That's two columns over from the accelerator pedal.**
Q. Okay. What is the service brake?
A. **So the service brake is an indication that the brake lights were active.**
Q. Okay. So, in other terms, you know, somebody that -- that maybe is just touching their brake pedal, that can activate the lights, yes?

A. **It depends on the threshold he has, so it -- whatever -- however the manufacturer has that designed, yes.**
Q. Okay. But for purposes of this vehicle, it does not look that the brakes were applied until minus .6 seconds before impact?
A. **Yes, that's when the service brake was activated, yes.**
Q. Does it give us a percentage anywhere on how much the brake pedal was pressed?
A. **Not that I've ever seen. I don't believe there's one on this one at all. I'm not seeing anything that indicates that.**
Q. Okay. I believe the last thing I want to just look at here, Bates stamp 185, it's page 21 of 45. Again, we've got that same time period reflected on this graph for that event, correct?
A. **Correct.**
Q. All right. And I'm looking here at that center column, really the two pertaining to cruise control.
A. **Yep.**
Q. So what does that tell you about what that vehicle had engaged at the time of the crash or the moments leading up to it?
A. **A cruise control status would tell me that the**



**cruise control switch wasn't on, and then the cruise control engage would tell me that it was not active.**
Q. Okay, so somebody can have cruise control on but not necessarily have it engaged?
A. **Yes.**
Q. Okay. And in this crash, it was neither on nor engaged?
A. **Correct.**
Q. Just out of curiosity, actually, one last thing on page -- Bates stamp 199, page 35, 45, I'm not expecting you to know what this is, but I'm just curious. Is there any part of your job as an accident reconstructionist or accident investigator, rather, that requires you to look at that data, the numbers that we see on this page?
A. **No, this -- the way I was taught, this data here is, this data just in a hexadecimal format, we've never been taught how to read this. We have no way of deciphering it. So my understanding is from my training is that it's just this information in that form.**
Q. Okay. And again, just based on your training, if you don't know, you don't know. Is the hexadecimal data considered the raw data for this?
A. **I believe so.**



Q. All right. All right, thank you, Officer, I'll take it back -- Sergeant, rather.
So, Sergeant, how is EDR data different from a person's memory or their account of what happened in an event?
A. **I mean this data is -- you can't really dispute it. It is what it is. You have to assume that it's right.**
Q. In other terms, this is regarded as being objective data?
A. **Yes.**
Q. There's no interpretation, really, or subjective interpretation that you do in your role when looking at this data?
A. **Correct.**
Q. In other terms, what this data says, we can rely on as being the accurate data from the vehicle?
MS. DEBLER: Objection to foundation.
**THE WITNESS: That's what I was taught, yes.**
BY MR. MARTINEZ:
Q. EDR data doesn't care what a driver says happened in an event?
A. **I wouldn't think so.**
Q. At the time that you downloaded this data here,



would that have been the first time that you learned that Officer Leithauser was traveling over 60 miles an hour at one point?
A. **Yes.**
Q. What did you do with that information upon receiving it?
A. **Well, there would have been a report generated based on that, and I don't know who completed that report.**
Q. Would you have had any role in notifying command about what this report said?
A. **I could have. I don't remember if I did or not. I'm sure at some point I was probably asked, but I don't have any recollection of it.**
Q. Did you ever have any conversations with Evan Leithauser directly about what this report says?
A. **I don't think so. Evan -- I don't think I did. I do not believe I did have any conversation with him about that.**
Q. Did you have any conversations with Scott Allan about what this report says?
A. **Possibly. Probably not. It probably would have been between me, Gail Parra, and Ken Hunter, so they're the ones that know how to read those.**
Q. Okay. Do you know what was discussed in a

Page 150

conversation with Gail Parra about this data?
**A. Not specifically.**
Q. Upon receiving this report, did you provide a copy to anybody?
**A. I believe a copy was given to Officer -- or Sergeant Eftink.**
Q. Prior to it being given to Sergeant Eftink, would you have given a report to this -- of this to anybody else?
**A. No. We keep it in a file on our computer that's designated for our Bosch software. Keep it on the file in there, and then we have one copy and that's it.**
Q. Okay. So at the time that Officer Leithauser was working on September 22, 2023, would he have been under your supervision?
**A. No.**
Q. Who would have been his direct supervisor?
**A. I don't know.**
Q. Upon finding out that at one point he was traveling over 60 miles an hour on a city street, would you have recommended discipline?
MS. DEBLER: Objection to discipline.
**THE WITNESS: That's not my job.**
BY MR. MARTINEZ:

Page 151

Q. So you would not have initiated an SI or anything of that sort for this incident?
**A. He was not under my -- under my supervision, so no, I would not have.**
Q. Understood. Were you given any information in the course of your investigation about what Officer Leithauser claimed he -- the speed he claimed he had been traveling?
MS. DEBLER: Objection to form.
**THE WITNESS: I don't remember. I'm sure he said something at some point, but I don't remember if he made any admissions to me or not.**
BY MR. MARTINEZ:
Q. Did you question Officer Leithauser at any point in time pertaining to your investigation of this incident?
MS. DEBLER: I'm going to object to form again in terms of his investigation of the incident, because that terminated on the 26th.
MR. MARTINEZ: We'll get into it.
**THE WITNESS: That would be no because I wasn't conducting the investigation, so no.**
BY MR. MARTINEZ:
Q. Did you ever ask Evan Leithauser if he was using his phone while he was driving?

Page 152

**A. No.**
Q. Did you ever ask Evan Leithauser if he was distracted by his mobile data computer while driving?
**A. No.**
Q. Did you ask him at all if he was distracted by anything?
**A. No, that's not my role.**
Q. Whose role would that have been?
**A. Well, if there was an internal investigation, it would be his immediate supervisor.**
Q. Did you make his immediate supervisor aware of what this report says?
**A. Like, personally did I go to them and -- I -- no. I mean --**
Q. Because to be clear, on September 25, 2023, we're not in dispute, you were still involved in the investigation of this crash?
**A. I was involved in the extraction of the data from the CDR.**
Q. And you had reported to the scene as well on the date of the crash?
**A. Yes.**
Q. So between that date of the crash and this EDR extraction, you were still involved in the

Page 153

investigation?
**A. I was -- those were my day offs -- those were my day offs in between. So, yeah, we still -- the decision to pass it on hadn't been made yet. But the extent of my investigation was getting that information.**
Q. In the course of your investigation, what did you learn about where Officer Leithauser's vehicle came to rest?
**A. When did I? When I arrived on scene.**
Q. And where did you see it?
**A. On the eastbound side of the road, off the road, half on the curb, half off.**
Q. Did you ever go to inspect that area?
**A. Yes, I would walk the entire scene.**
Q. Okay. Did you measure the distance from the purported impact to the final resting place?
**A. I did not.**
Q. Did you instruct somebody else to do that?
**A. No.**
Q. Would anybody have done that with the total station or the GPS stick?
**A. It should have been done, yes.**
Q. Do you know whether it was?
**A. I do not.**
Q. Do you know if anybody involved with SOCCIT measured

that distance?
A. **I do not.**
Q. Did anybody from Auburn Hills measure that distance?
A. **I do not know.**
Q. As an accident crash investigator, what does post impact travel, that distance, tell you about a crash that occurred?
A. **Again, it depends. What kind of surface it is, if there's anything else in between, was there a missing tire, was the tire flat, you know, was it drag -- was the frame dragging on the ground, there's all -- there's lot of factors involved.**
Q. Well, let's be specific. What does it tell you about this incident?
MS. DEBLER: Objection to form. What is what? Sorry.
BY MR. MARTINEZ:
Q. What is the distance, the post impact travel of Evan Leithauser's patrol vehicle tell you about what occurred in this crash?
A. **Again, I really couldn't say. I mean, I could see where the car was, but that -- I mean, that usually doesn't -- alone doesn't tell me anything because what if he was still on the accelerator, you know. What if he wasn't on the brake or the brakes weren't**



**-- there's so many factors, it's hard to say. You can't just look at a distance and say, oh, this is -- this was doing this. I know for sure, you are exactly doing something.**
Q. Well it's good that we don't have to guess because we've got this objective data as you referenced it, right?
A. **Right. For the five seconds, yes.**
Q. Okay. So what does that tell you altogether?
MS. DEBLER: Objection to form. What does what tell you, the data or --
BY MR. MARTINEZ:
Q. What does the data, your observations, your training and experience as a law enforcement officer who oversees and supervises the traffic safety division of the Troy Police Department, what does that tell you?
A. **That alone doesn't tell me much.**
Q. What would you be needing then to make an interpretation of all of these things?
A. **It would take a lot to determine. And like at the things I mentioned, was -- were there -- were the tires low, were they -- was something dragging, was it -- you know, if the frame gets bent, it gouges into the ground, that would cause it to slow down or**



**if it didn't, if it's just rolling on all four normal tires. There's a lot of factors. I can't just say oh, because it's over there, it's this. I can't do that.**
Q. Throughout any of the training that you've received, the training we've gone through and your certificates, your training with SOCCIT, your training with the Troy Police Department, has anybody ever told you about Newton's three laws of physics?
A. **I'm familiar with them, yes.**
Q. What's your familiarity of them?
A. **I mean I'm not a scientist or anything and --**
Q. That wasn't my question.
A. **-- I'm just a cop. But things in motion stay in motion basically.**
Q. An object in motion will stay in motion unless acted upon by an outside force?
A. **Okay.**
Q. Any reason to dispute that?
A. **No.**
Q. Is that consistent with your training and experience?
A. **That's not something we discussed typically, but I mean, it was brought -- I know it was talked about**



**briefly. But it wasn't, it's not like our motto or anything.**
Q. No, but it's important for an accident investigation, right?
A. **Yeah, yeah.**
MS. DEBLER: Objection to form.
BY MR. MARTINEZ:
Q. Your answer was?
A. **Yes.**
Q. So in the context of an accident investigation, an object in motion may remain in motion unless acted upon by perhaps brakes?
A. **That would be one.**
Q. Striking something?
A. **Yes.**
Q. Running out of inertia or the speed and force to where it comes to rest on its own?
A. **Yes.**
Q. Okay. Do you have any reason to believe that brakes were a part of what led Officer Leithauser's vehicle to come to a stop where it did?
A. **I don't know.**
Q. Did you see any skid marks, gouge marks or yaw marks on Maple Road during your walk of the scene, which led you to believe that Officer Leithauser applied

Page 158

his brakes after the collision?
A. **Not that I can remember.**
MS. DEBLER: After the collision?
MR. MARTINEZ: Correct.
BY MR. MARTINEZ:
Q. Tell me about your first conversation with Sergeant Eftink about this crash?
A. **I called him and asked him if he would be willing to take over the investigation.**
Q. When did that occur?
A. **September 26, 2023.**
Q. Where did that conversation occur?
A. **On the phone.**
Q. Where were you at when you had the conversation?
A. **Probably at work because that's -- yeah, I was working that day, yes.**
Q. How long did that conversation occur for?
A. **I don't remember.**
Q. Was the purpose of that conversation to bring him into the Troy investigation?
A. **The purpose of that conversation was to ask him if he would take over the investigation.**
Q. Did Sergeant Eftink ask you any questions about this incident?
A. **I'm sure he did. I don't recall our conversation**

Page 159

**specifically.**
Q. How many investigations have you ever had to hand off to Sergeant Eftink?
A. **None.**
Q. This would be the first?
A. **Yes.**
Q. What materials did you have with you when you had that conversation with him?
A. **I don't recall. There were some materials that were turned over right away and some that were turned over later on.**
MS. DEBLER: I think what he asked you is what did you have with you when you were on the phone with him.
**THE WITNESS: Oh.**
MS. DEBLER: If you remember.
**THE WITNESS: I don't know. I don't remember.**
BY MR. MARTINEZ:
Q. Well certainly you had provided him with some information during that conversation, right?
A. **Yeah, I would have filled him in on what happened, yes.**
Q. At the time of that conversation, you said it would have been September 26th, correct?

Page 160

A. **Yes.**
Q. Which means that you would have had access to this September 25th report from the EDR?
A. **Yes.**
Q. Did you share with officer -- or Sergeant Eftink the speed you determined Officer Leithauser had been traveling?
MS. DEBLER: Objection to form and foundation.
**THE WITNESS: I didn't determine the speed.**
BY MR. MARTINEZ:
Q. Did you tell him what this report said?
A. **Most likely, yes.**
Q. Okay. Had you formed any conclusions about this case at the time of that conversation?
A. **Not any -- not that I can recall. I mean, obviously I probably had some, but I don't remember exactly what. I guess if you could be more specific?**
Q. Well, it's -- so you think you might have made some conclusions --
A. **Well, obviously --**
Q. -- what does that mean?
A. **-- looking at the speed alone is one thing and -- but I mean, there was a crash and at that point we**

Page 161

**did -- we had information but it was limited, it wasn't everything we needed.**
Q. Okay. So you had information regarding his speed from the objective EDR data?
A. **Yes.**
Q. At that time did you have information regarding Officer Leithauser's use of lights and sirens?
A. **At some point, I was advised, yes.**
Q. Prior to the conversation with Sergeant Eftink?
A. **That I could not -- I can't recall.**
Q. Had you concluded anything about the call in which Officer Leithauser was responding to and whether that was urgent?
MS. DEBLER: Objection to form and foundation. I don't think you've established he knew about it yet.
BY MR. MARTINEZ:
Q. Did you know about it when you talked to Sergeant Eftink?
A. **About the -- about what -- what he was responding?**
Q. Yes.
A. **I knew he was responding to a personal injury accident, yes.**
Q. Did you draw any conclusions about the severity of that accident that he was responding to?

Page 162

A. **Like what do you mean by conclusions?**
Q. I guess I'm trying to figure out, did you know what he was responding to, the nature, the context, information at that point in time?
MS. DEBLER: Objection to form.
**THE WITNESS: The only thing I could say is that I knew -- I heard at some point, most likely prior to the 26th, that he was responding to a personal injury crash.**
BY MR. MARTINEZ:
Q. Okay. You knew nothing else at that point in time?
A. **No, I'm not saying I didn't know anything else. You asked me if I knew if -- what he was responding to. And I -- yes, I did. At what point, I couldn't say exactly.**
Q. Did you tell Sergeant Eftink about Officer Leithauser's use or nonuse of lights and sirens?
A. **I don't know.**
MS. DEBLER: Objection, asked and answered.
**THE WITNESS: I don't remember if I did.**
BY MR. MARTINEZ:
Q. Did you tell him anything about the injuries that Mr. Szczesny sustained in the crash?

Page 163

A. **Most likely.**
Q. What was your understanding of the injuries he suffered at that time?
A. **I just knew that he was severely injured. He was alive. That's about the extent of what I knew.**
Q. What did you know about Officer Leithauser's condition at the time that you spoke to Sergeant Eftink?
MS. DEBLER: Objection to form.
**THE WITNESS: I knew he was -- had minor injuries, that's about it, just because I knew he was walking around and talking, so...**
BY MR. MARTINEZ:
Q. Did you share with him any information about SOCCIT's involvement with the investigation up to that point?
A. **I don't -- I don't recall.**
Q. Did you tell him about any photographs taken of the scene?
A. **I wouldn't have to, he would know, he was there when they were taking photographs, I'm sure.**
Q. When did Sergeant Eftink first come to the scene?
A. **He didn't come to the scene that day. He was -- the first time he was at the scene was probably during the speed study that they conducted, but you'd have to ask him.**

Page 164

Q. So -- just so I'm understanding, so the photographs that were taken, it sounds like you're saying that nothing was taken -- no photographs were taken on the day of the incident?
A. **No, that's not true.**
Q. Okay. Clarify it for me.
A. **You asked me if I knew when Sergeant Eftink arrived on scene, and I -- I don't know. He was not there that day.**
Q. Okay. So at no point in time when you were at this scene, while it was an active scene, was Sergeant Eftink there at the same time?
A. **Not that I -- no, not that I recall at all.**
Q. Had you obtained or instructed anyone to obtain the video from the Shell Gas Station during the course of the investigation?
A. **I was advised that there was video and somebody was obtaining it.**
Q. But you yourself did not instruct anybody to do that?
A. **No.**
Q. All right. And as far as Sergeant Eftink's observations and interpretations, he never discussed any of that with you following him taking over the investigation or becoming involved?

Page 165

A. **No.**
Q. All right. Tell me all of the evidence that you ended up providing to Auburn Hills after your discussion with Sergeant Eftink?
A. **Well it would have been that CDR report. It would have been all of our pictures, all of our videos, blood results, search warrant, written reports. Anything that we had, it was turned over to him.**
Q. How did you decide what to provide?
A. **You just provide everything.**
Q. Do you know who gathered the materials that you provided?
A. **Different people. It was a collaborative effort, so...**
Q. Can you recall for us today specifically who did what in that process?
A. **Of collecting?**
Q. Yeah, compiling the information that you were going to be presenting to Auburn Hills after your conversation?
A. **I ultimately would be the person that was given to. But who specifically gave me what, I don't know exactly. There was, you know, the pictures were completed, I believe, by an evidence tech; and the**

Page 166

**search warrant was probably handed to me by, you know, one of the officers doing the search warrant. But eventually, that was all compiled into one and then handed over.**
Q. Did you have any role in assigning an officer to complete the warrant applications or warrant affidavits in this matter?
**A. I assigned tasks. So when I get to a scene I -- there's things that have to be done. I assign tasks mostly with the members of the traffic safety unit. Everyone knows what they're going to do. And they just tell me, hey, I'm going to do this, okay, I'm going to do that and then they do it.**
Q. Was anything withheld from Auburn Hills Police Department at the time following your conversation with Sergeant Eftink?
**A. Not to my knowledge.**
Q. Was anything not yet available at that time?
**A. There were things that weren't available, yes.**
Q. What things?
**A. One thing was the in-car video.**
Q. Okay, tell me about that.
**A. Just -- we didn't have it. I had no role in it at all. I was just told that we didn't have it.**
Q. Did anybody give you a reason as to why it wasn't

Page 167

available?
**A. Nobody knew at that time.**
Q. At any point in time did you ever have any conversations with anybody from the Oakland County Prosecutor's Office about this crash?
**A. Not that I recall.**
Q. What was the extent of your involvement in the OWI investigation of Mr. Szczesny?
**A. I had no involvement. Other than collecting the data, everything was -- I don't do the investigation and warrants on that particular charge.**
Q. When did you first learn that officers were investigating OWI?
MS. DEBLER: I'm going to object to form.
**THE WITNESS: I believe on scene.**
BY MR. MARTINEZ:
Q. So right -- like upon your arrival or after?
**A. Some time on scene. I couldn't say exactly when.**
Q. Do you recall who told you?
**A. I do not.**
Q. Who was responsible for that investigation?
**A. I don't recall.**
Q. Did you receive any information about that investigation?
**A. I was told it was a potential that he was impaired**

Page 168

**in some way.**
Q. Did that person who provided you this information tell you what information they were basing that off of?
**A. I just heard it was a witness.**
Q. What was your understanding of what that witness said?
**A. My understanding was that they had been partying all day.**
Q. And again, that was just information that was provided to you?
**A. Yes, and I had no role in any of it, so it was just information.**
Q. Would it have been an officer tasked with the OWI investigation who told you that?
MS. DEBLER: Object to form and foundation.
**THE WITNESS: I can only say it was an officer on scene. I don't remember exactly who it was.**
BY MR. MARTINEZ:
Q. Did you ever personally have conversations with any eyewitnesses on scene?
**A. Not that I recall, no.**
Q. Okay, you didn't speak to a gentleman named

Page 169

Dheeraj Chanda?
**A. It's possible, but I don't -- I don't recall.**
Q. Do you recall speaking with a woman named Kayla Orr?
**A. I don't recall.**
Q. Did you ever have any conversation or interaction with Tom Szczesny at the scene?
**A. I don't believe so. I went and checked on him, but I don't -- there was no conversation between us, no.**
Q. Okay. So you went to the hospital to check on him or --
**A. No. Oh, I'm sorry, no. I did not have any conversation, no, I didn't. I went and checked the bike. He wasn't there, he was already gone, yes.**
Q. Okay. Did you ever attempt to speak with Tom Szczesny?
**A. No.**
Q. Were you ever provided with any information regarding Officer Palm's conversation with Mr. Chanda?
**A. I don't know who Mr. Chanda is.**
Q. He was an eyewitness at the scene --
**A. Okay.**
Q. -- who ended up making a report. He testified that the black car was traveling very, very, very fast.
**A. Okay.**

Q. Did any of that information ever make its way to you?
**A. I was aware that there were witnesses, yes. Specifically about him, I don't. Again, it's not under my -- I'm not collecting that data. Somebody else is, so...**
Q. At the time that you spoke with Sergeant Eftink about this case on September 26th, did you have the information regarding what Mr. Chanda said?
**A. We should have. Yes, it should have been in the statements we had, yes.**
Q. Okay. So that would have been something that you would have provided --
**A. Yes.**
Q. -- to Sergeant Eftink?
Mr. Chanda testified the other day that he observed officers moving debris from the roadway after the crash. Had you heard of that before today?
**A. No.**
Q. He testified specifically that the debris was moved off of the roadway into the grass. Do you believe that would have affected the investigation that you were doing at that time?
MS. DEBLER: I'm going to object to



foundation.
**THE WITNESS: I wouldn't think so. I'd have to know what it is, but I wouldn't think so.**
BY MR. MARTINEZ:
Q. Does it matter to the crash investigation if debris was moved?
MS. DEBLER: Objection, asked and answered.
**THE WITNESS: It depends what it is.**
BY MR. MARTINEZ:
Q. What is -- actually, okay, let me -- let me -- I want to clarify something. So I know your attorney mentioned the investigation was done September 26th. I want your testimony.
MS. DEBLER: I didn't say that the investigation was done September 26th. That was not a statement that I made.
BY MR. MARTINEZ:
Q. Okay, so from your testimony, sir, when did Troy formally turn over or assign the continuation of the investigation to Auburn Hills Police Department?
**A. It was on September 26th of 2023.**
(Deposition Exhibit Number 2 was marked for identification)
BY MR. MARTINEZ:



Q. I'm going to hand you what's been marked for identification as Exhibit 2. And I'd like you to turn your attention to the page Bates stamped as 223. It's page 12 of 12 of the report.
**A. Okay.**
Q. Okay, we see a box there. See our number 230028389-021, written by TR Warzecha, B. Would that be you?
**A. That is me.**
Q. The date of that entry is January 9, 2024 at 1:49 p.m. Do you see that?
**A. I do.**
Q. Read for me what that says.
**A. "On Friday, January 5th, 2024, the Troy City Attorney was contacted about how to proceed in this matter. The decision was made to have the Auburn Hills Police Department continue the investigation. This investigation will include consulting with the Oakland County Prosecutor's Office for potential charges in this case.**
**On Tuesday, January 9, 2024, I turned over all materials from this case to Sergeant Eftink of the Auburn Hills Police Department. No further action taken."**
BY MR. MARTINEZ:



Q. I'm just going to come right out and say it. Why did you tell me that occurred on September 26th?
**A. Because it did.**
Q. Is this report wrong?
**A. No. This is -- this is informa -- this is the stuff we obtained after. This would have been the blood work which took time to get from the crime lab. It was -- I believe it was the search warrant and then the remainder of the report, our written report.**
Q. So you had not provided any of that information to Sergeant Eftink before January 9th of 2024?
**A. The stuff that he was given at the investigation, the time of the investigation, was stuff relevant to what he needed to do his investigation. This stuff wasn't -- our written report itself at that time wasn't as important. And then the blood work that came back, we had to wait for it to come back from the crime lab, so...**
Q. And that result came back in October, I'll represent to you. So between October and January, you didn't bother providing any of that to Sergeant Eftink?
MS. DUFRANE: Objection to form and foundation, and that's simply not true.
MS. DEBLER: Join.

**THE WITNESS: I can tell you the process.**
BY MR. MARTINEZ:
Q. Please do.
**A. The process is, is that this comes into our department through our warrants officer. Our warrant officer gets it on the computer, she takes it and she puts it into the written report. At no point am I contacted and told that that is available because I'm not involved in the investigation. At some point, obviously, I was aware that was there, and then I turned it over to him.**
Q. You testified there was a meeting between you, the chief, Gobler and Shuler that decided in September this event and investigation would be transferred to Auburn Hills. Do you recall that?
**A. Yes.**
Q. Why is it then that you're, in January of 2024, still having discussions about whether or not the investigation should continue with Troy or go with Auburn Hills?
MS. DEBLER: Objection to form and foundation. That's not what he testified to and it mischaracterizes his testimony.
**THE WITNESS: I didn't say that.**
BY MR. MARTINEZ:



Q. Okay. Well then explain it for me, sir. Because you -- I -- I seem to have a very clear recollection that you said the decision was made over concerns about the Troy Police Department being involved in the investigation. Those are your words, September 26th of 2023?
MS. DEBLER: All right, I'm going to object. That wasn't even a question, and that's a different narrative than what the question was preceding that. So if you want to ask a question, he'll answer it.
BY MR. MARTINEZ:
Q. Is that true, sir?
MS. DEBLER: Is what true? Objection, form and foundation. Is what true?
BY MR. MARTINEZ:
Q. Are you having difficulty following the questions I'm asking you?
**A. I am right now, yes.**
Q. Okay. So we discussed in pretty clear detail that on September 26, 2023, you met with Chief Jones, Shuler, Gobler and yourself to talk about how to proceed with this investigation. Do you remember giving that testimony today?
**A. Yes.**



Q. Okay. Now you were light on specifics when I asked you about what was discussed in that meeting --
MS. DEBLER: Objection to form, argumentative.
MR. MARTINEZ: Can I finish the question?
MS. DEBLER: Well, it was argumentative at the beginning, so...
BY MR. MARTINEZ:
Q. Okay. So -- so I think it's just your testimony that you didn't recall specifics on what was discussed, but the decision was ultimately made to transfer this to Auburn Hills on that day. Do you recall that?
**A. What day are you referring to?**
Q. September 26, 2023.
**A. Yes.**
Q. Okay. So what purpose then would you have, if that decision had already been made in September, to be discussing in January of 2024 what the City of Troy's involvement in this case would continue to be?
MS. DEBLER: Objection, form and foundation; mischaracterizes the report.
MS. DUFRANE: Join.
**THE WITNESS: I don't remember**



**specifically why I put that in there, but obviously the Troy City Attorney was involved and the Oakland County Sheriff's Department, but I had no involvement with them.**
BY MR. MARTINEZ:
Q. What was the sheriff's office's involvement?
**A. Well they would have been the deciding agency on if there was a warrant issued.**
MS. DEBLER: You mean the prosecutor's office?
**THE WITNESS: The prosecutor's office, I'm sorry.**
BY MR. MARTINEZ:
Q. Okay.
**A. Sorry, the prosecutor's office, not the sheriff's office.**
Q. So nowhere in this excerpt that you just read does it say that you provided some materials to Auburn Hills; is that correct?
**A. It says what it says, yes.**
Q. You turned over all materials from this case to Sergeant Eftink on January 9, 2024?
MS. DEBLER: Objection form and foundation, mischaracterizes his prior testimony.
MR. MARTINEZ: It's in the report.

Page 178

MS. DEBLER: It doesn't matter. He told you the report says what it says and the fact that he's testifying that he turned everything available on September 26th of 2023. That's what he testified to. You just don't like it.

MR. MARTINEZ: I don't think that's true, Counsel. I'm just trying to get an understanding.

MS. DEBLER: You have an understanding now. You've beaten this to -- like a dead horse. You have an understanding.

BY MR. MARTINEZ:

Q. It's about as clear as mud to me, Sergeant, I'll be honest with you. Because if I was going to be turning over materials and that decision was made four months prior, I don't know that there would be a reason to make this entry in January 5th and 9th of 2024. Am I crazy for that?

MS. DEBLER: Are you testifying? Are you testifying? Because that wasn't a question except for the am I crazy at the end of it. That wasn't a question. Okay. And what you would have done with it has absolutely no bearing on this case. You can ask him what he did, you can ask him what the report means. But what you did -- what you want to do with it is something completely different.

Page 179

BY MR. MARTINEZ:

Q. Sergeant, I'd like to know everything you turned over to Auburn Hills prior to this discussion that you memorialized on January 9th.

MS. DEBLER: Objection to form and foundation. Which question -- which discussion are you speaking of?

MR. MARTINEZ: The one on January 5th and 9th.

BY MR. MARTINEZ:

Q. What was turned over prior to that?

MS. DEBLER: What discussion on January 5th and January 9th are you talking about, the one with the city attorney?

MR. MARTINEZ: I'm using that as a reference point, yes.

MS. DEBLER: Okay.

MR. MARTINEZ: So I would like to know --

MS. DEBLER: So be specific and then ask him a specific question and he will try to answer it.

BY MR. MARTINEZ:

Q. What did you turn over before this conversation with the city attorney's office?

MS. DEBLER: And that's a different

Page 180

question.

MR. MARTINEZ: I'm trying to make it as easy as I can because I keep getting objections that seem to be suggesting answers to this witness. And so I'm trying to just get to the heart of what this witness is going to testify to.

MS. DEBLER: About what? Ask the question.

BY MR. MARTINEZ:

Q. The question that I asked you, sir, what was turned over prior to January 5, 2024 to Sergeant Eftink of the Auburn Hills Police Department, pertaining to the crash involving Evan Leithauser and Tom Szczesny?

MS. DEBLER: Objection, asked and answered.

MS. DUFRANE: Join.

**THE WITNESS: I did answer it.**

MS. DUFRANE: Can I suggest a brief break and let the attorneys speak? I might be able to help, and I don't want to make a speaking objection while Mr. -- Officer Warzecha is in the room. Just making a suggestion that the three of us have a brief conversation to help clarify.

MR. MARTINEZ: Give me a moment.

Page 181

MS. DUFRANE: Because I think you have materials in the production that I've provided that would clarify exactly what you're not understanding about this process. And I don't mean to interrupt your flow. I just -- we're not getting anywhere here.

MR. MARTINEZ: I agree. Okay, yeah, we'll take a brief recess. We can go off record.

THE VIDEOGRAPHER: Please stand by. The time is now 12:48 and we are off the record.

(A brief recess was taken)

THE VIDEOGRAPHER: The time is now 12:54 and we are back on the record.

BY MR. MARTINEZ:

Q. Sergeant, what decisions did you personally make with regards to the crash investigation between Evan Leithauser and Tom Szczesny?

**A. What? I'm sorry, what decision did I make in relation to what?**

Q. The crash investigation generally.

MS. DEBLER: Objection to foundation.

**THE WITNESS: The decisions I made were who was going to do what, and then I was involved in the conversation of however it was going to go.**

BY MR. MARTINEZ:

Page 182

Q. And the conversation you're speaking of would be the September 26th discussion?
**A. Yes.**
Q. What decisions did you make with regard to the OWI investigation into Tom Szczesny?
**A. None.**
Q. You were not the officer that completed the search warrant, correct?
**A. Correct.**
Q. You were not the officer who received the results from that search warrant, correct?
**A. Correct.**
Q. Would you have had any role whatsoever in personally providing that to Auburn Hills?
MS. DEBLER: The search warrant?
MR. MARTINEZ: The results from the search warrant.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. Okay, explain that to me.
**A. When I was made aware of them, I made sure that they were turned over to Auburn Hills because they were conducting the investigation.**
Q. When did you become aware?
**A. I believe that was this January date we're in**

Page 183

**dispute about.**
Q. Okay. So between the date of approximately on or about December 13, 2023 to January 5, 2024, am I understanding you correctly that no Troy officer provided that information to Auburn Hills?
**A. Not that I'm aware of.**
MS. DEBLER: Objection to foundation.
**THE WITNESS: Not that I'm aware of.**
BY MR. MARTINEZ:
Q. Did you take any steps, in the course of when you were involved with the investigation, to make sure that the investigation was not focused unfairly on Mr. Szczesny?
MS. DEBLER: Objection to foundation and form.
**THE WITNESS: This is no different than any other investigation we've completed. Up to that point, I did what I do in every other crash and every other investigation.**
BY MR. MARTINEZ:
Q. What steps did you take to make sure that the conduct of Evan Leithauser was investigated just as thoroughly as Mr. Szczesny?
**A. None.**
MS. DEBLER: Objection.

Page 184

**THE WITNESS: Sorry.**
MS. DEBLER: That's okay.
**THE WITNESS: None. It wasn't my position.**
BY MR. MARTINEZ:
Q. What steps did you take to make sure that objective evidence was shared with the proper decision-makers?
MS. DEBLER: Objection to form.
**THE WITNESS: I personally provided it to Auburn Hills.**
BY MR. MARTINEZ:
Q. When you provided the information to Auburn Hills, were you concerned about a thorough investigation or protecting Evan Leithauser?
MS. DEBLER: Objection to form and foundation.
**THE WITNESS: A thorough investigation.**
BY MR. MARTINEZ:
Q. Would there have been any reason that you would have discussed with Sergeant Eftink about prosecution in any way, shape or form?
**A. We could have possibly talked about it, yes.**
Q. Do you have a recollection of discussing it?
**A. Not specifically, no.**
Q. All right. So I was handed this morning a text

Page 185

message. I'm going to just show it to you.
**A. Yep.**
Q. See if you recognize it.
**A. I can't read it, but yes.**
MS. DEBLER: Do you need readers?
BY MR. MARTINEZ:
Q. What is it that you're looking at there?
**A. Looks like text message -- screenshots of the message I provided to my attorney.**
Q. Okay. Between you and whom?
**A. Sergeant Eftink.**
Q. Okay, what's the date of the first message on the first page?
MS. DEBLER: Do you need readers?
**THE WITNESS: I have my contacts in for reading, but I can't read it.**
BY MR. MARTINEZ:
Q. On the first page.
**A. First page?**
Q. Correct.
MS. DEBLER: If you can't read --
(Court reporter hands witness reading glasses)
MS. DEBLER: Thank you very much, court reporter.

Page 186

**THE WITNESS: September -- September something, 20 -- I can't make out what it is.**

BY MR. MARTINEZ:

Q. Here, I'll take it back.

**A. September twenty something.**

Q. Looks like 25th to me.

MS. DEBLER: I need readers. Yeah, I think it's not just -- you mean the top one?

MR. MARTINEZ: Uh-huh.

MS. DEBLER: I can't make it out either, which is not helpful. I can go get readers.

MR. MARTINEZ: Yeah, I was going to say, Julie, could we possibly get this in a clearer form in some way?

MS. DEBLER: You have it?

MS. WASKE: Uh-huh.

MS. DEBLER: Like an expanded form?

MS. WASKE: I have a color version. That will be produced this afternoon. The date to me looks to be either September 25th or September 26th of 2023 at 11:01 a.m.

MR. MARTINEZ: Were you able to get that on video?

THE VIDEOGRAPHER: I have the audio. If you want to repeat it just -- want to go ahead?

Page 187

MS. WASKE: The text messages that Mr. Martinez is referencing will be produced later this afternoon in color form. I'm looking at a color version on my computer screen. It appears to me that the date on that first text message on Bates City-0021 is either September 25, 2023 or September 26, 2023 at 11:01 a.m.

BY MR. MARTINEZ:

Q. Okay. So, it looks like, to the best that I can read this, does the date provided by your counsel, does that sound about accurate when you would have first reached out to Sergeant Eftink about this?

**A. Yeah, it would have been after the 22nd, yes.**

Q. Okay, all right. And it looks to me, jumping to the last page, that there was continued discussion into March 26, 2024 at 11:02 a.m. Do you recall that?

**A. Yes, if it's in there, yes.**

Q. You continued to have communications with Sergeant Eftink about the investigation and prosecution after it was turned over?

MS. DEBLER: Objection, form and foundation.

**THE WITNESS: It wasn't necessarily about the prosecution. I probably was asking questions, yes, to find out what was going on.**

Page 188

BY MR. MARTINEZ:

Q. All right. Since you've had issues reading it, I am as well. Looks like it says, that text message at 11:02 on March 26, 2024 from you to, Sergeant Eftink asks, any update from the prosecutor, do you recall sending that message?

**A. It looks like I did, yes.**

Q. Do you recall sending that message?

**A. I sent it. It's in my phone.**

Q. Okay. The response back from Sergeant Eftink appears to state, I called her yesterday morning and she was supposed to call me back, but she hasn't returned my calls. We even had a day and time to talk, as that was set up and she still won't call me back. Your response, okay, thank you. With three exclamation points.

**A. Okay.**

Q. What was the purpose of sending that email or that text message rather?

**A. Just find out where we were in the investigation.**

MS. DUFRANE: Can you give me the date from here, I'm sorry.

MS. DEBLER: I think he said March 26th.

MR. MARTINEZ: It looks to me to be March 26, 2024 at 11:02 a.m.

Page 189

MS. DEBLER: Thank you.

MR. MARTINEZ: We have a blown-up copy. That date could be subject to change based on my reading.

BY MR. MARTINEZ:

Q. All right. Going back prior on March 14th as it appears, 2024 at 12:36 p.m., you sent a message to Sergeant Eftink, asking are you working; do you recall sending that?

**A. It's in the -- it's there, yes.**

Q. He responds, I am! Exclamation point. What can I do for you? To which you respond, just trying to get an update on Evan's incident. Did you speak with the prosecutor? What's their stance on it?

**A. Okay. That's me, it's from my phone, yes.**

Q. Okay. Then the response back from Sergeant Eftink appears to state, I called her but she hasn't called me back. Lieutenant Hollenbeck has spoken to her and told her our view on the matter and that we aren't seeking charges on him. We just need it reviewed, to which you respond, okay, thanks.

**A. Okay.**

Q. What purpose did you have, after turning the investigation over to Auburn Hills, to reach out to them and inquire about this prosecution?

A. **It involves one of our employees. I am their direct contact between -- basically I'm the liaison between Auburn Hills and us, and I was just inquiring as to where it stands.**
Q. Were you instructed to reach out to Sergeant Eftink for this purpose?
A. **No.**
Q. You did it on your own?
A. **Yes.**
Q. Even though, as you testified, Officer Leithauser did not report to you?
A. **He did not report to me, no.**
Q. Why were you so concerned about the prosecution against -- potential prosecution of Evan Leithauser?
MS. DEBLER: Objection to form and foundation.
**THE WITNESS: I'm not seeing where you seem concerned at. I'm asking questions, I'm curious.**
BY MR. MARTINEZ:
Q. In any of these text messages, I'll let you look at them --
A. **Right here.**
Q. Do you express concern about Thomas Szczesny being prosecuted?



A. **No.**
Q. Wouldn't that be a concern?
A. **It wasn't for me here.**
Q. No, because in fact you were more concerned about Evan Leithauser and whether or not he would be facing criminal charges?
MS. DEBLER: Objection to form and foundation.
**THE WITNESS: I'm inquiring on what the status was.**
BY MR. MARTINEZ:
Q. And there was nobody else at the Troy Police Department who would have been a liaison, so to speak, with Auburn Hills as to this matter?
MS. DEBLER: Objection to foundation.
**THE WITNESS: Not that I'm aware of, no.**
BY MR. MARTINEZ:
Q. Okay, I believe you testified previously that in the September meeting, the decision was ultimately made by the chief to hand the crash investigation to Auburn Hills; is that right?
A. **He has the final decision, yes.**
Q. Okay. Were you appointed or designated in any way, shape or form by Chief Jones after that meeting to remain in contact with Sergeant Eftink?



A. **I was advised to make sure that he -- that it gets turned over to him, yes.**
Q. Okay. And following up with him about the prosecution -- or potential prosecution of Evan Leithauser, was that a part of the duties that Chief Jones asked you to do?
A. **Not necessarily, but I was inquiring.**
Q. Why?
A. **Why not? It's one of our employees. I was curious.**
Q. Are you aware of any internal investigation that occurred within the Troy Police Department after this incident, this crash occurred?
A. **There would have been one, but I wasn't involved in it.**
Q. Did anybody question you in any way, shape or form about -- pertaining to an internal affairs investigation?
A. **No.**
Q. Based on your knowledge, your understanding, the limited investigation you completed, did Evan Leithauser do anything wrong in this crash?
MS. DEBLER: Objection to form.
**THE WITNESS: It wasn't my place to make that decision.**



BY MR. MARTINEZ:
Q. I'm not asking you if it was your place. I'm asking you to apply your training and experience, based on your almost 25 plus years and many decades with the Troy Police Department, having understanding of their policies, procedures, guidelines, general orders, all the things we discussed earlier today. Based on that knowledge, did Evan Leithauser do anything wrong in this incident?
MS. DEBLER: I'm going to object to form and foundation. In terms of form, it's vague in terms of anything wrong. In terms of foundation he's testified repeatedly that he's not in a supervisory role, he did not have anything to do with the internal investigation, he does not make those types of decisions. And so it is completely inappropriate to ask him for his opinion as to whether there were any, you know, policy type wrongdoings. And the other part of it is just -- there's a lack of foundation. What do you mean did he do anything wrong?
BY MR. MARTINEZ:
Q. Did Evan Leithauser, based on your training and experience and knowledge and understanding of the Troy orders, directives, guidelines, policies and

Page 194

procedures, were any of those things I just mentioned violated --
MS. DEBLER: Same objection.
BY MR. MARTINEZ:
Q. -- in any way, shape or form by Evan Leithauser's conduct on September 22, 2023?
MS. DEBLER: Same objection, form and foundation. It's not even an appropriate question for this witness.
**THE WITNESS: Based on the information that I had, there's a potential that he violated a policy, yes.**
BY MR. MARTINEZ:
Q. Which one?
**A. It would be the vehicle operations.**
Q. What aspect of vehicle operations did he potentially violate?
**A. It could have been speed and/or how he responded.**
Q. Responding to the crash that he was responding to at Maple and Combermere?
**A. Yes.**
MR. MARTINEZ: Sergeant, I don't believe I have anything further for you at this time. Your attorney may have some questions or Ms. Dufrane from the City.

Page 195

MS. DEBLER: Julie, let's take a short break.
MS. DUFRANE: Sure.
THE VIDEOGRAPHER: Please stand by. The time is now 1:09 and we are off the record.
(A brief recess was taken)
THE VIDEOGRAPHER: The time is now 1:25 and we are back on the record.
(Deposition Exhibit Number 3 was marked for identification)
CROSS-EXAMINATION
BY MS. DEBLER:
Q. Okay. Good afternoon, Sergeant Warzecha. I just have a few follow-up or housekeeping questions for you. I think you were asked questions about whether you had ever had a supervisory or you had -- actually the question was about training. Did you ever provide any training in the course of your employment at the Troy Police Department. You mentioned you were an FTO for 18 years. What does FTO stand for?
**A. Field training officer.**
Q. So is that kind of training?
**A. Yes, that would be, yes.**
Q. I just wanted to make sure that that was clear.

Page 196

And then we talked about Guardian Tracking. Is Guardian Tracking considered official discipline plan in connection with or by the way that term is used in the collective bargaining agreement?
**A. It is not discipline, no.**
Q. And you said that discipline is, to your knowledge, kept in an officer's file forever. Is Guardian Tracking able to be removed in any way?
**A. Yes, an officer can request it, based on -- there's certain guidelines and what it is and when it can be removed. It's either six months or a year.**
Q. Okay. And do they have to request in writing after a year?
**A. Yes.**
Q. And you mentioned that you tasked -- in your supervisory capacity when you came to the scene, you tasked out various duties and you also indicated that officers generally in the traffic safety unit kind of just know what to do, and sometimes they will say I'm doing this, I'm doing that, but at other times, you task out duties, correct?
**A. Yes, sometimes, yeah.**
Q. Do you remember who you -- I think you might have been asked this, but I didn't get it in my notes.

Page 197

Do you remember who you tasked out to do the -- I think it's GPS stick?
**A. Yeah, I'm not sure. I believe it was Officer Ken Hunter, but I don't remember specifically if it was him or not because he would have been -- he was on scene, he would have been able to use it, yes.**
Q. Do you know if the Troy Police Traffic Safety Unit had a GPS stick in September of 2023?
**A. Yes.**
Q. And what about the total station --
**A. Yes. Sorry, yes.**
Q. That's okay. Do you know who tasked out the duties in connection with the total stick would have been the same person?
**A. No. We don't do both. So we would do one or the other. The GPS stick is preferred. But if you're in an area we have a lot of tree coverage or you have -- if you're inside or you're under a viaduct, then the GPS stick wouldn't work, so you'd have to do total station. So in most cases, it's strictly the GPS stick.**
Q. And you mentioned that this was a -- you got some indication that Mr. Szczesny's injuries were serious at the scene, correct?

A. **That was my understanding, yes.**
Q. And in a serious injury accident investigation situation or even worse, a fatality, is it the traffic safety unit's general procedure to try to get some type of either blood test or some type of indication as to whether either one of the drivers or maybe there were more than two drivers involved in an accident were impaired?
A. **Yes.**
Q. And would you often ask for search warrants for blood?
A. **Yes.**
Q. In this situation, did you task anyone to try to get a search warrant?
A. **The task was put upon Officer Scott Allan and Officer Gail Parra.**
MS. DEBLER: Okay. All right, I don't have any further questions for you. Thank you. Julie.
MS. DUFRANE: Thank you, Ms. Debler.
CROSS-EXAMINATION
BY MS. DUFRANE:
Q. Hi, Officer Warzecha.
A. **Hi.**
Q. I have a couple housekeeping questions as well. One



of the questions you were asked by Mr. Martinez involved the -- I think it was the MDC from the Leithauser vehicle. Do you remember those line of question -- that line of questioning?
A. **Yes.**
Q. And I think you told us that MDC would not have been sold with the vehicle, when they sold it for salvage, but should be in the Troy PD property room, is that my understanding?
A. **That was a reference to the airbag control module.**
Q. The airbag control module, okay. Is there -- I'm going to show you what's been marked -- I think it's Exhibit Number 2, the last page where it has all of the attachments. If that -- if that device were in the Troy property, would it be listed there?
A. **Yes.**
Q. Is it listed there?
A. **It is not.**
Q. I'm trying to head off a document production request from Mr. Martinez. Is there -- who would be responsible for putting that in the point, in the attachment for this particular CR 230028389?
A. **It would have been one of us in traffic. Why it wasn't that, I don't know.**
Q. So sitting here today, you don't know whether that



device is in the Troy property room right now?
A. **Correct.**
Q. I also want to refer you to -- I should probably just keep this with you -- Exhibit Number 2 that's been marked. You were asked a couple of questions -- so, Officer Warzecha, you were asked a couple of questions about turning over the investigation to Auburn Hills Police Department, and you wrote a sup dated January 9, 2024, correct?
A. **I did, yes.**
Q. So your report -- I think you already read it for us. But the Troy city attorney was contacted about how to proceed in the matter. Did you contact the Troy Police -- the Troy city attorney's office about how to proceed?
A. **I don't believe it was me directly, but again I couldn't say specifically.**
Q. Okay. And then you wrote, the decision was made to have Auburn Hills Police Department continue the investigation. What did you mean by "continue the investigation"?
A. **I believe because I didn't -- I didn't do a sup in the beginning about when it was turned -- about that. I just added it in there.**
Q. Okay. And then it goes on, you write, the



investigation will include consulting with the Oakland County Prosecutor's Office for potential charges in this case. Which case are you referring to when you say "this case"?
A. **Well, this -- the -- just this -- this incident I guess. I guess if you look at the wording I said "case," but this is a case or an incident. We look at it as one. Even though it's a separate investigation, it's just one incident or one case.**
Q. Okay. Do you know when the lab report, the second lab report with respect to Mr. Szczesny's blood draw, was received by the Troy Police Department? Or is there something that could refresh your recollection of when it was received?
A. **It should be in the report. So I could -- I don't know specifically what the date was. You're talking about the lab report that was returned from MSP, Michigan State Police?**
Q. Yes, the results.
A. **Yeah, that -- according to our report, it shows -- it was entered into the system on October -- no. Well, there's two. So the first one, October 25th, was the alcohol results, and then the December 13, '23 were the results of the drugs.**
Q. And those reports were only with respect to

Mr. Szczesny, correct?
**A. I'm sorry, what?**
Q. Those results, those lab reports were only with respect to Mr. Szczesny?
**A. Yes. I had no access to the ones from Officer Leithauser.**
(Deposition Exhibit Number 5 was marked for identification)
BY MS. DUFRANE:
Q. Officer Warzecha, you are being handed an Exhibit Number 5 to this deposition. It's an email chain. Do you see where you're copied here in the two section of that email?
**A. Yes, I do.**
Q. Okay. And does this -- what is the date of this email?
**A. January 3, 2024.**
Q. And who is this email from?
**A. Looks like Jason Clark.**
Q. And what is the substance of what Sergeant Clark is telling the people in this email?
**A. The subject is Evan Leithauser's traffic crash, CR 23-28389.**
Q. And then what is Officer Clark -- Sergeant Clark communicating to the people in this email chain?



**A. You want me to read it?**
Q. Yes.
**A. Okay. The internal investigation of Evan Leithauser's on-duty crash -- sorry, traffic crash has been completed. CLEMIS CR number 23-28389. The UD-10 completed by Auburn Hills Police Department reads the motorcyclist failed to yield the right of way. The MSP lab results also show the driver, Thomas Szczesny, to be operating under the influence of drugs. Is there a plan for this case to be presented to the city attorney or prosecutor's office for charges?**
Q. What did you understand Sergeant Clark's email to mean when he sent this email?
**A. He was inquiring on what was next, it appears, and what we were -- and what we had planned.**
Q. With respect to who, I guess, with respect to who in the case?
**A. That would be Mr. Szczesny.**
Q. So is it your understanding Officer -- or Sergeant Clark was questioning what we were going to do -- what the City was going to do with respect to assessing charges against Szczesny?
**A. Yes.**
MS. DUFRANE: Let me have this marked as



6, please.
MR. MARTINEZ: I'm sorry, was the Clark email 4?
**THE WITNESS: It's 5.**
MS. DUFRANE: Five.
(Deposition Exhibit Number 6 was marked for identification)
BY MS. DUFRANE:
Q. You're now being handed Exhibit Number 6 for this deposition. This is an email. Can you tell -- can you take a look at it and ask -- or okay, does this refresh rec -- do you remember receiving this email?
**A. Not specifically, but my name is on it, so...**
Q. Okay, and what is the date of this email?
**A. January 9, 2024.**
Q. And who was this email from?
**A. Nathan Gobler.**
Q. And what does the email say to you that you were included on?
**A. Email itself says thanks, I met with Julie Dufrane on Friday. Auburn Hills will be presenting this case for prosecution on the OWPD. In the near future, Sergeant Warzecha will go -- I'm sorry. Sergeant Warzecha will do a sup indicating this, and the Troy case will be closed out.**



Q. And that's from Captain Gobler, correct?
**A. Yes.**
Q. So Officer Warzecha, does that refresh your recollection as to why you wrote the sup that you wrote at the end of the CR?
**A. Yes, it does.**
Q. So when you -- when you wrote that sup, you were directed to do that, correct, by Captain Gobler?
**A. Yes, I was.**
Q. And that was with respect to specifically the OWPD charge -- seeking potential OWPD charge as to Tom Szczesny, correct?
**A. Yes.**
Q. Okay. Did this -- did you or anyone else in the City have any further concern about prosecution of Mr. Szczesny?
MR. MARTINEZ: Object to form and foundation.
BY MS. DUFRANE:
Q. You can answer.
**A. No.**
Q. Did you have any other -- did you have any conversations with the Oakland County Prosecutor who did the warrant review in this matter?
**A. I did not, no.**

Q. Would all of those conversations with respect to reviewing the warrant have been done by Sergeant Eftink of Auburn Hills?
**A. Most likely, yes --**
Q. Okay.
**A. -- or his representative.**
Q. Do you know -- sitting here today, do you have a -- do you remember when Auburn Hills finished writing their report?
**A. I would have -- no, I do not.**
Q. Is it your recollection that it was after January of 2024?
**A. I'm not sure. I mean, I could -- if I saw their report I'd be able to tell, but I'm not sure.**
Q. While I look at that, do you have any recollection, sitting here today, when Sergeant Eftink presented any information to the Oakland County Prosecutor's office?
**A. I'm not sure, no recollection.**
Q. And did you have any involvement in presenting any potential charges against anyone in this case to Auburn Hills?
**A. No, I did not.**
Q. If I told you that the Auburn Hills Police report indicates that this case was sent over to the



Oakland County Prosecutor to review on charges on Officer Leithauser for moving violation causing serious injury and for Mr. Szczesny for OUID. If I told you that that entry was done on January 10, 2024, would you have any reason to dispute that?
**A. No.**
Q. Okay. And one more housekeeping matter. In your report -- sorry. In Officer Huck's portion of the report, would you -- Huck is dash 001?
MR. MARTINEZ: Do you have the Bates number?
MS. DUFRANE: I do. Actually I need to use that.
MS. DEBLER: Here, you want this one?
**THE WITNESS: It should be 216, 5 of 12.**
MS. DUFRANE: Yeah, Exhibit 2 of this deposition, Bates stamped page 216.
BY MS. DUFRANE:
Q. Officer Huck was tasked with retrieving some video, correct?
**A. Yes.**
Q. And did you task Officer Huck with retrieving the video?
**A. Either -- either he was tasked with it or he told me**



**he was going to go get it. That's -- again, I testified I didn't know when I was made aware of that.**
Q. For sure. And Officer Huck's point, have you had a chance to take a look at Officer Huck's point, Sup001?
**A. Let's see here. Okay.**
Q. Did you read the second page --
**A. Yes.**
Q. -- 217? Officer Huck has indicated that he's retrieved some videos, and then he also indicates in the sup that he turned the above listed items over to Sergeant Warzecha. We've been unable to locate the Henry Ford Health system, which was I believe burned onto a CD. Do you have any recollection, Officer Warzecha, if there was a copy of that CD made?
**A. If we had it already, we wouldn't have made a second copy.**
Q. Would that CD have been materials that you turned over to Sergeant Eftink?
**A. Should have been included in the materials, yes.**
Q. And we can tell from his report that he did watch that video. So sitting here today, you don't know if a copy of that Henry Ford Health System video was



made and preserved from the City of Troy Police Department?
**A. I don't recall.**
Q. If it was burned under a CD and preserved that way, would it be listed in the attachments page?
**A. It should have been, yes.**
Q. Okay. Do you see it listed there?
**A. I don't have that page anymore. It does not appear to be here.**
Q. Okay. So but your testimony, do you -- so Officer Huck, according to his report, handed over the materials to you, correct?
**A. Yes, that's what he says.**
Q. And if I understand your testimony correctly, you handed it over -- all those materials to Sergeant Eftink, correct?
**A. Yes.**
Q. And based on your best recollection sitting here today, would that Henry Ford Health System video have been handed over to Sergeant Eftink?
**A. Should have been, yes.**
Q. And sitting here today, you don't know if there was a copy made and preserved in the Troy PD?
**A. Correct.**
MS. DUFRANE: I don't have any additional

questions for you. Thank you.
DIRECT EXAMINATION
BY MR. MARTINEZ:
Q. Just a few follow-up here for you, Sergeant. So we're in agreement that there is one incident number reflecting all aspects of this investigation; is that correct?
MS. DEBLER: Objection to foundation.
**THE WITNESS: The Troy Police Department only generated one report number, yes.**
BY MR. MARTINEZ:
Q. And are we in agreement that Troy Police was still receiving and providing information involving this incident after September 26, 2023?
**A. Yes.**
Q. Did you ever instruct anyone to contact the Michigan State Police to make them aware that Auburn Hills should be made the investigating agency of this incident?
MS. DEBLER: Objection to foundation and form.
**THE WITNESS: Not that I recall.**
BY MR. MARTINEZ:
Q. In your training and experience, have you been made aware of the standard required by law pertaining to



OWI arrests as it pertains to the presence of controlled substances?
MS. DEBLER: Objection to form.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. Okay, what is your understanding of that standard?
**A. Well it's no different than alcohol, except you don't get a -- you're -- the results come from their blood. And then as far as the levels, I'm not trained in any of that, so that's left for a lab tech to determine the levels.**
Q. Okay. So at no point in time in your training that you've received since joining the Troy Police Department were you ever made aware of the standard that the mere presence of a controlled substance does not automatically equal impairment?
MS. DEBLER: Objection to foundation.
**THE WITNESS: It does not automatically equal impairment, no.**
MR. MARTINEZ: Is there an Exhibit 5?
**THE WITNESS: It's right here.**
MR. MARTINEZ: Just want to make sure I'm looking at the right one. Thank you.
**THE WITNESS: And 6, if you want it.**



BY MR. MARTINEZ:
Q. Do you have another copy in front of you?
**A. No, I don't.**
MS. DUFRANE: Here.
MR. MARTINEZ: Thank you, I'll trade you. Give you that one back.
BY MR. MARTINEZ:
Q. All right, I'm looking at Exhibit 5, the one I just handed back to you. So this email from, you said it was Lieutenant Clark?
**A. Lieutenant Clark, correct.**
Q. All right. So Lieutenant Clark shares on January 3rd that the UD-10 by Auburn Hills indicated motorcyclist failed to yield the right of way. MSP lab results show driver Thomas Szczesny to be operating under the influence of drugs.
Is there anything in this email which tells you how Lieutenant Clark arrived at the conclusion that Mr. Szczesny was operating under the influence of drugs?
**A. No.**
Q. You indicated before that you had not gotten Officer Leithauser's toxicology; is that right?
**A. That is correct.**
Q. Could you have gotten it at any point in time after



the crash?
MS. DEBLER: Objection, foundation.
**THE WITNESS: I don't recall ever seeing his results.**
BY MR. MARTINEZ:
Q. In other words, they were never provided to you?
**A. Not that I recall, no.**
Q. Once the Troy case was closed out allegedly in January of 2024, there would have been no law enforcement purpose for any City of Troy personnel to be involved with the prosecution of Mr. Szczesny; is that correct?
MS. DEBLER: Objection to foundation.
MS. DUFRANE: Join.
**THE WITNESS: I can't speak for the people, but as far as I'm concerned probably not, no.**
BY MR. MARTINEZ:
Q. Were you made aware at any point in time that there was a litigation hold preservation notice issued to the Troy Police Department by Mr. Szczesny's attorneys from Christensen Law immediately after the crash?
**A. I was not made aware of that, no.**
Q. Okay. And I want to clarify one point because as I

understood your testimony earlier, maybe I heard it wrong, you indicated that the EDR, the black box, would have been held onto at the City of Troy evidence room. Did I understand that correct?
**A. Typically, that's what we would do, yes. We would hold on to it, yes.**
Q. Okay. Do you draw a distinction between the EDR and the airbag control module?
**A. No, I'm referring, that the same in the sense.**
Q. Those are the same terms, okay. And as we sit here today, you don't know where that airbag control module or EDR black box is currently located?
**A. Correct.**
MR. MARTINEZ: Okay, I don't have anything further for you, sergeant. Be safe.
**THE WITNESS: Thank you.**

RECROSS EXAMINATION

BY MS. DEBLER:
Q. I just have a question for you. Do you know whether the Auburn Hills Police Department completed its own case report in connection with this?
**A. I believe they have their own case report, yes.**
Q. And does -- to your knowledge, does the Auburn Hills Police Department case report have a different number?



**A. Yes, it would. Their numbers do not coincide with ours.**
Q. Did the Auburn Hills Police Department do the UD-10 in this case?
**A. Yes.**
Q. And would that case number be on the UD-10?
**A. I'm not sure if they use the same number or a different one. Some departments pull two separate numbers. We don't. We keep it as one. So I'm not sure how they do it.**
Q. Okay. And I can pass my computer. I don't have it in hard copy.
MR. MARTINEZ: Okay.
**THE WITNESS: But most likely it's the same network.**
BY MS. DEBLER:
Q. I'm handing you a copy of the first page, actually, on my computer of the Auburn Hills Police Department report. Do you see that it says case report on the top?
**A. Yes.**
Q. Could you read that case number for me?
**A. 230018832.**
Q. Okay. And then I'm going to show you this.
MR. MARTINEZ: UD-10?



MS. DEBLER: Yep.
BY MS. DEBLER:
Q. This is the UD-10 or the State of Michigan Traffic Crash Report. Do you see that? And that's the one completed by Auburn Hills?
**A. Yes.**
Q. And does that have a case report number on it?
**A. It's referred to as an incident number on here.**
Q. Okay, and what is that incident number?
**A. 230018832.**
MS. DEBLER: All right, thank you, I don't have any further questions.
MR. MARTINEZ: Nothing for me.
THE VIDEOGRAPHER: Is that it for everyone? Please stand by. This is the end of the deposition of Sergeant Brian Warzecha.
The court reporter will now take orders for the transcript, after which I will take orders for the video.
MR. MARTINEZ: I will take an E trans and a video, please.
MS. DUFRANE: I'll take an E trans. Hold off for the video for now.
MS. DEBLER: E trans, video, please.
THE VIDEOGRAPHER: All right, thank you



everyone. The time is now 1:54, and we are off the record.
MR. MARTINEZ: We're quickly back on the record at 1:53. Counsel has just identified that the exhibits we have are 1, 2, 3, 5 and 6, and we stipulate that we know that there is a gap on the record for that purpose.
MS. DEBLER: Correct. So stipulated.
MS. DUFRANE: Stipulated.

— — —

CERTIFICATE OF NOTARY PUBLIC - COURT REPORTER

I do certify that the attached deposition was taken before me in the above-entitled matter; that the witness was first sworn to testify the truth; that the testimony contained herein was by me reduced to writing in the presence of the witness by means of stenography, and afterwards transcribed upon a computer. The attached pages are a true and complete transcript of the testimony and proceedings.

I do further certify that I am not connected by blood or marriage with any of the parties, their attorneys or agents, and that I am not an employee of either of them, nor interested, directly or indirectly, in the matter of controversy.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at West Bloomfield, Michigan, County of Oakland, this 12th day of August 2026.

Theresa L. Roberts

Theresa L. Roberts, CSR
Certified Shorthand Reporter - CSR-4870
Notary Public - Oakland County, MI
My commission expires 10-4-2027

0

**0%** 144:21

**001** 207:10

1

**1** 21:5 124:2,6 144:12 217:5

**10** 207:5

**100%** 142:18

**10:39** 86:10

**10:48** 86:12

**11** 137:7 139:6

**11:01** 186:21 187:7

**11:02** 187:16 188:4,25

**11:27** 122:9

**11:30** 115:7 122:6

**11:41** 122:11

**12** 23:13,18 172:4 207:16

**120** 48:21

**123** 48:17

**12:36** 189:7

**12:48** 181:10

**12:54** 181:12

**13** 183:3 201:24

**14th** 189:6

**18** 16:14 143:19 195:20

**182** 143:18,20

**185** 146:15

**190** 140:17,18,24 141:5

**195** 141:23 142:1

**199** 147:10

**1996** 14:15 15:2,10 17:19

**1:09** 195:5

**1:25** 195:7

**1:49** 172:11

**1:53** 217:4

**1:54** 217:1

2

**2** 144:12,16 171:23 172:2 199:13 200:4 207:17 217:5

**20** 20:17 186:2

**2000** 15:17

**2004** 23:13,14,17,18

**2005** 20:18

**2006** 101:25

**2007** 101:25

**2008** 22:20 96:16

**2009** 96:15,16

**2016** 20:4,10 130:2

**2020** 64:15,18

**2021** 16:4 26:24 29:6 30:9,18,24 63:4

**2023** 5:17 24:16,21 71:9 126:23 150:15 152:16 158:11 171:22 175:6,21 176:15 178:4 183:3 186:21 187:6,7 194:6 197:9 210:14

**2024** 172:10,14,21 173:12 174:17 176:19 177:22 178:17 180:11 183:3 187:16 188:4,25 189:7 200:9 202:17 204:15 206:12 207:5 213:9

**2026** 4:2,7

**21** 146:15

**216** 207:16,18

**217** 208:10

**22** 5:17 24:21 139:13,19 150:15 194:6

**223** 172:4

**225** 4:10

**22nd** 29:11 187:13

**23** 201:24

**23-28389** 202:23 203:6

**230018832** 215:23 216:10

**230028389** 199:22

**230028389-021** 172:7

**25** 5:23 29:24 126:23 130:5 140:10,18,23 152:16 187:6 193:4

**25th** 160:3 186:6,20 201:22

**26** 140:24 141:5 158:11 175:21 176:15 187:7,16 188:4,25 210:14

**26th** 104:7 151:19 159:25 162:8 170:8 171:13,16,22 173:2 175:6 178:4 182:2 186:20 188:23

**29** 140:10

3

**3** 144:11 195:9 202:17 217:5

**30** 40:17

**31** 4:2,7 141:24

**35** 147:10

**3rd** 212:13

4

**4** 144:11 204:3

**4.5** 145:6

**4.9** 144:4

**40-page** 100:9

**45** 82:19,21 83:13,16,19,25 132:2 140:18 141:5,24 143:19 146:15 147:10

**49** 123:8

5

**5** 144:8 180:11 183:3 202:7,11

204:4 207:16 211:20 212:8 217:5

**50/50** 127:8

**53** 144:13

**57** 144:12

**58** 144:11

**5th** 172:14 178:16 179:8,13

**6**

**6** 144:5 145:7 146:5 204:1,6,9 211:24 217:5

**6,205** 133:1,3

**6,206** 132:12 133:2

**60** 143:8 149:2 150:21

**61** 144:11

**62** 144:10

**6206** 132:6

**63** 144:6,22

**64** 143:9,24 144:22

**8**

**8** 72:19,21 132:2

**89%** 142:21

**9**

**9** 72:19 132:24 133:19 135:24 138:20 172:10,21 177:22 200:9 204:15

**9-22-23** 126:20

**96** 14:14

**9:10** 4:3,6

**9th** 173:12 178:16 179:4,9,13

**A**

**a.m.** 4:3,6 186:21 187:7,16 188:25

**Aaron** 4:19 5:15 40:3,22 48:25 84:21 115:6

**abbreviation** 126:3

**abide** 50:18 91:12

**ability** 123:16 125:2,3

**absolutely** 178:22

**academy** 14:9,17,18 15:3,4 17:6,16,18,21 18:21 19:4,6,15,16,18,21

**accelerating** 134:25

**accelerator** 142:14,18,24 144:9,21 145:1,19 154:24

**access** 69:12 160:2 202:5

**accident** 8:17,19 19:12 20:14 21:3,5,7,9,12 62:4 69:21 70:19,23 71:18 72:18 97:19 114:10 135:3 147:13 154:5 157:3,10 161:23,25 198:2,8

**account** 148:4

**accountability** 54:5,9,11

**accountable** 54:14

**accurate** 82:10 148:17 187:11

**ACM** 122:21,22 136:11

**act** 133:16,17

**acted** 156:17 157:11

**action** 42:20 172:24

**activate** 145:25

**activated** 146:7

**active** 145:22 147:2 164:12

**actual** 73:24 128:14

**added** 200:24

**addition** 17:9

**additional** 19:5 23:24 97:3 114:22 209:25

**Additionally** 6:9 40:16

**address** 106:19

**addressed** 68:2

**addresses** 67:22

**addressing** 34:1 67:14

**adds** 27:13

**administer** 23:2 80:13

**administered** 85:10

**Administration** 22:1

**administrative** 34:21

**admissible** 40:2

**admissions** 78:16 80:25 151:12

**advanced** 21:19 79:13

**advancements** 71:2

**advised** 161:8 164:18 192:1

**affairs** 47:17 192:16

**affect** 58:13,14 108:3,4 133:11

**affected** 61:2 170:23

**affidavits** 166:7

**affiliated** 12:19 97:5

**afford** 93:24

**afternoon** 26:21,25 28:23,24 29:16 186:19 187:3 195:13

**afternoons** 29:21 30:12

**agencies** 15:5 17:9 97:14

**agency** 14:8 103:3 177:7 210:18

**aggravated** 51:12

**agree** 84:7 85:17 92:24 181:7

**agreement** 196:5 210:5,12

**ahead** 93:1 119:5,7 141:23 186:25

**aide** 30:1,3

**airbag** 16:19 122:18,22 125:11 134:14 135:16 199:10,11 214:8,11

**airbags** 135:23

**alarms** 109:6

**alcohol** 19:25 79:25 80:5,8,20 81:8 201:23 211:7

**Alejandro** 11:25 30:11

**Alex** 4:23

**alive** 163:5

**Allan** 4:23 11:22 29:14,23 30:5 63:8,14,16,18 64:13 98:4,9 149:20 198:15

**allegation** 85:16

**alleged** 49:13

**allegedly** 213:8

**allowable** 5:8

**allowed** 51:1

**allude** 43:8 47:11,13

**alluding** 48:16

**alongside** 75:16

**altered** 58:12

**altering** 58:13

**altogether** 155:9

**ambulance** 51:10,17,24 52:2,12, 14 78:22 107:10 110:4,5

**Amtsbuechler** 4:12

**analysis** 72:5

**and/or** 194:18

**angle** 74:2

**angles** 70:15 74:21,22

**answers** 6:5,6 180:4

**anymore** 22:17 30:16 116:11 209:8

**anytime** 46:5 67:23

**appears** 134:1 142:7 187:4 188:11 189:7,17 203:15

**applications** 166:6

**applied** 69:19 106:17 145:1 146:5 157:25

**apply** 41:4 54:23 193:3

**appointed** 191:23

**approximately** 143:8 183:2

**area** 19:11 24:11 121:16 153:13 197:18

**areas** 34:2 69:22

**argumentative** 40:19,23 176:4,6

**ARIDE** 21:18 22:4 79:14,16,23

**arise** 18:18

**arrest** 78:3 82:2

**arrests** 211:1

**arrival** 59:22 60:17 167:17

**arrive** 26:4 56:5 57:6 60:15 110:4

**arrived** 59:22 121:11 153:9 164:8 212:18

**arrives** 55:22 107:17 110:2,5

**asks** 52:11 188:5

**aspect** 28:11 194:16

**aspects** 70:12 210:6

**assertion** 40:12

**assess** 107:17 109:8

**assessing** 203:23

**assessment** 134:3

**assign** 55:12 68:1 71:20 166:9 171:20

**assigned** 16:23 56:1 71:22 75:5 119:17 129:22 166:8

**assigning** 166:5

**assignment** 28:8

**assist** 103:6 105:3 126:12

**assistance** 99:25 101:18 108:5

**assisted** 126:17

**assisting** 110:6

**assume** 7:8 26:4 148:7

**assuming** 8:8 18:6 36:22 124:18

**attached** 128:3

**attachment** 199:22

**attachments** 199:14 209:5

**attempt** 169:14

**attend** 14:21

**attended** 17:15

**attendee** 104:12

**attending** 17:18

**attention** 18:13 50:13 89:8 93:2, 14 172:3

**attorney** 6:23 171:12 172:15 177:2 179:14 185:9 194:24 200:12 203:11

**attorney's** 13:12 179:24 200:14

**attorneys** 6:21 180:20 213:22

**Auburn** 10:9 12:17 95:3 102:22 103:8 123:25 154:3 165:4,20 166:14 171:21 172:16,23 174:15,20 176:12 177:19 179:3 180:12 182:14,22 183:5 184:10, 12 189:24 190:3 191:14,21 200:8,19 203:6 204:21 206:3,8, 22,24 210:17 212:13 214:20,23 215:3,18 216:5

**audio** 186:24

**automated** 127:1 129:18

**automatic** 127:4

**automatically** 211:16,18

**autonomy** 35:17

**average** 130:24

**avoid** 13:23 112:25

**avoiding** 92:5

**aware** 11:7 35:9 36:12 60:21 63:23 64:2,3 65:8 67:2 112:10 121:2 130:10 152:12 170:3 174:10 182:21,24 183:6,8 191:16 192:10 208:2 210:17,25 211:14 213:19,24

**B**

**Bachelor** 15:1

**back** 5:17 20:4 22:20 31:17,18,20 36:15 38:25 52:17 71:24 80:14

81:4 82:3 83:18 86:13 97:2 101:23 107:9 122:12 128:16 129:11,14,15,24 138:20 143:20 148:2 173:18,20 181:13 186:4 188:10,12,15 189:6,16,18 195:8 212:6,9 217:3

**backed** 43:21 63:19,21,22

**background** 97:6

**bad** 39:17 81:6 89:3 96:16 141:1

**bag** 134:5

**balance** 92:5

**bar** 115:16 116:22 118:18

**bargaining** 196:4

**bars** 116:15 119:19

**base** 62:16

**based** 62:16 73:10 88:25 105:5 110:23 112:22 143:4 147:22 149:7 189:3 192:19 193:3,8,23 194:10 196:10 209:18

**basically** 16:20 70:13 80:5 93:21 106:22 127:5 156:16 190:2

**basing** 168:3

**basis** 6:23,25 14:11,13 102:18

**Bates** 140:15 141:4,24 143:18 146:15 147:10 172:3 187:5 207:11,18

**bathroom** 86:5

**battery** 62:10 125:22

**bearing** 178:22

**beaten** 178:9

**Beaver** 34:8

**Beether** 98:6,10

**began** 15:4 16:7

**beginning** 14:7 29:9 53:5 144:8 176:7 200:23

**begins** 4:7 144:10

**behalf** 4:19,21

**belt** 133:21 134:10 139:23

**Benchmark** 21:8 23:25 97:12

**bender** 52:10 65:4 110:3

**beneath** 33:12

**benefit** 12:20

**bent** 155:24

**big** 18:11 34:8 37:17 48:14

**bike** 169:13

**Birmingham** 95:3 96:8 103:9

**bit** 5:24 38:25 41:13 49:6 76:18 85:20 112:5 122:14 138:2 141:25

**black** 16:19 108:25 112:6 120:8, 9,17,18 127:21 129:10 169:24 214:2,12

**blaring** 112:21

**bleeding** 51:18

**blindsided** 36:1

**block** 58:3 110:18

**blocking** 110:11

**blood** 165:8 173:7,17 198:5,11 201:11 211:9

**Bloomfield** 95:4 99:12

**blown-up** 189:2

**board** 76:6

**body** 9:11,14 61:14 85:10

**body-worn** 52:19

**bodycam** 9:12 52:22

**bones** 88:14

**book** 27:25 28:2,14

**borrow** 128:22

**Bosch** 20:4 37:19 123:15,20 124:8 125:16 126:9 150:11

**bother** 173:22

**bottom** 132:24

**Bowers** 12:7

**box** 16:19 125:22 127:9,10,21 128:5 129:10,19,23 131:3 172:6 214:2,12

**boxes** 127:3

**brake** 123:10 142:15 145:16,20, 21,24 146:7,10 154:25

**brakes** 135:10 146:5 154:25 157:12,19 158:1

**braking** 74:6 123:11

**brand** 90:10

**break** 6:15,16 86:4,17 115:6,8 122:2,5 180:19 195:2

**breaking** 112:17,18

**breaks** 15:20 76:8

**breath** 79:6

**Brian** 4:8,22 5:7 216:16

**briefed** 113:25 114:2,6

**briefly** 5:13 122:15 157:1

**brighter** 120:22

**bring** 158:19

**bringing** 84:1

**broad** 44:17,22 45:22 96:11

**broadly** 45:11

**broken** 88:14

**brought** 27:2 50:13 156:25

**Bryan** 101:20 102:12

**buckled** 134:3 139:24

**build** 67:16

**building** 68:9,15

**bump** 98:20

**bumpers** 135:17

**bumping** 84:3

**bunch** 49:1

**burned** 208:15 209:4

**business** 97:13

**buy** 128:21

## C

**cables** 128:18,19,20

**CAD** 91:3

**calculated** 40:1

**call** 16:18,19 25:8,23,24 34:7 35:24 37:10 43:10 44:18 55:8 59:5,7,13 67:25 90:3 91:1 94:7 99:22 101:17 102:18 107:7,8 110:4 113:14 114:7 115:19 126:4 127:20 137:9 161:11 188:12,14

**called** 24:25 25:5,10 43:9 55:8 58:24 59:17 73:8 103:4 104:23 105:2 123:8 158:8 188:11 189:17

**calling** 35:1 94:12 99:25

**calls** 37:3 51:23 109:17 188:13

**camera** 9:12,15 53:2,13 85:10

**cameras** 38:15 52:19

**cams** 61:14

**capable** 71:8

**capacities** 16:6

**capacity** 7:9 17:8,10 26:20 56:23 70:1 100:3 102:3 196:17

**captain** 103:20,22,23 205:1,8

**captains** 36:17

**car** 18:8 21:21 46:5 50:16 60:6 62:10,11 65:18 74:6 81:1 100:12 109:23 115:19,20 117:3 119:15, 16,25 121:8 129:15 132:9,13 134:12 135:6,19 136:8 154:22 169:24

**car's** 77:10

**care** 148:22

**career** 14:7 16:11 130:1

**cars** 16:20 56:16 61:13 74:22 109:19 110:11,19 116:12 119:18 120:17 125:5 135:16,17

**case** 4:10 8:1,3 31:19 39:25 40:6, 8 41:7 61:1 66:1 103:1 109:24 119:15 137:17 160:16 170:8 172:20,22 176:20 177:21 178:22 201:3,4,7,9 203:11,18 204:22,25 206:21,25 213:8 214:21,22,24 215:4,6,19,22 216:7

**cases** 7:12,25 8:3 34:23 65:10,11 122:18 197:21

**catch** 51:4 63:19

**categories** 38:22 45:23

**category** 43:13 92:20

**caught** 42:10

**causing** 207:2

**caution** 41:13

**cautioned** 41:20

**CD** 208:15,16,20 209:4

**CDR** 16:18 37:19 124:8 126:4,25 152:20 165:6

**cell** 60:11,13

**center** 128:1,2 146:19

**certificate** 22:10 23:6

**certificates** 19:10,23 20:12 21:17 156:7

**certification** 20:4

**certifications** 130:11

**certified** 16:15 22:24 91:15 126:18 130:2

**chain** 39:7 43:15 64:22,25 65:21 129:19 202:12,25

**chance** 208:5

**chances** 131:20

**Chanda** 169:1,19,20 170:9,16

**change** 31:2,4 98:15 109:12 132:23 134:22 189:3

**changed** 120:1 121:6

**characterize** 118:1

**charge** 99:14,15 167:11 205:11

**charged** 85:5

**Charger** 117:4 119:15

**Chargers** 116:13,17 119:13

**charges** 172:20 189:20 191:6 201:3 203:12,23 206:21 207:1

**chart** 137:14,19 141:4,11 142:12

**charts** 137:6 139:19

**check** 90:18 169:9

**checked** 52:11 169:7,12

**checklist** 57:10

**chief** 36:18 66:18,19 103:1,17,19 112:3 174:13 175:21 191:20,24 192:6

**chief's** 104:9

**chiefs** 94:2 100:24

**Chris** 4:14 98:9

**Christensen** 213:22

**circumstance** 128:24

**circumstances** 44:23 51:2 111:20

**citizen** 44:18 67:9

**citizen's** 65:18

**citizens** 46:8 67:20

**citizens'** 34:1 45:19

**city** 4:9,25 13:11 14:12 15:18 16:25 17:1,10 30:2 36:25 40:14 150:21 172:14 176:19 177:2 179:14,24 194:25 200:12,14 203:11,22 205:15 209:1 213:10 214:3

**City-0021** 187:6

**civil** 5:9,23 40:18 41:4

**claim** 40:3,13 41:5,8 49:12 84:24

**claimed** 151:7,8

**claims** 40:8 49:13,16

**clarify** 86:16 164:7 171:12 180:24 181:3 213:25

**Clark** 202:19,20,24 203:21 204:2 212:10,11,12,18

**Clark's** 203:13

**class** 21:10 70:21

**classes** 21:2 70:17 125:18

**clear** 9:14 43:1 44:5 86:23 87:20 152:16 175:2,20 178:12 195:25

**clear-cut** 69:1

**clearance** 87:24

**clearer** 186:13

**CLEMIS** 203:5

**client** 85:5

**clock** 115:12

**close** 40:20 102:17

**close-knit** 94:18,19

**closed** 204:25 213:8

**closer** 138:2

**clothing** 78:14

**clue** 83:7

**clues** 82:13 83:11 84:12,13 87:13

**coasting** 145:2

**code** 25:5,7,13

**coincide** 21:24 215:1

**collaboration** 93:21 94:5,16,18 95:2 96:14

**collaborative** 165:14

**collect** 75:4,5 136:12

**collecting** 165:18 167:9 170:5

**collective** 196:4

**College** 20:13

**collision** 5:16 63:12,17 64:16 65:9,20 66:5 140:6 158:1,3

**collisions** 63:6,24

**color** 120:20 186:18 187:3,4

**column** 146:20

**columns** 141:22 145:19

**Combermere** 194:20

**command** 12:12 26:10 35:4 46:17 54:6 60:1 149:9

**commercial** 37:6,8,20

**commission** 34:10 96:4,5

**common** 97:5 124:19

**communicating** 202:25

**communication** 90:12

**communications** 187:18

**community** 20:13 67:11,17 68:4,15,18 69:6 98:24 99:1

**compare** 132:17,18,19 133:2

**compartment** 127:22

**compile** 31:14,23

**compiled** 166:3

**compiling** 31:22 165:19

**complaining** 44:19 109:19

**complaint** 10:18 49:14 63:8

**complaints** 45:20 46:8 67:9

**complete** 166:6

**completed** 19:25 20:4,9,14,20 21:17 23:9,11 55:14 78:18 149:8 165:25 182:7 183:17 192:20 203:5,6 214:20 216:5

**completely** 178:25 193:16

**completing** 11:4

**comprised** 99:4

**computer** 90:3,6 91:11 125:10 150:10 152:3 174:6 187:4 215:11,18

**computers** 90:9

**concern** 18:18 68:3 104:11,17,20 113:19 190:24 191:2 205:15

**concerned** 109:7 184:13 190:13,18 191:4 213:16

**concerns** 34:1 40:3 44:9 175:3

**concluded** 161:11

**conclusion** 212:19

**conclusions** 160:15,21 161:24 162:1

**condition** 163:7

**conduct** 38:10,18 45:21 85:15 104:17 108:23 183:22 194:6

**conducted** 87:7 163:25

**conducting** 151:22 182:23

**conductor** 96:10

**conducts** 66:16

**conference** 104:9 115:9

**configuration** 121:13

**confine** 49:10

**confirm** 135:4

**confused** 42:21

**confusion** 33:1

**connect** 125:25

**connection** 196:3 197:14 214:21

**connections** 130:19

**connector** 125:20

**considered** 96:25 147:24 196:2

**Consistency** 69:5

**consistent** 140:1 156:22

**console** 81:3

**conspicuity** 73:8

**constantly** 19:9 91:25

**constitute** 52:13

**constitutes** 51:6 117:2 136:5

**consulting** 172:18 201:1

**contact** 34:10 67:20 77:14,16,25 78:4,13 81:25 100:1 190:2 191:25 200:13 210:16

**contacted** 172:15 174:8 200:12

**contacts** 67:19 185:15

**context** 50:8 114:11,22 157:10 162:3

**continuation** 171:20

**continue** 86:15 107:12 132:22 172:17 174:19 176:20 200:19,20

**continued** 187:15,18

**continues** 53:5 144:6

**continuing** 119:1

**continuous** 121:23

**continuum** 106:14,16

**control** 16:19 18:12 26:5 50:1 122:19,22 125:11 146:20,25 147:1,2,3 199:10,11 214:8,11

**controlled** 211:2,15

**conversation** 32:14,16 44:15 112:2 149:18 150:1 158:6,12,14, 17,19,21,25 159:8,21,24 160:16 161:9 165:21 166:15 169:5,8,12, 18 179:23 180:24 181:24 182:1

**conversations** 10:10,12,15,16, 19 11:2 13:17 31:12 32:11 149:14,20 167:4 168:22 205:23 206:1

**coordinate** 59:25

**cop** 156:15

**copied** 202:12

**copy** 101:2,4 150:3,5,12 189:2 208:16,19,25 209:23 212:2 215:12,17

**correct** 12:10 34:18 37:23 49:22 50:1 53:13 56:25 64:19 75:22 78:6 79:14 81:19,20 83:1 84:6,9 87:10 89:19,22,23,25 90:1 92:17,23 93:3,18 101:19 128:1 129:4 130:4 134:4 142:6 144:14 146:17,18 147:8 148:15 158:4 159:25 177:19 182:8,9,11,12 185:20 196:22 197:25 200:2,9 202:1 205:1,8,12 207:21 209:12, 16,24 210:7 212:11,24 213:12 214:4,13 217:8

**correction** 44:23 45:21 53:3,4 5 213:1,23 216:4

**corrections** 44:16 53:8

**correctly** 84:16 183:4 209:14

**counsel** 4:16 9:25 40:10 178:7 187:10 217:4

**counseling** 38:1

**counts** 30:1

**County** 12:21 14:17 17:16 23:6 95:8 105:2 128:22 167:4 172:19 177:3 201:2 205:23 206:17 207:1

**couple** 10:21 21:11 71:15 198:25 200:5,6

**courses** 19:17 20:21 21:11 23:24 24:9 69:21 71:24,25 75:21

**court** 4:17 6:1 8:18 12:20 39:25 42:4,14 46:25 86:4,8 185:22,24 216:17

**court's** 48:14

**cover** 125:16

**coverage** 197:18

**covered** 14:4 24:10 48:20 56:2 95:20 126:9 134:19

**CR** 199:22 202:23 203:5 205:5

**crash** 5:23 12:21 16:16 20:10 24:2,7,11 25:1,3,17 26:17 29:9, 10,14 30:11,20 31:2,5,8 32:6 33:25 36:4 46:4,25 55:23 57:14, 16,21 59:18 61:5 62:5,12,21 64:9 67:4 70:9 71:10,18 72:11 73:12 74:24 78:21,23 79:1 88:5, 6,19,25 89:16,18,24 90:8 96:10, 12 97:4 99:23,24 100:12 101:10, 23 102:2,4,9,23 104:12,24 107:5,6 109:22 110:11 114:14, 16 118:5 121:11 123:22,24 124:8 126:6,7,8,20,21 129:8,24 131:15 132:16,25 133:1,2,15 135:3 136:18 137:9 139:3 141:12 143:9 144:2,13,23 145:14 146:23 147:6 152:18,22, 24 154:5,6,20 158:7 160:25 162:9,25 167:5 170:18 171:5 180:13 181:16,20 183:18 191:20 192:12,21 194:19 202:22 203:4,

**crashes** 5:23 8:9 33:25 51:11 55:6,12,14 62:24 64:4 72:16,24 88:23 89:13 90:19 95:22 101:11

**crazy** 178:17,20

**create** 125:7

**credentials** 130:11

**crime** 173:7,19

**crimes** 51:12

**criminal** 7:12,17 15:1 191:6

**criteria** 72:2

**CROSS-EXAMINATION** 195:11 198:21

**cruise** 146:20,25 147:1,3

**crush** 70:15

**culture** 40:14

**curb** 61:6 136:24 153:12

**curbs** 46:4

**curiosity** 147:9

**curious** 147:12 190:19 192:9

**current** 27:20

**custody** 129:19

**cut** 107:1 109:19

**CV-12836-GAD-EAS** 4:10

**cycle** 132:2,4

**cycles** 132:3,5,9,25 133:1

**cycling** 34:9

**D**

**damage** 46:5 107:5

**darker** 117:23

**dash** 207:10

**dashboard** 134:14

**data** 20:9 90:3,4,6 122:21 123:2, 4 124:20,25 126:6,7,8,10,22 127:13 128:24 129:2,3 131:3,18

136:20 142:4 143:10,23 145:13 147:14,16,17,24 148:3,6,10,14, 16,17,22,25 150:1 152:3,19 155:6,11,13 161:4 167:10 170:5

**date** 5:6 23:10 28:22 29:5 36:10 126:20,22 152:22,24 172:10 182:25 183:2 185:12 186:19 187:5,10 188:21 189:3 201:16 202:15 204:14

**dated** 200:9

**dates** 127:11

**day** 9:13 15:15 24:22 29:3 31:19 35:10 43:7 55:10 95:1 101:24 114:24 153:2 158:16 163:23 164:5,10 168:9 170:16 176:12, 14 188:13

**day-shift** 24:20

**days** 29:1,16,22 32:3 114:21

**dead** 178:9

**death** 105:19

**Debler** 4:21 10:23 12:25 23:19 39:23 40:22 41:3,11,21,25 42:2, 5,13 45:4,25 48:5,11 49:8 51:21 53:18 54:7,15 56:22 57:1 65:23 68:10,16,23 69:14,24 70:10 73:13 74:11 81:11 84:21 85:7, 17,19 89:2 96:1 97:9 104:14 105:8,25 107:21 108:6 110:8 113:2 115:3,6 117:13 118:8,23 119:2,10 120:12 122:4 129:13 137:1,21 139:1,5,7 140:15,18,22 141:2 143:12 145:9 148:18 150:23 151:9,17 154:15 155:10 157:6 158:3 159:12,16 160:8 161:14 162:5,20 163:9 167:14 168:16 170:25 171:7,15 173:25 174:21 175:7,14 176:3,6,22 177:9,23 178:1,8,18 179:5,12, 17,19,25 180:7,15 181:21 182:15 183:7,14,25 184:2,8,15 185:5,14,21,24 186:7,10,15,17 187:21 188:23 189:1 190:15 191:7,15 192:22 193:10 194:3,7 195:1,12 198:17,20 207:15 210:8,20 211:3,17 213:2,13 214:18 215:16 216:1,2,11,24 217:8

**Debler's** 41:15

**debris** 58:6,18 61:5 62:6,7,8,17 72:24 73:11 74:16,17 75:11 170:17,21 171:5

**decades** 193:4

**decelerating** 134:25 135:6

**December** 183:3 201:24

**decide** 56:20 57:7 58:23 67:25 165:10

**decided** 104:17 174:13

**decides** 100:21 101:18

**deciding** 177:7

**deciphering** 147:19

**deciphers** 125:13

**decision** 35:2 78:3 82:2 87:16 100:5 102:24,25 103:10,11 153:3 172:16 175:3 176:11,18 178:14 181:18 191:19,22 192:24 200:18

**decision-makers** 184:7

**decisions** 34:25 35:3 181:15,22 182:4 193:16

**defense** 40:3 41:5 49:12 84:25

**defenses** 40:8

**define** 120:19

**defined** 45:9

**defining** 45:9

**definition** 106:25

**degree** 14:23,25 83:16

**degrees** 82:19,21 83:13,19,25

**delegated** 56:6

**delegates** 56:3

**deliberative** 41:17,18

**delta-v** 134:19,21,22 135:2,5 140:11

**demonstrate** 40:25

**department** 12:13,17 14:10,12 15:12,16,25 16:7 24:16 25:20 27:3 28:18 29:24 33:4 36:14 38:8 40:15 45:14,19 48:4 49:18, 22,25 50:4 52:18 62:24 63:25 67:15,21 68:5,9 69:9 90:8 94:8, 25 95:8 96:3 97:21,22,23 99:7, 16,17,24,25 100:1 101:16,17 102:15 104:10,13 109:1,7 115:22 116:10,23 118:15,22 120:10 124:1 127:17 128:16,23 130:10 155:16 156:8 166:15 171:21 172:17,23 174:5 175:4 177:3 180:12 191:13 192:11 193:5 195:19 200:8,19 201:12 203:7 209:2 210:9 211:14 213:21 214:20,24 215:3,18

**departments** 13:9 93:22,23 94:2, 16 96:17 99:18 100:25 215:8

**depend** 62:8 109:14 111:19

**dependent** 131:2

**depending** 28:1 32:19 33:8 38:5 74:20 91:13 116:22 131:5

**depends** 27:10,11 31:25 33:5 37:25 48:6,7 58:17 60:23 61:10 62:7,20 73:14 97:21 98:17 99:7 107:24 109:22 110:9 111:18,20, 25 112:6 118:2 123:4 135:12,18 136:10 146:1 154:8 171:9

**deployment** 135:16,23

**deposition** 4:8,11 5:6,19,20 8:18, 22 10:20,21 11:20 115:9 124:2 171:23 195:9 202:7,11 204:6,10 207:18 216:16

**depositions** 7:7

**derive** 87:15

**describe** 18:14 82:16 118:6

**description** 36:11

**designated** 150:11 191:23

**designed** 135:12,19 146:3

**detail** 175:20

**detailed** 55:3

**detect** 79:7,8,24

**detected** 134:8

**detecting** 22:6 134:5

**detection** 23:8

**determination** 72:11 101:15 109:9

**determinations** 71:25 74:20

**determine** 47:10 51:25 57:7,15 107:11,18 132:14 140:5 155:21 160:10 211:11

**determined** 104:4 143:7 160:6

**determines** 27:12

**determining** 106:17

**deviation** 82:20 83:20,21,22,23

**device** 123:9 199:14 200:1

**devices** 90:12 123:5,14

**Dheeraj** 169:1

**diagnostic** 125:20

**differ** 34:19

**difference** 51:19 73:22 110:24 111:2,4 116:21 118:6,11 122:20 142:22

**differently** 82:9

**difficulty** 175:17

**dipping** 137:13

**direct** 5:10 126:2 150:18 190:1 210:2

**directed** 55:8,11 205:8

**direction** 121:17

**directions** 137:11

**directives** 193:25

**directly** 30:16 125:23,25 129:3 149:15 200:16

**disbanded** 96:24

**disciplinary** 39:5,21 42:20

**discipline** 38:25 39:15,19 41:16 42:23,24 43:3 150:22,23 196:3, 6,7

**disciplined** 43:11

**discouraged** 92:10

**discovery** 10:23 11:4 39:25 49:19

**discretion** 108:1

**discuss** 11:10,15 32:8

**discussed** 27:24 28:10 31:8 45:2 69:22 70:16 97:7 103:25 149:25 156:24 164:24 175:20 176:2,11 184:20 193:7

**discussing** 142:5 176:19 184:23

**discussion** 104:2 165:5 179:3,6, 12 182:2 187:15

**discussions** 46:14 174:18

**disheveled** 78:14 79:9

**dispatch** 25:11,16 51:22 52:3 90:14 100:2 107:4

**dispatched** 37:5 90:16

**dispatchers** 51:25

**disposal** 9:19 71:10

**dispute** 117:9 148:6 152:17 156:20 183:1 207:6

**disrespectful** 46:12

**distance** 72:7 153:15 154:1,3,6, 18 155:2

**distinction** 106:24 108:21 111:5 118:13 119:21 214:7

**distracted** 60:12 93:6 152:3,6

**distraction** 89:9 92:5

**division** 8:8 20:23 37:14 44:11 52:16 55:5 56:24 57:6 58:23,24 59:24 155:15

**DLC** 125:19

**docu** 65:4

**document** 14:4 38:3 73:16 100:10 129:17 199:19

**document-wise** 9:7

**documentation** 38:4 39:3 65:5

**documented** 44:25 45:3,24 46:6, 13 47:2 60:19,20 61:13,15,19 62:3

**documents** 86:18,20 129:19

**domestic** 51:12

**domestics** 7:23

**door** 81:1

**download** 16:20 124:15 125:4 128:17 132:4,5,19 133:2

**downloaded** 148:25

**downloading** 86:22

**downloads** 123:19

**downtime** 55:12

**dozen** 53:13 63:2 102:7

**drafted** 54:21

**drag** 70:15 72:6 154:11

**dragging** 154:11 155:23

**draw** 111:4 161:24 201:12 214:7

**driver** 60:6 77:25 93:1,5,8 109:23 133:9,10 134:2 139:23 148:22 203:9 212:15

**drivers** 89:13 198:6,7

**driving** 8:3 21:19 23:7 44:9 50:7, 16 57:24 60:12 77:5,10 80:23 81:4,6 89:4 91:20,24 92:10,15, 19 93:12 110:13,19 111:6 129:9 151:25 152:4

**drone** 16:15 71:8,14

**drones** 95:24 96:1,2

**drug** 8:3 20:1 80:12,17 81:18,20

**drugs** 80:24 81:10 201:24 203:10 212:16,20

**drunk** 8:3 23:7 96:10

**Dufrane** 4:24 23:13 41:14 48:25 49:4 69:16 85:22 86:16,24 87:1 113:4 144:15 173:23 176:24 180:17,19 181:1 188:21 194:24 195:3 198:20,22 202:9 203:25

204:5,8,20 205:19 207:13,17,19 209:25 212:4 213:14 216:22 217:9

**duly** 5:2

**duties** 16:5 192:5 196:18,22 197:13

**duty** 25:7 65:25 94:8 100:4

**DWI** 23:8

**dynamic** 27:7

**E**

**earlier** 55:9 193:7 214:1

**easily** 38:1

**eastbound** 121:19,23 153:11

**easy** 180:3

**ECM** 122:25

**EDR** 16:17 122:3,15,16,20 125:7 126:10,22 128:25 129:5,19,25 130:12 148:3,22 152:24 160:3 161:4 214:2,7,12

**EDR's** 127:20

**education** 14:19

**effectively** 34:13 39:4

**effort** 165:14

**Eftink** 10:9,13,18 12:16 101:20 150:6,7 158:7,23 159:3 160:5 161:9,19 162:16 163:8,22 164:8,13 165:5 166:16 170:7,15 172:22 173:12,22 177:22 180:11 184:20 185:11 187:12,19 188:4,10 189:8,16 190:5 191:25 206:3,16 208:21 209:16,20

**Eftink's** 164:23

**egregious** 61:2

**ejection** 73:2

**electronic** 122:21 124:20,25

**elevated** 46:16

**eligible** 88:8,12,15

**email** 67:22 188:18 202:11,13,16,18,21,25 203:13,14 204:3,10,12,14,16,18,20 212:9,17

**emergency** 8:11 17:25 18:4,19 43:17 50:14 51:3,6 52:13 105:7,9,14,17,22 106:18,22,24,25 107:8,13,20 108:25 109:3,21 111:14

**emergent** 110:1 111:1,2,7

**employee** 25:20 47:22

**employees** 190:1 192:9

**employment** 195:19

**EMS** 59:25 114:25

**encompass** 77:4

**encounter** 105:15

**end** 7:25 28:4 35:10 45:23 46:16 75:12 79:20 86:22 93:5 178:20 205:5 216:15

**ended** 9:20 62:12 165:4 169:23

**ends** 126:9

**enforce** 49:24 50:10 51:7 54:11 68:21 109:13 113:9

**enforcement** 7:9 14:7 15:23 17:8,22 20:1 21:19 37:7 90:20 120:25 121:10 155:14 213:10

**enforcements** 55:11

**enforcing** 108:21

**engage** 147:2

**engaged** 146:23 147:4,7

**engine** 127:22 142:21 144:9

**engineering** 34:7

**ensure** 92:21

**entail** 119:22

**entered** 47:16 201:21

**entering** 112:17,18

**entire** 40:15 63:24 96:21 130:1 153:14

**entry** 172:10 178:16 207:4

**equal** 211:16,19

**equipment** 45:17,18 125:6 134:5

**equipped** 116:24

**escalate** 53:6

**escalated** 53:15

**escalation** 53:16

**essentially** 26:9 134:23

**established** 161:15

**et al** 4:10

**Evan** 4:23 118:5 133:7 149:15,17 151:24 152:2 154:19 180:13 181:17 183:22 184:14 190:14 191:5 192:5,21 193:8,23 194:5 202:22 203:4

**Evan's** 189:13

**event** 20:9 49:6 133:24 135:3 136:1,5,11,14,21 137:18,23,24 138:8,9,13,15,17,19,22,23 139:10,15,17,18,23 142:5,18 143:22,24 144:5,19 145:8 146:17 148:5,23 174:14

**events** 135:13 136:4,12,16 137:18

**eventually** 25:14 61:19 114:17 166:3

**everybody's** 68:24 85:9 86:2

**everyone's** 36:12

**everything's** 31:14 56:1 62:2,3

**evidence** 18:21 40:2 56:13,18,20 57:7,14 59:5,6,14,17,19,21 60:16,22 70:8 73:12 75:4,6,10,15 78:8 80:11 88:22 110:14 165:3,25 184:7 214:4

**EXAMINATION** 5:10 210:2 214:17

**examined** 5:4

**examples** 59:2 105:11

**exceed** 50:19 51:1 111:21

**Excel** 24:6

**exceptions** 50:19,23

**excerpt** 177:17

**exclamation** 188:16 189:11

**Exhibit** 124:2,6 171:23 172:2 195:9 199:13 200:4 202:7,11 204:6,9 207:17 211:20 212:8

**exhibits** 217:5

**existed** 96:14

**exists** 125:3

**expanded** 186:17

**expect** 40:12 54:23

**expectation** 55:17

**expectations** 54:16,17,19,24 55:4

**expected** 13:18 65:21 97:17

**expecting** 147:11

**expensive** 128:19

**experience** 73:10 87:7 88:16 89:1 99:8 105:5 110:23 111:9 112:22 115:24 155:14 156:23 193:3,24 210:24

**experienced** 37:15 134:20

**expert** 81:21

**expired** 22:15,17

**explain** 49:6 111:23,24 141:25 175:1 182:20

**Explorers** 116:14,15

**express** 190:24

**extent** 73:14 80:3,4 103:12 153:4 163:5 167:7

**extracting** 124:24

**extraction** 125:15 130:20 131:18 152:19,25

**eye** 83:8,11 84:1,5 107:2 115:12

**eyes** 78:15 79:8 82:18 83:18 87:22,25 140:25

**eyewitness** 169:21

**eyewitnesses** 168:23

**F**

**facie** 51:1

**facilitate** 37:21

**facing** 191:6

**fact** 88:18 89:21,24 178:2 191:4

**fact-finding** 66:10

**factor** 70:15 72:7

**factors** 154:12 155:1 156:2

**failed** 203:7 212:14

**Failing** 89:11

**fair** 6:7 7:8 9:23 19:6,12 33:10 41:1 49:18 67:9 68:5 90:11 106:11 117:11 131:6 134:18 142:19 145:11

**fairly** 45:11

**fall** 44:10

**falls** 28:8 43:12 68:14 92:20

**familiar** 87:21 134:11 156:11

**familiarity** 156:12

**Farmington** 4:1,13

**farther** 85:20 112:5

**fashion** 106:7 107:13 110:1,17, 25 111:1

**fast** 87:5 117:12 169:24

**fatalities** 100:14

**fatality** 100:12 101:14 198:3

**Federal** 5:8 39:25 40:17 41:4

**feel** 6:11,16 51:9 105:11

**fender** 52:10 61:11 65:4 110:3

**field** 8:5 16:13 22:1,3,11 23:1,2,8 27:5,6,8 76:2 79:21 82:4,12 84:22 85:8,11 88:9,17 195:22

**fields** 58:6 72:24

**fifty** 7:18

**figure** 72:3 86:17 96:18 97:17 162:2

**file** 47:3 126:25 150:10,12 196:8

**filled** 159:22

**final** 24:5 61:12 66:18 73:19 74:21 153:16 191:22

**find** 60:3,16,18 80:19 131:23 139:10 145:18 187:25 188:20

**finding** 143:6 150:20

**fine** 19:1 109:24

**finger** 107:1 108:16 109:20

**finish** 6:6 27:21 28:2 120:21,23 176:5

**finished** 30:13 85:3 206:8

**fire** 109:1

**five-minute** 115:8

**flat** 154:10

**fled** 43:7

**flee** 43:8

**fleeing** 47:11,12 48:16

**flipping** 139:12

**flow** 115:7 181:5

**fluid** 60:2

**focus** 22:2 28:5 33:15

**focused** 18:16 33:24 34:11 72:15 183:12

**folks** 11:10

**follow** 23:19 100:16

**follow-up** 55:12 195:14 210:4

**footage** 9:12,15

**force** 94:4 106:14,15 156:18 157:16

**Ford** 208:14,25 209:19

**forever** 47:22 196:8

**form** 31:10 41:23 45:4,25 51:21 53:9 54:8,15 56:22 65:23 68:10 69:14,25 70:10 73:13 89:2

104:14 105:8 107:21 108:6 113:2 115:4 117:13 118:9,24 119:1 125:13 127:14 147:21 151:9,17 154:15 155:10 157:6 160:8 161:14 162:5 163:9 167:14 168:16 173:23 174:21 175:15 176:3,22 177:23 179:5 183:15 184:8,15,21 186:13,17 187:3,21 190:15 191:7,24 192:15,22 193:10,11 194:5,7 205:17 210:21 211:3

**formal** 7:17

**formally** 171:20

**format** 147:17

**formed** 160:15

**formulas** 72:1

**forward** 40:21

**found** 11:8,19 113:22 114:17

**foundation** 45:5 46:1 48:5,11 49:9 53:18 54:7 68:23 69:15,24 81:11 97:9 104:15 107:22 108:7 110:8 113:3 115:3 118:9,24 119:1 129:13 137:1,21 143:12 145:9 148:18 160:9 161:15 168:17 171:1 173:24 174:22 175:15 176:23 177:24 179:6 181:21 183:7,14 184:16 187:22 190:16 191:8,15 193:11,12,20 194:8 205:18 210:8,20 211:17 213:2,13

**frame** 128:4 154:11 155:24

**Frank** 103:20

**Franklin** 4:12

**freak** 111:10

**free** 6:11,16 105:11

**frequency** 31:1

**Friday** 4:2 172:14 204:21

**front** 28:3 93:9 125:8 131:22 134:2 212:2

**FTO** 27:3,9,20 28:10 30:13 195:20,21

**FTO's** 28:16

**FTOS** 27:4

**full** 28:21 93:2 118:22 119:18,22, 24

**full-time** 15:10,13

**fully** 116:20 118:19,20 120:5

**function** 67:8

**functional** 97:19

**functions** 90:13

**fuse** 125:22

**future** 204:23

## G

**G-FORCES** 135:18,23

**Gail** 4:22 11:24 30:19 98:11 126:17 130:6 149:23 150:1 198:16

**gain** 62:4

**game** 49:18

**gap** 217:6

**gas** 127:23,24 164:16

**gather** 19:4 78:8 142:12

**gathered** 165:12

**gave** 165:23

**Gaze** 82:22

**general** 48:17,18,20 49:1 50:5,9, 13,24 52:17 54:25 55:2 68:8 69:10,12 77:4 106:21 108:19 112:9,23 120:24 193:6 198:4

**generally** 28:9 31:11 36:19 52:21 73:11 90:2,12 91:10 92:24 116:4 118:12 125:6 181:20 196:19

**generate** 130:18

**generated** 46:18 149:7 210:10

**generic** 51:9 122:25

**gentleman** 168:25

**germane** 41:8 49:15

**Giorgi** 103:22,24

**give** 6:4,6 7:4 10:2 38:25 78:20 96:9 98:7 103:18 105:11 118:25 134:7 139:2 140:8,15 141:8 142:7 146:9 166:25 180:25 188:21 212:6

**giving** 41:12 93:1 116:1 175:24

**glasses** 185:23

**glassy** 78:14 79:8

**goal** 68:14 77:24

**Gobler** 103:20 174:13 175:22 204:17 205:1,8

**good** 4:5 5:12 6:14 13:2 18:24 38:19 39:17 79:16 81:22 99:3 100:19 155:5 195:13

**gouge** 73:17,22,24 75:1 157:23

**gouges** 74:8 155:24

**GPS** 56:12 71:7,13,17 75:7 94:9 95:24 153:21 197:2,9,17,20,22

**grab** 60:13

**graduate** 14:16

**graduated** 14:9,15 15:2

**graph** 146:17

**graphics** 118:3 120:17,25

**graphs** 137:8

**grass** 170:22

**great** 42:13

**greater** 93:13 136:15 138:21

**ground** 154:11 155:25

**Guardian** 38:3,9,17,24 39:1,9,13, 16 40:5 41:6 48:15 54:2 196:1,2, 8

**guess** 7:21,25 16:17 42:21 45:6 52:16 69:5 71:16 82:3 90:9 93:15 94:3 97:16 105:13 130:17 135:9 138:1 143:1 155:5 160:19 162:2 201:6 203:17

**guessing** 101:25

**guidance** 123:7,13

**guideline** 101:4 106:16 112:9

**guidelines** 91:12,14,18,19,21 92:25 100:8,9,10,15,16,22 101:3 112:24 193:6,25 196:11

**guy** 11:17

**guys** 17:12 32:19 37:6,12,18 43:5 46:4,25 55:13 58:4 59:4 65:17 93:25 94:11,12 99:13 102:17

**H**

**half** 27:20 102:7 153:12

**halfway** 139:15

**hand** 39:5 124:5 159:2 172:1 191:20

**handed** 166:1,4 184:25 202:10 204:9 209:11,15,20 212:9

**handing** 215:17

**handle** 96:10

**handled** 44:14

**hands** 185:22

**hands-on** 66:19

**Hanson** 4:15

**HAP** 136:23

**happen** 11:3 35:9 53:5 61:17 64:4 88:23

**happened** 6:11 10:11 15:8 22:19 32:14 36:11 43:12 60:5 61:2 148:5,22 159:22

**happening** 47:1 112:3

**happy** 48:2

**hard** 46:21 155:1 215:12

**he'll** 175:11

**head** 6:3 21:15 71:23 88:3,6,11 109:5 123:4 199:19

**heads** 32:12 103:21

**Health** 208:14,25 209:19

**hear** 37:10

**heard** 40:11 95:15 162:7 168:5 170:18 214:1

**heart** 180:5

**held** 15:23,24 214:3

**helpful** 105:12 109:4 119:8 186:11

**helping** 86:24

**helps** 68:20

**Henry** 208:14,25 209:19

**hexadecimal** 147:17,23

**hey** 35:14 37:18 43:12 59:11 60:4,5,12 67:25 69:1 80:21 92:14 94:3,13 95:15,17 99:22 108:16 112:1,4 113:18 133:14 166:12

**hidden** 23:16

**high** 14:19 39:2 135:5

**higher** 12:13 26:1 39:6 46:17

**Highway** 20:22 21:25 70:7

**Hills** 4:1,13 10:9 12:17 95:3,4 99:12 102:22 103:8 123:25 154:3 165:4,20 166:14 171:21 172:17,23 174:15,20 176:12 177:19 179:3 180:12 182:14,22 183:5 184:10,12 189:24 190:3 191:14,21 200:8,19 203:6 204:21 206:3,8,22,24 210:17 212:13 214:20,23 215:3,18 216:5

**hire** 28:22 29:5

**hired** 14:9,12 15:16 26:19 28:22

**hit** 46:4 62:14 65:17,18 88:11

**hit-and-run** 55:14

**hits** 136:8

**hold** 33:5 54:13,17 55:5 83:17 101:2 213:20 214:6 216:22

**holding** 82:24 83:24

**Hollenbeck** 189:18

**home** 114:23

**honest** 55:20 178:13

**honestly** 117:5

**hook** 125:10 130:19

**hoping** 77:13

**Horizontal** 82:22

**horrendous** 55:10

**horse** 178:9

**hospital** 78:22 169:9

**host** 94:24

**hosting** 94:24

**hour** 137:15 143:9,24 144:6,11, 12,22,23 149:3 150:21

**hours** 114:21

**housekeeping** 195:14 198:25 207:8

**Huck** 98:4,9 207:10,20,23 208:10 209:11

**Huck's** 207:9 208:4,5

**hundred** 7:18 132:8 133:13

**Hunter** 63:15 98:5,9 126:16 130:8,9 149:23 197:4

**hurt** 108:16

**hurting** 93:23

**hurts** 108:17

**I**

**IA** 103:17,19

**idea** 34:23 68:18 100:19

**ideas** 103:14

**identification** 124:3,6 171:24 172:2 195:10 202:8 204:7

**identified** 14:1 77:20 217:4

**identify** 60:7 77:8 124:17

**identifying** 103:3

**ignition** 132:2,3,4,5,9,25 133:16

**illegal** 80:24

**imagine** 131:5

**imaging** 126:22

**immediately** 128:13 213:22

**impact** 62:16,21 68:14 73:5 74:7, 10,19 104:12 136:7,9,21,23 137:14,19 140:2 141:14,15 146:6 153:16 154:6,18

**impacted** 88:7

**impacting** 135:11

**impaired** 21:19,23 22:8 80:19 167:25 198:8

**impairment** 79:24 80:9 81:7,17 84:15 211:16,19

**implemented** 76:3

**important** 57:12,15 58:4,10,19, 21 59:11,12 60:25 61:11 62:13, 15,22 69:4 73:15 77:7 85:13 112:19 117:12 157:3 173:17

**impossible** 91:24 92:11

**Impounding** 56:15

**impression** 86:19

**in-car** 9:12 38:15 52:18 166:21

**inaccurate** 128:25

**inappropriate** 193:17

**Inattentiveness** 89:7

**incapacitated** 78:21 79:2 88:13

**incident** 11:16 12:8,9 35:25 36:8 64:12 85:6 107:18,19 108:14 109:12 113:1 114:6 115:1 131:17,21 132:19,20,22 133:4, 25 135:8 151:2,16,18 154:14 158:24 164:5 189:13 192:12 193:9 201:5,7,9 210:5,14,19 216:8,9

**incidents** 64:21 66:14

**incline** 121:16

**include** 172:18 201:1

**included** 204:19 208:22

**increasing** 93:15

**independent** 32:5 105:5

**independently** 32:17

**indica** 130:7

**indicating** 204:24

**indication** 117:6 145:21 197:24 198:6

**indicator** 81:17 135:7

**indicators** 80:16

**individual** 21:2 88:7

**individuals** 63:7 90:17 130:9

**inertia** 157:16

**influence** 203:10 212:16,20

**informa** 173:5

**informal** 7:16

**informals** 7:22

**information** 25:17,19 31:15 32:4 35:20 45:16,17 62:5 65:21 66:4 74:15 75:12 90:11,15 91:1 92:7 96:9 113:23 123:17 125:5,13,19 126:25 131:24 134:16 139:10 141:10 142:11,13 147:20 149:5 151:5 153:5 159:21 161:1,3,6 162:4 163:14 165:19 167:23 168:2,3,10,13 169:17 170:1,9 173:11 183:5 184:12 194:10 206:17 210:13

**infraction** 77:22

**initial** 10:20 140:2

**initiate** 39:9,19,21 41:6 42:21 43:9,18,22,23 65:9 130:20

**initiated** 42:19 43:2,19 44:2 151:1

**initiation** 43:4

**injured** 163:4

**injuries** 107:7,16 162:24 163:2, 11 197:24

**injury** 51:11,18 88:4 101:13 105:19 106:1,4,5,25 107:5,6 108:3,4 110:17 114:10 161:22 162:9 198:2 207:3

**input** 35:4

**inputted** 127:1

**inquire** 189:25

**inquiring** 190:3 191:9 192:7 203:15

**inside** 116:7 117:21 197:19

**insight** 102:21

**insights** 62:5

**inspect** 153:13

**inspection** 125:7 126:13 128:6 129:25 130:12

**inspections** 123:19

**Institute** 20:6,13

**institution** 20:15

**institutions** 97:8

**instruct** 23:1,4 153:18 164:20 210:16

**instructed** 164:15 190:5

**instructing** 41:10

**instructor** 16:15 17:14 18:9 22:11

**instructors** 17:12

**instructs** 6:23,24

**intentionally** 45:22

**interact** 35:13

**interacting** 52:24

**interaction** 169:5

**interested** 37:19,20 95:14,17

**internal** 47:17 152:10 192:10,16 193:15 203:3

**interpretation** 136:20 148:12,13 155:20

**interpretations** 164:24

**interpreted** 144:18

**interpreting** 126:10

**interrupt** 181:4

**interruption** 125:22

**intoxicants** 79:7

**intoxicated** 21:23 78:10 87:17 89:22,25

**intoxication** 88:19

**invest** 85:24

**investigate** 43:13,14 93:25

**investigated** 47:8 183:22

**investigating** 47:14 132:16 167:13 210:18

**investigation** 12:22 16:16 18:22 19:12 20:14 21:3,4,5,12 39:14 47:5 58:13 61:25 65:3 66:9 69:20,22 70:23 71:18 72:14,16, 19 73:15 75:13,25 78:1,25 80:17 81:9 85:4,15,25 90:21 96:12 97:19 104:3,24 105:3 113:12 151:6,15,18,22 152:10,18 153:1, 5,6 157:4,10 158:9,20,22 163:15 164:17 165:1 167:8,10,21,24 168:15 170:23 171:5,13,16,21 172:17,18 173:13,14,15 174:9, 14,19 175:5,23 181:16,20 182:5, 23 183:11,12,17,19 184:13,17 187:19 188:20 189:24 191:20 192:10,17,20 193:15 198:2 200:7,20,21 201:1,9 203:3 210:6

**investigations** 24:2,12 66:14,20 72:20 75:21 87:6 88:17 103:21 159:2

**investigator** 62:4 74:15 75:12 97:4 102:23 135:3 144:24 145:14 147:13 154:5

**investigators** 59:25 100:13 101:9

**involuntary** 82:17

**involve** 36:4 63:7

**involved** 5:16 7:23 10:8 41:7,22 43:6 44:12 48:16 52:9 60:11,25 63:11 64:11 66:5,24 67:1,5 88:6 89:18,24 94:23 96:20 97:18 98:1,11,15 99:6 100:23 103:10 109:19 129:12 132:15 152:17, 19,25 153:25 154:12 165:1 174:9 175:4 177:2 181:23 183:11 192:13 198:7 199:2 213:11

**involvement** 67:3 101:12 103:12 163:15 167:7,9 176:20 177:4,6 206:20

**involves** 87:19 190:1

**involving** 29:10 63:18 64:10,16 73:4 85:15 180:13 210:13

**issue** 34:7 46:8 86:22 93:4

**issued** 177:8 213:20

**issues** 34:12 37:10 44:7,14 45:2, 9 46:7,16 47:16 188:2

**items** 71:9 208:12

**J**

**Jacob** 98:10

**Jake** 98:10

**January** 17:19 172:10,14,21 173:12,21 174:17 176:19 177:22 178:16 179:4,8,13 180:11 182:25 183:3 200:9 202:17 204:15 206:12 207:5 212:12 213:9

**Jason** 202:19

**jerk** 84:2

**jerking** 82:17 83:18,25

**job** 15:11,13 28:11,16 37:21 43:14 55:25 70:2 75:4 92:12 112:6 147:12 150:24

**jobs** 14:14 15:13

**jogging** 76:18

**join** 41:14 69:16 85:22 113:4 173:25 176:24 180:17 213:14

**joining** 14:18 211:13

**Jones** 103:19 175:21 191:24 192:6

**Joppich** 4:12

**Josh** 103:19

**Julie** 4:24 186:13 195:1 198:19 204:20

**July** 4:2,7

**jump** 141:23

**jumping** 187:14

**jurisdiction** 96:9

**justice** 15:1

**K**

**Kayla** 169:3

**Ken** 98:9 130:8,9 149:23 197:4

**key** 131:16,17,18,19 132:12,17, 18 133:3,5,13

**kicks** 58:18 60:24

**kidnapping** 51:13

**kind** 18:12 21:7 39:24 42:21 45:20 46:6 51:9,11 61:25 70:25 74:2,9 77:11 80:6,9 84:3 102:15 106:18 109:4 115:17,25 122:25 127:21,24 140:25 154:8 195:23 196:20

**kinds** 28:9 34:25 35:3 38:21 44:14 45:2 46:16 47:16 48:10 62:8 73:11 78:12 101:11 123:2

**knew** 28:22 60:19 101:21,24 114:19 161:16,22 162:7,11,13 163:4,5,10,11 164:8 167:2

**knowing** 62:6

**knowledge** 97:19 105:4 110:23 112:22 124:23 131:4 166:17 192:19 193:8,24 196:7 214:23

**L**

**lab** 173:8,19 201:10,11,17 202:3 203:8 211:10 212:15

**lack** 82:18 83:9 88:8 193:20

**laid** 121:14

**Lake** 14:10 15:7

**land** 5:25

**lane** 76:25 89:5 121:13,20,24

**lanes** 121:17,21

**laptop** 90:9

**largely** 99:4

**latitude** 137:10,11 140:12

**law** 7:9 14:6 15:23 17:8 50:19 90:20 120:24 123:6 155:14 210:25 213:9,22

**laws** 17:23 50:18 156:9

**lawsuit** 9:3 32:8,23 41:22

**lay** 5:24

**lead** 40:1 66:22 80:16

**leading** 146:24

**learn** 18:7 27:25 95:13,14 113:14 114:7 121:12 153:7 167:12

**learned** 113:16,20 149:1

**leash** 85:1

**leave** 37:9 58:2

**led** 157:20,25

**Lee** 21:13

**left** 26:24 87:3 98:25 211:10

**left-turn** 121:20,23

**LEIN** 90:21,22,23 91:15,17

**Leithauser** 4:23 5:17 11:15 26:16,18 27:2,16 28:20 29:10 32:22 63:8 64:16 89:18,22 112:25 113:14 115:1 117:2 118:5 129:9 140:5 143:7 149:2, 15 150:14 151:7,14,24 152:2 157:25 160:6 161:12 180:13 181:17 183:22 184:14 190:10,14 191:5 192:5,21 193:8,23 199:3 202:6 207:2

**Leithauser's** 67:3 136:25 153:7 154:19 157:20 161:7 162:17 163:6 194:5 202:22 203:4 212:23

**lengthy** 50:14

**lettering** 120:8

**letting** 90:14

**level** 108:3,22 109:2,11

**levels** 211:9,11

**liaison** 190:2 191:13

**lieutenant** 34:21,22,23 35:1,4,14 39:1,6,10,11 46:17 65:7 66:21, 24 103:19 189:18 212:10,11,12, 18

**lieutenant's** 34:20

**lieutenants** 35:11 36:13,17 103:17

**life** 105:20,23 132:9

**lifespan** 132:13

**light** 34:8 44:20 55:9 115:16 116:15,21 118:18 119:19 123:11 134:13 176:1

**lights** 34:3 43:24 52:5 89:4 108:14 111:8,10,15 112:12,14, 20,25 116:6 117:19,21 145:22, 25 161:7 162:17

**limit** 50:20 51:1 93:12 111:17,22 112:11

**limited** 161:1 192:20

**lines** 136:13

**link** 125:20,23

**list** 51:8

**listed** 13:18 64:11 106:21 124:9 199:15,17 208:12 209:5,7

**litigation** 213:20

**LLC** 21:8 24:1

**locate** 208:13

**located** 214:12

**location** 58:20 62:16 116:1

**locks** 136:11

**long** 7:22 9:1,4 11:13 22:21 26:22 29:20 30:7 31:23 32:5 47:22,23 49:13 50:21 74:21 84:22 85:1 96:14,20 97:12 101:20 114:20 130:17 131:5 158:17

**longer** 22:25 29:25 96:24 130:23 131:1 132:1 134:24 144:25

**longitude** 137:10,11 140:11

**longitudinal** 141:11

**looked** 75:3 119:13 131:11

**lost** 107:2

**lot** 7:22 9:17 16:8 28:15 29:25 35:17 37:3 46:8,15,19 48:21 49:13 56:16 59:13 62:12 65:15 70:11 96:4 98:2 99:6,8,11 127:17,19 128:21 137:6 142:13 154:12 155:21 156:2 197:18

**lots** 65:16

**low** 115:25 116:4 155:23

**lower** 116:6,18 117:17 118:18

**Lyon** 15:11,13

M

**Macomb** 17:5 20:13 21:5

**MADD** 23:6

**made** 65:8 81:3 151:12 153:4 160:20 171:17 172:16 175:3 176:11,18 178:14 181:22 182:21 191:19 200:18 208:2,17,18 209:1,23 210:18,24 211:14 213:19,24

**magic** 125:12

**Magraw** 98:5,10

**main** 33:20 60:3 71:3

**maintaining** 76:25

**major** 35:24 66:6 109:21

**make** 6:17,21 31:15 34:4,25 37:16 42:7 44:5 47:14 55:10,13,

25 58:11 62:1 68:24 70:3 72:10 75:17 77:18,24 80:25 86:23 97:23 98:7 100:5 109:9 119:21 131:15,19 138:4 152:12 155:19 170:1 178:16 180:2,21 181:15, 18 182:4 183:11,21 184:6 186:2, 10 192:1,23 193:15 195:25 210:17 211:22

**makes** 101:15 102:25

**making** 49:17 53:12 57:24 68:3 71:25 77:1 78:3 101:17 103:13 169:23 180:23

**Management** 20:7

**manner** 92:14 111:7,14

**manually** 127:1,7

**manufacturer** 123:5 131:3 146:2

**manufacturers** 123:15 136:10

**Maple** 121:13 157:24 194:20

**March** 187:16 188:4,23,25 189:6

**Margaret** 4:21 122:1

**marijuana** 80:12

**mark** 59:11 73:22,23,24,25 74:4, 7,21 83:17

**marked** 116:20 118:19,20 124:3, 5 171:24 172:1 195:10 199:12 200:5 202:8 203:25 204:7

**marker** 128:15

**marking** 119:24

**markings** 57:18 61:12 70:14 116:22 117:24 118:4,7,22 119:18,22 120:1

**marks** 58:7 70:14 73:16,17,19 74:4,5,25 75:1,10 157:23

**Martinez** 4:19 5:5,11 11:1 13:2,5 23:15,18,21,23 40:9 41:1,9,24 42:17 45:8 48:8,19 49:2,5,20 52:7 53:22 54:10,18 56:25 57:4 66:2 68:12,19 69:3,18 70:5,18 73:21 74:14 81:13 85:3,12,18, 21,23 86:2,6,14 87:2 89:6 96:13 97:15 104:19 105:10 106:2 108:2,11 110:22 113:8 115:11, 13 117:16 118:14,16,25 119:8, 20 120:13 122:1,7,13 124:4 129:16 137:4,25 138:3 139:8 140:21 141:3 143:14,17 144:17 145:10 148:21 150:25 151:13, 20,23 154:17 155:12 157:7 158:4,5 159:19 160:12 161:17 162:10,23 163:13 167:16 168:21 171:4,10,18,25 172:25 174:2,25 175:12,16 176:5,8 177:5,13,25 178:6,11 179:1,8,10,15,18,22 180:2,9,25 181:7,14,25 182:16, 19 183:9,20 184:5,11,18 185:6, 17 186:3,9,12,22 187:2,8 188:1, 24 189:2,5 190:20 191:11,17 193:1,22 194:4,13,22 199:1,20 204:2 205:17 207:11 210:3,11, 23 211:5,20,22 212:1,5,7 213:5, 18 214:14 215:13,25 216:13,20 217:3

**mass** 128:1,2

**materials** 159:7,9 165:12 172:22 177:18,21 178:14 181:2 208:20, 22 209:12,15

**matte** 120:21,23

**matter** 4:9 7:4,18 49:12 61:16 62:11 84:25 166:7 171:5 172:16 178:1 189:19 191:14 200:13 205:24 207:8

**matters** 73:12

**max** 136:19

**maximum** 82:20 83:20,21,22,23

**MDC** 90:6,7 91:7,19,23 92:7,15, 19 93:5,8 199:2,6

**MDOT** 96:3

**means** 11:21 132:8 160:2 178:24

**meantime** 15:21

**measure** 82:21 83:14 153:15 154:3

**measured** 153:25

**measurement** 71:3

**measuring** 70:24 71:6

**Measuring's** 70:25

**media** 36:2

**medical** 87:24

**medically** 87:20

**medications** 80:22

**meet** 5:13 101:9 102:1

**meeting** 102:16 103:14,16,21,25 104:6,11 174:12 176:2 191:19, 24

**meetings** 95:12

**members** 101:8 166:10

**memorialized** 53:8,10 179:4

**memory** 76:18 148:4

**mention** 53:20,23 133:21 134:18

**mentioned** 15:7 19:5 22:9 23:25 29:8 45:20 46:3 48:13 55:9 81:16 155:22 171:13 194:2 195:20 196:16 197:23

**mentions** 126:4 142:4

**mentor** 37:14

**mentored** 27:9

**mere** 88:18 211:15

**merit** 47:10

**message** 25:7,8 185:1,8,9,12 187:5 188:3,6,8,19 189:7

**messages** 187:1 190:21

**met** 101:21 102:13 175:21 204:20

**mic** 42:1,11

**Michigan** 4:1,13 20:1,21,25 21:13,17 76:4 96:3 104:23 128:23 201:18 210:16 216:3

**microphone** 42:3

**Microsoft** 24:6

**middle** 111:11 121:23

**midnights** 29:1

**midway** 135:25

**Mike** 103:24

**miles** 137:15 143:9,24 144:6,11, 12,22,23 149:2 150:21

**milliseconds** 141:9,15,19,20

**mind** 105:18

**minor** 46:8,22 52:10 65:3,14 66:6 107:19 110:3 123:11 163:10

**minus** 144:15 145:6,7 146:5

**minutes** 122:5 130:21,25

**mischaracterizes** 174:23 176:23 177:24

**missing** 45:16 48:14 95:6 154:10

**mistaken** 124:11

**mobile** 90:3,4,6 152:3

**mode** 52:24

**modified** 78:24

**module** 122:19,23 125:10,11,25 126:1,2 128:18 199:10,11 214:8, 12

**modules** 16:20 122:18 125:9,24

**moment** 145:8 180:25

**moments** 143:9 146:23

**Monell** 40:13 41:8

**money** 93:23,24 96:17

**month** 38:13,15

**months** 9:3 10:21 178:15 196:12

**morning** 4:5 5:12 24:23 184:25 188:11

**Mothers** 23:7

**motion** 76:14,23 77:3,12 81:24 156:15,16,17 157:11

**motivated** 99:10

**motor** 37:6,8,20 50:22

**motorcycle** 21:21 72:16,20,24 73:1,4,6,7 125:1,5 140:7

**motorcycles** 124:19

**motorcyclist** 5:16 203:7 212:14

**motto** 157:1

**move** 40:21 77:11 81:8 83:3 119:9

**moved** 34:5 60:16,22 61:17,20, 22 62:2 170:21 171:6

**movement** 73:5 99:11

**moves** 58:20

**moving** 61:4 85:2 116:2 134:24 135:22 136:13 170:17 207:2

**MSP** 21:5,7 201:17 203:8 212:14

**MSU** 70:7 71:24 72:18 97:7,11

**mud** 178:12

**multiple** 48:2

**murder** 51:12

**N**

**N-H-T-S-A** 23:8

**named** 10:18 11:11 32:23 63:7, 15 168:25 169:3

**names** 98:8 103:18 115:17 126:15

**narrative** 175:9

**narrowed** 45:12

**Nate** 103:20

**Nathan** 204:17

**National** 21:25

**nature** 114:7 162:3

**necessarily** 25:24 39:11 42:22 44:24 47:2 58:14 60:23 61:8,18 66:7 88:10 97:14 110:13 111:8 117:25 147:4 187:23 192:7

**neck** 107:10

**needed** 8:24 97:4 106:19,21 108:5 125:6 161:2 173:15

**needing** 155:19

**negative** 38:23 144:15

**neighboring** 102:14

**network** 90:21 215:15

**newer** 28:17

**Newton's** 156:9

**NHTSA** 23:7 75:20,24 76:8 78:25 79:18 84:7

**Nicholas** 98:10

**nods** 6:2

**nonintoxication** 88:25

**nonoccupant** 134:7

**nonuse** 162:17

**normal** 33:21 156:2

**Northville** 14:12 15:8

**note** 58:7 74:25 139:22

**notes** 129:17 196:25

**notice** 5:7 213:20

**notified** 9:2,4 25:3,6

**notify** 35:8 64:25 65:7,25

**notifying** 65:6 149:9

**November** 23:13,18

**number** 4:10 124:2 127:11 129:22 136:1 138:9,11,14,19,22 139:16 140:13,16 171:23 172:6 195:9 199:13 200:4 202:7,11 203:5 204:6,9 207:12 210:5,10 214:25 215:6,7,22 216:7,8,9

**numbers** 147:15 215:1,9

**nystagmus** 82:15,22 88:2

**O**

**Oakland** 12:21 17:5 23:6 95:8 105:2 128:22 167:4 172:19 177:3 201:2 205:23 206:17 207:1

**oath** 5:4

**object** 39:23 49:8,9 83:1 118:8, 23 119:6 151:17 156:17 157:11 167:14 168:16 170:25 175:8

193:10 205:17

**objection** 40:11,20 41:15 45:4,25 48:5,11 51:21 53:18 54:7,15 56:22 65:23 68:10,16,23 69:14, 24 70:10 73:13 81:11 85:23 86:2 89:2 97:9 104:14 105:8 107:21 108:6 110:8 113:2 115:3 117:13 119:1 129:13 137:1,21 143:12 145:9 148:18 150:23 151:9 154:15 155:10 157:6 160:8 161:14 162:5,20 163:9 171:7 173:23 174:21 175:14 176:3,22 177:23 179:5 180:15,21 181:21 183:7,14,25 184:8,15 187:21 190:15 191:7,15 192:22 194:3,7 210:8,20 211:3,17 213:2,13

**objectionable** 119:6

**objections** 6:22 40:18 180:3

**objective** 60:3 75:15 148:9 155:6 161:4 184:6

**obscured** 127:24

**observations** 77:5 82:11 155:13 164:24

**observe** 74:25 76:24 87:9

**observed** 170:17

**obstructed** 127:25

**obtain** 74:15 164:15

**obtained** 164:15 173:6

**obtaining** 164:19

**obvious** 81:7

**occasionally** 30:23 34:5

**occasions** 101:8

**occupants** 133:22

**occur** 10:19 30:7,17 36:19 56:4 94:21 104:8 158:10,12,17

**occurred** 25:1 31:9 67:2 88:19 129:8 154:7,20 173:2 192:11,12

**occurs** 66:10 78:23 145:6

**October** 173:20,21 201:21,22

**odor** 79:7

**office** 13:12,14 105:2 167:5 172:19 177:10,11,15,16 179:24 200:14 201:2 203:12 206:18

**office's** 177:6

**officer** 5:17 7:10 11:15,22 15:24 16:2,6,12,13 17:8 26:2,9,16,18, 19 27:2,5,6,7,8,16 28:20,21 29:10,13,23 30:5,10,19 31:25 32:22 35:5 37:23 39:22 41:7,10 42:4,20 43:1,20,25 44:3,7,19,24 45:13,18 46:11 47:12,15 48:3,16 49:21 51:24 52:3,8,10,15 53:1, 11,12 55:5 63:14,15,16,18 64:13,16 65:15,18,25 66:5 67:3 76:3 77:19 79:13 85:14 87:3 89:15,18,22 91:8,16 93:12 94:7 97:17,22 98:4,5,6,17,24,25 105:7 107:11,17 108:5,23 109:11,13,17 110:2,6,16 111:21 112:11,25 113:14 115:1 117:2,7 126:16 129:9 130:6 140:5 143:7 148:1 149:2 150:5,14 151:7,14 153:7 155:14 157:20,25 160:5,6 161:7,12 162:17 163:6 166:5 168:14,19 169:18 174:5,6 180:22 182:7,10 183:4 190:10 195:22 196:10 197:4 198:15,16, 23 200:6 202:6,10,24 203:20 205:3 207:2,9,20,23 208:4,5,10, 16 209:11 212:23

**officer's** 38:10 51:25 196:8

**officer-involved** 62:24 63:6,12, 23 64:21 65:8,20 66:14

**officers** 4:22 9:15,16 10:8,13,18 11:24 12:4 16:24 26:12 28:17 31:2,8 32:9 33:12 36:21,22 37:1, 7,15 40:6 41:21 44:12 49:25 54:5,13 55:17 58:3 59:25 63:8,9 64:11 66:13 68:1 79:15 82:11 85:14 87:8 91:1,6 92:4,18 97:5 98:1,15 99:5,9 102:10 105:14 106:14 107:25 166:2 167:12 170:17 196:19

**offices** 4:11

**official** 196:2

**officially** 52:15

**offs** 153:2,3

**offset** 70:15

**on-duty** 203:4

**one-car** 109:22

**ongoing** 60:1

**onset** 82:19 83:25

**open** 81:2

**opening** 17:13 127:23

**operating** 18:19 50:21 117:2 140:6 203:9 212:16,19

**operation** 17:25 43:17 50:14

**operations** 8:12 18:5 194:15,16

**operator** 16:15,17,18

**opinion** 193:17

**opportunity** 5:12 86:17

**opposed** 120:21

**opposite** 136:24

**order** 48:18 50:13 52:17 112:10 128:6

**orders** 48:18,21 49:1 50:5,9,24 54:25 55:2 68:8 69:10 106:21 108:19 112:23 193:7,25 216:17, 18

**original** 21:4

**originally** 102:14

**Orr** 169:3

**OUID** 207:3

**outboard** 134:2

**outcome** 43:19

**outcomes** 48:10

**outsource** 104:3

**oversaw** 85:25

**overseeing** 33:22,23 34:13 66:21 85:14

**oversees** 66:16 155:15

**overtime** 93:25 94:11,12

**OWI** 8:1 75:20,25 78:25 85:4,16 87:6 88:16 167:7,13 168:14 182:4 211:1

**OWPD** 204:22 205:10,11

**P**

**P.C.** 4:12

**p.m.** 172:11 189:7

**pace** 51:4

**pages** 132:23 139:12

**paid** 94:8

**paint** 120:8

**Palm** 117:7

**Palm's** 169:18

**paper** 46:13

**paperwork** 8:23

**paramedics** 79:3

**park** 65:16

**Parker** 114:3,4

**parking** 65:15

**Parra** 4:22,23 11:24,25 30:11,19 63:9 98:11,24 126:17 130:6 149:23 150:1 198:16

**part** 10:4 28:16 30:25 41:16 49:24 56:18 64:7 66:9 67:7 70:22 75:13 87:19 90:20 96:22, 24 100:17 105:24 106:3 108:20 129:21 133:14 147:12 157:20 192:5 193:19

**part-time** 14:11,13 15:12

**parts** 61:4 72:3 77:3

**partying** 168:8

**pass** 91:17 153:4 215:11

**pass/fail** 84:8

**passenger** 134:2,4,9,14

**passes** 83:6,10

**past** 26:14

**patrol** 16:10 33:6,16 55:8 56:9 58:3 59:25 64:16 103:23 115:16 119:17,18 124:18 136:22,23 137:20 154:19

**pavement** 70:14 73:24

**paying** 18:13 89:8 94:10

**PBT** 79:5 80:6,14

**PD** 34:20 41:21 95:3 99:23 199:8 209:23

**pedal** 142:14,18,24,25 144:10,21 145:1,19,24 146:10

**pedestrian** 62:12,20

**pen** 82:25

**pencil** 82:25

**pending** 6:18 40:13

**people** 16:19 21:1 22:7 25:6 26:7 34:7 35:23 46:4 55:8,10 57:24, 25 59:8,9 61:4 67:20 70:3 90:3, 18 96:3,4 98:3 99:18 102:11 103:13 106:7 110:12,15,20 111:10 116:2 121:8 133:6 165:14 202:21,25 213:16

**percent** 143:2

**percentage** 146:9

**perform** 27:14 123:22 125:7 128:6

**performance** 44:8 45:13 46:7

**performed** 124:15

**performing** 82:4,21 126:12

**period** 27:1 47:20 63:3 105:1 146:16

**periodically** 29:7

**permanent** 128:15

**person** 14:1 60:6 67:25 99:20 112:21 165:22 168:2 197:15

**person's** 77:5 78:21 148:4

**personal** 77:14,16 78:4,13 81:24 107:5 131:4 161:22 162:9

**personally** 75:2 108:17 152:14 168:22 181:15 182:13 184:9

**personnel** 47:17 213:10

**pertaining** 24:11 43:24 67:3 72:20 139:10 146:20 151:15 180:12 192:16 210:25

**pertains** 44:3 50:7 57:14 139:22 211:1

**phase** 27:10,11,13,19,20,21,22, 23,25 28:3,4,5,6,7 76:14 77:12, 15 78:4,13 81:24,25 82:5,7

**phases** 27:11,17,24 76:9,12 78:17

**phone** 25:8 60:11,13 151:25 158:13 159:14 188:9 189:15

**photographed** 62:2

**photographs** 56:13 57:19 163:18,21 164:2,4

**photography** 56:15 59:7

**photos** 9:7,10

**physical** 70:8 73:12 75:9

**physically** 71:6

**physics** 156:10

**PI** 107:8,19

**picture** 21:8

**pictures** 60:9 61:13 94:9 165:7, 24

**piece** 58:17 60:21,24

**pieces** 62:10

**pills** 81:2

**pivot** 75:19 80:7 90:2 122:14

**place** 10:10 40:10,16 68:22 71:6 91:14,18 92:25 100:6 103:3 104:6 110:21 123:7 153:16 192:23 193:2

**plaintiff** 4:20

**plan** 196:3 203:10

**planned** 203:16

**plastic** 60:24 62:10

**plate** 27:13

**plays** 68:9

**point** 6:15,17 18:24 24:25 25:23 26:6 30:4 31:20 32:8 53:15 66:11 74:6,9,19 77:18,19,24 78:17 80:18 82:3 97:24 98:13 110:14 113:16,17 114:18 131:23 132:10 135:14 137:13 145:3 149:3,12 150:20 151:11,14 160:25 161:8 162:4,7,11,14 163:16 164:11 167:3 174:8,10 179:16 183:18 189:11 199:21 208:4,5 211:12 212:25 213:19, 25

**points** 48:2 121:20 188:16

**pole** 65:15

**poles** 65:17

**police** 4:22 8:14 12:13,17 14:10, 12,17,18 15:4,11,16,25 16:1,7 17:5,16 19:25 20:6 21:17 24:12, 15 27:2 28:18,21 29:24 33:3,4 38:7 45:14,19 48:4 49:17,21,25 50:4,16 52:18 62:23 63:25 67:15,21 68:4,8 69:9 85:13 89:15 90:7 91:8,15 93:22 96:7 104:9,13,23 105:7 109:7 112:23 115:22 116:20 118:4,7,11,12,15, 22 120:4 121:1,8 124:1 128:16, 23 130:10 155:16 156:8 166:14 171:21 172:17,23 175:4 180:12 191:12 192:11 193:5 195:19 197:8 200:8,14,19 201:12,18 203:7 206:24 209:1 210:9,12,17 211:13 213:21 214:20,24 215:3, 18

**policies** 8:14 28:18 49:15,16,24 50:4,10,24 68:8,18,21 69:9 100:6,21 108:19,22 109:13 110:24 112:23 113:9 193:6,25

**policing** 67:12 69:6

**policy** 43:8 44:8 45:13,15 46:24 48:4 49:17 50:7,21 51:7,15,19 52:17,21 53:2 55:1 68:7,13 112:9 113:6,11 193:18 194:12

**polite** 40:24 41:13

**portal** 67:23

**portals** 67:22

**portion** 207:9

**pos** 22:7

**position** 16:23 142:24 184:4

**positions** 15:23

**positive** 38:21,22

**possibly** 7:18 22:8 75:14 76:10 131:23 149:22 184:22 186:13

**post** 14:19 19:6 73:5 136:18 144:1 154:5,18

**posted** 50:20 111:21

**potential** 42:24 47:6,7 51:5 77:9 101:13 167:25 172:19 190:14 192:4 194:11 201:2 205:11 206:21

**potentially** 23:6 79:5 93:4,11 194:16

**pre** 136:18

**pre-arrest** 82:7

**pre-crash** 142:4

**precautionary** 51:17 110:3

**preceding** 175:10

**preclude** 94:11

**prefer** 61:16,21

**preferred** 197:17

**preliminary** 79:6

**preparation** 10:4

**prepare** 8:21 10:5 11:16 12:8,13 13:6,12,15 14:2

**prepared** 8:24,25

**preparing** 9:1 10:16

**prepopulated** 127:12

**prescription** 80:22

**prescriptions** 80:11

**presence** 211:1,15

**present** 6:1

**presented** 203:11 206:16

**presenting** 165:20 204:21 206:20

**preservation** 18:22 56:18 213:20

**preserve** 57:15,17 58:6 110:14

**preserved** 56:21 57:8 209:1,4,23

**preserving** 57:22 58:10

**pressed** 142:18 146:10

**pressure** 144:25

**pretty** 28:25 37:8 46:20 72:8 79:19 88:6 94:18 96:21 108:25 130:22,23 175:20

**prevent** 110:12

**previously** 7:8 81:16 139:20 191:18

**prima** 51:1

**prior** 14:18 53:16 64:1,5 82:19 83:25 102:8 129:11 137:16 139:18 140:6 141:18 142:5,17 144:5 150:7 161:9 162:8 177:24 178:15 179:3,11 180:11 189:6

**privilege** 6:25 40:12 41:18

**probable** 87:17

**problem** 77:9 115:11

**problems** 44:8 45:13,15,17

**procedure** 5:9 40:18 41:4 78:24 100:21 112:9 198:4

**procedures** 8:15 24:12 50:4 100:6 103:2 108:19 112:23 193:6 194:1

**proceed** 172:15 175:23 200:13, 15

**process** 31:23 32:6 39:4,5,19,21 41:17,19 42:25 43:9 67:1 100:23 128:12 165:17 174:1,4 181:4

**produced** 186:19 187:2

**production** 181:2 199:19

**professor** 21:13,14

**profile** 116:1,4,19 117:17 118:19

**program** 20:25 23:9 27:8 28:10 30:13 70:7

**programs** 20:22 91:4

**progress** 112:16,18

**promoted** 16:2,3 22:17 26:24 98:23 99:10

**promotes** 97:22

**proper** 34:9 38:18 184:7

**properly** 62:3

**property** 105:21,23 107:4,5 129:6,7,21,22,23 199:8,15 200:1

**Proprietary** 126:11

**prosecuted** 190:25

**prosecution** 184:20 187:20,24 189:25 190:13,14 192:4 204:22 205:15 213:11

**prosecutor** 188:5 189:14 205:23 207:1

**prosecutor's** 13:14 167:5 172:19 177:9,11,15 201:2 203:12 206:17

**protect** 106:7,8 110:13,14,15

**protected** 56:21

**protecting** 184:14

**protection** 105:20

**protocols** 103:2

**prove** 89:25

**proves** 88:19

**provide** 7:1 13:21 25:17 48:1 51:15 150:3 165:10,11 195:18

**provided** 19:22 24:13 48:23 128:24 159:20 165:13 168:2,11 169:17 170:13 173:11 177:18 181:2 183:5 184:9,12 185:9 187:10 213:6

**providing** 165:4 173:22 182:14 210:13

**public** 20:12 50:24 52:25 67:13 69:6,12 127:17

**pull** 77:21 128:5 131:9 215:8

**pulled** 127:13 130:16

**pulse** 137:9 139:3 141:12

**purported** 153:16

**purpose** 120:25 121:5 158:19,21 176:17 188:18 189:23 190:6 213:10 217:7

**purposes** 5:8 121:10 145:14 146:4

**pursuant** 5:7

**pursuit** 82:19 83:10

**purview** 44:10 49:19

**put** 16:11 31:16 34:5 35:20 38:9,16,21 52:1 74:18 96:23 98:18 126:15 127:3,7,10 129:2,14,15,20 177:1 198:15

**puts** 125:13 174:7

**putting** 61:5 97:14 127:24 199:21

**Q**

**qualify** 107:19

**quarterly** 101:6

**question** 6:6,18 18:25 41:12 42:18,22 45:7 49:9 57:2 118:9,10 119:6 121:3 131:21 133:14 151:14 156:14 175:8,9,10 176:5 178:19,21 179:6,20 180:1,8,10 192:15 194:8 195:17 199:4 214:19

**questioning** 49:14 86:15 199:4 203:21

**questions** 6:10 11:9 37:3 40:4 49:11 80:20 87:4 113:18 158:23 175:17 187:24 190:18 194:24 195:14,15 198:18,25 199:1 200:5,7 210:1 216:12

**quick** 60:13 74:7 130:22,23

**quickly** 23:22 65:22 87:8 104:4 217:3

**quietly** 112:19

**quote/unquote** 105:6

**R**

**radar** 34:4

**radio** 108:15

**railroad** 96:7

**ran** 44:19

**random** 38:14

**ranking** 26:1 39:6

**rankings** 15:24 16:1

**rapidly** 135:6

**rarely** 99:1

**rate** 134:23

**raw** 147:24

**reach** 11:14 189:24 190:5

**reached** 187:12

**read** 16:21 92:2,15 137:17 147:18 149:24 172:13 177:17 185:4,16,21 187:10 200:11 203:1 208:8 215:22

**readers** 185:5,14 186:7,11

**reading** 93:8 142:19 145:11 185:16,23 188:2 189:4

**readout** 140:8

**reads** 203:7

**ready** 21:6

**reason** 7:3 47:1 61:21 77:20 88:9,10 99:2 112:24 117:8 143:16 156:20 157:19 166:25 178:16 184:19 207:5

**reasonable** 81:8 136:20

**reasons** 88:23,25

**rec** 204:12

**recall** 8:13,20 9:16 12:4 18:3 23:11,12 25:21 36:7 38:12 39:8

44:4 64:20 71:22 72:25 73:9 75:3,5 76:12,13 113:22 114:12 120:16 158:25 159:9 160:17 161:10 163:17 164:14 165:16 167:6,19,22 168:24 169:2,3,4 174:15 176:10,13 187:16 188:5, 8 189:9 209:3 210:22 213:3,7

**recalls** 119:12

**receive** 14:23 88:9 91:7 167:23

**received** 86:20 156:5 182:10 201:12,14 211:13

**receiver** 126:6

**receiving** 92:6 149:5 150:3 204:12 210:13

**recent** 39:20 42:19 43:5,16 71:14 137:18 138:17 143:22

**recently** 96:6 120:1 121:7

**recess** 86:11 122:10 181:8,11 195:6

**recognition** 81:21

**recognize** 185:3

**recognizing** 70:8

**recollection** 32:5 59:21 76:11 124:24 149:13 175:2 184:23 201:14 205:4 206:11,15,19 208:15 209:18

**recommended** 91:23 100:16 150:22

**reconstruction** 8:18,19 16:17 20:10 21:7,9 24:3,7

**reconstructionist** 147:13

**record** 4:6 5:5,25 6:4,22 12:25 39:12 40:10,17,24 42:8 52:24 86:3,7,10,13,16,23 122:9,12 131:3 181:8,10,13 195:5,8 217:2,4,7

**recorded** 53:17 136:3 143:22

**recorder** 20:9 122:21 124:25 126:6 136:17 143:23

**recorders** 124:20

**recording** 135:15

**records** 90:24 136:11,17 137:10

**recovery** 59:7

**RECROSS** 214:17

**recruits** 17:11

**red** 25:6,7,13 34:2 44:20 55:9 89:4

**refer** 29:9 76:1 115:21 123:1 200:3

**reference** 41:16 179:16 199:10

**referenced** 122:15 131:24 142:8 155:6

**referencing** 45:13 76:20 138:19 187:2

**referred** 216:8

**referring** 13:3 29:10 107:4 118:4 140:23 176:14 201:3 214:9

**refers** 122:22

**reflect** 5:5

**reflected** 143:10 146:16

**reflecting** 210:6

**reflective** 120:6,8,22,23

**reflects** 144:7

**refresh** 201:13 204:12 205:3

**refresher** 22:5,23 79:21

**regard** 26:12 84:8 182:4

**regarded** 148:9

**Regional** 14:17

**register** 134:15

**Regner** 4:14

**regular** 56:9 91:8 102:18 118:3,7, 12 121:15

**relate** 49:16

**related** 40:2,7 67:24 95:22 102:20

**relation** 181:19

**relationship** 31:4 95:10

**relevant** 40:16 41:5 49:11 84:24 173:14

**rely** 145:15 148:16

**remain** 157:11 191:25

**remainder** 173:9

**remained** 99:4

**remember** 9:4 11:12 18:6,8,9,23 25:4,18 28:24 36:9 59:20 84:16 96:15 102:16 104:21 114:5,9 115:5 116:13,17 117:4,5 120:1 149:11 151:10,12 158:2,18 159:16,18 160:18 162:22 168:19 175:23 176:25 196:24 197:1,4 199:3 204:12 206:8

**remind** 77:13 85:23

**reminds** 57:10

**removed** 196:9,12

**Renaissance** 4:15

**repeat** 42:11 186:25

**repeatedly** 193:13

**rephrase** 6:12

**report** 9:5 14:5 32:1 36:5,7 38:9 39:10 44:8 45:15,16 53:25 60:20 61:7,18 65:1,6 122:17 124:8 125:7 126:4 127:10 128:7 129:20 130:16,18 131:5,9,22 133:4 134:16 135:24 137:6 139:10 140:4 141:5,24 143:10 145:15 149:7,8,10,15,21 150:3,8 152:13 160:3,13 165:6 169:23 172:4 173:4,9,10,16 174:7 176:23 177:25 178:2,23 190:11, 12 200:11 201:10,11,15,17,20 206:9,14,24 207:9,10 208:23 209:11 210:10 214:21,22,24 215:19 216:4,7

**reported** 64:22 81:7 114:13 152:21

**reporter** 4:18 6:1 12:20 42:4,14 74:12 86:4,8 185:22,25 216:17

**Reporting** 4:15

**reports** 8:23 16:21 35:10,21 36:3,10,13 55:15 129:18 130:3 131:13 138:6 143:6 165:8 201:25 202:3

**represent** 4:17 5:15 99:16 173:20

**representative** 99:16 206:6

**representing** 4:15,25 99:21

**request** 52:2 98:20 196:10,13 199:19

**requests** 10:24 51:11

**require** 35:3 40:18 45:21 50:5 51:13 61:7 65:2 99:12

**required** 32:2 35:8 52:1,3,22 53:19 100:17 210:25

**requirement** 106:6 107:24

**requirements** 50:16,17

**requires** 40:1 51:10 75:25 78:25 105:19 107:8 112:10 147:14

**requiring** 84:11

**resigned** 15:12,15

**respect** 40:5 49:15 201:11,25 202:4 203:17,22 205:10 206:1

**respond** 6:5 25:1,13 40:9 67:22 107:12 108:9,12 109:2,25 189:12,21

**responded** 62:25 64:2,5,10 194:18

**responding** 25:14 51:3 59:15,16 64:15 67:8 107:10,25 108:13 109:11 110:7 113:15 114:7,10, 16 115:1 161:12,20,22,25 162:3, 8,13 194:19

**responds** 25:13 108:9 189:11

**response** 51:10,14,25 52:4,5 105:20 106:18,20 107:8 108:23 188:10,15 189:16

**responses** 11:5 34:14

**responsibilities** 33:20 97:2,3

**responsible** 28:13 33:9,14 34:4, 6,13 37:16 64:8,24 94:25 99:20 167:21 199:21

**rest** 32:25 61:12 73:19 74:22 136:25 137:5 153:8 157:17

**resting** 88:2 153:16

**result** 39:14 43:3 48:10 65:11 79:6 80:6 136:1 173:20

**results** 165:8 182:10,16 201:19, 23,24 202:3 203:8 211:8 212:15 213:4

**retrievable** 124:8

**retrieval** 126:7,8

**retrieved** 208:11

**retrieving** 207:20,23

**returned** 188:13 201:17

**review** 9:9 38:15 43:19 131:9,13 205:24 207:1

**reviewed** 8:23 9:6,7,10,14 14:4 189:21

**reviewing** 9:21 206:2

**reviews** 38:13,14 43:23 44:2

**rib** 108:17

**rider** 73:1

**road** 16:10 31:25 33:6,16 34:10 56:9 58:2 79:13 81:5 93:14 96:4 97:2 103:23 111:11 119:17 121:13 136:24 153:11 157:24

**Road's** 121:13

**Roadside** 21:19

**roadway** 61:12 63:20 74:16 75:11 93:2 110:12 121:15 170:17,22

**roadways** 57:18

**Rochester** 34:8

**role** 24:15 25:22,25 30:5 33:5,12 34:19,20,21 49:24 64:15 66:3 68:7 98:22 99:13 148:13 149:9 152:8,9 166:5,23 168:12 182:13 193:14

**rolling** 156:1

**rollover** 109:23

**roof** 117:22

**room** 104:9 115:10 129:7 180:22 199:8 200:1 214:4

**Rosati** 4:11

**rotating** 73:25

**roughly** 7:14 9:20 11:3 29:23 101:6 102:6

**RPM** 132:11

**RPM's** 143:1

**RPMS** 123:10

**rude** 46:11

**Rule** 40:17 123:8

**rules** 5:9 40:17 41:4 91:12,14

**run** 51:3 52:1 90:17 91:15,25 94:9 96:8 100:11 130:3

**running** 35:10 55:10 89:4 90:23 91:4 135:13 157:16

**runs** 37:5 90:14

## S

**S-O-C-C-I-T** 12:21 93:18

**safe** 92:15 214:15

**safely** 92:22

**safety** 16:12 20:22 21:25 24:17 30:15 33:17,18,21 34:14 36:20 37:14 44:11,12 52:16 55:5 56:23 57:5 58:23 59:24 64:8 66:3,13 67:24 70:7 96:22,24,25 97:23 102:10 115:25 116:11 119:16 133:21 139:23 155:15 166:10 196:19 197:8 198:4

**sale** 129:11

**sallyport** 65:16

**salvage** 199:8

**save** 93:23 96:18

**scaring** 112:21

**scene** 9:10 13:4 25:25 26:3,4,7, 13 37:11 38:21 52:10 55:23 57:6,17,22 58:1,3,5,10,13,25 59:4,10,18,22 60:1,16 61:5 64:23 70:9 73:12 74:24 75:6 84:23 101:10 107:18 108:5,15 109:8,13,18 110:2,4,7,19 113:13,20,25 114:3,20,25 121:11 152:21 153:9,14 157:24 163:19,22,23,24 164:9,12 166:8 167:15,18 168:19,23 169:6,21 196:17 197:6,25

**scenes** 70:20 94:1 102:5

**schedule** 24:19,20

**scheme** 120:20

**school** 14:19

**Schultz** 4:12

**Science** 15:1

**scientist** 156:13

**scope** 39:24

**Scott** 4:23 11:22 29:14 98:9 149:20 198:15

**scratching** 32:12

**screen** 90:16 91:2 92:3 187:4

**screening** 82:7

**screenshots** 185:8

**screws** 128:8

**seal** 23:16

**search** 165:8 166:1,2 173:8 182:7,11,15,17 198:10,14

**searg** 36:16

**seat** 81:3 134:6,8,10

**seatbelts** 133:23

**sec** 122:3

**secondary** 110:6

**seconds** 83:17 136:14,16,18 137:16 138:22 141:18 142:7,10, 17 143:23 144:4,5,8 145:6,7,8 146:6 155:8

**Secretary** 90:23

**secretive** 69:9

**section** 132:24 138:20 139:15 202:13

**secure** 127:17

**secured** 127:14

**sedan** 116:9

**seeking** 189:20 205:11

**sees** 112:3

**selected** 102:22 103:8

**self-explaining** 137:15

**seminar** 20:1

**send** 25:7

**sending** 188:6,8,18 189:9

**seniority** 29:3

**sense** 53:11 131:20 214:9

**sensitivity** 65:22

**sensors** 135:17

**Sep** 14:14

**separate** 201:8 215:8

**separately** 12:2,3

**September** 5:17 14:15 15:10,16 16:4 24:16,21 26:24 29:6,11 30:9,18,24 63:4 104:7 126:23 150:15 152:16 158:11 159:25 160:3 170:8 171:13,16,22 173:2 174:13 175:6,21 176:15,18 178:4 182:2 186:1,5,20 187:6,7 191:19 194:6 197:9 210:14

**sergeant** 4:8 5:7,12 10:9,13,18 12:7,16 16:2 24:17 29:17 30:15, 24 33:4,6,11,16,17,18,21,23 34:22,25 36:15,20 37:13,23 38:7 49:21 54:4 55:22 56:9,20,23 57:5 58:22 59:24 60:15 62:23 63:4,13 64:1,6,23,24 66:4,21,23 67:7 68:20 85:14,24 86:15 101:20 104:22 114:3,4 115:14 122:14 148:2,3 150:6,7 158:7,23 159:3 160:5 161:9,19 162:16 163:8,22 164:8,12,23 165:5 166:16 170:7,15 172:22 173:12, 22 177:22 178:12 179:2 180:11 181:15 184:20 185:11 187:12,19 188:4,10 189:8,16 190:5 191:25 194:22 195:13 202:20,24 203:13,21 204:23,24 206:3,16 208:13,21 209:16,20 210:4 214:15 216:16

**sergeant's** 34:19 66:24

**sergeants** 33:6,7 36:17 99:19

**service** 20:12 30:1,3 107:10 145:16,20,21 146:7

**services** 24:1 98:25 99:1

**set** 5:6 188:14

**severe** 110:18

**severely** 163:4

**severity** 37:25 108:3 114:13 161:24

**SFST** 16:14 22:3 76:1 95:23

**SFST's** 76:7,8 82:8,13,14 84:8

**SFSTS** 22:5,11 75:20

**shakes** 6:3

**shape** 41:22 53:8 127:14 184:21 191:24 192:15 194:5

**share** 39:8,20 40:5 43:17 102:21 114:13 160:5 163:14

**shared** 104:11,20 184:7

**shares** 212:12

**Shearer** 98:5,10

**Shell** 164:16

**sheriff's** 95:8 105:2 128:22 177:3,6,15

**shift** 24:18 26:21,23,25 28:21,24 29:4 30:23 33:21 34:15 35:10, 17,20 36:2,4,7,10,13,20,21,25 53:25 64:24 65:1,5

**shifts** 28:24 52:23

**shock** 32:22

**shoes** 60:15 62:12,13,17,21

**short** 29:1 195:1

**shorter** 131:1

**shoulder** 82:23 83:14,22

**show** 27:14 185:1 199:12 203:9 212:15 215:24

**showing** 84:14 134:9 137:12 145:12

**shows** 26:9 109:8 135:5 201:20

**Shuler** 103:20 174:13 175:22

**shut** 108:18 109:25

**SI** 43:22 46:18,20 47:2,4 65:9,11, 18,19 66:8,9 67:2 151:1

**SI's** 47:16 66:17

**side** 119:25 120:2 136:24 153:11

**sides** 120:5

**sign** 136:23

**sign-off** 35:4

**signify** 109:6 136:2

**signs** 21:22 79:24 80:15 81:7 84:14

**similar** 57:21 72:8 97:6,13 139:19 143:1

**simple** 127:23

**simply** 173:24

**sir** 171:19 175:1,13 180:10

**siren** 43:24 116:24 117:19

**sirens** 52:6 108:14 111:8,11 112:12,14,21 113:1 161:7 162:18

**SIS** 43:10

**sit** 48:22 134:13 214:10

**sitting** 9:25 81:2 199:25 206:7,16 208:24 209:18,22

**situation** 30:12,21 38:20 52:8 53:7 61:1 62:19 81:6,15 88:5 93:10,14 108:13 110:2 111:16 112:7 114:2 198:3,13

**situations** 38:8 89:15 105:14,17 106:9 108:24 112:13,15

**six-week** 27:1

**sketching** 70:19,21

**skid** 58:7 59:11 73:23 74:4,5,7,25 157:23

**slamming** 135:10

**slick-top** 115:14,21,22 116:4,8, 19,24 117:3,8,11 118:11,17,21 119:11

**slick-tops** 116:12 118:2

**sliding** 73:5

**slight** 121:15

**slow** 42:4 155:25

**slowing** 77:2 135:6

**slowly** 42:15

**slurred** 78:14

**small** 140:25

**Smith** 53:12

**smoking** 80:11

**smooth** 82:18 83:10

**snippet** 22:5

**sober** 89:13,15

**sobrieties** 79:4,5

**sobriety** 8:6 22:1,2,4,12 23:1,3,8 76:2 79:21 82:4,12 84:23 85:8, 11 88:9,17

**SOCCIT** 12:19,24 13:1,2 93:17, 18,20,21 95:2,10,12,20 96:14, 20,22 97:5,18 98:1,11,16 99:4, 14,17,21 100:7,8 101:5,8,11 102:12 103:2 104:23 105:1,6 153:25 156:7

**SOCCIT's** 163:15

**software** 123:20 125:16 126:9,11 127:6,12 150:11

**sold** 129:10 199:7

**solely** 22:3

**somebody's** 56:1 75:16 87:25

**someone's** 62:12 111:13

**something's** 43:2

**sore** 107:10

**sort** 14:19 44:10 47:6 58:8 94:4 102:19 106:14,16 121:18 125:21 129:18 151:2

**sorts** 50:8

**sound** 22:20 187:11

**sounds** 6:14 35:17 164:3

**source** 54:19,20

**South** 15:11,13

**Southeast** 12:21

**speak** 10:1,5,7 12:2,7,12,16,19, 24 13:8,11 28:9 42:15 48:21,23 52:4,9 108:10 168:25 169:14 180:20 189:13 191:14 213:15

**speaker** 95:16

**speaking** 45:11 113:5 120:7 169:3 179:7 180:21 182:1

**special** 33:7 91:8 92:8 99:9

**specialist** 97:1

**specialized** 58:23 59:6

**specialty** 37:18

**specific** 10:3 28:17 37:13 58:19 82:13 87:9,12 91:6 92:13 96:12 99:18 113:10 154:13 160:19 179:19,20

**specifically** 6:23,24 12:6 18:6,10 25:18,21 36:9 51:8 62:18 72:15, 17,23 73:6 76:1,12 91:22 104:21 114:5 119:12 122:22 150:2 159:1 165:16,23 170:4,21 177:1 184:24 197:5 200:17 201:16 204:13 205:10

**specifics** 176:1,10

**spectrum** 47:25 51:16 106:11

**speculate** 131:6

**speech** 78:14

**speed** 44:3 50:20 51:1 71:25 72:3,11 74:20 93:12 111:17,22 112:11 123:10 140:5,8 141:6,8, 13,15 142:14 151:7 157:16 160:6,11,24 161:3 163:25 194:18

**speeders** 34:2

**speeding** 77:2 89:4

**speeds** 18:11 93:15

**spell** 74:11

**spells** 50:15

**spinning** 74:1

**spoke** 10:8 11:21 12:4 13:14 18:3 25:16 50:24 55:1 64:13 163:7 170:7

**spoken** 10:17 11:24 14:2 189:18

**spot** 143:5

**spread** 36:22

**staff** 46:17 60:1

**stamp** 141:5,24 146:15 147:10

**stamped** 143:18 172:3 207:18

**stance** 189:14

**stand** 47:4 86:9 122:8 126:5 181:9 195:4,21 216:15

**standard** 23:8 84:17 210:25 211:6,14

**standardized** 8:5 22:3 23:1 76:2, 5,7 79:21 82:12 88:17

**standards** 43:10 45:19 47:5,13

**standpoint** 54:4 68:20

**stands** 190:4

**Star** 107:9

**start** 9:1 17:18 29:15,16 37:25 39:4 41:20 43:9,10 46:20,23 47:13,14 80:20 135:13,15 141:19

**started** 15:2 16:10 29:25 46:23 61:4 65:3 93:23 100:23,24

**starting** 78:4 115:9 140:10

**starts** 66:23,25 141:7,8

**state** 4:16 14:22 20:1,21,25 21:13,17 50:19 55:2 76:3 90:24 104:23 128:23 134:1 188:11 189:17 201:18 210:17 216:3

**statement** 81:4 171:17

**statements** 60:8,9 75:16 170:11

**states** 112:13

**static** 106:10

**station** 56:13 59:16 71:7,13,17 75:8 94:10 95:24 153:20 164:16 197:11,21

**status** 133:21 139:23 146:25 191:10

**stay** 156:15,17

**Staying** 133:19

**steady** 83:17 137:12

**steering** 125:21

**step** 80:17 81:9

**steps** 183:10,21 184:6

**stick** 56:12 71:7,13,17 94:9 95:24 153:21 197:2,9,14,17,20,22

**sticker** 75:7

**stimuli** 82:24

**stipulate** 217:6

**stipulated** 217:8,9

**stop** 43:6 77:18 92:2 111:11 157:21

**stopped** 22:24 63:20

**stored** 123:2 129:3,21

**straight** 77:10 93:1 121:15

**street** 150:21

**stretcher** 79:3

**striations** 74:2

**strictly** 197:21

**strikes** 65:15

**Striking** 157:14

**stripe** 120:2,4

**stroke** 131:17,18 133:3,5,13

**strokes** 131:16,19 132:17,18 133:13

**study** 163:25

**stuff** 7:24 18:7 22:21 32:20 37:8, 19,22 55:16 56:17 62:11 69:12 98:3 122:3 144:1 173:5,13,14,15

**style** 116:9

**subdued** 116:23 117:23 118:3 120:17,19,25

**subject** 87:20 189:3 202:22

**subjective** 148:12

**submit** 43:14

**substance** 202:20 211:15

**substances** 211:2

**suffered** 163:3

**suffering** 109:21

**sufficient** 84:14

**suggest** 41:15 119:11 180:19

**suggesting** 180:4

**suggestion** 41:2 100:18 180:23

**suggestions** 100:10 103:13

**suggestive** 40:19,23

**summarize** 87:8

**summarized** 105:22

**Sup001** 208:6

**supervise** 36:21 37:1 50:9 54:13 68:21 110:24

**supervises** 155:15

**supervising** 26:5 108:20

**supervision** 55:18 72:10 91:7 150:16 151:3

**supervisor** 25:25 33:11 44:11 100:4 150:18 152:11,12

**supervisory** 25:22 26:4 30:4 33:12 193:14 195:16 196:17

**supplemental** 32:1

**supplementing** 86:21

**supporting** 88:22

**supposed** 58:1 69:1 77:4 122:5 133:22 188:12

**surface** 154:8

**surprised** 35:23

**suspect** 88:2

**suspected** 80:18

**suspension** 38:5

**suspicion** 77:20 78:9

**sustained** 162:25

**SUV** 116:9

**swear** 4:18

**swerving** 76:24

**switch** 147:1

**sworn** 5:2

**symptoms** 80:15

**system** 25:5 39:16 47:18 90:7,21 91:3 127:2 134:15 201:21 208:14,25 209:19

**Szczesny** 4:9,20 5:15 29:11 84:23 89:24 136:22 162:25 167:8 169:6,15 180:14 181:17 182:5 183:13,23 190:24 202:1,4 203:9,19,23 205:12,16 207:3 212:15,19 213:11

**Szczesny's** 125:1 197:24 201:11 213:21

**T**

**table** 124:10 133:20 135:25 136:13

**tailgating** 77:1

**takes** 130:20 174:6

**taking** 4:11 5:25 33:25 55:6 64:9 66:22 80:22,23 98:22 163:21 164:25

**talk** 11:17 57:22 75:19 90:2 93:17 96:5 120:14 175:22 188:14

**talked** 18:10 36:19 46:24 73:11 138:21 156:25 161:18 184:22 196:1

**talking** 13:23 41:20 44:7 48:1 56:16 62:9 69:5 85:4 109:23 118:10,14 122:14 126:21 163:12 179:13 201:16

**tampered** 58:11

**tank** 127:24

**task** 27:25 28:2,8,13 94:4 196:22 198:13,15 207:23

**tasked** 100:25 168:14 196:16,18 197:1,13 207:20,25

**tasks** 28:2,4,6 56:4,6,8,11,18 70:2,3 87:9 166:8,9

**taught** 17:23 19:15,16 70:13 71:1 79:20 82:23 88:18 92:4,18 147:16,18 148:19

**teach** 17:21 18:21 70:8,19 71:25 79:17,23 80:4

**teaches** 79:18

**teaching** 80:5

**team** 12:22 58:24

**tech** 13:8 56:14 59:5,14,17,19,21 165:25 211:11

**technical** 24:1

**technology** 20:7 71:2

**telling** 18:9 37:18 73:18 76:10 136:3 137:8,12,19 138:13 143:3 202:21

**tells** 74:7 100:11 133:3 135:15 141:6 212:18

**ten** 9:23 63:2

**tended** 79:2

**term** 18:15 44:6 67:11 88:8 105:17 115:14 122:25 196:4

**termina** 39:14

**terminal** 90:4

**terminated** 151:19

**termination** 38:5

**terminology** 90:4

**terms** 10:16 68:13 78:23 86:22 145:23 148:9,16 151:18 193:11, 12 214:10

**test** 22:4 23:2,3 75:16 76:2,4 79:6,22 82:4,12,22 84:10 85:8, 11 87:19 88:9 91:16,17 198:5

**testified** 5:4 7:12,24 8:1,5,9,11, 14 119:3 169:23 170:16,21 174:12,22 178:4 190:10 191:18 193:13 208:2

**testify** 180:6

**testifying** 178:3,18,19

**testimony** 7:4 10:2 13:18,21 171:14,19 174:23 175:24 176:9 177:24 209:10,14 214:1

**testing** 22:1,2

**tests** 8:6 22:12 84:18,23 87:9,13, 15 88:18

**text** 102:17 184:25 185:8 187:1,5 188:3,19 190:21

**thing** 18:11,16 37:2,4,9 48:14 61:11 68:25 71:3 90:23 106:14 107:2 110:10 123:7,11,12 131:16 135:4 138:6 146:14 147:9 160:24 162:6 166:21

**things** 8:23 9:18 18:12 25:6 28:1, 9 33:24 35:8 37:3,18 38:19 39:15 44:9 46:19,21,22 48:20 50:8,12 55:7 57:11 58:7 59:5 60:14 62:1 68:25 70:16 72:7 73:15,20 78:12 79:10,24 81:16 91:5,20 92:1 96:6 99:11 111:12 121:6,17 123:12 131:14 137:3 155:20,22 156:15 166:9,19,20 193:7 194:1

**thinking** 109:5

**Thomas** 4:9 190:24 203:9 212:15

**thought** 8:24 94:1 144:3

**thousand** 132:8

**threat** 105:23

**threshold** 146:1

**throttle** 142:15,21,25 144:9

**thrown** 103:14

**ticket** 46:10

**tickets** 34:1 55:7 90:19

**time** 4:6 5:6 6:10,17,18,21 7:22 11:4,13 14:11 16:7 24:25 25:5,9,16,23 27:21 28:25 29:1,5,18 30:2,4,14 32:8,19,21 36:11,25 46:10 47:20 53:15,20 55:13 58:22 59:14 63:3,24 64:4 65:22 66:11 67:19 68:11 71:10 77:19 78:3,5,17 79:1 82:3 84:22 86:10,12 90:8 91:5 92:2 95:25 96:6,19,21,23 97:12 98:21 99:5 100:3 105:1 107:15 111:13 113:13 114:23 116:14 119:12,25 121:7 122:9,11 123:18 129:8 130:13,14 131:17,18 132:5,18,20 133:1,24 135:14 136:14 140:11 141:8,16 143:13 144:18 145:3 146:16,23 148:25 149:1 150:14 151:15 159:24 160:16 161:6 162:4,11 163:3,7,24 164:11,13 166:15,18 167:2,3,18 170:7,24 173:7,14,16 181:10,12 188:13 194:23 195:5,7 211:12 212:25 213:19 217:1

**time-distance** 72:5

**timely** 106:7 110:17,25 111:2,7,14

**times** 5:22,23 9:17 32:16 46:15 53:13 56:17 59:14 81:1 94:22 95:7 101:6 102:6 107:6 111:6 128:21 129:25 132:12 196:22

**tip** 83:3

**tire** 70:14 73:16 154:10

**tires** 74:1 155:23 156:2

**today** 4:14 5:19 6:1,5,15,22 7:1,5 8:22 9:1 10:2,5,16 11:16 12:8,14 13:6,12,15 14:2 40:13,21 44:7 48:22 126:21 129:5 165:16 170:19 175:24 193:7 199:25 206:7,16 208:24 209:19,22 214:11

**told** 25:11,14,20 54:24 92:9,18 114:1 156:9 166:24 167:19,25 168:15 174:8 178:1 189:19 199:6 206:24 207:4,25

**Tom** 4:20 169:6,15 180:14 181:17 182:5 205:12

**top** 71:23 124:9 132:3,24 133:20 135:25 138:20 139:15 186:8 215:20

**topic** 31:11 95:14,17

**topics** 13:23 94:25 95:20

**torture** 86:8

**total** 7:20 56:12 71:7,13,17 75:7 94:10 95:23 153:20 197:11,14,21

**totally** 19:1

**touching** 18:2 145:24

**tow** 133:9,10

**Township** 95:4

**toxicology** 212:23

**TR** 172:7

**tracking** 38:3,9,17,24 39:2,9,13,16 40:5 41:6 47:17 48:15 54:2 196:2,9

**tracks** 96:8

**trade** 212:5

**traffic** 7:16,21 8:8,9 16:12 17:21,23 20:10,22 21:25 23:25 24:2,6,17 29:18 30:8,15,25 33:17,18,20 34:8,14 36:20 37:14 43:5 44:11,12 50:18 51:4,5 52:16 55:5 56:23 57:5 58:22 59:4,24 64:8 66:3,13 67:24 70:7 75:13 77:18,22 78:23 96:22,23,25 97:1,22 98:21,23,25 99:2 101:22,23 102:10 115:25 116:11 119:16 121:10 155:15 166:10 196:19 197:8 198:4 199:23 202:22 203:4 216:3

**traffic-related** 34:12

**trailers** 34:4

**train** 28:16 94:19 95:13 96:10 125:18

**trained** 18:4 24:1,6 27:24 28:10 37:22 56:14 59:6 78:12 81:19,20 82:9,11 87:9,12 91:11 92:4 94:5,14 97:24,25 106:15 123:2,18 125:4 211:10

**training** 14:17 16:13,16,23,24 19:6 21:18,24 22:19 23:9 24:10 26:19 27:5,6,8 32:20 37:17 57:9 69:20,23 70:6 72:23 73:1,4,7,10 76:11,13 79:12,14,17,23 84:7 87:7 88:16 89:1 91:6,8,10 92:9,13 94:6,21,23,24 95:9,18,19,21,23 97:1,6,11 99:13 101:23 102:2,8,12,15 105:5 125:15,17 130:11 134:20 147:20,22 155:13 156:5,6,7,8,22 193:3,23 195:17,18,22,23 210:24 211:12

**trainings** 19:11,14,16

**trains** 101:5

**trans** 216:20,22,24

**transcript** 216:18

**transfer** 176:12

**transferred** 174:14

**transparent** 55:20 67:18

**travel** 144:6 154:6,18

**traveling** 117:12 143:8,24 144:22 149:2 150:20 151:8 160:7 169:24

**treated** 8:17,19

**tree** 136:9 197:18

**trigger** 101:11 135:20,22 136:7

**triggers** 136:6,7

**trouble** 76:25

**Troy** 4:9,22,25 8:14 12:12 13:8, 11 15:16,18,25 16:7,25 17:1,11 24:15 27:2 28:17 29:24 33:4 34:20 38:7 40:14 41:21 45:14,19 48:4 49:17,21,25 50:4,23 52:18 62:23 63:24 67:15,20 68:4,8 69:9 85:13 90:7 95:3 98:1,15 99:21,23 104:13,22 112:22 118:11,15 119:5,11 120:4 130:10 155:16 156:8 158:20 171:19 172:14 174:19 175:4 177:2 183:4 191:12 192:11 193:5,25 195:19 197:8 199:8,15 200:1,12,14 201:12 204:25 209:1,23 210:9,12 211:13 213:8, 10,21 214:3

**Troy's** 176:20

**truck** 133:9,10

**true** 48:25 164:6 173:24 175:13, 14,15 178:6

**trust** 37:12 67:16 68:9,15

**trusts** 68:4

**truth** 5:2,3

**truthful** 7:4 19:2 55:18

**Tuesday** 31:20 104:7 172:21

**tunnel** 18:10,14

**turn** 77:1 99:6,8 121:20 171:20 172:3 179:23

**turnaround** 63:21

**turned** 133:8 159:10 165:9 172:21 174:11 177:21 178:3 179:2,11 180:10 182:22 187:20 192:2 200:23 208:12,20

**turning** 133:10,16,17 178:14 189:23 200:7

**turns** 94:24

**twenty** 186:5

**Twenty-six** 140:20,21

**two-week** 21:9

**type** 30:12,21 35:20 47:18 48:17 51:13 57:21 80:12 88:3 89:3 97:10 106:20 108:14 118:18 123:7 193:18 198:5

**types** 48:20 56:11 91:14 122:18 193:16

**typical** 24:18 79:13 81:8 129:24

**typically** 31:17,23 39:18 53:2 56:4 64:21 66:15,16,19 95:20 101:2,5 102:11,25 105:6 115:21 116:6 126:14 128:17 131:12 134:6 135:2 141:10,14 156:24 214:5

**typing** 92:18 93:8

**U**

**UC** 115:19 118:21

**UD-10** 203:6 212:13 215:3,6,25 216:3

**Uh-huh** 126:24 186:9,16

**ultimately** 47:16 66:18 68:3 75:11 84:13 102:22 143:6 165:22 176:11 191:19

**un** 110:6

**unable** 7:4 208:13

**undercover** 115:19,20 118:18 119:4

**undergone** 19:5

**understand** 5:24 6:9 47:25 48:2 51:15 67:7 69:13,19 79:12 84:10,25 85:7,13 95:2 118:21 125:14 203:13 209:14 214:4

**understanding** 50:3 67:11,16 75:20 105:13 120:24 125:3 127:19 138:5 147:19 163:2 164:2 168:6,8 178:7,8,10 181:3 183:4 192:19 193:5,24 198:1 199:9 203:20 211:6

**understood** 21:16 43:4,16 53:25 54:3 70:6 82:6 85:18 92:4 97:16 107:14 126:19 133:12 151:5 214:1

**undo** 128:8

**unfairly** 183:12

**unfounded** 46:9,15

**uniform** 52:23

**unit** 10:14 16:12 21:15 24:17 30:8,25 33:8,23 43:21 54:17,23 64:8 96:22,24,25 97:23 98:18,19 99:2,3 100:17 119:16 166:10 196:19 197:8

**unit's** 198:4

**units** 30:22 33:7,11 99:9

**University** 14:22 20:2,21

**unreliable** 128:25

**update** 22:16 66:4,7 188:5 189:13

**updates** 19:20 91:25

**upkeeping** 45:18

**upset** 46:9

**urgency** 108:4,22 109:11 110:5

**urgent** 161:13

**urinated** 78:15 79:9

**user** 124:9

**V**

**vacation** 32:3

**vague** 193:11

**varying** 24:19

**vehicle** 8:11 17:25 18:4,19 37:6, 8,21 43:6,7,17,21 44:3 50:14,22 58:19,20 61:4,5 62:17 63:19,22 64:17 73:5,25 76:14,23 77:3,12 81:23 115:15,16,18,23 116:7,19, 20,22 117:1,8,11,23 118:21 119:4,21 121:1,5 122:17 123:6, 10 124:17,18 126:1 127:13 128:5 129:3,5,9,11 130:17 132:15 134:24 135:12,15 136:22,23,25 137:20 143:23 144:5,10,22 145:2 146:4,22 148:17 153:7 154:19 157:20 194:15,16 199:3,7

**vehicle's** 117:17 125:11

**vehicles** 57:18 73:18,20 74:23 75:11 90:8,18 115:25 116:4,5,8, 24 118:11,12,15,17,18 119:11 120:7 128:2

**vehicles'** 118:13

**velocity** 70:15 134:22

**verbal** 6:5 44:15,22 53:2,4,7,14, 16

**version** 186:18 187:4

**versus** 4:9 92:6 110:25 116:9 118:7

**viaduct** 197:19

**video** 4:15 38:13,14 40:24 44:20 164:16,18 166:21 186:23 207:20,24 208:24,25 209:19 216:19,21,23,24

**videos** 9:7,20 165:7 208:11

**view** 91:1 189:19

**VIN** 124:16,17 127:4,5,6,7 128:13,15

**violate** 194:17

**violated** 194:2,11

**violates** 48:3 53:1

**violation** 46:24 47:6,7 48:7,15,18 207:2

**violations** 44:8,9 45:14 48:9

**violator** 51:5 63:20

**visibility** 73:8

**visible** 120:5

**vision** 18:10,14

**visors** 117:21

**vomited** 78:15 79:9

W

**wait** 173:18

**waiting** 32:4

**walk** 14:6 153:14 157:24

**walking** 57:25 109:24 110:20 163:12

**wanted** 98:24 195:25

**warning** 117:12

**warnings** 44:15 53:14,16,21

**warrant** 165:8 166:1,2,6 173:8 174:6 177:8 182:8,11,15,17 198:14 205:24 206:2

**warrants** 90:18 167:11 174:5 198:10

**Warzecha** 4:8,22 5:7 85:24 86:15 172:7 180:22 195:13 198:23 200:6 202:10 204:23,24 205:3 208:13,16 216:16

**WASKE** 186:16,18 187:1

**watch** 208:23

**watched** 9:11

**watching** 22:6

**watery** 78:14 79:8

**Wayne** 14:17,22 17:15

**ways** 58:16 67:20 72:4,8 82:18 127:5

**wayside** 70:25

**wearing** 133:23 134:10

**weeds** 51:22

**week** 22:22 29:4

**weeks** 21:6 26:20 27:22,23

**weight** 134:8

**westbound** 121:19,22

**whatsoever** 123:13 182:13

**wheel** 125:21

**whichever** 101:17

**white** 108:25 112:7 120:4

**whites** 84:5

**wide** 77:1

**wife's** 134:12

**wild** 7:25

**withheld** 166:14

**witnessed** 77:21

**witnesses** 56:16 57:19 60:7 73:17 110:20 115:10 117:7 122:5 170:3

**Wolverine** 14:10 15:7

**woman** 169:3

**wondering** 32:10,13

**wording** 91:22 201:6

**words** 33:3 75:9 76:5 78:9 82:24 92:13 129:2 145:2 175:5 213:6

**work** 10:14 26:20,23 27:16,19 28:20 30:15 31:18,20 32:18 59:4 68:4 102:20 158:15 173:7,17 197:20

**worked** 14:8,13 15:14 26:13,16, 18,20 29:3,6,13,20 30:10,13,19, 22 31:1 102:3,5

**working** 15:4 24:21,22 29:15,17 33:12 100:3 150:15 158:16 189:8

**works** 127:18

**worse** 198:3

**write** 32:1 90:19 128:13,14 200:25

**write-up** 53:24

**writing** 33:25 44:9 45:15 55:7,15 196:13 206:8

**written** 10:21 38:4 39:3 48:4 53:3,17 61:7,18 165:8 172:7 173:9,16 174:7

**wrong** 37:24 47:12 77:10 89:5 173:4 192:21 193:9,12,21 214:2

**wrongdoings** 193:19

**wrote** 200:8,18 205:4,5,7

Y

**Y-A-W** 74:13

**yaw** 73:19,22,25 74:4,11,13,21,25 157:23

**year** 9:3 91:16 94:22 101:6 119:15 196:12,14

**years** 10:11,15 15:14,15 16:11,13,14 22:23 29:19,24 43:20,24 63:5 71:15 75:22 98:19 121:7 193:4 195:20

**yellow** 120:3

**yesterday** 188:11

**yield** 89:11 203:8 212:14

**younger** 28:16

Z

**zeros** 80:6