UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

THOMAS SZCZESNY,

Plaintiff,

-vs- Case No. 2:25-cv-12836-GAD-EAS
Hon. Gershwin A. Drain

CITY OF TROY, a municipal corporation, EVAN LEITHAUSER, in his personal and professional capacities, SCOTT ALLAN, in his personal and professional capacities, ALEJANDRO PARRA, in his personal and professional capacities, GAIL PARRA, in her personal and professional capacities, and BRIAN WARZECHA, in his personal and professional capacities,

Defendants.
____________________________________/

The Deposition of ALEJANDRO PARRA, taken before me, Theresa L. Roberts, Certified Shorthand Reporter (CSR-4870) and Notary Public in and for the County of Oakland, at 27555 Executive Drive, Suite 250, Farmington Hills, Michigan, noticed for 1:30 p.m.

APPEARANCES:

For the Plaintiff: LAW OFFICES OF JASON A. WAECHTER
By: Aaron R. Martinez, Esq. (P86228)
19080 W. Ten Mile Road, 2nd Floor
Southfield, Michigan 48075
(248) 355-4701
aaron@877powerlaw.com

APPEARANCES CONTINUING:

For the Defendant City of Troy: TROY CITY ATTORNEY'S OFFICE
By: Julie Q. Dufrane, Esq. (P59000)
500 W. Big Beaver Road
Troy, Michigan 48084
(248) 524-3320
dufrane@troymi.gov

For Defendant Officers: ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, P.C.
By: Amanda P. Waske, Esq. (P81128)
27555 Executive Drive, Suite 250
Farmington Hills, Michigan 48331
(248) 489-4100
awaske@rsjalaw.com



I N D E X


| | PAGE |
|---|---|
| Direct Examination by Mr. Martinez | 4 |


E X H I B I T S


| DESCRIPTION | PAGE |
|---|---|
| Deposition Exhibit No. 1A Discover Response | 13 |
| Deposition Exhibit No. 1B Document | 15 |
| Deposition Exhibit No. 2 SGT Bowers Bodycam at Scene | 27 |
| Deposition Exhibit No. 3 Body Camera Video 3X60A1575M | 33 |
| Deposition Exhibit No. 4 Bodycam - Start Time 21:21:14 | 42 |
| Deposition Exhibit No. 5 Bodycam - Start Time 21:23:43 | 53 |
| Deposition Exhibit No. 6 Officer Parra's Notebook | 93 |
| Deposition Exhibit No. 7 Excerpt of Police Report | 96 |
| Deposition Exhibit No. 8 Guardian Tracking Record | 130 |




Farmington Hills, Michigan
Tuesday, August 11, 2026
(At about 12:55 p.m.)

A L E J A N D R O  P A R R A

having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified upon his oath as follows:

MR. MARTINEZ: Let the record reflect this is the date and time set for the deposition of Alejandro Parra taken pursuant to notice, to be used for all purposes allowable under the Federal Rules of Civil Procedure.

DIRECT EXAMINATION

BY MR. MARTINEZ:
Q. Good afternoon, sir.
**A. Hello, sir, how are you?**
Q. I'm doing well, how are you?
**A. Good.**
Q. Good. My name is Aaron Martinez. I represent a gentleman named Thomas Szczesny pertaining to a vehicle collision that occurred back on September 22, 2023, between himself and Officer Evan Leithauser. Okay?
**A. Yes, sir.**



Q. If I reference an incident, accident or the crash, that will be the incident that I'll be referencing today, okay?
**A. Yes, sir.**
Q. All right. Have you ever given your deposition before?
**A. Have I given a deposition before?**
Q. Correct.
**A. Yes.**
Q. About how many times?
**A. Two, I think two times.**
Q. I'll just go over some brief ground rules, just so we can be on the same page here today. We've got our court reporter here who's going to be taking down a verbatim record of the things that we discuss here today. So I'm going to give you verbal questions, I'll just need a verbal response -- verbal answer in response, okay?
**A. Yes, sir.**
Q. Even though you and I can see each other here right now, nods of head, shakes of the head don't always come out neat on the record. So we'll just need to make sure that you can give us verbal answers to the questions. Understood?
**A. Yes, sir.**

Page 6

Q. All right. At any point in time if you don't understand my question, it wouldn't be the first time, feel free to ask me to rephrase it, and I will do my best to try to get it to where you can understand the question. If you do answer the question, I will assume that you understood the question as I've asked it, fair?
**A. Yes, sir.**
Q. From time to time the attorneys may make objections on the record today. Unless your attorney specifically instructs you not to answer because of a privilege, once the objections are placed on the record, we'll look for you to give the answer. Understood?
**A. Yes, sir.**
Q. All right. If you need a break at any point in time, we're not here to hold you hostage, we're happy to take a break anytime you need it. I will just ask that if there's a question pending at the time, you answer that question before we take a break.
**A. Yes, sir.**
Q. All right. Is there any reason why you would be unable to provide truthful and complete testimony today as to this matter?

Page 7

**A. No, sir.**
Q. All right. Fantastic. Could you start by just giving me your full name?
**A. Alejandro Parra.**
Q. Okay. And Officer Parra, do you go by Alex?
**A. Sometimes.**
Q. Okay. We've heard people refer to you as Alex Parra before, so do you prefer Alejandro or Alex?
**A. Whatever you want, sir.**
Q. Okay, thank you. What is your current employment?
**A. City of Troy.**
Q. And what do you do at the City of Troy?
**A. Police officer.**
Q. All right, what is your current rank?
**A. Police officer.**
Q. Do you have a specific assignment as a police officer?
**A. No, just a police officer.**
Q. Is there a particular division or unit that you're affiliated with?
**A. Patrol.**
Q. What was your assignment back on September 22nd of 2023?
**A. Patrol.**
Q. How long have you worked for Troy Police Department

Page 8

for?
**A. Twelve years.**
Q. All right, I'm going to just get a little bit of background on your history in law enforcement. How long have you been a law enforcement officer?
**A. Twenty-nine years.**
Q. Prior to joining the City of Troy, were you employed anywhere else?
**A. Yes, sir.**
Q. Where at?
**A. Detroit Police.**
Q. How long were you with Detroit Police for?
**A. Eighteen years.**
Q. Prior to Detroit Police, were you with any other police departments?
**A. No.**
Q. Prior to joining Detroit Police Department, had you completed any post high school education?
**A. Yes.**
Q. Where did you complete?
**A. Royal Oak Shrine High School.**
Q. Post high school?
**A. Oh, post? I'm sorry, sir. Oakland Community College.**
Q. Did you receive a degree from there?

Page 9

**A. Associates.**
Q. And what was the field?
**A. Criminal justice.**
Q. Do you have any other degrees?
**A. No.**
Q. All right. Where did you attend -- well, I should ask, did you attend the police academy?
**A. Yes, sir.**
Q. Where did you attend?
**A. Detroit Metropolitan Police Academy.**
Q. When did you graduate from that academy?
**A. '96.**
Q. All right, aside from the training that you received in the academy, have you undergone any additional training since becoming a law enforcement officer?
**A. Yes.**
Q. Can you tell me a little bit about the training that you've taken since then?
**A. Undercover school, Reid interrogation class.**
Q. And that's R-E-I-D?
**A. I think it's R-E-E-D (sic), sir.**
Q. R-E-E-D?
**A. I believe so.**
Q. Okay, fair enough.
**A. Homicide classes, homicide investigation classes. I**

Page 10

**can't think of anything else.**
Q. Have you been trained in any capacity with crash investigations?
**A. Not -- I'm not an accident investigator --**
Q. Okay.
**A. -- but I do respond to accidents and are able to put pieces of puzzle together.**
Q. Understood. With regard to OWI investigations, Operating While Intoxicated investigations, have you been given any training in that?
**A. Yes.**
Q. Tell me about that training?
**A. Just what they teach us at the Troy Police Department.**
Q. All right. Aside from the training that we've discussed that you took previously, since joining the Troy Police Department have you been given any additional training in any capacity?
**A. We train quite a bit at the Troy Police Department. We train with firearms, we train with -- I'm on the crisis negotiation team. So I -- I do -- have attended that training also. We do -- like I said, we qualify quite a bit with the Troy Police Department with, you know, firearms, firearms training, firearms and also -- that's pretty much**

Page 11

**it.**
Q. Thank you for that. Prior to coming here today, what -- did you do anything to prepare for this deposition?
**A. I took a shower and came in. That's about it, sir.**
Q. I can appreciate that. Did you review any documents of any kind before coming today?
**A. No, sir.**
Q. Did you get an opportunity to review any of your body camera footage from the night in question of this incident?
**A. Today? No, sir.**
Q. At any point in time after this incident occurred, did you have an opportunity to review your body camera footage?
**A. Yes, I have watched it.**
Q. How long ago was it when you watched it?
**A. That's several weeks ago.**
Q. All right. Have we covered generally all the trainings that you've been a part of since becoming a law enforcement officer, generally?
**A. Generally. There's a couple I probably can't remember.**
Q. Fair enough. It's been a long career, it sounds like. So I can assume you've probably taken quite a

Page 12

bit of training?
**A. Yes, sir.**
Q. Remind me, I didn't write it down. When did you join the Troy Police Department?
**A. 2014.**
Q. All right. Based on your training and experience as a law enforcement officer, can you tell me from your perspective what makes a police investigation reliable?
**A. The evidence.**
Q. Tell me more about that.
**A. You go to the scene or you get your assignment, you review it or review the scene and you look for the evidence.**
Q. Can you tell me, based on your training and experience, why accuracy is important when it comes to preparing police reports?
**A. Because it's a document of what's going on. It's a documentation of what's going on.**
Q. And it's important to be accurate when memorializing the observations you make at the scene?
**A. Yes, sir.**
MS. WASKE: Objection to form.
BY MR. MARTINEZ:
Q. All right. To be clear have you ever been a part of

Page 13

the SOCCIT team?
**A. No.**
Q. And that's what you were indicating when you said that you've never been an accident investigator; is that fair?
**A. That's correct.**
Q. All right.
(Deposition Exhibit Number 1A was marked for identification)
BY MR. MARTINEZ:
Q. I'm going to hand you briefly what's been marked for identification here as Exhibit 1A. Can you take a look at that document and just tell me what it is, if you recognize it?
**A. Some type of legal brief.**
Q. Are there -- have you seen this document before today?
**A. Yes.**
Q. When do you recall seeing this document?
**A. I don't remember the date, but I have seen it.**
Q. Did you assist with the preparation of this document?
**A. No.**
Q. Can I have you take a look at page 15 of Exhibit 1A? All right, do you recognize any signatures on that

page?
**A. Mine.**
Q. Okay. Does that signature or is that signature intended to signify that you've had the opportunity to review the contents of this document?
**A. Yes, sir.**
Q. And that they are true and accurate to the best of your knowledge and information and belief?
**A. Yes, sir.**
Q. Do you need to take a moment to look through that document?
**A. Sure.**
Q. Okay. Go ahead.
**A. Is there a specific section you want me to review?**
Q. Well, I'm just looking to understand if we can rely on the answers in this document as being truthful responses from you?
**A. They seem to be accurate.**
Q. Okay. Now you testified that you didn't have any part of preparing this document. Are these responses that you've reviewed in Exhibit 1A consistent with what your response to those questions would have been?
**A. Yes.**
Q. Okay. Yeah, it's possible -- yeah, you may not have



been the one that specifically typed this document, but --
**A. These are my answers.**
Q. Okay, that's what I was looking for. Thank you, sir. I can take it back.
(Deposition Exhibit Number 1B was marked for identification)
BY MR. MARTINEZ:
Q. I will hand you next what's been identified as 1B. There's no signature on this one, but I just want to get an understanding if you've ever seen this document before?
**A. I don't think I've seen this.**
Q. Okay, that's all right.
**A. I'm reaching across again.**
Q. Thank you. All right. I'd like to have you take me back as far as you can remember to September 22, 2023, the night of this incident occurring. When did you first become aware that there was an officer-involved collision involving Officer Leithauser?
**A. When we broadcast it on the radio.**
Q. Where were you at at the time?
**A. Station.**
Q. And after receiving the call from



Officer Leithauser, what did you do next?
**A. Respond to the scene.**
Q. About how long did it take you to get to the scene?
**A. Three, four minutes.**
Q. At the time that you arrived on scene, were you one of the first to arrive?
**A. I believe so.**
Q. Had the ambulance arrived yet at the time?
**A. I don't remember.**
Q. When you first arrived on scene, what did you do?
**A. Exited my vehicle and approached the scene.**
Q. Okay. Take me through generally what happened after that.
**A. Approached the scene, saw the victim on the ground; saw that, obviously, he was in pain. Ambulance might have been there. I saw if Officer -- checked if Officer Leithauser was okay. And then I let them -- yeah, I'm pretty sure he was getting worked on. And let him -- let the EMTs do their job.**
Q. You let the EMTs do their job with Officer Leithauser?
**A. With your client.**
Q. With Mr. Szczesny?
**A. Yes, sir.**
Q. Okay. When you approached -- well, first let me



back up. So you indicated that it appeared to you that Mr. Szczesny was in pain?
**A. Yes, sir.**
Q. What makes you say that?
**A. He was on the ground and had an anguished look on his face.**
Q. Did you hear any expressions of pain being made?
**A. I don't remember.**
Q. Fair enough. All right. And then when you checked in with Officer Leithauser, did you two have a conversation?
**A. Yes.**
Q. What did you two discuss?
**A. A, is he okay. He's -- you know, he did suffer a bump to his head, and he just told me the man turned in front of him.**
Q. And that was your first understanding of what had occurred in this incident?
**A. Yes, sir.**
Q. At the time that you arrived, where was your vehicle parked in relation to where Mr. Szczesny was?
**A. Close enough to the scene. Like I pulled up, made sure traffic is blocked so nobody comes through there.**
Q. Where was Officer Leithauser at the time that you

responded?
**A. Don't remember.**
Q. Do you recall how long after you arrived on the scene that you first spoke with Officer Leithauser?
**A. Pretty quick. I don't remember the time, the time frame.**
Q. Fair to say though that he was probably in close proximity to where you had arrived?
MS. WASKE: Objection to form.
**THE WITNESS: Yes, he was -- you want me -- he's going to be in the vicinity. He's not going to go anywhere.**
BY MR. MARTINEZ:
Q. All right. Did you get an opportunity to see where Officer Leithauser's patrol vehicle was at the time you arrived?
**A. I'm sure I did. I don't remember where it was parked, sir.**
Q. Do you recall where the motorcycle was at the time you arrived?
**A. No.**
Q. At the time that you arrived on scene, what was your -- for lack of a better term, assignment? What were you there to do?
**A. What was I there to do? Respond to -- the -- to**



**respond to a crash, render aid if necessary, preserve the scene and speak with Officer Leithauser. It wasn't my assignment, it's just what I was going to do, speak with Officer Leithauser.**
Q. Had you been given any instruction from any sergeant or lieutenant or anybody in Troy Police Department command as to what you were supposed to be doing at the scene?
**A. No, sir.**
Q. So you just kicked into your training to do what you knew needed to be done at the scene?
**A. Yeah, you can put it like that.**
Q. When you referenced preserving the scene, what do you mean by that?
**A. Making sure nobody else runs -- another car does not come through it and cause any injury to anybody else.**
Q. Were you responsible then for closing down that roadway at all?
**A. Yes, sir. I had said that, to block traffic.**
Q. How did you block traffic?
**A. With my vehicle.**
Q. Did you just place your vehicle across both lanes of travel nearest?



**A. Don't remember how I placed it.**
Q. Have you blocked off roadways before in other incidents?
**A. Yes, sir.**
Q. When you have a two-lane road similar to -- at least two lanes going in one direction, the center lane, two lanes going in the opposite direction, where is it that your training would tell you that you need to place your car in order to block traffic?
**A. Block the scene of the accident. So you put your vehicle there so vehicles that may be traveling in the same direction will take a different route.**
Q. Fair to say, you did not witness the crash actually occurring?
**A. No, sir.**
Q. You didn't ever see my client operate the motorcycle before arriving on scene?
**A. No, sir.**
Q. What was your understanding when you arrived on scene of whether or not Officer Leithauser had activated his emergency lights and sirens prior to this collision?
**A. Say your question one more time, sir.**
Q. So at the time that you arrived on scene or were responding to the scene, did you have any



information about the status of Officer Leithauser's overhead lights and siren?
**A. No idea.**
Q. Did there come a time while you were on scene where you learned more information about that?
MS. WASKE: Objection, form.
**THE WITNESS: Yeah, at some point during the course of the investigation I did find out. I don't remember when, though.**
BY MR. MARTINEZ:
Q. When did -- what information did you find out about the status of the lights and sirens?
**A. That they weren't activated.**
Q. So at the time that you arrived on the seen of this crash, you were not assigned to determine crash causation or anything like that?
**A. That's correct, sir.**
Q. You were not assigned to determine whether Mr. Szczesny's turn caused the crash?
**A. No, sir.**
Q. And it's safe to say then that you were not assigned to determine whether Officer Leithauser's speed had any cause of this crash?
**A. No, sir.**
Q. All right. So as you're there and you're completing

the tasks that you explained to us, you're gathering information, you're preserving the scene. Take me through how the investigation transpired from there.
**A. For me or for --**
Q. Yeah, from your standpoint.
MS. WASKE: Objection to foundation and form.
MS. DUFRANE: Join.
**THE WITNESS: Well, how did it proceed. To proceed, I'm going to let the boss, supervisors make the determination of what's going on with the scene at that point, if they're going to recall SOCCIT, just due to the nature of the -- of the crash. If I see something, I'll point it out to them. I'm also going to speak with Officer Leithauser and make sure he doesn't need any medical attention, if he has sustained any serious injuries.**
**If there's any witnesses, I'm going to speak to them, okay, it could contribute to the investigation. That's pretty much my role, sir.**
BY MR. MARTINEZ:
Q. What did you observe about the lighting conditions at this area of Maple and Stephenson when you arrived?



**A. It's well lit.**
Q. What did you observe about the traffic conditions at this area?
**A. The traffic conditions? They seemed to be fine.**
Q. What do you mean by "fine"?
**A. There wasn't a traffic jam or anything like that.**
Q. Was there high volume of traffic at the time you arrived?
**A. I don't remember, sir.**
Q. We've heard testimony from some folks who have characterized Officer Leithauser's vehicle as being a "slicktop." Are you familiar with that term?
**A. Yes, sir.**
Q. What does that term mean to you?
**A. It's just a vehicle with no -- it doesn't have a light bar.**
Q. Is there any other feature or -- or element of that vehicle that makes it different than a traditional police vehicle?
**A. Yeah, it does -- a traditional police vehicle will have a light bar on the top.**
Q. Do you recall whether or not Officer Leithauser's vehicle had any decals on it?
**A. No, I do not recall.**
Q. When you arrived on scene, did you see debris in the



roadway?
**A. I don't remember.**
Q. Did you see skid marks at the scene?
**A. I don't remember, sir.**
Q. Did you see tire marks of any kind?
**A. Do not remember.**
Q. Did you see anybody moving debris from the roadway off of the roadway?
**A. No.**
Q. At any point in time, did you talk to a gentleman by the name of Dheeraj Chanda?
**A. I don't remember speaking to him.**
Q. He was a South Asian man, he was wearing a suit, had the top of his shirt unbuttoned?
MS. WASKE: Objection to form.
**THE WITNESS: I'm sorry, I do not remember speaking to him, sir.**
BY MR. MARTINEZ:
Q. Fair enough. Did you ever speak with a woman named Kayla Orr?
**A. Kayla Orr? Is that your client's girlfriend?**
Q. No.
**A. No? No, I don't remember speaking with somebody named Kayla Orr, sir.**
Q. So at the time that you first saw Mr. Szczesny, I



understand he was on the ground near the driveway of the Shell; is that right?
**A. He was on the ground, yeah, that's fair -- fair enough to say.**
Q. What was his position? How was he --
**A. He was on his back, sir.**
Q. Were the medics treating him at the time you arrived?
**A. That's a -- I believe so, I'm not 100%.**
Q. At the time that the medics were with him, was Mr. Szczesny speaking to you?
**A. No.**
Q. At any point in time, did you speak with Mr. Szczesny?
**A. No, I did not speak to Mr. Szczesny.**
Q. All right. At what point in the night while the investigation is going on were you closest to Mr. Szczesny in proximity?
**A. Probably when I first arrived.**
Q. And about how far away from him were you?
**A. I got fairly close. I don't -- I can't tell you how many feet.**
Q. Okay. So you and I are at a distance right now a couple feet. Would you say that this is a similar distance to you and Mr. Szczesny?

Page 26

MS. WASKE: Objection to form.
**THE WITNESS: That's fair to say.**
BY MR. MARTINEZ:
Q. Okay. Fair to characterize the space between us as roughly about five feet?
**A. Yeah. Again, I don't remember the exact, but I -- it was enough for me to -- to observe.**
Q. All right. At the time that you were closest to Mr. Szczesny, was this before or after you ultimately made contact with Autumn Campbell?
**A. When I first arrived, I walked -- I got close to Mr. Szczesny, and then I let the medics do whatever they were doing.**
Q. Did you speak to Mr. Szczesny?
**A. No, sir.**
Q. What were you doing as you were getting close to him?
**A. Observing.**
Q. What was it that you were observing for?
**A. His injuries, if I smelled anything, seen anything, observed anything, something that could be dangerous to anybody else on scene.**
Q. What was your observation of his injuries? Obviously, I'm not asking you to make a medical opinion here today, but just from what you saw with

Page 27

your own eyes, what was apparent to you?
**A. Well, he was on his back. I think he possibly had a leg injury. Other than that, I can't really say.**
(Deposition Exhibit Number 2 was marked for identification)
BY MR. MARTINEZ:
Q. All right, I'm going to show you what's been marked for identification as Exhibit 2. It's going to be a video. And I'll represent to you that this was video from then Sergeant Bowers, now Lieutenant Bowers at the scene, okay?
**A. Do you want me to come over there?**
Q. I will show it to you.
MS. WASKE: Do you want me to show it to him on my laptop?
MR. MARTINEZ: If that's easy for you, yeah. And I was going to have you cue it up to about 12 minutes and 51 seconds run time.
MS. WASKE: Twelve minutes and 51 seconds?
MR. MARTINEZ: Correct.
MS. WASKE: How about I start it at 12:50?
MR. MARTINEZ: Perfect.
MS. DUFRANE: I'm going to object to

Page 28

foundation.
MS. WASKE: Join.
(Video shown)
BY MR. MARTINEZ:
Q. Do you observe yourself in this video?
**A. I think so.**
MS. WASKE: Can he -- can he watch?
**THE WITNESS: Should we go back? Are we looking for sound too or no? Just go back there.**
MS. DUFRANE: Can we repeat the starting point? I'm sorry, I missed it.
MS. WASKE: 12:50.
(Video shown)
MR. MARTINEZ: Okay, we can pause it there. Can you read a --
MS. WASKE: I'm pausing the video at 13:04, and I just for the record want to make clear that the audio does cut out on this video that is being used as an exhibit.
BY MR. MARTINEZ:
Q. Officer, were you able to hear what you said at approximately 12 minutes and 55 seconds?
**A. Yes, sir.**
Q. What was it that you said?
**A. Someone's going to have to do paper.**

Page 29

Q. I heard somebody needs to do paper on him to get his blood. Did you hear that?
**A. I just heard somebody's got to do paper, but --**
Q. Okay.
**A. -- the audio cut out, so...**
Q. Okay. Who were you referring to when you said "him"?
**A. Your client.**
Q. What paperwork were you referring to?
**A. Search warrant.**
Q. Why did you believe that paperwork needed to be completed?
**A. A -- one of the things that I observed when I approached your client was I could smell alcohol.**
Q. Okay. From what distance did you smell the alcohol?
**A. I don't know the feet, sir, but it was close enough for me to get a whiff.**
Q. So we established previously that it was about five feet?
MS. WASKE: Objection to form.
**THE WITNESS: Again, I don't want to say something that's not 100% accurate there.**
BY MR. MARTINEZ:
Q. Understood. But, you know, as far as we can approximate and estimate, based on your knowledge

and experience, life experience, professional experience, this distance you and I are we've said is about five feet. Were you any closer or --
**A. Probably a little closer than five feet, sir.**
MS. WASKE: Objection to form and foundation.
MS. DUFRANE: Join. And the record speaks for itself what he already testified to.
BY MR. MARTINEZ:
Q. All right. So what then was the distance between you and Mr. Szczesny at the time that you allegedly made this observation?
MS. DUFRANE: Objection, asked and answered.
MS. WASKE: Join.
**THE WITNESS: Close enough for me to smell, sir. I don't -- I can't say two feet, one feet, five feet, twenty feet. I don't want to -- I want to -- I would like to be accurate on that.**
BY MR. MARTINEZ:
Q. Did you observe whether there was any fluids from the motorcycle leaking in the area?
**A. No, sir.**
Q. All right. So what facts then did you have at the moment that you made the statement to



Sergeant Bowers that the paperwork needed to be completed?
MS. WASKE: Objection to foundation.
MS. DUFRANE: Join.
**THE WITNESS: Just what I smelled.**
BY MR. MARTINEZ:
Q. And again, you had not spoken directly to Mr. Szczesny?
**A. No, sir.**
Q. Where was Mr. Szczesny facing at the time you smelled alcohol on him?
**A. He was --**
MS. WASKE: Objection to form.
**THE WITNESS: He was on his back, sir. So...**
BY MR. MARTINEZ:
Q. Okay. So his face, as you motioned just now, was facing directly upward?
**A. Yes, sir, he's on his back.**
Q. Okay. And then you would appro -- have approached Mr. Szczesny from his left?
MS. DUFRANE: Objection to form.
MS. WASKE: Join and add an objection to foundation.
**THE WITNESS: From a side. I don't**



**remember what side.**
BY MR. MARTINEZ:
Q. Did you ever kneel down towards Mr. Szczesny?
**A. No, sir.**
Q. Did anyone ever conduct a field sobriety testing on Mr. Szczesny in your presence?
**A. No, sir.**
Q. Did anyone ever administer a preliminary breath test on Mr. Szczesny in your presence?
**A. No, sir.**
Q. Had you spoken to any witnesses on scene who said that Mr. Szczesny was intoxicated?
**A. Yes.**
Q. And who is that?
**A. I spoke to the girlfriend.**
Q. Okay. And what did -- the girlfriend, you mean Autumn Campbell?
**A. Yes, sir.**
Q. What did Ms. Campbell tell you?
**A. Basically the timeline of how long they have been drinking or partying, however you want to say it.**
Q. Okay. What precise words did Ms. Campbell tell you to lead you to this conclusion?
MS. WASKE: An objection to form and foundation.



MS. DUFRANE: Join.
**THE WITNESS: That I don't know, but I know that interview is captured on my bodycam, sir.**
MR. MARTINEZ: All right. So let's jump ahead here. Actually no, we'll go in order.
(Deposition Exhibit Number 3 was marked for identification)
BY MR. MARTINEZ:
Q. I'm going to show you what's been marked for identification as Exhibit 3. I will start playing at the beginning of the video. Are you able to see?
**A. Yes, sir.**
MS. WASKE: Hold on, hold on. I think objection to foundation. Do you want to describe what this is?
MR. MARTINEZ: So this is a body camera video. The top right corner reads Axon body 3X60A1575M as in Mary. The date is 2023, September 22nd at 21:17:31.
MS. WASKE: So the exhibits that were provided to me this morning in the Google Drive link, I do not have an Exhibit 3. I have 1A, 1B, 2, 4, 5, 5, 6, 7 and 8.
MS. DUFRANE: Oh, that's weird.
MS. WASKE: Do you have it?

MS. DUFRANE: I agree.
MS. WASKE: You want it, okay?
MS. DUFRANE: I have --
MS. WASKE: Can you just confirm that you guys are looking at the same thing and then we can go off of his computer.
MS. DUFRANE: So to me it looks like it's facing -- I don't know.
MR. MARTINEZ: Looks like a garage or parking --
MS. DUFRANE: Carport.
MR. MARTINEZ: Yeah. And then the -- just for the clarity of the record, Exhibit 4 you just see what looks to be a hand highlighted in red. Exhibit 5 has a video, thumbnail of what appears to be Officer Leithauser, and I'll represent all three of these videos come from that same camera unit X60A1575M.
MS. DUFRANE: For the record, are you representing that this is Officer Parra's bodycam?
MR. MARTINEZ: Well, that's what I was going to ask.
MS. WASKE: That was my -- that was my foundational objection.
MR. MARTINEZ: Yeah.



**THE WITNESS: So click on the one that looks like it's facing the wall?**
MS. WASKE: Exhibit 3 here.
MS. DUFRANE: You need to double click.
MS. WASKE: Do you have sound on, Julie?
MS. DUFRANE: It might be off. I'll see.
BY MR. MARTINEZ:
Q. Officer, do you recognize --
MS. DUFRANE: Hang on, we're just having a little technical difficulty here.
**THE WITNESS: One second, sir.**
MS. DUFRANE: Is that the next one or is it -- good to go?
MS. WASKE: That's good.
**THE WITNESS: I don't hear anything. Is there sound?**
BY MR. MARTINEZ:
Q. Usually these videos have --
MS. WASKE: You got to wait 30 seconds.
MR. MARTINEZ: Yeah, 30 seconds.
MS. WASKE: Thirty-second sound delay.
(Video shown)
MR. MARTINEZ: You can pause.
BY MR. MARTINEZ:
Q. All right, and just for the sake of the record, this



is a 3 minute and 30-second clip. Officer, does this video appear to reflect your initial response to the Maple and Stephenson collision involving Officer Leithauser?
**A. Yes, sir.**
Q. All right. So back at your arrival, which is approximately depicted at 3 minutes and 21 seconds, we hear the car door open and you exit the vehicle?
**A. Yes, sir.**
Q. At the time that you exit the vehicle, did it appear to you that EMTs were on scene?
**A. I wasn't even -- I'd have to look at it one more time.**
Q. That's okay.
MR. MARTINEZ: We can go to 3 minutes and 24 seconds.
MS. WASKE: Why don't we back it up to 3 minutes and 21 seconds since that's the portion you indicated that he exits the vehicle.
MR. MARTINEZ: Fair enough. We can even go 3:20 if that's helpful.
(Video shown)
**THE WITNESS: It doesn't look like it.**
BY MR. MARTINEZ:
Q. Okay. Now we see you then begin to approach



Officer Leithauser. Did you see that?
**A. Yes, sir.**
Q. And where was Officer Leithauser positioned at that point in time?
**A. Standing off to my left there.**
Q. At approximately 3 minutes and 27 seconds we see a hand come from the right side of the video screen and appear to make contact with your body camera device. Did you see that?
**A. Yes, sir.**
Q. All right. And shortly thereafter the video stops at that 3 minutes and 30-second mark. Did you see that?
**A. Yes, sir.**
Q. Why did your video turn off at 3 minutes and 30 seconds?
**A. Because I was going to speak to him.**
Q. And you needed to turn your body camera off to do that?
**A. Yes, sir.**
Q. Why is that?
**A. Because I wanted -- whatever he was going to say to me, I also represent him as -- in the -- from the union, so he's en -- we're entitled to have a conversation that's not documented.**

Q. Was it important that you have union discussions with Mr. Leithauser right as the scene is ongoing?
MS. DUFRANE: Objection to form and foundation.
MS. WASKE: Join.
**THE WITNESS: Union discussions, sir, what do you mean by that?**
BY MR. MARTINEZ:
Q. So you invoked your status as a union representative when you arrived on scene?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
MS. WASKE: You can answer.
**THE WITNESS: Yeah, I'm just trying to formulate my words here. Say your question one more time, sir.**
BY MR. MARTINEZ:
Q. So you indicated you needed to turn off your body camera so you can have conversations with Officer Leithauser pertaining to some union business?
**A. I'm his union steward. I want to make sure that whatever he's going to say is going to be correct, it's going to be accurate, it's going to forthcoming, it's going to be truthful, okay. We**



**are -- he is entitled to have a moment of privacy there while he speaks to me about that incident.**
Q. Does that comply with your understanding of the Troy Police Department body camera policy?
**A. Yes.**
Q. And what aspect of this conduct complies with the standard? Is there a specific union steward exemption to the body camera policy?
MS. WASKE: Objection to form and foundation.
MS. DUFRANE: Join.
**THE WITNESS: Anytime an officer is involved in a shooting, a -- something of a high risk or a high -- you know, a high incident, we shut him off and we talk to the -- we talk to the officer involved.**
BY MR. MARTINEZ:
Q. At what point in time -- well, I guess let me back up. When you arrive on scene, are you arriving on scene as a responding officer to this collision, or are you responding as a union steward?
**A. Officer first.**
Q. Take me through then how the investigation is benefited by having the body camera turned off?
MS. DUFRANE: Objection to form and



foundation.
MS. WASKE: Join.
**THE WITNESS: When we have the conversation it's private.**
BY MR. MARTINEZ:
Q. And it was important to you at that moment in time to turn off your body camera so those conversations could not be heard?
**A. That is correct.**
Q. What occurred after your body camera turned off?
MS. WASKE: Objection to foundation.
MS. DUFRANE: Join.
**THE WITNESS: He basically told me what happened.**
BY MR. MARTINEZ:
Q. How did he describe it to you?
**A. I don't remember, sir.**
Q. And we don't have a record otherwise that would be able to tell us?
MS. DUFRANE: Objection, argumentative.
MS. WASKE: Objection form, argumentative,.
**THE WITNESS: No, there is none, other than his statement that he made. He made the statement on the air, which is captured. He gave a**



**statement to -- in his report, so...**
BY MR. MARTINEZ:
Q. You indicated that it was important to you as the union steward to ensure that the statements of Officer Leithauser were complete and thorough and accurate, do you recall that?
**A. Yes, sir.**
MS. WASKE: Objection to form.
BY MR. MARTINEZ:
Q. How does you speaking to him without a body camera recording ensure that objective?
MS. WASKE: Objection to form, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: He's entitled to have a private conversation with me.**
BY MR. MARTINEZ:
Q. At that time?
**A. Yes, sir.**
Q. You couldn't have that conversation later with him?
MS. WASKE: Objection to form, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: He was right there. I'm going to speak to him.**

BY MR. MARTINEZ:
Q. Did you tell Officer Leithauser how he should answer questions pertaining to this investigation?
**A. No.**
Q. Did you tell him that he did not have to answer questions?
**A. No.**
Q. Did you ever tell him that he should be careful what he says on scene?
**A. No.**
Q. It took you a second to think of that. Are you confident in that answer?
MS. WASKE: Objection, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: This happened three years ago. I want to make sure that I give you all the accurate information, sir.**
(Deposition Exhibit Number 4 was marked for identification)
BY MR. MARTINEZ:
Q. All right. So then I will have you refer to Exhibit 4. And I will just note on the record that this is another body camera video from Axon body 3, device number X60A1575M. The starting timestamp at the top is 21:21:14 seconds. And the video itself is 2



minutes and 12 seconds long. Go ahead and play the video.
MS. WASKE: Can you see that?
**THE WITNESS: Uh-huh.**
MS. WASKE: I would like the record to be clear that the audio in this video starts at 0.29 seconds.
(Video shown)
MR. MARTINEZ: How about this, let's let madam court reporter take a quick break and then we can go back on the record and discuss.
**THE WITNESS: Sure.**
(A brief recess was taken)
MR. MARTINEZ: All right. We're back on the record at 1:49. Just for the sake of the record, can we identify the timestamp where we stopped prior to the break?
MS. WASKE: One minute 47 seconds.
MR. MARTINEZ: Okay, we can continue to show the video from there.
(Video shown)
MR. MARTINEZ: Is it concluded?
MS. WASKE: Yes.
BY MR. MARTINEZ:
Q. All right. Officer, at the time that this video



started, is it fair to assume this was following your initial conversation with Officer Leithauser?
MS. WASKE: Objection to foundation. I don't know that we've closed the foundational loop as to whether or not this is his body camera footage.
MR. MARTINEZ: He did indicate that the last video, which had the same document -- or serial number rather ending in 1575M did appear to be his video. So this is just a similar video from that device.
MS. WASKE: It's -- it's -- I know, but it's not the same. So I'll just renew my foundational objection.
MR. MARTINEZ: Understood.
MS. DUFRANE: Join.
BY MR. MARTINEZ:
Q. Officer, does this appear to be a continuation of video from your body camera?
**A. I can't really say, sir. I'm trying to look at it one more time here.**
MS. WASKE: I gotcha.
**THE WITNESS: That's a different voice on there now.**



BY MR. MARTINEZ:
Q. I'm sorry, what was that, officer?
MS. WASKE: He indicated to me he's trying to hear if that's his voice.
**THE WITNESS: Yeah, that's my voice.**
BY MR. MARTINEZ:
Q. So fair to assume that moving forward any videos which come from the serial number Axon body 3X60A1575M, which you can see at the top right-hand corner, would be a reference to the body camera device that you were wearing at the time of this incident?
MS. WASKE: Objection to form and foundation.
MS. DUFRANE: Join.
**THE WITNESS: I don't want to go that far because, you know, this technology can always mess up or something. So I cannot -- but I'm thinking because I just heard my voice, but...**
BY MR. MARTINEZ:
Q. Fair enough. At any point in time while you were on scene of this collision, did you swap body cameras with anybody?
**A. No.**
Q. When you have a body camera, you put it on and it

stays on for your entire shift?
A. **Yes, sir.**
Q. And that's what occurred here while you were at the Stephenson and Maple crash?
A. **Yes, sir.**
Q. All right. I'll draw your attention to approximately 1 minute and 16 seconds.
MS. DUFRANE: Still Exhibit 4?
MR. MARTINEZ: Yes, of Exhibit 4, correct.
(Video shown)
MR. MARTINEZ: Can you pause?
BY MR. MARTINEZ:
Q. All right, so at approximately that time, is it fair to say that this camera depicts you approaching Officer Leithauser and another officer on scene who were in the middle of a conversation?
A. **Yes.**
Q. Can you identify the other officer with whom Officer Leithauser is speaking?
A. **Sergeant Bowers possibly. His head's cut off in this.**
Q. Okay. If we need to back it up for you, we can. We might be able to get a better vantage point between 1:16 and 1:20 running time.



A. **Yep, Sergeant Bowers.**
Q. All right. As that conversation is ongoing, we eventually see at around 1 minute and 48 seconds that a third officer approaches from the right of the video.
(Video shown)
BY MR. MARTINEZ:
Q. Do you see that?
A. **It's coming. It hasn't shown up yet.**
Q. Do you see the third officer?
A. **Not yet.**
MR. MARTINEZ: Can we get the timestamp on the record, please?
MS. WASKE: I started it at 1:20. We're playing it to the point where you indicated, which was 1 minute 47 seconds, so you'll have to give me 40 -- 27 seconds.
MR. MARTINEZ: That's okay. No, I just want to make sure the record's clear. Thank you.
**THE WITNESS: Okay.**
BY MR. MARTINEZ:
Q. So you do observe there's a third officer that approaches?
A. **Yes.**
Q. Can you identify that third officer?



A. **Sergeant Hancock.**
Q. All right. In the course of what you've observed here on Exhibit 4, it does capture Officer Leithauser talking about his version of the crash, correct?
A. **Yes, that's correct.**
Q. All right. Captures him stating that what he was told by Mr. Szczesny was that Mr. Szczesny thought he was stopped at a light. Did you hear that?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. All right. It captures Officer Leithauser saying that he couldn't see Tom?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: Yeah, he said he was -- he thought he was stopped at the light.**
BY MR. MARTINEZ:
Q. And I believe Officer Leithauser uses the term, it was just a headlight turning, do you recall that?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: I'm sorry, I don't recall**



**that.**
BY MR. MARTINEZ:
Q. Okay.
A. **I need to look at it again.**
Q. Yeah, if we need to, we can back it up to that, you know, at 1:15, 1 minute and 15 seconds run time.
MS. WASKE: Okay. I am starting the video at 1 minute and 14 seconds.
(Video shown)
BY MR. MARTINEZ:
Q. Did you hear the statement I was referring to?
A. **Yeah, it sounds like to me, he says his headlight wasn't on. That's what it sounds like to me.**
Q. Okay. I will draw your attention here to what I'll show you; it's still within Exhibit 4, and this is at 1 minute and 59 seconds run time. Do you see that?
A. **Yes, sir.**
Q. Okay. So the gentleman that you've identified as Sergeant Hancock makes a motion what appears to be towards your body camera device. Do you see that?
A. **I see the finger, yes, sir.**
Q. Okay. And after --
A. **That's Sergeant Bowers, sir.**
Q. Okay, thank you for correcting me. So

Sergeant Bowers then motions towards your body camera device on this video at that time?
**A. That is correct.**
Q. All right. What did you take that sign or that motion by the sergeant to mean?
**A. That my bodycam was on.**
Q. And did you believe that to be an issue?
**A. It's -- we're not dealing with the public, so we're entitled to not have the bodycams going when we're not dealing with the public.**
Q. Does it change the analysis in your mind that you are speaking to someone who's just been involved in a serious crash?
MS. WASKE: Objection to form and foundation.
MS. DUFRANE: Join.
**THE WITNESS: I don't understand, sir.**
BY MR. MARTINEZ:
Q. So you indicate you're not talking to the general public?
**A. That is correct.**
Q. So tell me why that matters, if you're talking to the general public, why a body camera would need to be on?
**A. So that way the officer doesn't have to endure any**



**frivolous accusations of inappropriate behavior or conduct or anything like that, sir.**
Q. Okay. So is that your understanding of the Troy Police Department policy?
**A. Yes.**
Q. So as long as you're not interacting with the public, you can do whatever you'd like with the body camera?
MS. DUFRANE: Objection.
MS. WASKE: Objection. Form, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: What do you mean by whatever we'd like?**
BY MR. MARTINEZ:
Q. You can turn it on when you'd like, you can turn it off when you'd like?
**A. Yes. When we're dealing with the public, we turn it on. When we're not dealing with the public, we turn it off.**
Q. Okay. So as a responding officer to the crash that Officer Leithauser was involved in, did that factor into your decisions on when to stop the body camera from recording?
**A. We're not dealing with the public, sir.**



Q. All right. And then shortly thereafter, we see that the video stops at, again, 2 minutes and 12 seconds, yes?
**A. Yes, sir.**
Q. All right.
MS. WASKE: I just want to make a note on the record that I'm not sure that you've established that the video stops versus this is how this clip was cut. But that's just for the record.
BY MR. MARTINEZ:
Q. So after the sergeant motioned to you, to your body camera, what did you do?
**A. Turned it off.**
Q. When you turn off a body camera, does that stop the recording?
**A. Yes.**
Q. So it is normal then for this video to stop where it did because you turned the body camera off?
**A. Yes, I turned the body camera off, sir.**
Q. All right. Do you recall being a party to this conversation with Leithauser, Bowers and Hancock, while you were on scene?
**A. No, sir.**
Q. Did you tell anybody at the scene or at the department shortly after that you had heard these



statements from Officer Leithauser?
**A. I don't recall ever doing that.**
(Deposition Exhibit Number 5 was marked for identification)
MR. MARTINEZ: Let's move to what is marked as Exhibit 5.
MS. WASKE: I have two Exhibit 5s.
MR. MARTINEZ: How'd that happen?
MS. DUFRANE: 5 is -- looks like this -- I think it's -- I think it's Leithauser, but I'm not sure.
MS. WASKE: What's the title?
MR. MARTINEZ: On mine it's Exhibit 5.
MS. WASKE: I've got -- if we can just go to the Axon video, I've got 2023-09-22_2117_X60A. And then I also have 9-22_2124.
MR. MARTINEZ: It's the 2124.
MS. WASKE: Okay.
MR. MARTINEZ: And just so I know, are you looking in the drive link I gave you?
MS. WASKE: Uh-huh.
MR. MARTINEZ: I don't know why --
MS. DUFRANE: Mine says 212343. 2023092221:23:43. Is that different than yours?
MS. WASKE: This is how mine is titled.

Exhibit 5-Axon, underscore body, underscore 3, underscore video, underscore. Just so the record's clear, underscore 2023-09-22_2124_X60A1575, the letter M as in Mark dot MP4.
MR. MARTINEZ: Yeah. So that is the video that is marked as Exhibit 5. So we can go ahead and we can start playing that from the beginning.
MS. WASKE: And I'll just add that this video appears to be 6 minutes 42 seconds in length.
MR. MARTINEZ: Yes, and the starting time in the upper right corner of the video is 21:23 and 43 seconds.
BY MR. MARTINEZ:
Q. Who is it that we see in this video, Officer?
MS. WASKE: I've stopped the video at 023 seconds, and just for the record there still is no sound.
**THE WITNESS: At 23 seconds you want me to see --**
BY MR. MARTINEZ:
Q. No, let's -- at the very beginning. I'm sorry, I'm not able to see the screen that you're viewing it off of, so I don't know exactly what it is that you're seeing?



**A. So like, the beginning of the video, sir?**
Q. Correct.
**A. She's backing it up. There's Officer Leithauser and Sergeant Hancock at the time, that's it.**
Q. Okay. At four seconds there was another individual in the distance there. Do you see the two officers walking away?
**A. Yes, sir.**
Q. Can you identify --
**A. That's both sergeants. That's Sergeant Hancock and Sergeant Bowers, sir.**
Q. Thank you. We can resume from there. Can we pause right here?
MS. WASKE: Make this a fuller screen.
MR. MARTINEZ: For the record, where did we pause?
MS. WASKE: 044 seconds.
MR. MARTINEZ: All right.
BY MR. MARTINEZ:
Q. Officer, does this appear to be a continuation of your body camera video?
**A. Yes, sir.**
Q. All right. So at approximately 30 seconds you encounter an individual on the scene of this crash, correct?



**A. Yes, sir.**
Q. All right. Is the person depicted in this video who you believe was Autumn Campbell?
**A. Yes.**
Q. All right Is this the body camera footage that was later provided to Officer Allan?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. All right. How did you come to speak with Autumn Campbell?
**A. She showed up on the scene, sir.**
Q. And who identified her to you?
**A. I saw her.**
Q. And then how was she identified to you? Did she identify herself?
**A. Yes.**
Q. Okay. What did you know about her before speaking with her as we see in Exhibit 5?
**A. I don't quite understand. I don't know anything about her.**
Q. Then that may be the answer then. I was looking to find out whether or not you had any information about who she was prior to her making contact with



you?
**A. This is the first time I've ever seen this woman in my life.**
Q. All right. How did she appear to you when you first made contact with her?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: Concerned.**
BY MR. MARTINEZ:
Q. Did she seem upset?
**A. And concerned, upset and concerned, sir.**
Q. What was the purpose in speaking with her at the scene?
**A. She knows the victim.**
Q. Okay.
**A. Or your client, I should say.**
Q. Walk me through the conversation beginning to end from your recollection?
**A. I'm going to have to watch it, sir.**
Q. Okay. Do you recall whether she told you anything about Mr. Szczesny?
MS. WASKE: Objection, foundation.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. What did she tell you?

**A. I want to get it right, sir, for you. So I'd like to watch it if possible.**
Q. I'm just looking to understand what it is you do recall today prior to seeing the video.
**A. A timeline of their day.**
Q. And what do you recall of that timeline as we sit here today?
MS. WASKE: Objection, foundation.
**THE WITNESS: They attended a funeral home or a funeral for I believe she said a little boy. I know she got the name of the funeral home incorrect. She called it Auschwitz.**
BY MR. MARTINEZ:
Q. And what was the proper name of the funeral home?
**A. Mandziuk.**
Q. Okay.
**A. That they had been partying pretty much ever since the funeral home.**
Q. Did she ever use the terms "we" or "they" in any part of the interview that you can recall right now?
MS. WASKE: Objection, foundation.
**THE WITNESS: I'd have to watch it, sir, to get it right for you.**
BY MR. MARTINEZ:
Q. Understood. So as we sit here, do you know



specifically what Autumn Campbell had told you about whether or not Mr. Szczesny consumed alcohol that day?
MS. WASKE: Objection, form, foundation, argumentative.
**THE WITNESS: I don't remember at this time, but I'd have to watch the video.**
MR. MARTINEZ: Okay. We can go ahead and start playing the video where we left off, which I believe Ms. Waske, you said 44?
MS. WASKE: Correct.
MR. MARTINEZ: Forty-four seconds.
(Video shown)
MR. MARTINEZ: Can you pause there?
MS. WASKE: Pausing the video from -- per the request of plaintiff's counsel at 2 minutes, 26 seconds.
BY MR. MARTINEZ:
Q. All right. So up to this point in time, what can you tell me about the observations that you make of Autumn Campbell?
**A. She's frazzled, she's concerned, she's scared for him, probably wondering what's going to happen to him.**
Q. At this point in time, you had no idea what



Autumn Campbell sounds like on a regular day, right?
**A. Never met her before.**
Q. This is the first time you've ever had any encounter with her whatsoever?
**A. Never met her before.**
MS. WASKE: Objection to form.
BY MR. MARTINEZ:
Q. Do you observe anything about her manner of speaking or the way that she's conducting herself here that you believe is of note?
**A. Her mannerisms she's -- she's -- she's nervous.**
Q. Tell me all the reasons why you believe that she appears nervous?
**A. Hands clenched over her mouth, playing with her hair, not standing still.**
Q. And so it is clear on the record, you're facing Ms. Campbell and Ms. Campbell is facing in the direction where Mr. Szczesny is laying on the ground; is that fair?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: It's fair to say she's moving around, but right now she's facing what would be my right shoulder.**



BY MR. MARTINEZ:
Q. Does it appear to you that she is looking around you or trying to look around you to observe what's happening with Mr. Szczesny?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: No.**
BY MR. MARTINEZ:
Q. How would you characterize it?
**A. Nervous, again hands clenched, playing with her hair, not being able to stand still.**
Q. Did you read anything into that nervousness that you describe today?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. What is it that you read into it?
**A. Well, I could tell that she's probably been drinking herself. I can smell it. Her pupils were dilated, so...**
Q. And at this point in time, we agree that there are a lot of oscillating lights from the tops of police vehicles in the area, yes?
MS. WASKE: Objection to form.

MS. DUFRANE: Join.
**THE WITNESS: Oscillating lights are behind her. There is the EMS truck, I think that's a headlight.**
BY MR. MARTINEZ:
Q. Okay. I'm going to show you where I've stopped Exhibit 5 at 2 minutes and 23 seconds. Do you see light reflecting off of Ms. Campbell?
MS. WASKE: Objection to form.
**THE WITNESS: Might be your screen, sir, because it looks different on mine.**
BY MR. MARTINEZ:
Q. So at this part here, what color does Ms. Campbell appear where I pause the video at 2 minutes and 43 seconds?
(Video shown)
**A. Just pause it right here. Might be your screen. You might have one of those high-definition fancy screens.**
Q. So at this point in time though, we can see even on this screen -- can we get the brightness up a little bit?
MS. WASKE: That's as far as it goes.
MR. MARTINEZ: Okay, all right.



BY MR. MARTINEZ:
Q. Well, as it appears then, sir, on my screen, which as you've described as one of those high-def screens --
**A. Fancy.**
Q. Yeah. What color does the light on Ms. Campbell appear to be?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: It could be the richness from the screen, it could be the lights because my partner off to the side is not all lit up.**
BY MR. MARTINEZ:
Q. Okay, so here, just for the sake of this discussion, I will back it up to 2 minutes and 41 seconds on mine. Do you see lights flashing and reflecting off of Ms. Campbell?
MS. WASKE: Objection to form, asked and answered, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: I do see lights flashing.**
BY MR. MARTINEZ:
Q. Okay. So fair for us to say there are lights at a frontward vantage point, which are reflecting off of Ms. Campbell?



MS WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: Kind of disagree with you, Counsel. The lights are behind her, sir.**
BY MR. MARTINEZ:
Q. All right, thank you. So at this point in time when you are talking with Ms. Campbell, did you observe any resting nystagmus in her eyes?
MS. WASKE: Objection to form and foundation.
MS. DUFRANE: Join.
BY MR. MARTINEZ:
Q. Based on your training and experience --
MS. WASKE: Hold on --
BY MR. MARTINEZ:
Q. -- with OWI investigations --
MS. WASKE: -- let him answer your question. Let him answer your question. I didn't assert a privilege. He can answer your question.
**THE WITNESS: I wasn't doing an OWI investigation, sir.**
BY MR. MARTINEZ:
Q. But you were drawing conclusions that were relevant to an OWI investigation; isn't that right?
**A. I was drawing conclusions based on my training and**



**experience when someone is intoxicated or not. I wasn't doing an OWI investigation, sir. I was just speaking with her.**
Q. Okay. Break that down for me. How is that different, your experience? How is that informed your interactions here versus what you're trained in the OWI investigations training that you described for me earlier?
**A. Not put anybody through a sobriety test, sir.**
Q. Okay.
**A. So, I was just having a conver -- I'm sorry, I didn't mean to cut you off. Just a -- I was just having a conversation with her.**
Q. So at this point in time are you viewing Autumn Campbell as a suspect in any way, shape or form?
**A. No. Just having a conversation with her, sir.**
Q. All right. So at this point in time, you observed what you described as the odor of alcohol on Ms. Campbell, right?
**A. That is correct.**
Q. All right. And then you attribute her nervousness as being a sign of impairment?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.

**THE WITNESS: Part of it. I think it's captured on there when -- towards the end of the bodycam how much she consumed.**
BY MR. MARTINEZ:
Q. We can get to that. I appreciate that you have a recollection of the video so clearly.
Now when it comes to how you weigh all of these factors, she's looking at her boyfriend who appears to be seriously injured to you -- to her. How then do you, as a law enforcement officer, distinguish if the nervousness that she's displaying is from that and observing that, Mr. Szczesny in the condition that he was versus alcohol?
MS. WASKE: Objection to form, foundation, argumentative, assumes facts not in evidence, attributing factual feelings to a person who has not provided testimony in this case.
MS. DUFRANE: Join.
MS. WASKE: If you can answer, you may answer.
MS. DUFRANE: Join.
**THE WITNESS: One more time. You lost me.**
BY MR. MARTINEZ:
Q. Okay. So we've described that you've observed



nervousness, yes?
**A. That is correct.**
Q. We have established that Ms. Campbell is facing in the direction where Mr. Szczesny is on his back following this crash, correct?
**A. At points, at times.**
Q. Okay. So as the officer who is interviewing Ms. Campbell, how do you then distinguish whether the nervousness that she is displaying, in your opinion, is from the scene that she is experiencing involving Mr. Szczesny in the condition he was in versus alcohol and intoxication or impairment leading her to appear that way?
MS. WASKE: Objection to form. It's a very compound question. Do you think it would be possible to break it down further?
BY MR. MARTINEZ:
Q. Officer, do you understand the question as I've asked it?
**A. I think so. I think it's going to be a totality of the circumstances. She's drunk, she drove there, she probably feels that she's going to get in trouble. She shows that her boyfriend called her from the ground, he called her on her cell phone. So I think it's probably a totality of the**



**circumstances.**
Q. What evidence did you have to say that Autumn Campbell drove there?
**A. She came running from across the street.**
Q. Okay. Did she tell you where she was coming from?
**A. I think it's mentioned in the video. I'd have to watch it again, sir.**
Q. Did you ever observe Autumn Campbell operating a motor vehicle on the night of September 22, 2023?
**A. She was not the focus.**
Q. Did she tell you that she drove there?
**A. No.**
Q. How do you draw that conclusion that she drove there?
**A. Because she came running from the parking lot across the street.**
Q. And how do you know that that was her that would have driven there as opposed to somebody else who brought her?
**A. I don't know that.**
Q. Okay. So this is just a conclusion that you drew on your own?
**A. Yes, sir.**
MR. MARTINEZ: Okay, all right. We can continue the video where it's paused.



MS. WASKE: Starting the video from 2 minutes and 24 seconds.
(Video shown)
MR. MARTINEZ: Pause that, please.
MS. WASKE: I'm pausing the video at 3 minutes and 33 seconds.
BY MR. MARTINEZ:
Q. All right. So we can see on this video, roughly starting at about 3 minutes and 20 seconds, there's an obstruction in front of the video. Do you see that?
**A. Yes, sir.**
Q. Why is it that we can no longer see out of the camera at this point?
**A. Probably because I'm holding my hand in my notebook writing.**
Q. Okay. So at this point in time, you were writing notes into a notebook of some kind?
**A. Yes, sir.**
Q. Is it a memo pad?
**A. A memo pad? It's just a -- it's a notebook.**
Q. Like one of the small ones, the pocket-sized notebooks?
**A. Yes, sir.**
Q. Okay. All right. So then at this point in time at

approximately 3 minutes and 30 seconds, Ms. Campbell asks you a question about whether or not Mr. Szczesny is okay. Did you hear that?
A. **Yes, sir.**
Q. And what did you tell her?
A. **He's fine.**
Q. Okay. What led you to believe at that point in time Mr. Szczesny was fine?
A. **He wasn't dead, he wasn't bleeding, he didn't have any missing limbs, and he was being treated and put on the gurney to be transported to the hospital.**
Q. So at that point in time, how did you mean the term "fine"?
A. **He's alive.**
MR. MARTINEZ: All right. We can pick up where the video is paused.
MS. WASKE: Starting the video from 3 minutes and 33 seconds.
(Video shown)
MR. MARTINEZ: We can pause the video there.
MS. WASKE: Pausing the video at 6 minutes and 28 seconds.
BY MR. MARTINEZ:
Q. All right. So at any point in time, did you ask



Autumn to identify who she meant as "we" when she was making statements to you about we drank a pint?
A. **No, I did not ask that question.**
Q. Did you ever ask at any point in time how much Tom Szczesny personally drank?
A. **No, I didn't ask her that question, sir.**
Q. Did Autumn Campbell ever tell you how much Tom personally drank?
A. **No, I did not. The interview concluded.**
Q. Did Autumn Campbell ever say she personally saw Tom drink?
A. **No, just when she mentioned "we."**
Q. And again, you didn't ask her to define what she meant by "we," correct?
MS. WASKE: Objection, asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: They are a couple.**
BY MR. MARTINEZ:
Q. Are they a couple with everybody at the wake?
MS. WASKE: Objection, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: She said, "We split a pint."**



BY MR. MARTINEZ:
Q. Did you ask her what she meant by "we split a pint"?
A. **No, sir.**
MS. WASKE: Objection, asked and answered.
BY MR. MARTINEZ:
Q. Did Autumn say at any point in time that she saw Tom drink from the pint?
MS. WASKE: Objection, asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: No.**
BY MR. MARTINEZ:
Q. Did she ever say that the pint was shared equally between them?
MS. WASKE: Objection, form, asked and answered. I think he's given you a pretty clear answer to this line of questioning. You can go ahead and tell him one more time what your answer is.
MS. DUFRANE: Join.
**THE WITNESS: No.**
BY MR. MARTINEZ:
Q. Okay. Did she ever indicate to you that Tom Szczesny was intoxicated?



A. **No.**
Q. Did she ever indicate to you that she believed Tom Szczesny was impaired?
A. **She did not say that to me.**
Q. Did she ever say that Tom Szczesny was under the influence?
A. **She did not.**
Q. All right. So at the time that you claim you observed the odor of alcohol or intoxicants, I believe was your term, coming from Mr. Szczesny, how long were you in the vicinity where you claim to smell that?
A. **Enough to -- enough to smell. Long enough to smell I mean.**
Q. Are we talking under a minute or over a minute?
A. **I can't say.**
Q. Are we talking under 30 seconds?
A. **Again, sir, long enough to smell. I don't know. I wasn't -- I didn't go over there and stand over him or anything like that.**
Q. What does "long enough to smell it" mean to you?
MS. WASKE: Objection, asked and answered.
**THE WITNESS: To take a breath in.**

BY MR. MARTINEZ:
Q. Did you ever undertake any efforts to determine whether what you were smelling was emanating from Mr. Szczesny as opposed to anything or anyone else at the scene?
**A. No one else would have been drinking.**
Q. Fair point. At the time that you went over to Mr. Szczesny and where you claim that you smelled this odor of intoxicants, had the medics arrived at that point?
**A. I do not remember.**
Q. At that point in time, do you have any recollection of the medics applying any sort of antiseptic wipes or alcohol wipes to Mr. Szczesny's skin?
MS. WASKE: Objection, foundation.
**THE WITNESS: I'd have to go back and see on the video and see if the medics had arrived. I don't remember.**
BY MR. MARTINEZ:
Q. Do you believe we have video showing the moment when you went over to Mr. Szczesny?
**A. Haven't we watched -- haven't we gone through it?**
Q. We can certainly go back to -- I believe Exhibit 4 may get us close there. But I'll represent to you that I don't know that you had gotten close to



Mr. Szczesny in that video, but we can watch it again.
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
MR. MARTINEZ: Are we starting the video?
MS. WASKE: Uh-huh.
MR. MARTINEZ: Okay. For the record, Exhibit 4 has been started from the beginning time code.
(Video shown)
**THE WITNESS: Right here.**
MS. WASKE: He's asking me to stop the video at 24 seconds.
MR. MARTINEZ: Okay.
**THE WITNESS: One second, sir.**
MS. WASKE: We're rewinding it ten seconds.
MR. MARTINEZ: Sorry, 14 seconds?
**THE WITNESS: One second, sir.**
(Video shown)
MS. WASKE: We started at ten seconds. Twenty-two seconds, he's indicated that he'd like me to stop the video.
BY MR. MARTINEZ:
Q. So what we see here at 22 seconds, is this where --



the moment where you claim that you observed the odor of intoxicants on Mr. Szczesny?
MS. WASKE: Could you give him a second to actually -- he wants to give you a good answer. He's trying to watch to make sure that he gives you the best possible answer. Could you give him a second just to review your exhibit?
MR. MARTINEZ: As long as I know exactly what he's looking at.
MS. WASKE: Sure, and I'll tell you exactly where he stops -- stops at, but he started it at the beginning.
**THE WITNESS: I'm pretty close at 26. Go to 26, sir, from probably -- goddamn it. I screwed this whole thing up.**
MS. WASKE: No, no, it's okay, it's because you're hitting that one.
**THE WITNESS: Oh.**
MS. WASKE: Yeah.
MR. MARTINEZ: Can I get the time code that's in front of the officer right now?
MS. WASKE: Okay. Hold on, hold on a second. This is no different than you'd be showing him a document. Give him an opportunity to watch what he wants to watch, and then when he's says like



this is what I want to talk about, he'll tell you where he's starting. Give him a second just to go through. It's your exhibit. No one's showing him a new video. Just give him a second.
MR. MARTINEZ: I understand, Ms. Waske, I just want it clear on the record precisely what he's looking --
MS. WASKE: And I will make it clear on the record. I don't know that he knows yet where he's at. So give him a second to review the exhibit. As soon as he tells me this point, I will give you a timestamp, okay?
MS. DUFRANE: It's no different if he were reviewing something -- he was reading something.
MR. MARTINEZ: Thank you.
MS. WASKE: If you would like to next time we have a deposition bring your own screen and then you can control the video, that's fine. But give him a second to review the exhibit and I will make sure that you understand exactly where he's looking, okay?
MR. MARTINEZ: Fair enough.
MS. WASKE: Is this where you feel like you were closest to Mr. Szczesny when you first

approached him, when you arrived on the scene?
**THE WITNESS: Yeah. So anything going back -- from the start of --**
MS. WASKE: So start at 24 seconds up until 29 seconds?
**THE WITNESS: Yeah, like, yeah, 23, 24 all the way to 29.**
MS. WASKE: Okay.
**THE WITNESS: I was very -- I was close, sir.**
BY MR. MARTINEZ:
Q. So your testimony today is as we observe beginning at 24 seconds until approximately 28 seconds?
**THE WITNESS: Two nine, sir.**
BY MR. MARTINEZ:
Q. Twenty-nine seconds. This was the closest that you came to Mr. Szczesny throughout this encounter?
**A. Yep, I was -- that's I was -- that's where I was closest.**
Q. All right, and for the record, in this video, we do observe Mr. Szczesny's upper torso in the bottom left corner of the video and his head is facing straight ahead. He is lying on his back. There is an item in his left hand. So from this vantage point right here, that is where you testified today



that you were able to smell the odor of intoxicants?
**THE WITNESS: Can we make this bar go away?**
MS. WASKE: Yeah, here. No, I can't make the bar go away because that's the time stamp. But what I can do is I can take it to full screen now. I will back it up to 29 seconds. That is the full bar. There you go.
(Video shown)
**THE WITNESS: Yeah, so starting right at 22 to 29, I was close to your client, sir.**
BY MR. MARTINEZ:
Q. How close were you to my client, sir?
**A. Close enough to smell.**
MS. WASKE: Objection to form.
MS. DUFRANE: And asked and answered.
BY MR. MARTINEZ:
Q. Based on your training and experience as a law enforcement officer, how much distance is between you and Mr. Szczesny at the moment you claim to smell the odor of intoxicants?
MS. WASKE: Objection, form, foundation, asked and answered, argumentative. He has answered this question for you at least 12 times.
MS. DUFRANE: Join.



MS. WASKE: Tell him again one more time, Officer Parra.
**THE WITNESS: I can't give you an accurate feet because I don't want to get locked into something. It was close enough for me to smell.**
BY MR. MARTINEZ:
Q. Based on your review of this video, do you believe that you were under ten feet away from Mr. Szczesny?
MS. WASKE: Objection, asked and answered. Just because you don't like that he's not giving you the exact answer that you're looking for does not mean that the more times you ask it, he's going to answer it differently. He is doing his best to answer your question. Tell him one more time, Officer Parra, what your answer is and then we will be moving on.
**THE WITNESS: I don't have an exact feet or measurement.**
BY MR. MARTINEZ:
Q. Does your training in OWI investigations tell you that there's a specific distance you should be from someone before attempting to allege that a person smells like intoxicants?
MS. WASKE: Objection, argumentative.



MS. DUFRANE: Join.
**THE WITNESS: I wasn't doing an OWI investigation, sir.**
MR. MARTINEZ: That wasn't my question. Can I ask him the question again?
MS. WASKE: Objection, it kind of was your question because you asked him about his experience in OWI investigations, and his answer to you was that at that time he was not conducting an OWI investigation.
BY MR. MARTINEZ:
Q. Do you leave your knowledge and training behind you whenever you respond to a scene or does it all come with you?
MS. WASKE: Objection, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: I don't quite get the question. Is it a sarcastic question or something? I don't quite get it.**
BY MR. MARTINEZ:
Q. No, the question is intended to ask, you carry your knowledge and experience with you at all times when you're a law enforcement officer, right?
**A. For the most part, yeah.**
Q. Okay. So does your training and experience tell you

that there is a proper distance to be away from somebody before you try to make a determination that somebody smells like alcohol?
MS. WASKE: Objection, form.
MS. DUFRANE: Join.
**THE WITNESS: What I can tell you, sir, is that I got close enough to smell your client, and I smelled alcohol or the odor of intoxicants. I can't tell you if it was two feet, five feet, seven feet, but I was close enough, sir.**
BY MR. MARTINEZ:
Q. Based on your knowledge, training and experience, does the odor of alcohol appear on a person at any amount of alcohol that they consume or does it generally come about at a certain point of intoxication?
MS. DUFRANE: Object to form of the question.
MS. WASKE: Join.
**THE WITNESS: Probably depends on the sensitivity of the nose.**
BY MR. MARTINEZ:
Q. And are you saying you have a fairly sensitive nose?
**A. I think I have a regular nose.**
Q. And what do you define as a regular nose?



MS. WASKE: Objection, form, foundation.
**THE WITNESS: It's not overly sensitive or underly sensitive.**
BY MR. MARTINEZ:
Q. All right. So at some point in time, once you finish talking with Ms. Campbell, she makes a reference to wanting to speak with an attorney, correct?
**A. I think she says, I'm just not going to answer your questions, I'd like to help the investigation.**
Q. If it depicts it in the video that she said she wants to talk to her lawyer --
**A. Yeah. Yeah, absolutely, if it depicts it, absolutely. I just -- I'm sorry, I don't remember.**
Q. So at that point in time, had you completed your interview with her?
**A. No.**
Q. What else did you still want to ask her but didn't get the opportunity to?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: Probably some of the questions you're hammering me on.**
BY MR. MARTINEZ:
Q. All right. So after you spoke with Autumn Campbell,



what did you do from there?
**A. What did I do from there. I'm assume -- I went back to the station. I can't tell you what I did, like chronological or timeline. I mean this was three years ago, sir.**
Q. How long after you spoke with Ms. Campbell did you return to the station?
**A. I don't remember, sir. I really don't.**
Q. Would it be under a half hour?
**A. I don't know. Probably maybe once your client was loaded up and went to the hospital, maybe. And then the motorcycle was impounded.**
Q. At the time that you went back to the station, what were you doing?
**A. Well, went back to the station, gave them the information that I obtained probably from my bodycam.**
Q. Who did you give the information to?
**A. I don't remember. Whoever was investigating it.**
Q. Did you participate in any briefings or discussions about this accident when you got to the station?
**A. Probably just told them, hey, you guys need to watch my bodycam.**
Q. Who would you have told that to?
**A. To whoever's in the traffic office.**



Q. As you sit here today, can you tell us who was in the traffic office at the time you arrived back to the station?
**A. Man. Sir, I'm sorry, I just don't know or remember who was back there.**
MS. WASKE: I'm just going to say it's 2:42; we've been going for a couple hours. Do you need a break?
**THE WITNESS: No, I'm good.**
MS. WASKE: Okay.
BY MR. MARTINEZ:
Q. So when you arrived back to the station, you made a motion earlier like you handed off your body camera; is that what occurred?
**A. No, I probably put it -- I put it in the charger.**
Q. Where does that charger exist at?
**A. It -- I'm assuming you've never been to our station, so it's just around the corner from the command desk where the prep batteries are and the bodycam cradle is.**
Q. Is that a part of the traffic safety unit office?
**A. No, sir.**
Q. Did you ever have a conversation with Scott Allan about what you observed at the scene?
**A. Probably.**

Q. What leads you to say that?
**A. I think he offered the search warrant.**
Q. So are you aware of the facts that he was at the station or are you guessing?
**A. I -- I don't remember.**
Q. At any point in time after returning to the Troy Police Department, did you have a conversation with Gail Parra about what you observed at the scene?
**A. Don't remember.**
Q. What do you recall telling Scott Allan about your observations?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: Just you need to watch my bodycam footage. I talked to the girlfriend. That would be -- pretty sure was what I told him.**
BY MR. MARTINEZ:
Q. How long would this conversation have happened for?
**A. A minute, a minute and a half, maybe a little bit longer.**
Q. Can you tell me everybody who was present at the time when you had this conversation?
**A. I'm sorry, sir, I can't.**
Q. Did you ever provide information to any other officer that Autumn Campbell used the word "we" when



describing the pint of alcohol that she explained to you?
MS. WASKE: Objection, foundation.
**THE WITNESS: They would have had to watch my bodycam footage, sir.**
BY MR. MARTINEZ:
Q. Nothing on your body camera shows any clarification of how the term "we" was being used in that conversation, correct?
MS. WASKE: Objection, form.
MS. DUFRANE: Join.
MS. WASKE: And foundation.
MS. DUFRANE: Join.
**THE WITNESS: Like the context?**
BY MR. MARTINEZ:
Q. Correct.
MS. WASKE: Same objections.
**THE WITNESS: Can we go back to that part where I see her on the bodycam footage? Because I almost want to say she points inadvertently to him when she says "we." Can I -- can I look at that please?**
MS. WASKE: I'm opening up Exhibit 5. I'm starting at 2 minutes and 22 seconds. I'm not exactly clear on where exactly that part of the



video is, but that's where I'm starting it.
(Video shown)
**THE WITNESS: You see that?**
MR. MARTINEZ: So just to be clear --
MS. WASKE: Hold on, hold, on. Let me back it up. Let me give Mr. Martinez the timestamp here. We are about 4 minutes and 12 seconds into the video.
(Video shown)
MS. WASKE: His hand --
**THE WITNESS: Her hand.**
MS. WASKE: -- oh, her hands are at 4 minutes and 17 -- yes, 4 minutes and 17 seconds.
BY MR. MARTINEZ:
Q. So what I'm showing the officer right now is that exact timestamp, 4:17. She's making eye contact with you, right?
**A. Yeah, she's looking at me when she's talking to me.**
Q. Okay. And she's talking with her hands as she's describing this situation to you?
**A. "We," she went "we."**
Q. Is that what you're saying she's doing here?
**A. One hundred percent, sir.**
(Video shown)
**THE WITNESS: His buddy -- she points to him again.**



MS. WASKE: That's at 4 minutes and 26 seconds.
BY MR. MARTINEZ:
Q. So was it your understanding at that point in time that she's pointing to Mr. Szczesny to reference his friend whose son died?
**A. And then, "We split a pint."**
Q. Okay. So again the question was, at the time that you're indicating that she motioning to Mr. Szczesny the second time, it's because she's referencing to you that we had gone to a wake for a friend's son?
**A. Yes. Probably inadvertent hand motions, you know, subconscious when indicating somebody else, we did this, we did that, so on and so forth.**
Q. What training have you received on interpreting subconscious clues?
**A. Can't remember.**
Q. What are you basing this off of as you're testifying today?
**A. Interviewing individuals, talking to people.**
Q. So what do you base it off of, aside from the fact that you've interviewed other people over the course of your law enforcement career?
MS. WASKE: Objection, asked and

answered.
**THE WITNESS: Based on my training, based on my experience, I've taken again, interrogation classes, interview classes. I've taken many witness statements, I've taken many victim statements, I've taken many confessions. I've spoken to many people, thousands of people probably. You get a sense to what -- how people talk, how people react and how honest and how not honest they are.**
BY MR. MARTINEZ:
Q. Do you believe Autumn is being honest?
**A. Yes.**
Q. At this point in time, having never met Autumn Campbell before, did you have any understanding of her mannerisms?
**A. No.**
Q. And in the course of this conversation, you did not ask whether she was referring to we drank a pint versus we bought a pint, correct?
MS. WASKE: Objection, form, foundation, asked and answered.
MS. DUFRANE: Join, join, join.
**THE WITNESS: Again, she showed up at the scene, that's his girlfriend, we did this, we did that.**



BY MR. MARTINEZ:
Q. And then later in this video, we heard Ms. Campbell call out to somebody who's in the distance. Do you recall that?
**A. Yes, I do, sir.**
Q. There's a moment when she momentarily stops talking to you and her attention is directed off to her right, your left.
**A. Okay.**
Q. Do you recall seeing that?
**A. Yes, sir.**
Q. So at this point in time there are other people on scene who Ms. Campbell clearly knows, right?
MS. WASKE: I'm just going to -- my review of the video, she's motioning to the left of the screen. I think it probably would have been her right.
MR. MARTINEZ: Her right, his left.
MS. WASKE: Correct.
MR. MARTINEZ: Yes.
MS. WASKE: Just so that that's clear. Go ahead, and give your answer.
**THE WITNESS: I'm sorry, can you say it one more time?**



BY MR. MARTINEZ:
Q. So she then is motioning off again, her right, your left, to other individuals on scene that she knows?
**A. Yes, they were telling her not to talk to me.**
Q. Okay. How long were those people on scene for?
**A. No idea, sir.**
Q. They could have been behind you this entire time you were talking with Ms. Campbell?
**A. Again, I don't know where they were, sir.**
Q. They could have been the people that brought Ms. Campbell to the scene, right?
MS. WASKE: Objection, foundation.
**THE WITNESS: Again, I don't know where they were, sir.**
BY MR. MARTINEZ:
Q. And that's ultimately the point, is we don't know that because your focus at this point in time is just on Ms. Campbell, right?
MS. WASKE: Objection, form, foundation, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: I was having a conversation with Ms. Campbell, yes, sir.**
MR. MARTINEZ: All right.



(Deposition Exhibit Number 6.
was marked for identification)
BY MR. MARTINEZ:
Q. I'm going to hand you what's been marked for identification as Exhibit 6. Can you tell me what this document is that we're looking at?
**A. It's a page from my notebook -- or yeah.**
Q. For the record Exhibit 6 has a Bates stamp at the bottom that says city0020. Is this page from your notebook the information you were writing down while you were at the scene of the incident at Maple and Stephenson?
**A. Yes, sir.**
Q. So when the -- when we see the -- the video on your body camera go dark but still hearing sound, this is -- these are the notes that you were writing which caused that obstruction?
**A. That's correct, sir.**
Q. All right. At any point in time in your notes here, do you identify any information about whether or not Mr. Szczesny had been drinking?
**A. One pint, went to buddy's son died -- died at the wake 5-ish. Funeral home, 18 and Ryan. Drank at funeral home, 6 p.m.**
Q. All right. Was 6 p.m. the time that Ms. Campbell

gave you?
**A. I don't remember, sir.**
Q. Would you have written it down if she hadn't given you that time?
**A. Probably not.**
MR. MARTINEZ: Just for the record, I'm starting Exhibit 5 at 4 minutes 27 seconds. I'm showing the screen to the witness.
(Video shown)
MR. MARTINEZ: Pause the recording at 4:45 run time.
BY MR. MARTINEZ:
Q. What time did you hear Ms. Campbell just tell you?
**A. Between 5 and I thought she was leading on -- didn't she say 6?**
Q. Oh, here we can -- I'll start it at 4:42.
(Video shown)
MR. MARTINEZ: Pausing at 4 minutes and 53 seconds.
MS. WASKE: Well I just -- I don't want to lead my client. I don't want to get accused of making a speaking objection. I will just say if you allow the video to play through, I think you will get your question answered, but you keep stopping it.



BY MR. MARTINEZ:
Q. Would that assist you, Officer?
**A. Yes, please.**
Q. All right, we will resume where we left off at 4 minutes 53 seconds.
(Video shown)
MR. MARTINEZ: Pausing the video at 6:08.
BY MR. MARTINEZ:
Q. So Ms. Campbell gives you two times in the span of what we just reviewed, correct?
**A. Sounds like it.**
Q. She initially tells you 5 p.m. and then later estimates it to be 6 p.m., correct?
**A. Yes, sir.**
Q. Why was it that only 5 -- or 6 p.m. was added to your note?
**A. No idea.**
Q. Did you believe the time to be uncertain based on the information she gave you?
**A. No. Just didn't make it into my notes, that's all.**
Q. All right, and then your written notes from your field notes, rather, ultimately informed the report you made, correct?
**A. You asked me if I used my notes to write my report?**
Q. Correct.



**A. That's correct, sir.**
Q. All right.
(Deposition Exhibit Number 7 was marked for identification)
BY MR. MARTINEZ:
Q. I'm going to hand you what's been marked for identification as Exhibit 7. I'll represent to you this is obviously just an excerpt of the report?
MS. WASKE: Take your time, read it.
BY MR. MARTINEZ:
Q. Did you have an opportunity to review Exhibit 7?
**A. I did.**
Q. Does this comprise the entirety of the report you prepared in this matter?
**A. Yes.**
Q. I think some people have referred to this as a point?
**A. Yeah, it just means it's just another report.**
Q. All right. So the information that you put here in your report is that you, upon your arrival, check to see if Officer Leithauser needed medical attention, which he did not?
MS. WASKE: Objection to form.
BY MR. MARTINEZ:
Q. Do you see that?



MS. WASKE: Can you direct the witness to where you were reading from?
MR. MARTINEZ: Yes, it's the very first sentence -- first two sentences, rather, of his report.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. All right. So then after that, it goes on to state that during the course of the investigation, I was able to speak to a female that approached the crash scene, now identified as Autumn Campbell. Do you see that?
**A. Yes, sir.**
Q. All right. Now it goes on in the next paragraph that you wrote here, "While speaking to Campbell, I was able to gather the following information regarding the whereabouts and some of the activities prior to the crash occurring." Do you see that?
**A. Yes, sir.**
Q. All right. She had -- Campbell advised Szczesny had called her to advise that he was involved in a crash. She was able to provide the full name and date of birth and believed he resided on Alger Street in Madison Heights. Do you see that?
**A. Yes, sir.**

Q. All right. That prior to the crash, they were at a friend's house in Troy by the name of Dave Koehler and he resides near a street named Vermont. Do you see that?
**A. Yes, sir.**
Q. What was your understanding of the distance between Vermont Street and this accident scene?
**A. It's not far.**
Q. What do you mean by that?
**A. It's -- it's Livernois -- it's Livernois and Maple area, and we're at Stephenson and Maple.**
Q. Would this be under a mile?
**A. About a mile, sir.**
Q. All right. So then, Campbell further stated they were at a wake for a friend, his son had passed away. She believed the name of the funeral home was Auschwitz with the fancy cars in Troy at 18 Mile and Ryan, correct?
**A. Yes, sir.**
Q. Did you include any of the other attempts that Ms. Campbell had made to identify the location of the funeral home?
MS. WASKE: Objection, form, argumentative.
MS. DUFRANE: Join.



**THE WITNESS: Fancy cars, Auschwitz, 18 Mile and Ryan.**
BY MR. MARTINEZ:
Q. And that was the entirety of what you captured in your report?
**A. Which was basically what she said.**
MR. MARTINEZ: Basically but not exact, right?
MS. WASKE: Objection, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: She said Auschwitz, she said fancy cars, 18 Mile and Ryan.**
BY MR. MARTINEZ:
Q. Was that all that you heard in the video today?
**A. That's basically what she said.**
Q. All right. Now you go on after you identify the Mandziuk Funeral Home. And for the court reporter, it's written in the report at M-A-N-D-Z-U-I-K Funeral Home. Goes on to say, "I then inquired how much they have had to drink. She advised they had a pint around 6 p.m. and they did not have dinner." Do you recall that?
**A. Yes, sir.**
Q. And you've noted that in your report?
**A. It is.**



Q. And you did not include the initial time she provided of 5 p.m.; is that right?
MS. WASKE: Objection, form, argumentative.
MS. DUFRANE: Join.
**THE WITNESS: Yeah, you're right, it's not in there.**
BY MR. MARTINEZ:
Q. All right. Then looking to the next page, which for the record is page 12 of 12 of the Troy Police Department report in this matter. At the very top it continues. "My observations during the interview of Campbell were as following. She was unable to hold eye contact with me during the interview."
How did you factor -- what evidentiary value was that fact to you?
**A. That it goes that she's intoxicated.**
Q. Did you ever consider that there was any other reason why she was unable to hold eye contact with you during the interview?
**A. No.**
Q. Do you recall testifying earlier today that we identified a point specifically on Exhibit 5 where you testified that Autumn Campbell was making direct eye contact with you?



MS. WASKE: Objection, argumentative.
MS. DUFRANE: Join.
BY MR. MARTINEZ:
Q. Do you recall that testimony you gave?
**A. At times she did and at times -- at other -- more than that. Other times she's unable to hold eye contact with me during the interview.**
Q. And that's what you're saying today, but not what was put in the report, correct?
**A. It's captured --**
MS. WASKE: Objection, form, foundation, argumentative.
MS. DUFRANE: Join.
MS. WASKE: Asked and answered.
**THE WITNESS: It's captured on the bodycam.**
BY MR. MARTINEZ:
Q. So the body camera will just speak for itself?
**A. It does.**
Q. All right. You go on to note Ms. Campbell was, quote, delayed in answering questions. What did you mean by that?
**A. We can watch it.**
Q. I'm asking you what you meant by it when you put it into your report?

MS. WASKE: Objection, argumentative.
MR. MARTINEZ: He hasn't answered the question.
MS. WASKE: That doesn't mean you get to talk to him that way, Aaron.
**THE WITNESS: She couldn't remember the funeral home, she couldn't remember what street Dave Koehler lives on, she couldn't remember Dave Koehler's name. So there's a few instances right there, sir.**
BY MR. MARTINEZ:
Q. Did you ask her how long she had known Dave Koehler for?
**A. No, I did not.**
Q. Did you ever try to find out if there were other reasons why she had difficulty recalling things like that?
**A. No.**
Q. Did you ask her if she had ever been to that funeral home before?
**A. No.**
Q. Did you consider the possibility that Ms. Campbell may have been very overwhelmed by the situation that was happening around her?
**A. It's a possibility, but there's also the alcohol**



**factor.**
Q. Did you consider all possibilities or did you just focus on the alcohol that you believed you smelled?
MS. WASKE: Objection, argumentative.
**THE WITNESS: I do consider things when on scene, and I did smell the alcohol, and she admitted to drinking.**
BY MR. MARTINEZ:
Q. Okay. So did you consider any other possibilities though for why she was demonstrating these clues or observations, as you put it in your report?
**A. Just her behavior is indicative.**
Q. And that was the only thing you considered at this point in time was that you believed she was drunk?
**A. She was drunk.**
Q. All right. You indicated she was constantly moving?
**A. Yes, sir.**
Q. All right. Did you bother to see what she was trying to do as she was moving?
MS. DUFRANE: Objection to form.
MS. WASKE: Join.
**THE WITNESS: Just nervous energy.**
BY MR. MARTINEZ:
Q. She had a lot to be nervous about at this scene, would you agree?



MS. WASKE: Objection, form.
MS. DUFRANE: Join.
**THE WITNESS: Yeah, talking to a police officer drunk is definitely something to be nervous about.**
BY MR. MARTINEZ:
Q. That was what you believe she was nervous about?
**A. Absolutely.**
Q. You didn't believe she was nervous or concerned about her long-time boyfriend being on the pavement with serious injuries as you've described them to her?
MS. WASKE: Objection, form, foundation, argumentative.
MS. DUFRANE: Join.
MS. WASKE: Asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: She didn't make any attempts to run to him or go around me or anything like that.**
BY MR. MARTINEZ:
Q. Did you ever instruct her not to?
**A. No.**
Q. Had she attempted to go towards Mr. Szczesny, would you have stopped her?



**A. Yes, because the medics were working on her -- on her boyfriend.**
Q. All right. The final line that you put in your report here is, "Based on my observations and training and experience, Campbell was intoxicated despite her claim that she and Szczesny had stopped consuming alcohol around 6 p.m. and this accident occurred approximately three hours later." Do you see that?
**A. Sure do.**
Q. What is the observations, training and experience you're referencing in your report?
**A. My observations, the observations are listed, we've been talking about them. My experience is 29 years on the job of dealing with people.**
Q. And the training?
**A. Police academy and training with the Troy Police Department.**
Q. What aspects of that training were you invoking in your report?
**A. That she's drunk.**
Q. At any point in time in your report, do you document Tom's eyes?
**A. No, I don't.**
Q. Do you document Tom and any admissions of drinking

that he may have made?
**A. I didn't have a conversation with him, sir.**
Q. Where in your report do you document that you smelled alcohol on Mr. Szczesny?
**A. It's not in there.**
Q. Where in your report do you document your distance from Mr. Szczesny?
**A. It's not in there.**
Q. Where in your report do you document personally observing Mr. Szczesny appearing intoxicated in any way?
**A. Just my bodycam.**
Q. Where in this report?
**A. Not in the report. I wrote a report based on my interaction with Autumn Campbell, sir.**
Q. So it's fair to say though that you never memorialized any observations you made of Tom Szczesny in a report?
**A. No, just on my bodycam.**
**THE WITNESS: I'm ready for a break.**
MS. WASKE: Take a break.
MR. MARTINEZ: Go off record at 3:11.
(A brief recess was taken)
MS. WASKE: Before you start any more questioning of Mr. Martinez, I just want to make a



point to put on the record that my client is here today and you are more than welcome and, in fact, entitled to ask him questions about his personal observations and what he saw and what's in his report and to authenticate his body camera footage and to discuss anything that's on the body camera footage; to talk about his experience as a police officer, to talk about any involvement he has with this case.
He is here today, he was on time, in fact he came early to accommodate our schedule. He is prepared to give answers for you. He is trying his best to provide complete, accurate and honest answers to all of your questions. I would ask that the remainder of your questioning, as a professional courtesy, to be respectful of my client.
MR. MARTINEZ: Okay, the record's clear.
MS. WASKE: Thank you.
BY MR. MARTINEZ:
Q. All right, sir, I'm going to draw your attention back to Exhibit 4 at approximately 1 minute and 50 seconds, one five zero.
(Video shown)
MS. WASKE: You ready?
**THE WITNESS: Uh-huh.**



MS. WASKE: Okay.
**THE WITNESS: You said one five zero?**
BY MR. MARTINEZ:
Q. Correct.
**A. Okay. I paused it at one five zero.**
Q. Okay, we can start from there and I'll tell you when to stop.
(Video shown)
MR. MARTINEZ: You can pause right there.
MS. WASKE: Pausing at two minutes and three seconds.
BY MR. MARTINEZ:
Q. Okay. So Officer, at approximately 1 minute and 54 seconds -- well, first let's set the scene here. So this view of the body camera has three officers depicted whom I believe you've identified as Officer Leithauser, Sergeant Bowers and Sergeant Hancock; is that right?
**A. Yes.**
Q. Okay. So at approximately 1 minute and 54 seconds, did you observe the moment when the officer in the middle, who I believe you identified as Officer Bowers; is that right?
**A. In the middle, sir?**
Q. Yes.



**A. That's going to be Sergeant Hancock.**
Q. Okay, thank you so much. So Sergeant Hancock makes a motion, he starts looking towards what appears to be Officer Leithauser's body camera. Did you see that?
**A. Yes, he does look at each other. Yes, sir.**
MS. DUFRANE: Didn't we go over this already?
MR. MARTINEZ: Hold on.
BY MR. MARTINEZ:
Q. Looking specifically at his body camera, right?
MS. WASKE: Objection, foundation.
BY MR. MARTINEZ:
Q. All right. So then the officer in the middle, whom you've identified as Sergeant Hancock, then makes, at 1 minute and 56 seconds, a hushing signal with his one finger, his index finger up to his lips towards Officer Leithauser. Do you see that?
MS. WASKE: Objection to form. It's paused at 1 minute and 54 seconds. Would you like me to play a portion for him?
MR. MARTINEZ: Yes, let's start from there.
MS. WASKE: Okay, I'm going to start it at 1:53. When would you like me to stop it?

MR. MARTINEZ: We can go ahead and stop at two minutes.
(Video shown)
BY MR. MARTINEZ:
Q. So the sequence of events that we just saw in that excerpt, we see Sergeant Hancock motion to Officer Leithauser with his index finger over his lips; is that right?
**A. Uh-huh.**
Q. And then it was Sergeant Bowers after that who then points to your body camera at that point in time, correct?
**A. Yeah.**
Q. All right. In this clip that we've just watched in response to the hush signal as I'll call it, Officer Leithauser then acknowledges, he says something, I know, I understand. Did you hear that?
**A. Yes.**
Q. Do you know why they were motioning to him in that way?
MS. DUFRANE: Objection, calls for speculation.
MS. WASKE: Objection, form and foundation.
**THE WITNESS: That's a question you'll**



**have to ask Sergeant Hancock who is a lieutenant now, sir.**
BY MR. MARTINEZ:
Q. Thank you. So how would you interpret it if somebody who is a sergeant or a lieutenant motioned to you in a similar way with their index finger over their lips?
MS. WASKE: Objection, form, foundation.
MS. DUFRANE: Join.
**THE WITNESS: Well, if somebody told -- if somebody did that to me, that means be quiet.**
BY MR. MARTINEZ:
Q. In your presence at any other point in time, did anybody else either motion or verbally instruct Officer Leithauser to be quiet?
**A. No.**
Q. In the conversation that you had with Officer Leithauser when you first arrived on scene, did you make any reference similar to what the lieutenant -- the now Lieutenant Hancock did towards Officer Leithauser?
**A. Did I -- are you asking me, sir, if I did that to Evan?**
Q. Yes, yes.
**A. No, I never did this to Evan.**



Q. Okay. You never motioned to him with the hushing motion just so the record's clear?
**A. No, sir.**
MS. WASKE: And just so that the record's clear, the motion being made is index finger over Mr. Martinez's lips.
MR. MARTINEZ: Correct. Thank you, Ms. Waske.
BY MR. MARTINEZ:
Q. Sir, based on your training and experience over this decade plus with the Troy Police Department, what can you tell me about how Troy trains officers or training you've received, more specifically, about body-worn camera activation?
MS. WASKE: Objection, form and foundation.
MS. DUFRANE: Join.
**THE WITNESS: We received the general order, we read it and they told us how to wear it. And one how you -- you know, obviously how it goes. They gave us the necessary equipment to fasten it to your -- to your shirt.**
BY MR. MARTINEZ:
Q. Describe for me the body camera itself. So you have on your uniform. Do you wear a vest, a bulletproof



vest or anything like that underneath?
**A. I wear mine on the outside, sir.**
Q. Okay. Where do you typically affix your body worn camera?
**A. Mid level.**
Q. Does that attach to anything on your uniform?
**A. Yes, so there's like a holder or whatever you want to call it. It just screws right in.**
Q. When you receive a body-worn camera, is that typically at the start of your shift?
**A. Yes.**
Q. So this isn't a device that you would take home with you?
**A. No.**
Q. Do you receive the same device every time you put one on?
**A. Yes.**
Q. How do you know which body camera is yours to take?
**A. It's marked with our -- it's either our name or our badge number, one of the two. I can't remember now.**
Q. In any event there's some indication to you that that is your camera to put on yourself?
**A. Yes, let's say it's the badge number.**
Q. So tell me the camera that you pick up. I believe you said it comes from like a charging station?

A. **Yes, sir.**
Q. So you pick up the camera from the charging station and you place it onto the area on your vest where it goes or your uniform?
A. **Yes.**
Q. What are the buttons on the camera in order to operate the camera?
A. **The buttons. Oh, how to start it.**
Q. Sure, I'm just looking to get kind of generally how it's configured. What is --
A. **A big button in the middle and you push it.**
Q. Okay. So is that the only button on the camera?
A. **No, there's two buttons on the side -- one on the side, inside or outside, one of the sides.**
Q. Okay. What is your understanding of what the two buttons on the side do?
A. **The volume. It will make a -- you ever watch TV or whatever, you hear the beeping sound, it's -- you can lower the beeping sound.**
Q. And then as far as how to mute the audio but continue to shoot video on the camera, what do you have to do?
A. **Yeah, there's a button. I don't -- I don't mess with any of that. I know there's a button on there. I don't know where it is.**



Q. So the button that you use to activate or deactivate or to record and stop recording in other words, is that the center button that you were motioning to?
A. **Yes, sir.**
Q. Based on your understanding of the training you receive from the City of Troy, when are officers allowed to mute their cameras?
MS. WASKE: Objection, asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: When we're not dealing with the public.**
BY MR. MARTINEZ:
Q. I thought that was your answer for when you could stop recording, are you saying that it's the same thing for muting?
A. **Yeah, you can mute your conversation if you're not dealing with the public.**
Q. Are officers supposed to document why they mute based on your understanding?
A. **No.**
Q. All right, now during the course of this investigation we presented Exhibits 3, 4 and 5, which are each three separate videos that we've determined came from your body-worn camera that



evening, correct?
A. **Yes, sir.**
Q. All right. So are there -- is that to say then that after each -- each video that we presented today was because you had stopped the video previously and then restarted the camera recording?
MS. DUFRANE: Objection to form and foundation.
MS. WASKE: Join.
**THE WITNESS: Yes.**
BY MR. MARTINEZ:
Q. And as it pertained to the initial video depicted in Exhibit 3 when you arrive on scene and immediately stop recording to speak with Officer Leithauser, you indicated that was for a union discussion, essentially, between you and Officer Leithauser, correct?
A. **Well a couple things. It was a private conversation between Officer Leithauser and I, and again there's no public around, so I don't have to have it on, sir.**
Q. As it pertains to the other occasions when you stopped your video that evening, what were the reasons for those recordings to be stopped?
A. **Probably just not around the public, and sometimes they get triggered by other cameras. Or if the light bar is on or the oscillating lights are going, they'll trigger your camera too. So kind of have to constantly turn it off.**



Q. Is that likely what initiated the video we saw in Exhibit 3, where you're getting in the car?
A. **Probably, most likely. I mean I can look at the video again and tell you.**
Q. Do you recall getting into your car and turning the camera on specifically?
A. **Is that when I first went to the scene?**
Q. Correct, yes.
A. **It would probably be turned on as soon as I hit the lights.**
Q. I don't want to get too far into personal stuff, I'm going to try to keep it centered on this incident. We heard testimony earlier today, you are married to Gail Parra; is that right?
A. **Yes, sir. She's married to me.**
Q. Good clarification. At the time of this incident, did you have any contact with Gail Parra regarding the incident with Officer Leithauser?
A. **Yes.**
Q. Tell me about that.
A. **I called her to let her know that there's been an**

**accident at work and that I'm not involved and that everyone is fine.**
Q. When did you make that call to her?
**A. Oh, man. I don't remember the time, sir.**
Q. Would this have been on your way to the scene or after you arrived?
**A. No, it would have been after, sir.**
Q. So while you're on scene --
**A. It was after.**
Q. Okay. So after you left the scene?
**A. Yes, sir.**
Q. And so just so I understand, you called her just to let her know essentially someone had been in a crash but it wasn't you?
**A. And everyone's okay and you're probably going to get called out.**
Q. Did you have any other conversations at any point in time with Gail Parra as it pertains to this incident, the investigation or this lawsuit?
**A. No, no.**
Q. Have you ever discussed this crash at home?
**A. No.**
Q. How long was your phone call when you spoke with Gail after you left the scene?
**A. It wasn't long and I had to use Evan's phone because**



**I had left mine at the station. Yeah, it was not long at all. I can't tell you if it was 30 seconds, a minute 30 or 2:05. I mean, it was a short conversation, sir.**
Q. Understood. I am going to just quickly play you what's been marked for identification as Exhibit 2 beginning at 12 minutes and 50 seconds, twelve five zero?
MS. WASKE: Hold on, let me get there. Twelve five two.
MR. MARTINEZ: Twelve -- I'm sorry, did I say that? Twelve five zero I should have said.
(Video shown)
MS. WASKE: Is there a stopping point?
(Video shown)
MR. MARTINEZ: All right. For the record --
MS. WASKE: I did the same thing you did.
MR. MARTINEZ: It jumped ahead on you?
MS. WASKE: Uh-huh.
MR. MARTINEZ: That's okay, where did it leave off?
MS. WASKE: I'm at 12:37.
(Video shown)
**THE WITNESS: Okay, sir.**



MS. WASKE: Stopped at 12:59.
MR. MARTINEZ: Thank you.
BY MR. MARTINEZ:
Q. So there were a couple points in this video where the audio cuts out; did you hear that?
**A. Yeah, I heard it cut out.**
Q. Was that something that you did or --
**A. No, not something I --**
MS. WASKE: Objection, Exhibit 2 is marked as officer -- Lieutenant Bowers' body camera video.
MR. MARTINEZ: Yeah.
BY MR. MARTINEZ:
Q. So, in other words, this and any alterations to the original video may have happened because of something Officer Bowers had done on his camera?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join. And alterations is misleading.
**THE WITNESS: Yeah, I don't know, sir.**
BY MR. MARTINEZ:
Q. Were you depicted at all in this clip that we just watched?
**A. Yes.**
Q. Okay. At the time for that you paused at?



**A. Twelve five zero.**
Q. Do you recall what it was that you were doing at this point in time, which I'll just put on the record, at 12:50 running time Exhibit 2 has time code 21:31:06. Do you recall what you were doing at this point in time?
**A. Let me watch it really fast, sir.**
Q. Take your time.
(Video shown)
**THE WITNESS: So what I was doing, I was directing traffic. There was a car. I didn't -- I wanted to make sure it didn't come through the scene. There was a car going by. And then the lieutenant approaches me -- or no, I'm sorry, the sergeant approaches me and I informed, hey, somebody needs to do some paper on him.**
MR. MARTINEZ: Where did we stop?
MS. WASKE: 12:59.
MR. MARTINEZ: Okay. Let's -- let's keep watching from 12:59.
(Video shown)
MR. MARTINEZ: We can stop at 13:41 when you get there.
BY MR. MARTINEZ:
Q. All right, did you observe Officer Leithauser enter

the frame in that excerpt we just watched?
**A. Yes, sir.**
Q. What were you two discussing at that point in time?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: I do not remember, sir.**
MR. MARTINEZ: Let's see if I can get the exact timestamp here. There was a moment at 13 minutes and 21 seconds where you place your right arm onto Officer Leithauser's left shoulder. Do you see that?
MS. DUFRANE: 21, 13:21?
MR. MARTINEZ: Correct.
MS. DUFRANE: Thank you.
**THE WITNESS: Okay.**
BY MR. MARTINEZ:
Q. Does that help refresh your memory as to what you two were discussing?
**A. Probably not. No, it does not. I have no idea what I said to him at that point, sir.**
Q. Does it appear to you that you're consoling him at this point in time?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: I mean, probably.**



BY MR. MARTINEZ:
Q. All right. Close out of Exhibit 2. At the time that you obtained the interview with Autumn Campbell, you understood that your notes and report from that encounter would be used in this investigation?
**A. I don't know if I was really thinking about that back then.**
Q. Do you agree with me that you are the person on scene who initiated the OWI investigation into Tom Szczesny?
MS. WASKE: Objection, form, foundation.
MS. DUFRANE: Join.
**THE WITNESS: I disagree with your question.**
BY MR. MARTINEZ:
Q. Why is that?
**A. I didn't start an OWI investigation on scene.**
Q. Prior to the statement that we heard in Exhibit 2 at 12 minutes and 55 seconds where you indicate someone needs to do paperwork on Mr. Szczesny --
**A. Yes.**
Q. -- had anybody discussed with you the need for an OWI investigation or a blood draw?
**A. Nobody.**



Q. So is it fair to say then that you are the person who had that idea at the time?
MS. WASKE: Objection, form, foundation, asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: I don't know what anyone else was thinking.**
BY MR. MARTINEZ:
Q. At the time that you made that statement at 12 minutes and 55 seconds in Exhibit 2, had anyone else discussed with you the possibility that this case may result in a blood draw?
**A. No.**
MS. WASKE: Objection, form, foundation, asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: No.**
BY MR. MARTINEZ:
Q. You understood that the facts from your interview were important to the warrant that was ultimately issued in this case?
**A. Yes, I understand that, sir.**
Q. Did you understand that at the time of this incident?
**A. Again, I don't even know what I was really -- what**



**my thought process back then was other than doing my job. Securing the scene, gathering evidence, you know, obviously, notating facts.**
Q. Can you take me through every step you took to investigate Officer Leithauser's conduct?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: Investigate Officer Lighthouse -- Leithauser? That's not my job, sir.**
BY MR. MARTINEZ:
Q. Did anyone ask you to gather facts for a blood warrant for Officer Leithauser?
**A. A blood warrant? No.**
Q. Did anyone ask you to gather any facts for purposes of investigating Officer Leithauser in any way?
**A. I know he took a PBT and he did a urine test, I believe it was. I can't remember now.**
Q. My question was, did anybody ask you to investigate and determine as to whether any conduct by Officer Leithauser caused this crash?
**A. No, I can't do that, sir.**
Q. And why not?
**A. I'm -- don't have -- I'm not part of the SOCCIT team.**

Q. Do you have to be a member of the SOCCIT team to interview witnesses to a crash?
**A. No.**
Q. Did anyone ask you whether Officer Leithauser should be blood tested?
**A. No.**
Q. Did anyone ask you to determine -- or, I'm sorry, interview Officer Leithauser for any purposes as to this investigation?
**A. No.**
Q. Are you aware of whether anyone ever sought a warrant for Officer Leithauser for any reason stemming from this crash?
**A. I have no idea.**
Q. Who are all of the officers that you recall speaking with on scene?
**A. Oh, man. I'd have to go through my whole bodycam footage if you want the names.**
Q. Would there have been interviews or conversations rather with other officers on scene that were not captured by your body camera?
**A. I don't think so.**
Q. So, in essence, we can rely upon the excerpts of your body camera to determine who you spoke with on scene?



**A. Yes.**
Q. Is it accurate to say, though, that we may not know the contents of those conversations if the body camera was muted or turned off?
**A. Yeah, if you can't hear it.**
Q. Do you have any recollection of speaking with Officer Palm on scene?
**A. No.**
Q. Did you ever speak with -- is it Officer Huck or is it Lieutenant Huck?
**A. Oh, no, Officer Huck. I don't even think he was -- I don't even know if he was there, sir.**
Q. At any point in time in the conversations that you had with Evan Leithauser, did you discuss with him Tom Szczesny's blood or the need to search his blood?
**A. No.**
Q. Do you have a recollection of the conversations that you had with Officer Leithauser?
MS. DUFRANE: Objection, asked and answered.
MS. WASKE: Join.
**THE WITNESS: Not verbatim. I can't tell you, you know, we talked about the Tigers or the weather or anything like that. But I would have**



**calmed him down. He had just been in a traumatic situation. He got bumped on the noggin by a dislodged rifle. So, you know, making sure that he's coherent, that he's okay, things of that nature, sir.**
BY MR. MARTINEZ:
Q. At any point in time, did you attempt to render aide to Mr. Szczesny?
**A. No, sir.**
MR. MARTINEZ: Pardon the silence. Let me just look through my notes here.
BY MR. MARTINEZ:
Q. Do you believe that the statement Autumn Campbell provided to you involved secondhand information?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: No.**
BY MR. MARTINEZ:
Q. Do you believe that she was providing you with personal knowledge?
**A. Yes.**
Q. Within the course of the knowledge and information that she gave you -- let me rephrase.
The alcohol consumption information that you attributed to Mr. Szczesny came from



Autumn Campbell, correct?
MS. WASKE: Objection, form.
MS. DUFRANE: Join.
MS. WASKE: And asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: No, it came from obviously the smell and then the conversation with Ms. Campbell, sir.**
BY MR. MARTINEZ:
Q. Do you have any other materials in your possession where you discuss this incident, the aftermath, the prosecution or this lawsuit aside from any directed to your attorney?
MS. WASKE: Objection to form.
**THE WITNESS: No, sir.**
BY MR. MARTINEZ:
Q. Did you receive discipline in any way, shape or form relating to this crash?
**A. No.**
Q. Was your conduct reviewed in any way, shape or form pertaining to this crash?
MS. WASKE: Objection, foundation.
MS. DUFRANE: Join.
**THE WITNESS: No, sir.**

BY MR. MARTINEZ:
Q. Were you ever asked to explain the ambiguity of Autumn Campbell's statement where she used the term "we"?
MS. WASKE: Objection, form, foundation.
MS. DUFRANE: Join.
MS. WASKE: Argumentative.
**THE WITNESS: No, sir.**
BY MR. MARTINEZ:
Q. Were you ever asked to explain the body-worn camera videos being stopped and restarted multiple times throughout your time at this scene?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: No.**
(Deposition Exhibit Number 8 was marked for identification)
BY MR. MARTINEZ:
Q. Last thing I'll draw your attention to here, sir, is what's been marked for identification as Exhibit 8. Have you seen this document before?
MS. WASKE: Hold on. I'm just going to place an objection to this -- to the use of this exhibit. This is Officer Parra's -- it's a policy -- a negative policy violation in his Guardian



Tracking, dated September 2, 2021. First of all, it predates this accident. Second of all, it has nothing to do with this accident. So it's not relevant under Rule 26. I will allow my client to answer questions about this; I just want that objection noted for the record.
MR. MARTINEZ: So noted.
**THE WITNESS: What do we have here?**
BY MR. MARTINEZ:
Q. Are you familiar with this document?
**A. Yes. I want to read it real quick, sir.**
Q. Sure.
**A. Yes.**
Q. All right. What is your understanding or familiarity with the Guardian Tracking System?
**A. It notates incidents like this or anytime you have a positive or a negative encounter or you do something right or something like this, you get either negative GT or a positive GT.**
Q. All right. So as it pertains to the September 2, 2021 entry, what do you recall about this particular incident?
**A. I got pulled over for speeding.**
Q. Who pulled you over?
**A. Officer Garcher.**



Q. Is Officer Garcher employed with the Troy Police Department?
**A. Yes, sir, he is.**
Q. What was the reason why you were pulled over?
**A. Because I was speeding.**
Q. Were you speeding in a personal vehicle or a patrol vehicle?
**A. My personal vehicle.**
Q. So at the time that Officer Garcher pulled you over, where were you headed?
**A. To the Troy Police Department.**
Q. For what purpose?
**A. Training.**
Q. Do you recall what training you were going to attend?
**A. No, I do not.**
Q. Why were you speeding at the time of this incident?
**A. Because I needed to get to training. I had made a mistake and I went to the wrong location.**
Q. Were you counseled after being pulled over about driving with due care and caution?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: They told me that I was receiving a negative Guardian Tracking because I was**



**pulled over for speeding.**
BY MR. MARTINEZ:
Q. Were you issued a ticket?
**A. No, sir, I was not.**
Q. What does the term "due care and caution" mean to you?
MS. WASKE: Objection, form, foundation.
MS. DUFRANE: Join, calls for a legal conclusion this witness is unable to provide.
**THE WITNESS: Driving in a careful manner.**
BY MR. MARTINEZ:
Q. Does due care matter when an officer's doing police work?
MS. WASKE: Objection, form, foundation, asked and answered.
MS. DUFRANE: Join.
**THE WITNESS: Say it one more time.**
BY MR. MARTINEZ:
Q. Does due care and caution matter when an officer is in the course of their job as a police officer?
MS. WASKE: Same objections.
MS. DUFRANE: Join.
**THE WITNESS: I think it matters in everybody's job.**

BY MR. MARTINEZ:
Q. Does due care matter even when the officer thinks a task is important enough to speed?
MS. WASKE: Objection to form.
MS. DUFRANE: Join.
**THE WITNESS: I mean I made a mistake. I got a Guardian Tracker for speeding.**
BY MR. MARTINEZ:
Q. At any other point in time while you've been employed at the Troy Police Department, have you received any other negative GTs or UPRs pertaining to speeding or use of emergency lights and sirens?
MS. WASKE: Objection to form, foundation.
MS. DUFRANE: Join.
**THE WITNESS: Not that I remember.**
BY MR. MARTINEZ:
Q. Officer, have we covered every aspect of your involvement with this investigation?
**A. Yes.**
MR. MARTINEZ: I don't have anything further for you.
MS. WASKE: I have no questions for my client.
MS. DUFRANE: I have no questions for



this witness. Thank you.
MR. MARTINEZ: Thank you very much. We can go off record at 4:03.
MS. WASKE: I would like an E trans, please.
MR. MARTINEZ: Yes, E trans as well.
MS. DUFRANE: Same. Thank you.
— — —



CERTIFICATE OF NOTARY PUBLIC - COURT REPORTER

I do certify that the attached deposition was taken before me in the above-entitled matter; that the witness was first sworn to testify the truth; that the testimony contained herein was by me reduced to writing in the presence of the witness by means of stenography, and afterwards transcribed upon a computer. The attached pages are a true and complete transcript of the testimony and proceedings.

I do further certify that I am not connected by blood or marriage with any of the parties, their attorneys or agents, and that I am not an employee of either of them, nor interested, directly or indirectly, in the matter of controversy.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at West Bloomfield, Michigan, County of Oakland, this 23rd day of August 2026.

Theresa L. Roberts

Theresa L. Roberts, CSR
Certified Shorthand Reporter - CSR-4870
Notary Public - Oakland County, MI
My commission expires 10-4-2027

## 0

**0.29** 43:7

**023** 54:17

**044** 55:17

## 1

**1** 46:7 47:3,16 49:6,8,16 107:21 108:13,20 109:16,20

**100%** 25:9 29:22

**11** 4:2

**12** 27:18 28:22 43:1 52:2 79:24 88:7 100:10 119:7 123:20 124:10

**12:37** 119:23

**12:50** 27:23 28:12 121:4

**12:55** 4:3

**12:59** 120:1 121:18,20

**13** 122:9

**13:04** 28:17

**13:21** 122:12

**13:41** 121:22

**14** 49:8 75:18

**15** 13:24 49:6

**1575M** 44:9

**16** 46:7

**17** 88:13

**18** 93:23 98:17 99:1,12

**1:15** 49:6

**1:16** 46:25

**1:20** 46:25 47:14

**1:49** 43:15

**1:53** 109:25

**1A** 13:8,12,24 14:21 33:22

**1B** 15:6,9 33:22

## 2

**2** 27:4,8 33:22 42:25 52:2 59:16 62:7,14 63:15 69:2 87:24 119:6 120:9 121:4 123:2,19 124:10 131:1,21

**20** 69:9

**2014** 12:5

**2021** 131:1,21

**2023** 4:23 7:23 15:18 33:18 68:9

**2023-09-22_2117_X60A** 53:15

**2023-09-22_2124_X60A1575** 54:3

**2023092221:23:43** 53:24

**2026** 4:2

**21** 36:7,18 122:9,12

**212343** 53:23

**2124** 53:17

**21:17:31** 33:19

**21:21:14** 42:25

**21:23** 54:12

**21:31:06** 121:5

**22** 4:23 15:18 68:9 75:25 79:11 87:24

**22nd** 7:22 33:19

**23** 54:19 62:7 78:6

**24** 36:16 69:2 75:13 78:4,6,13

**26** 59:17 76:13,14 89:3 131:4

**27** 37:6 47:17 94:7

**28** 70:23 78:13

**29** 78:5,7 79:7,11 105:14

**2:05** 119:3

**2:42** 85:7

## 3

**3** 33:6,10,22 35:3 36:1,7,15,18 37:6,12,15 42:23 54:1 69:6,9 70:1,18 115:23 116:13 117:6

**30** 35:19,20 37:16 55:23 70:1 73:17 119:2,3

**30-second** 36:1 37:12

**33** 69:6 70:18

**3:11** 106:22

**3:20** 36:21

**3X60A1575M** 33:18 45:9

## 4

**4** 33:23 34:13 42:18,22 46:8,9 48:3 49:15 74:23 75:8 88:7,13 89:2 94:7,18 95:5 107:21 115:23

**40** 47:17

**41** 63:15

**42** 54:10

**43** 54:13 62:15

**44** 59:10

**47** 43:18 47:16

**48** 47:3

**4:03** 135:3

**4:17** 88:16

**4:42** 94:16

**4:45** 94:11

## 5

**5** 33:23 34:15 53:3,6,9,13 54:6 56:20 62:7 87:23 94:7,14 95:12, 15 100:2,23 115:23

**5-axon** 54:1

**5-ish** 93:23

**50** 107:22 119:7

**51** 27:18,19

**53** 94:19 95:5

**54** 108:14,20 109:20

**55** 28:22 123:20 124:10

**56** 109:16

**59** 49:16

**5s** 53:7

**6**

**6** 33:23 54:10 70:23 93:1,5,8,24, 25 94:15 95:13,15 99:21 105:7

**6:08** 95:7

**7**

**7** 33:23 96:3,7,11

**8**

**8** 33:23 130:16,20

**9**

**9-22_2124** 53:16

**96** 9:12

**A**

**Aaron** 4:20 102:5

**absolutely** 83:13,14 104:8

**academy** 9:7,10,11,14 105:17

**accident** 5:1 10:4 13:4 20:10 84:21 98:7 105:7 118:1 131:2,3

**accidents** 10:6

**accommodate** 107:11

**accuracy** 12:16

**accurate** 12:20 14:7,18 29:22 30:19 38:24 41:6 42:17 80:4 107:13 127:2

**accusations** 51:1

**accused** 94:21

**acknowledges** 110:16

**activate** 115:1

**activated** 20:21 21:13

**activation** 112:14

**activities** 97:17

**add** 31:23 54:9

**added** 95:15

**additional** 9:14 10:18

**administer** 32:8

**admissions** 105:25

**admitted** 103:7

**advise** 97:21

**advised** 97:20 99:20

**affiliated** 7:20

**affix** 113:3

**aftermath** 129:11

**afternoon** 4:16

**agree** 34:1 61:22 103:25 123:9

**ahead** 14:13 33:5 43:1 54:7 59:8 72:19 78:23 91:22 110:1 119:19

**aid** 19:1

**aide** 128:7

**air** 40:25

**alcohol** 29:14,15 31:11 59:2 65:19 66:13 67:12 73:9 74:14 82:3,8,13,14 87:1 102:25 103:3, 6 105:7 106:4 128:24

**Alejandro** 4:11 7:4,8

**Alex** 7:5,7,8

**Alger** 97:24

**alive** 70:14

**Allan** 56:6 85:23 86:10

**allege** 80:23

**allegedly** 30:11

**allowable** 4:12

**allowed** 115:7

**alterations** 120:14,18

**ambiguity** 130:2

**ambulance** 16:8,15

**amount** 82:14

**analysis** 50:11

**anguished** 17:5

**answering** 101:21

**answers** 5:23 14:16 15:3 107:12, 14

**antiseptic** 74:13

**anytime** 6:18 39:12 131:16

**apparent** 27:1

**appeared** 17:1

**appearing** 106:10

**appears** 34:15 49:20 54:10 60:13 63:2 66:9 109:3

**applying** 74:13

**appro** 31:20

**approach** 36:25

**approached** 16:11,14,25 29:14 31:20 78:1 97:10

**approaches** 47:4,23 121:14,15

**approaching** 46:15

**approximate** 29:25

**approximately** 28:22 36:7 37:6 46:7,14 55:23 70:1 78:13 105:8 107:21 108:13,20

**area** 22:24 23:3 30:22 61:24 98:11 114:3

**argumentative** 40:20,22 41:13, 22 42:13 51:11 59:5 63:19 66:15 71:21 79:23 80:25 81:15 92:20 98:24 99:9 100:4 101:1,12 102:1 103:4 104:14 130:7

**arm** 122:10

**arrival** 36:6 96:20

**arrive** 16:6 39:19 116:13

**arrived** 16:5,8,10 17:20 18:3,8, 16,20,22 20:19,24 21:14 22:25 23:8,25 25:8,19 26:11 38:10 74:9,17 78:1 85:2,12 111:18 118:6

**arriving** 20:17 39:19

**Asian** 24:13

**asks** 70:2

**aspect** 39:6 134:18

**aspects** 105:19

**assert** 64:19

**assigned** 21:15,18,21

**assignment** 7:16,22 12:12 18:23 19:3

**assist** 13:21 95:2

**Associates** 9:1

**assume** 6:6 11:25 44:1 45:7 84:2

**assumes** 66:15

**assuming** 85:17

**attach** 113:6

**attempt** 128:7

**attempted** 104:24

**attempting** 80:23

**attempts** 98:20 104:19

**attend** 9:6,7,9 132:15

**attended** 10:22 58:9

**attention** 22:17 46:6 49:14 91:7 96:21 107:20 130:19

**attorney** 6:10 83:7 129:13

**attorneys** 6:9

**attribute** 65:22

**attributed** 128:25

**attributing** 66:16

**audio** 28:18 29:5 43:6 114:20 120:5

**August** 4:2

**Auschwitz** 58:12 98:17 99:1,11

**authenticate** 107:5

**Autumn** 26:10 32:17 56:3,12 59:1,21 60:1 65:15 68:3,8 71:1, 7,10 72:7 83:25 86:25 90:11,14 97:11 100:24 106:15 123:4 128:13 129:1 130:3

**aware** 15:19 86:3 126:11

**Axon** 33:17 42:23 45:8 53:15

**B**

**back** 4:22 7:22 15:5,17 17:1 25:6 27:2 28:8,9 31:14,19 36:6,17 39:18 43:11,14 46:23 49:5 63:15 67:4 74:16,23 78:3,23 79:7 84:2, 13,15 85:2,5,12 87:18 88:6 107:21 123:8 125:1

**background** 8:4

**backing** 55:3

**badge** 113:20,23

**bar** 23:16,21 79:2,5,8 117:2

**base** 89:22

**based** 12:6,15 29:25 64:13,25 79:18 80:8 82:12 90:2 95:18 105:4 106:14 112:10 115:5,20

**basically** 32:20 40:13 99:6,7,15

**basing** 89:19

**Bates** 93:8

**batteries** 85:19

**beeping** 114:18,19

**begin** 36:25

**beginning** 33:11 54:8,22 55:1 57:17 75:8 76:12 78:12 119:7

**behavior** 51:1 103:12

**belief** 14:8

**believed** 73:2 97:23 98:16 103:3, 14

**benefited** 39:24

**big** 114:11

**birth** 97:23

**bit** 8:3 9:17 10:19,23 12:1 62:22 86:19

**bleeding** 70:9

**block** 19:21,22 20:9,10

**blocked** 17:23 20:2

**blood** 29:2 123:24 124:12 125:12,14 126:5 127:15,16

**body** 11:10,14 33:16,17 37:8,18 38:18 39:4,8,24 40:7,10 41:10 42:23 44:5,19 45:8,10,22,25 49:21 50:1,23 51:7,23 52:11,14, 18,19 54:1 55:21 56:5 85:13 87:7 93:15 101:18 107:5,6 108:15 109:4,11 110:11 112:24 113:3,18 120:10 126:21,24 127:3

**body-worn** 112:14 113:9 115:25 130:10

**bodycam** 33:3 34:20 50:6 66:3 84:17,23 85:19 86:15 87:5,19 101:16 106:12,19 126:17

**bodycams** 50:9

**boss** 22:10

**bother** 103:18

**bottom** 78:21 93:9

**bought** 90:19

**Bowers** 27:10,11 31:1 46:21 47:1 49:24 50:1 52:21 55:11 108:17, 23 110:10 120:16

**Bowers'** 120:10

**boy** 58:11

**boyfriend** 66:8 67:23 104:10 105:2

**break** 6:16,18,21 43:10,17 65:4 67:16 85:8 106:20,21

**breath** 32:8 73:24

**briefings** 84:20

**briefly** 13:11

**brightness** 62:21

**bring** 77:18

**broadcast** 15:22

**brought** 68:19 92:10

**buddy** 88:25

**buddy's** 93:22

**bulletproof** 112:25

**bump** 17:15

**bumped** 128:2

**business** 38:21

**button** 114:11,12,23,24 115:1,3

**buttons** 114:6,8,13,16

**C**

**call** 15:25 91:3 110:15 113:8 118:3,23

**called** 58:12 67:23,24 97:21 117:25 118:12,16

**calls** 110:21 133:8

**calmed** 128:1

**camera** 11:10,15 33:16 34:17 37:8,18 38:19 39:4,8,24 40:7,10 41:10 42:23 44:5,19 45:10,25 46:15 49:21 50:2,23 51:8,23 52:12,14,18,19 55:21 56:5 69:14 85:13 87:7 93:15 101:18 107:5,6 108:15 109:4,11 110:11 112:14, 24 113:4,9,18,22,24 114:2,6,7, 12,21 115:25 116:6 117:3,10 120:10,16 126:21,24 127:4 130:10

**cameras** 45:22 115:7 117:1

**Campbell** 26:10 32:17,19,22 56:3,12 59:1,21 60:1,17 62:8,13 63:6,17,25 64:7 65:15,20 67:3,8 68:3,8 70:1 71:7,10 83:6,25 84:6 86:25 90:14 91:2,13 92:8,11,18, 23 93:25 94:13 95:9 97:11,15,20 98:14,21 100:13,24 101:20 102:22 105:5 106:15 123:4 128:13 129:1,8

**Campbell's** 130:3

**capacity** 10:2,18

**capture** 48:3

**captured** 33:3 40:25 66:2 99:4 101:10,15 126:21

**captures** 48:7,14

**car** 19:16 20:9 36:8 117:6,9 121:11,13

**care** 132:21 133:5,13,20 134:2

**career** 11:24 89:24

**careful** 42:8 133:10

**Carport** 34:11

**carry** 81:21

**cars** 98:17 99:1,12

**case** 66:17 107:9 124:12,21

**causation** 21:16

**caused** 21:19 93:17 125:21

**caution** 132:21 133:5,20

**cell** 67:24

**center** 20:6 115:3

**centered** 117:16

**Chanda** 24:11

**change** 50:11

**characterize** 26:4 61:9

**characterized** 23:11

**charger** 85:15,16

**charging** 113:25 114:2

**check** 96:20

**checked** 16:16 17:9

**chronological** 84:4

**circumstances** 67:21 68:1

**City** 7:11,12 8:7 115:6

**city0020** 93:9

**Civil** 4:13

**claim** 73:8,11 74:8 76:1 79:20 105:6

**clarification** 87:7 117:20

**clarity** 34:13

**class** 9:19

**classes** 9:25 90:4

**clear** 12:25 28:17 43:6 47:19 54:3 60:16 72:17 77:6,8 87:25 88:4 91:21 107:17 112:2,5

**clenched** 60:14 61:10

**click** 35:1,4

**client** 16:22 20:16 29:8,14 57:16 79:11,13 82:7 84:10 94:21 107:1,16 131:4 134:24

**client's** 24:21

**clip** 36:1 52:8 110:14 120:22

**close** 17:22 18:7 25:21 26:11,16 29:16 30:16 74:24,25 76:13 78:9 79:11,13,14 80:5 82:7,10 123:2

**closed** 44:4

**closer** 30:3,4

**closest** 25:17 26:8 77:25 78:16, 19

**closing** 19:19

**clues** 89:17 103:10

**code** 75:9 76:20 121:5

**coherent** 128:4

**College** 8:24

**collision** 4:22 15:20 20:22 36:3 39:20 45:22

**color** 62:13 63:6

**command** 19:8 85:18

**Community** 8:23

**complete** 6:24 8:20 41:5 107:13

**completed** 8:18 29:12 31:2 83:15

**completing** 21:25

**complies** 39:6

**comply** 39:3

**compound** 67:15

**comprise** 96:13

**computer** 34:6

**concerned** 57:8,11 59:22 104:9

**concluded** 43:22 71:9

**conclusion** 32:23 68:13,21 133:9

**conclusions** 64:23,25

**condition** 66:13 67:11

**conditions** 22:23 23:2,4

**conduct** 32:5 39:6 51:2 125:5,20 129:20

**conducting** 60:9 81:9

**confessions** 90:6

**confident** 42:12

**configured** 114:10

**confirm** 34:4

**considered** 103:13

**consistent** 14:22

**consoling** 122:21

**constantly** 103:16 117:4

**consume** 82:14

**consumed** 59:2 66:3

**consuming** 105:7

**consumption** 128:24

**contact** 26:10 37:8 56:25 57:5 88:16 100:14,19,25 101:7 117:21

**contents** 14:5 127:3

**context** 87:14

**continuation** 44:18 55:20

**continue** 43:19 68:25 114:21

**continues** 100:12

**contribute** 22:20

**control** 77:19

**conver** 65:11

**conversation** 17:11 37:25 40:4 41:16,20 44:2 46:17 47:2 52:21 57:17 65:13,17 85:23 86:7,18,22 87:9 90:17 92:22 106:2 111:17 115:17 116:18 119:4 129:7

**conversations** 38:19 40:7 118:17 126:19 127:3,13,18

**corner** 33:17 45:10 54:12 78:22 85:18

**correct** 5:8 13:6 21:17 27:21 38:23 40:9 46:10 48:5,6 50:3,21 55:2,25 59:11 65:21 67:2,5 71:14 83:8 87:9,16 90:19 91:19 93:18 95:10,13,23,25 96:1 98:18 101:9 108:4 110:12 112:7 116:1,17 117:12 122:13 129:1

**correcting** 49:25

**counsel** 59:16 64:4

**counseled** 132:20

**couple** 11:22 25:24 71:18,20 85:7 116:18 120:4

**court** 5:14 43:10 99:17

**courtesy** 107:16

**covered** 11:19 134:18

**cradle** 85:19

**crash** 5:1 10:2 19:1 20:13 21:15,19,23 22:14 46:4 48:5 50:13 51:21 55:24 67:5 97:10,18,22 98:1 118:13,21 125:21 126:2,13 129:18,21

**Criminal** 9:3

**crisis** 10:21

**cue** 27:17

**current** 7:10,14

**cut** 28:18 29:5 46:21 52:9 65:12 120:6

**cuts** 120:5

**D**

**dangerous** 26:21

**dark** 93:15

**date** 4:10 13:20 33:18 97:23

**dated** 131:1

**Dave** 98:2 102:8,9,12

**day** 58:5 59:3 60:1

**deactivate** 115:1

**dead** 70:9

**dealing** 50:8,10 51:18,19,25 105:15 115:11,18

**debris** 23:25 24:7

**decade** 112:11

**decals** 23:23

**decisions** 51:23

**define** 71:13 82:25

**degree** 8:25

**degrees** 9:4

**delay** 35:21

**delayed** 101:21

**demonstrating** 103:10

**department** 7:25 8:17 10:14,17,19,24 12:4 19:7 39:4 51:4 52:25 86:7 100:11 105:18 112:11 132:2,11 134:10

**departments** 8:15

**depends** 82:20

**depicted** 36:7 56:2 108:16 116:12 120:22

**depicts** 46:15 83:11,13

**deposition** 4:10 5:5,7 11:4 13:8 15:6 27:4 33:6 42:18 53:3 77:18 93:1 96:3 130:16

**describe** 33:14 40:16 61:13 112:24

**describing** 87:1 88:20

**desk** 85:18

**determination** 22:11 82:2

**determine** 21:15,18,22 74:2 125:20 126:7,24

**determined** 115:25

**Detroit** 8:11,12,14,17 9:10

**device** 37:9 42:23 44:11 45:11 49:21 50:2 113:12,15

**Dheeraj** 24:11

**died** 89:7 93:22

**differently** 80:14

**difficulty** 35:10 102:16

**dilated** 61:20

**dinner** 99:21

**direct** 4:14 97:1 100:24

**directed** 91:7 129:12

**directing** 121:11

**direction** 20:6,7,12 60:18 67:4

**directly** 31:7,18

**disagree** 64:3 123:14

**discipline** 129:17

**discuss** 5:15 17:13 43:11 107:6 127:14 129:11

**discussed** 10:16 118:21 123:23 124:11

**discussing** 122:3,18

**discussion** 63:14 116:15

**discussions** 38:1,6 84:20

**dislodged** 128:3

**displaying** 66:11 67:9

**distance** 25:23,25 29:15 30:2,10 55:6 79:19 80:22 82:1 91:3 98:6 106:6

**distinguish** 66:11 67:8

**division** 7:19

**document** 12:18 13:13,16,19,22 14:5,11,16,20 15:1,12 44:8 76:24 93:6 105:22,25 106:3,6,9 115:19 130:21 131:10

**documentation** 12:19

**documented** 37:25

**documents** 11:6

**door** 36:8

**dot** 54:4

**double** 35:4

**drank** 71:2,5,8 90:18 93:23

**draw** 46:6 49:14 68:13 107:20 123:24 124:12 130:19

**drawing** 64:23,25

**drew** 68:21

**drink** 71:11 72:8 99:20

**drinking** 32:21 61:19 74:6 93:21 103:7 105:25

**drive** 33:21 53:20

**driven** 68:18

**driveway** 25:1

**driving** 132:21 133:10

**drove** 67:21 68:3,11,13

**drunk** 67:21 103:14,15 104:4 105:21

**due** 22:13 132:21 133:5,13,20 134:2

**DUFRANE** 22:8 27:25 28:10 30:7,13 31:4,22 33:1,24 34:1,3, 7,11,19 35:4,6,9,12 38:3,12 39:11,25 40:12,20 41:14,23 42:14 44:16 45:15 46:8 48:11, 17,24 50:16 51:9,12 53:9,23 56:8 57:7 60:21 61:6,15 62:1 63:9,20 64:2,11 65:25 66:18,21 71:17,22 72:11,21 75:4 77:13 79:16,25 81:1,16 82:5,17 83:21 86:13 87:11,13 90:22 92:21 98:25 99:10 100:5 101:2,13 103:20 104:2,15,17 109:7 110:21 111:9 112:17 115:10 116:7 120:18 122:5,12,14,24 123:13 124:5,16 125:7 127:20 128:16 129:3,5,23 130:6,14 132:23 133:8,17,23 134:5,15,25 135:7

**duly** 4:6

E

**earlier** 65:8 85:13 100:22 117:17

**early** 107:11

**easy** 27:16

**education** 8:18

**efforts** 74:2

**Eighteen** 8:13

**element** 23:17

**emanating** 74:3

**emergency** 20:21 134:12

**employed** 8:7 132:1 134:10

**employment** 7:10

**EMS** 62:3

**EMTS** 16:19,20 36:11

**en** 37:24

**encounter** 55:24 60:3 78:17 123:5 131:17

**end** 57:17 66:2

**ending** 44:9

**endure** 50:25

**energy** 103:22

**enforcement** 8:4,5 9:15 11:21 12:7 66:10 79:19 81:23 89:24

**ensure** 41:4,11

**enter** 121:25

**entire** 46:1 92:7

**entirety** 96:13 99:4

**entitled** 37:24 39:1 41:15 50:9 107:3

**entry** 131:21

**equally** 72:14

**equipment** 112:21

**essence** 126:23

**essentially** 116:16 118:13

**established** 29:18 52:7 67:3

**estimate** 29:25

**estimates** 95:13

**Evan** 4:24 111:23,25 127:14

**Evan's** 118:25

**evening** 116:1,23

**event** 113:21

**events** 110:5

**eventually** 47:3

**everybody's** 133:25

**everyone's** 118:15

**evidence** 12:10,14 66:16 68:2 125:2

**evidentiary** 100:15

**exact** 26:6 80:12,18 88:16 99:7 122:8

**EXAMINATION** 4:14

**examined** 4:8

**excerpt** 96:8 110:6 122:1

**excerpts** 126:23

**exemption** 39:8

**exhibit** 13:8,12,24 14:21 15:6 27:4,8 28:19 33:6,10,22 34:13, 15 35:3 42:18,21 46:8,9 48:3 49:15 53:3,6,7,13 54:1,6 56:20 62:7 74:23 75:8 76:7 77:3,11,20 87:23 93:1,5,8 94:7 96:3,7,11 100:23 107:21 116:13 117:6 119:6 120:9 121:4 123:2,19 124:10 130:16,20,24

**exhibits** 33:20 115:23

**exist** 85:16

**exit** 36:8,10

**Exited** 16:11

**exits** 36:19

**experience** 12:6,16 30:1,2 64:13 65:1,5 79:18 81:8,22,25 82:12 90:3 105:5,11,14 107:7 112:10

**experiencing** 67:10

**explain** 130:2,10

**explained** 22:1 87:1

**expressions** 17:7

**eye** 88:16 100:14,19,25 101:6

**eyes** 27:1 64:8 105:23

**F**

**face** 17:6 31:17

**facing** 31:10,18 34:8 35:2 60:16, 17,23 67:3 78:22

**fact** 89:22 100:16 107:2,10

**factor** 51:22 100:15 103:1

**factors** 66:8

**facts** 30:24 66:15 86:3 124:19 125:3,12,15

**factual** 66:16

**fair** 6:7 9:24 11:24 13:5 17:9 18:7 20:13 24:19 25:3 26:2,4 36:20 44:1 45:7,21 46:14 60:19,22 63:23 74:7 77:23 106:16 124:1

**fairly** 25:21 82:23

**familiar** 23:12 131:10

**familiarity** 131:15

**fancy** 62:18 63:5 98:17 99:1,12

**Fantastic** 7:2

**Farmington** 4:1

**fast** 121:7

**fasten** 112:21

**feature** 23:17

**Federal** 4:12

**feel** 6:3 77:24

**feelings** 66:16

**feels** 67:22

**feet** 25:22,24 26:5 29:16,19 30:3, 4,17,18 80:4,9,18 82:9,10

**female** 97:10

**field** 9:2 32:5 95:22

**final** 105:3

**find** 21:8,11 56:24 102:15

**fine** 23:4,5 70:6,8,13 77:19 118:2

**finger** 49:22 109:17 110:7 111:6 112:5

**finish** 83:6

**firearms** 10:20,24,25

**flashing** 63:16,21

**fluids** 30:21

**focus** 68:10 92:17 103:3

**folks** 23:10

**footage** 11:10,15 44:6 56:5 86:15 87:5,19 107:5,7 126:18

**form** 12:23 18:9 21:6 22:7 24:15 26:1 29:20 30:5 31:13,22 32:24 38:3,11 39:9,25 40:21 41:8,12, 21 45:13 48:10,16,23 50:14 51:10 57:6 59:4 60:6,20 61:5,14, 25 62:9 63:8,18 64:1,9 65:16,24 66:14 67:14 72:16 75:3 79:15,22 82:4,17 83:1 87:10 90:20 92:19 96:23 98:23 100:3 101:11 103:20 104:1,13 109:19 110:23 111:8 112:15 116:7 123:12 124:3,14 128:15 129:2,14,17,20 130:5,13 132:22 133:7,15 134:4, 13

**formulate** 38:15

**forthcoming** 38:25

**Forty-four** 59:12

**forward** 45:7

**foundation** 22:6 28:1 30:6 31:3, 24 32:25 33:14 38:4 39:10 40:1, 11 44:3 45:14 50:15 56:7 57:22 58:8,21 59:4 64:10 66:15 74:15 79:22 83:1,20 86:12 87:3,12 90:20 92:12,19 101:11 104:13 109:12 110:24 111:8 112:16 116:8 120:17 122:4,23 123:12 124:3,14 125:6 129:22 130:5 133:7,15 134:14

**foundational** 34:24 44:4,14

**frame** 18:6 122:1

**frazzled** 59:22

**free** 6:3

**friend** 89:7 98:15

**friend's** 89:12 98:2

**frivolous** 51:1

**front** 17:16 69:10 76:21

**frontward** 63:24

**full** 7:3 79:6,7 97:22

**fuller** 55:14

**funeral** 58:9,10,11,14,18 93:23, 24 98:16,22 99:17,19 102:7,19

**G**

**Gail** 86:8 117:18,21 118:18,24

**garage** 34:9

**Garcher** 131:25 132:1,9

**gather** 97:16 125:12,15

**gathering** 22:1 125:2

**gave** 40:25 53:20 84:15 94:1 95:19 101:4 112:21 128:23

**general** 50:19,23 112:18

**generally** 11:19,21,22 16:12 82:15 114:9

**gentleman** 4:21 24:10 49:19

**girlfriend** 24:21 32:15,16 86:15 90:24

**give** 5:16,23 6:13 42:16 47:16 76:3,4,6,24 77:2,4,10,12,20 80:3 84:18 88:6 91:22 107:12

**giving** 7:3 80:12

**goddamn** 76:14

**good** 4:16,19,20 35:13,14 76:4 85:9 117:20

**Google** 33:21

**gotcha** 44:22

**graduate** 9:11

**ground** 5:12 16:14 17:5 25:1,3 60:19 67:24

**GT** 131:19

**GTS** 134:11

**Guardian** 130:25 131:15 132:25 134:7

**guess** 39:18

**guessing** 86:4

**gurney** 70:11

**guys** 34:5 84:22

**H**

**hair** 60:15 61:11

**half** 84:9 86:19

**hammering** 83:23

**Hancock** 48:1 49:20 52:21 55:4, 10 108:18 109:1,2,15 110:6 111:1,20

**hand** 13:11 15:9 34:14 37:7 69:15 78:24 88:10,11 89:13 93:4 96:6

**handed** 85:13

**hands** 60:14 61:10 88:12,19

**Hang** 35:9

**happen** 53:8 59:23

**happened** 16:12 40:14 42:15 86:18 120:15

**happening** 61:4 102:24

**happy** 6:18

**he'll** 77:1

**head** 5:21 17:15 78:22

**head's** 46:21

**headed** 132:10

**headlight** 48:22 49:12 62:4

**hear** 17:7 28:21 29:2 35:15 36:8 45:4 48:9 49:11 70:3 94:13 110:17 114:18 120:5 127:5

**heard** 7:7 23:10 29:1,3 40:8 45:19 52:25 91:2 99:14 117:17 120:6 123:19

**hearing** 93:15

**Heights** 97:24

**helpful** 36:21

**hey** 84:22 121:15

**high** 8:18,21,22 23:7 39:13,14

**high-def** 63:3

**high-definition** 62:18

**highlighted** 34:14

**Hills** 4:1

**history** 8:4

**hit** 117:13

**hitting** 76:17

**hold** 6:17 33:13 64:14 76:22 88:5 100:14,19 101:6 109:9 119:9 130:22

**holder** 113:7

**holding** 69:15

**home** 58:10,11,14,18 93:23,24 98:16,22 99:17,19 102:7,20 113:12 118:21

**homicide** 9:25

**honest** 90:9,11 107:13

**hospital** 70:11 84:11

**hostage** 6:17
**hour** 84:9
**hours** 85:7 105:8
**house** 98:2
**How'd** 53:8
**Huck** 127:9,10,11
**hundred** 88:23
**hush** 110:15
**hushing** 109:16 112:1

**I**

**idea** 21:3 59:25 92:6 95:17 122:19 124:2 126:14
**identification** 13:9,12 15:7 27:5,8 33:7,10 42:19 53:4 93:2,5 96:4,7 119:6 130:17,20
**identified** 15:9 49:19 56:14,16 97:11 100:23 108:16,22 109:15
**identify** 43:16 46:19 47:25 55:9 56:17 71:1 93:20 98:21 99:16
**immediately** 116:13
**impaired** 73:3
**impairment** 65:23 67:12
**important** 12:16,20 38:1 40:6 41:3 124:20 134:3
**impounded** 84:12
**inadvertent** 89:13
**inadvertently** 87:20
**inappropriate** 51:1
**incident** 5:1,2 11:11,13 15:18 17:18 39:2,14 45:12 93:11 117:16,20,22 118:19 124:24 129:11 131:22 132:17
**incidents** 20:3 131:16
**include** 98:20 100:1
**incorrect** 58:12
**index** 109:17 110:7 111:6 112:5
**indicating** 13:3 89:10,14
**indication** 113:21
**indicative** 103:12
**individual** 55:5,24
**individuals** 89:21 92:3
**influence** 73:6
**information** 14:8 21:1,5,11 22:2 42:17 56:24 84:16,18 86:24 93:10,20 95:19 96:19 97:16 128:14,22,24
**informed** 65:5 95:22 121:15
**initial** 36:2 44:2 100:1 116:12
**initially** 95:12
**initiated** 117:5 123:10
**injured** 66:9
**injuries** 22:18 26:20,23 104:11
**injury** 19:17 27:3
**inquired** 99:19
**inside** 114:14
**instances** 102:9
**instruct** 104:22 111:14
**instruction** 19:6
**instructs** 6:11
**intended** 14:4 81:21
**interacting** 51:6
**interaction** 106:15
**interactions** 65:6
**interpret** 111:4
**interpreting** 89:16
**interrogation** 9:19 90:3
**interview** 33:3 58:20 71:9 83:16 90:4 100:12,14,20 101:7 123:3 124:19 126:2,8
**interviewed** 89:23
**interviewing** 67:7 89:21
**interviews** 126:19
**intoxicants** 73:9 74:9 76:2 79:1,21 80:24 82:8
**intoxicated** 10:9 32:12 65:1 72:25 100:17 105:5 106:10
**intoxication** 67:12 82:16
**investigate** 125:5,8,19
**investigating** 84:19 125:16
**investigation** 9:25 12:8 21:8 22:3,21 25:17 39:23 42:3 64:21,24 65:2 81:3,10 83:10 97:9 115:23 118:19 123:6,10,18,24 126:9 134:19
**investigations** 10:3,8,9 64:16 65:7 80:21 81:8
**investigator** 10:4 13:4
**invoked** 38:9
**invoking** 105:19
**involved** 39:13,16 50:12 51:22 97:21 118:1 128:14
**involvement** 107:8 134:19
**involving** 15:20 36:3 67:11
**issue** 50:7
**issued** 124:21 133:3
**item** 78:24

**J**

**jam** 23:6
**job** 16:19,20 105:15 125:2,10 133:21,25
**join** 12:4 22:8 28:2 30:7,15 31:4,23 33:1 38:5,12 39:11 40:2,12 41:14,23 42:14 44:16 45:15 48:11,17,24 50:16 51:12 56:8 57:7 60:21 61:6,15 62:1 63:9,20 64:2,11 65:25 66:18,21 71:17,22 72:11,21 75:4 79:25 81:1,16 82:5,19 83:21 86:13 87:11,13 90:22 92:21 98:25 99:10 100:5 101:2,13 103:21 104:2,15,17 111:9 112:17 115:10 116:9 120:18 122:5,24 123:13 124:5,

16 125:7 127:22 128:16 129:3,5, 23 130:6,14 132:23 133:8,17,23 134:5,15

**joining** 8:7,17 10:16

**Julie** 35:5

**jump** 33:4

**jumped** 119:19

**justice** 9:3

**K**

**Kayla** 24:20,21,24

**kicked** 19:11

**kind** 11:7 24:5 64:3 69:18 81:6 114:9 117:3

**kneel** 32:3

**knew** 19:12

**knowledge** 14:8 29:25 81:12,22 82:12 128:20,22

**Koehler** 98:2 102:8,12

**Koehler's** 102:9

**L**

**lack** 18:23

**lane** 20:6

**lanes** 19:24 20:6,7

**laptop** 27:15

**law** 8:4,5 9:15 11:21 12:7 66:10 79:18 81:23 89:24

**lawsuit** 118:19 129:12

**lawyer** 83:12

**laying** 60:18

**lead** 32:23 94:21

**leading** 67:13 94:14

**leads** 86:1

**leaking** 30:22

**learned** 21:5

**leave** 81:12 119:22

**led** 70:7

**left** 31:21 37:5 59:9 78:22,24 91:8,15,18 92:3 95:4 118:10,24 119:1 122:10

**leg** 27:3

**legal** 13:15 133:8

**Leithauser** 4:24 15:21 16:1,17,21 17:10,25 18:4 19:3,5 20:20 22:16 34:16 36:4 37:1,3 38:2,20 41:5 42:2 44:2 46:16,20 48:4,14, 21 51:22 52:21 53:1,10 55:3 96:21 108:17 109:18 110:7,16 111:15,18,21 116:14,16,19 117:22 121:25 125:9,13,16,21 126:4,8,12 127:14,19

**Leithauser's** 18:15 21:1,22 23:11,22 109:4 122:10 125:5

**length** 54:10

**letter** 54:4

**level** 113:5

**lieutenant** 19:7 27:11 111:1,5,20 120:10 121:14 127:10

**life** 30:1 57:3

**light** 23:16,21 48:9,19 62:8 63:6 117:2

**Lighthouse** 125:9

**lighting** 22:23

**lights** 20:21 21:2,12 61:23 62:2 63:11,16,21,23 64:4 117:2,14 134:12

**limbs** 70:10

**link** 33:22 53:20

**lips** 109:17 110:8 111:7 112:6

**listed** 105:13

**lit** 23:1 63:12

**Livernois** 98:10

**lives** 102:8

**loaded** 84:11

**location** 98:21 132:19

**locked** 80:4

**long** 7:25 8:5,12 11:17,24 16:3 18:3 32:20 43:1 51:6 73:11,13, 18,21 76:8 84:6 86:18 92:5 102:12 118:23,25 119:2

**long-time** 104:10

**longer** 69:13 86:20

**loop** 44:4

**lost** 66:22

**lot** 61:23 68:15 103:24

**lower** 114:19

**lying** 78:23

**M**

**M-A-N-D-Z-U-I-K** 99:18

**madam** 43:10

**made** 17:7,22 26:10 30:12,25 40:24 57:5 85:12 95:23 98:21 106:1,17 112:5 124:9 132:18 134:6

**Madison** 97:24

**make** 5:23 6:9 12:21 22:11,16 26:24 28:17 37:8 38:22 42:16 47:19 52:6 55:14 59:20 76:5 77:8,21 79:2,4 82:2 95:20 104:18 106:25 111:19 114:17 118:3 121:12

**makes** 12:8 17:4 23:18 49:20 83:6 109:2,15

**making** 19:16 56:25 71:2 88:16 94:22 100:24 128:3

**man** 17:15 24:13 85:4 118:4 126:17

**Mandziuk** 58:15 99:17

**manner** 60:8 133:11

**mannerisms** 60:11 90:15

**Maple** 22:24 36:3 46:4 93:11 98:10,11

**mark** 37:12 54:4

**marked** 13:9,11 15:7 27:5,7 33:7, 9 42:19 53:4,6 54:6 93:2,4 96:4, 6 113:19 119:6 120:10 130:17, 20

**marks** 24:3,5

**married** 117:17,19

**Martinez** 4:9,15,20 12:24 13:10 15:8 18:13 21:10 22:22 24:18 26:3 27:6,16,21,24 28:4,14,20 29:23 30:9,20 31:6,16 32:2 33:4, 8,16 34:9,12,21,25 35:7,17,20, 23,24 36:15,20,24 38:8,17 39:17 40:5,15 41:2,9,17 42:1,20 43:9, 14,19,22,24 44:7,15,17 45:1,6, 20 46:9,12,13 47:7,12,18,21 48:13,20 49:2,10 50:18 51:15 52:10 53:5,8,13,17,19,22 54:5, 11,14,21 55:15,18,19 56:10 57:9,24 58:13,24 59:8,12,14,18 60:7 61:1,8,17 62:5,12,24 63:1, 13,22 64:5,12,15,22 66:4,24 67:17 68:24 69:4,7 70:15,20,24 71:19 72:1,6,13,23 74:1,19 75:5, 7,14,18,24 76:8,20 77:5,16,23 78:11,15 79:12,17 80:7,20 81:4, 11,20 82:11,22 83:4,24 85:11 86:17 87:6,15 88:4,6,14 89:4 90:10 91:1,18,20 92:1,15,24 93:3 94:6,10,12,18 95:1,7,8 96:5,10,24 97:3,7 99:3,7,13 100:8 101:3,17 102:2,11 103:8, 23 104:6,21 106:22,25 107:17, 19 108:3,9,12 109:9,10,13,22 110:1,4 111:3,12 112:7,9,23 115:13 116:11 119:11,16,19,21 120:2,3,12,13,21 121:17,19,22, 24 122:7,13,16 123:1,16 124:8, 18 125:11 128:6,10,12,18 129:9, 16 130:1,9,18 131:7,9 133:2,12, 19 134:1,8,17,21 135:2,6

**Martinez's** 112:6

**Mary** 33:18

**materials** 129:10

**matter** 6:25 96:14 100:11 133:13, 20 134:2

**matters** 50:22 133:24

**means** 96:18 111:11

**meant** 71:1,14 72:2 101:24

**measurement** 80:19

**medical** 22:17 26:24 96:21

**medics** 25:7,10 26:12 74:9,13,17 105:1

**member** 126:1

**memo** 69:20,21

**memorialized** 106:17

**memorializing** 12:20

**memory** 122:17

**mentioned** 68:6 71:12

**mess** 45:17 114:23

**met** 60:2,5 90:13

**Metropolitan** 9:10

**Michigan** 4:1

**Mid** 113:5

**middle** 46:17 108:22,24 109:14 114:11

**mile** 98:12,13,17 99:2,12

**mind** 50:11

**mine** 14:2 53:13,23,25 62:11 63:16 113:2 119:1

**minute** 36:1 43:18 46:7 47:3,16 49:6,8,16 73:15 86:19 107:21 108:13,20 109:16,20 119:3

**minutes** 16:4 27:18,19 28:22 36:7,15,18 37:6,12,15 43:1 52:2 54:10 59:16 62:7,14 63:15 69:2, 6,9 70:1,18,23 87:24 88:7,13 89:2 94:7,18 95:5 108:10 110:2 119:7 122:9 123:20 124:10

**misleading** 120:19

**missed** 28:11

**missing** 70:10

**mistake** 132:19 134:6

**moment** 14:10 30:25 39:1 40:6 74:20 76:1 79:20 91:6 108:21 122:8

**momentarily** 91:6

**morning** 33:21

**motion** 49:20 50:5 85:13 109:3 110:6 111:14 112:2,5

**motioned** 31:17 52:11 111:5 112:1

**motioning** 89:10 91:15 92:2 110:19 115:3

**motions** 50:1 89:13

**motor** 68:9

**motorcycle** 18:19 20:16 30:22 84:12

**mouth** 60:14

**move** 53:5

**moving** 24:7 45:7 60:23 80:17 103:16,19

**MP4** 54:4

**multiple** 130:11

**mute** 114:20 115:7,17,19

**muted** 127:4

**muting** 115:16

## N

**named** 4:21 24:19,24 98:3

**names** 126:18

**nature** 22:13 128:5

**nearest** 19:25

**neat** 5:22

**needed** 19:12 29:11 31:1 37:18 38:18 96:21 132:18

**negative** 130:25 131:17,19 132:25 134:11

**negotiation** 10:21

**nervous** 60:11,13 61:10 103:22,

24 104:4,7,9

**nervousness** 61:12 65:22 66:11 67:1,9

**night** 11:10 15:18 25:16 68:9

**nods** 5:21

**noggin** 128:2

**normal** 52:17

**nose** 82:21,23,24,25

**notates** 131:16

**notating** 125:3

**note** 42:22 52:6 60:10 95:16 101:20

**notebook** 69:15,18,21 93:7,10

**notebooks** 69:23

**noted** 99:24 131:6,7

**notes** 69:18 93:16,19 95:20,21, 22,24 123:4 128:11

**notice** 4:11

**number** 13:8 15:6 27:4 33:6 42:18,24 44:9 45:8 53:3 93:1 96:3 113:20,23 130:16

**nystagmus** 64:8

**O**

**Oak** 8:21

**Oakland** 8:23

**oath** 4:8

**object** 27:25 82:17

**objection** 12:23 18:9 21:6 22:6 24:15 26:1 29:20 30:5,13 31:3, 13,22,23 32:24 33:14 34:24 38:3,11 39:9,25 40:11,20,21 41:8,12,21 42:13 44:3,14 45:13 48:10,16,23 50:14 51:9,10 56:7 57:6,22 58:8,21 59:4 60:6,20 61:5,14,25 62:9 63:8,18 64:1,9 65:24 66:14 67:14 71:15,21 72:4,9,16 73:22 74:15 75:3 79:15,22 80:10,25 81:6,15 82:4 83:1,20 86:12 87:3,10 89:25 90:20 92:12,19 94:22 96:23 98:23 99:9 100:3 101:1,11 102:1 103:4,20 104:1,13 109:12,19 110:21,23 111:8 112:15 115:8 116:7 120:9,17 122:4,23 123:12 124:3,14 125:6 127:20 128:15 129:2,14,22 130:5,13,23 131:6 132:22 133:7,15 134:4,13

**objections** 6:9,12 87:17 133:22

**objective** 41:11

**observation** 26:23 30:12

**observations** 12:21 59:20 86:11 100:12 103:11 105:4,11,13 106:17 107:4

**observe** 22:23 23:2 26:7 28:5 30:21 47:22 60:8 61:3 64:7 68:8 78:12,21 108:21 121:25

**observed** 26:21 29:13 48:3 65:18 66:25 73:9 76:1 85:24 86:8

**observing** 26:18,19 66:12 106:10

**obstruction** 69:10 93:17

**obtained** 84:16 123:3

**occasions** 116:22

**occurred** 4:22 11:13 17:18 40:10 46:3 85:14 105:8

**occurring** 15:19 20:14 97:18

**odor** 65:19 73:9 74:9 76:2 79:1, 21 82:8,13

**offered** 86:2

**office** 84:25 85:2,21

**officer** 4:23 7:5,13,15,17,18 8:5 9:15 11:21 12:7 15:21 16:1,16, 17,21 17:10,25 18:4,15 19:3,5 20:20 21:1,22 22:16 23:11,22 28:21 34:16,20 35:8 36:1,4 37:1, 3 38:20 39:12,15,20,22 41:5 42:2 43:25 44:2,18 45:2 46:16, 19,20 47:4,10,22,25 48:4,14,21 50:25 51:21,22 53:1 54:15 55:3, 20 56:6 66:10 67:7,18 76:21 79:19 80:2,16 81:23 86:25 88:15 95:2 96:21 104:4 107:8 108:13, 17,21,23 109:4,14,18 110:7,16 111:15,18,21 116:14,16,19 117:22 120:10,16 121:25 122:10 125:5,9,13,16,21 126:4,8,12 127:7,9,11,19 130:24 131:25 132:1,9 133:20,21 134:2,18

**officer's** 133:13

**officer-involved** 15:20

**officers** 55:6 108:15 112:12 115:6,19 126:15,20

**one's** 77:3

**ongoing** 38:2 47:2

**open** 36:8

**opening** 87:23

**operate** 20:16 114:7

**operating** 10:9 68:8

**opinion** 26:25 67:10

**opportunity** 11:9,14 14:4 18:14 76:24 83:19 96:11

**opposed** 68:18 74:4

**opposite** 20:7

**order** 20:9 33:5 112:19 114:6

**original** 120:15

**Orr** 24:20,21,24

**oscillating** 61:23 62:2 117:2

**overhead** 21:2

**overly** 83:2

**overwhelmed** 102:23

**OWI** 10:8 64:16,20,24 65:2,7 80:21 81:2,8,10 123:10,18,24

**P**

**p.m.** 4:3 93:24,25 95:12,13,15 99:21 100:2 105:7

**pad** 69:20,21

**pain** 16:15 17:2,7

**Palm** 127:7

**paper** 28:25 29:1,3 121:16

**paperwork** 29:9,11 31:1 123:21

**paragraph** 97:14

**Pardon** 128:10

**parked** 17:21 18:18

**parking** 34:10 68:15

**Parra** 4:11 7:4,5,7 80:2,16 86:8 117:18,21 118:18

**Parra's** 34:20 130:24

**part** 11:20 12:25 14:20 58:20 62:13 66:1 81:24 85:21 87:18,25 125:24

**participate** 84:20

**partner** 63:12

**party** 52:20

**partying** 32:21 58:17

**passed** 98:15

**patrol** 7:21,24 18:15 132:6

**pause** 28:14 35:23 46:12 55:12, 16 59:14 62:14,17 69:4 70:20 94:10 108:9

**paused** 68:25 70:16 108:5 109:20 120:25

**pausing** 28:16 59:15 69:5 70:22 94:18 95:7 108:10

**pavement** 104:10

**PBT** 125:17

**pending** 6:19

**people** 7:7 89:21,23 90:6,7,8 91:12 92:5,10 96:16 105:15

**percent** 88:23

**Perfect** 27:24

**person** 56:2 66:16 80:23 82:13 123:9 124:1

**personal** 107:3 117:15 128:20 132:6,8

**personally** 71:5,8,10 106:9

**perspective** 12:8

**pertained** 116:12

**pertaining** 4:21 38:20 42:3 129:21 134:11

**pertains** 116:22 118:18 131:20

**phone** 67:24 118:23,25

**pick** 70:15 113:24 114:2

**pieces** 10:7

**pint** 71:2,24 72:2,8,14 87:1 89:8 90:18,19 93:22 99:21

**place** 19:24 20:9 114:3 122:9 130:23

**plaintiff's** 59:16

**play** 43:1 94:23 109:21 119:5

**playing** 33:10 47:15 54:7 59:9 60:14 61:10

**pocket-sized** 69:22

**point** 6:1,16 11:13 21:7 22:12,14 24:10 25:13,16 28:11 37:4 39:18 45:21 46:24 47:15 59:19,25 61:22 62:20 63:24 64:6 65:14,18 69:14,17,25 70:7,12,25 71:4 72:7 74:7,10,12 77:11 78:25 82:15 83:5,15 86:6 89:5 90:13 91:12 92:16,17 93:19 96:17 100:23 103:14 105:22 107:1 110:11 111:13 118:17 119:14 121:3,6 122:3,20,22 127:13 128:7 134:9

**pointing** 89:6

**points** 67:6 87:20 88:25 110:11 120:4

**police** 7:13,15,16,18,25 8:11,12, 14,15,17 9:7,10 10:13,17,19,23 12:4,8,17 19:7 23:19,20 39:4 51:4 61:23 86:7 100:10 104:3 105:17 107:7 112:11 132:1,11 133:13,21 134:10

**policy** 39:4,8 51:4 130:24,25

**portion** 36:18 109:21

**position** 25:5

**positioned** 37:3

**positive** 131:17,19

**possession** 129:10

**possibilities** 103:2,9

**possibility** 102:22,25 124:11

**possibly** 27:2 46:21

**post** 8:18,22,23

**precise** 32:22

**precisely** 77:6

**predates** 131:2

**prefer** 7:8

**preliminary** 32:8

**prep** 85:19

**preparation** 13:21

**prepare** 11:3

**prepared** 96:14 107:12

**preparing** 12:17 14:20

**presence** 32:6,9 111:13

**present** 86:21

**presented** 115:23 116:4

**preserve** 19:2

**preserving** 19:14 22:2

**pretty** 10:25 16:18 18:5 22:21 58:17 72:17 76:13 86:16

**previously** 10:16 29:18 116:5

**prior** 8:7,14,17 11:2 20:21 43:17 56:25 58:4 97:18 98:1 123:19

**privacy** 39:1

**private** 40:4 41:16 116:18

**privilege** 6:12 64:19

**Procedure** 4:13

**proceed** 22:9,10

**process** 125:1

**professional** 30:1 107:15

**proper** 58:14 82:1

**prosecution** 129:12

**provide** 6:24 86:24 97:22 107:13 133:9

**provided** 33:21 56:6 66:17 100:2 128:14

**providing** 128:19

**proximity** 18:8 25:18

**public** 50:8,10,20,23 51:7,18,19, 25 115:12,18 116:20,25

**pulled** 17:22 131:23,24 132:4,9, 20 133:1

**pupils** 61:20

**purpose** 57:12 132:12

**purposes** 4:12 125:15 126:8

**pursuant** 4:11

**push** 114:11

**put** 10:6 19:13 20:10 45:25 65:9 70:10 85:15 96:19 101:9,24 103:11 105:3 107:1 113:15,22 121:3

**puzzle** 10:7

## Q

**qualify** 10:23

**question** 6:2,5,6,7,19,20 11:10 20:23 38:15 64:18,19 67:15,18 70:2 71:3,6 79:24 80:15 81:4,5, 7,18,21 82:18 89:9 94:24 102:3 110:25 123:15 125:19

**questioning** 72:18 106:25 107:15

**questions** 5:17,24 14:23 42:3,6 83:10,23 101:21 107:3,14 131:5 134:23,25

**quick** 18:5 43:10 131:11

**quickly** 119:5

**quiet** 111:11,15

**quote** 101:21

## R

**R-E-E-D** 9:21,22

**R-E-I-D** 9:20

**radio** 15:22

**rank** 7:14

**reaching** 15:15

**react** 90:8

**read** 28:15 61:12,18 96:9 112:19 131:11

**reading** 77:14 97:2

**reads** 33:17

**ready** 106:20 107:24

**real** 131:11

**reason** 6:23 100:19 126:12 132:4

**reasons** 60:12 102:16 116:24

**recall** 13:19 18:3,19 22:12 23:22, 24 41:6 48:22,25 52:20 53:2 57:20 58:4,6,20 86:10 91:4,10 99:22 100:22 101:4 117:9 121:2, 5 126:15 131:21 132:14

**recalling** 102:16

**receive** 8:25 113:9,15 115:6 129:17

**received** 9:13 89:16 112:13,18 134:11

**receiving** 15:25 132:25

**recess** 43:13 106:23

**recognize** 13:14,25 35:8

**recollection** 57:18 66:6 74:12 127:6,18

**record** 4:9 5:15,22 6:10,13 28:17 30:7 34:13,19 35:25 40:18 42:22 43:5,11,15,16 47:13 52:7,9 54:17 55:15 60:16 75:7 77:6,9 78:20 93:8 94:6 100:10 106:22 107:1 115:2 119:17 121:4 131:6 135:3

**record's** 47:19 54:2 107:17 112:2,4

**recording** 41:11 51:24 52:15 94:10 115:2,15 116:6,14

**recordings** 116:24

**red** 34:14

**refer** 7:7 42:21

**reference** 5:1 45:10 83:7 89:6 111:19

**referenced** 19:14

**referencing** 5:2 89:11 105:12

**referred** 96:16

**referring** 29:6,9 49:11 90:18

**reflect** 4:9 36:2

**reflecting** 62:8 63:16,24

**refresh** 122:17

**regard** 10:8

**regular** 60:1 82:24,25

**Reid** 9:19

**relating** 129:18

**relation** 17:21

**relevant** 64:23 131:4

**reliable** 12:9

**rely** 14:15 126:23

**remainder** 107:15

**remember** 11:23 13:20 15:17 16:9 17:8 18:2,5,17 20:1 21:9 23:9 24:2,4,6,12,17,23 26:6 32:1 40:17 59:6 74:11,18 83:14 84:8, 19 85:4 86:5,9 89:18 94:2 102:6, 7,8 113:20 118:4 122:6 125:18 134:16

**Remind** 12:3

**render** 19:1 128:7

**renew** 44:13

**repeat** 28:10

**rephrase** 6:3 128:23

**report** 41:1 95:22,24 96:8,13,18, 20 97:5 99:5,18,24 100:11 101:9,25 103:11 105:4,12,20,22 106:3,6,9,13,14,18 107:5 123:5

**reporter** 5:14 43:10 99:17

**reports** 12:17

**represent** 4:20 27:9 34:16 37:23 74:24 96:7

**representative** 38:9

**representing** 34:20

**request** 59:16

**resided** 97:23

**resides** 98:3

**respectful** 107:16

**respond** 10:6 16:2 18:25 19:1 81:13

**responded** 18:1

**responding** 20:25 39:20,21 51:21

**response** 5:17,18 14:22 36:2 110:15

**responses** 14:17,21

**responsible** 19:19

**restarted** 116:6 130:11

**resting** 64:8

**result** 124:12

**resume** 55:12 95:4

**return** 84:7

**returning** 86:6

**review** 11:6,9,14 12:13 14:5,14 76:7 77:10,20 80:8 91:15 96:11

**reviewed** 14:21 95:10 129:20

**reviewing** 77:14

**rewinding** 75:16

**richness** 63:10

**rifle** 128:3

**right-hand** 45:9

**risk** 39:14

**road** 20:5

**roadway** 19:20 24:1,7,8

**roadways** 20:2

**role** 22:21

**roughly** 26:5 69:8

**route** 20:12

**Royal** 8:21

**Rule** 131:4

**rules** 4:12 5:12

**run** 27:18 49:6,16 94:11 104:19

**running** 46:25 68:4,15 121:4

**runs** 19:16

**Ryan** 93:23 98:18 99:2,12

**S**

**safe** 21:21

**safety** 85:21

**sake** 35:25 43:15 63:14

**sarcastic** 81:18

**scared** 59:22

**scene** 12:12,13,21 16:2,3,5,10, 11,14 17:22 18:4,22 19:2,9,12, 14 20:10,17,20,24,25 21:4 22:2, 12 23:25 24:3 26:22 27:11 32:11 36:11 38:2,10 39:19,20 42:9 45:22 46:16 52:22,24 55:24 56:13 57:13 67:10 74:5 78:1 81:13 85:24 86:8 90:24 91:13 92:3,5,11 93:11 97:11 98:7 103:6,24 108:14 111:18 116:13 117:11 118:5,8,10,24 121:13 123:10,18 125:2 126:16,20,25 127:7 130:12

**schedule** 107:11

**school** 8:18,21,22 9:19

**Scott** 85:23 86:10

**screen** 37:7 54:23 55:14 62:10, 17,21 63:2,11 77:18 79:6 91:16 94:8

**screens** 62:19 63:4

**screwed** 76:14

**screws** 113:8

**search** 29:10 86:2 127:15

**secondhand** 128:14

**seconds** 27:18,20 28:22 35:19, 20 36:7,16,18 37:6,16 42:25 43:1,7,18 46:7 47:3,16,17 49:6, 8,16 52:2 54:10,13,17,19 55:5, 17,23 59:12,17 62:7,15 63:15 69:2,6,9 70:1,18,23 73:17 75:13, 17,18,21,22,25 78:4,5,13,16 79:7 87:24 88:7,13 89:3 94:7,19 95:5 107:22 108:11,14,20 109:16,20 119:2,7 122:9 123:20 124:10

**section** 14:14

**Securing** 125:2

**sense** 90:7

**sensitive** 82:23 83:2,3

**sensitivity** 82:21

**sentence** 97:4

**sentences** 97:4

**separate** 115:24

**September** 4:23 7:22 15:18 33:19 68:9 131:1,21

**sequence** 110:5

**sergeant** 19:6 27:10 31:1 46:21 47:1 48:1 49:20,24 50:1,5 52:11 55:4,10,11 108:17,18 109:1,2,15 110:6,10 111:1,5 121:15

**sergeants** 55:10

**serial** 44:8 45:8

**set** 4:10 108:14

**shakes** 5:21

**shape** 65:15 129:17,20

**shared** 72:14

**Shell** 25:2

**shift** 46:1 113:10

**shirt** 24:14 112:22

**shoot** 114:21

**shooting** 39:13

**short** 119:3

**shortly** 37:11 52:1,25

**shoulder** 60:24 122:10

**show** 27:7,13,14 33:9 43:20 49:15 62:6

**showed** 56:13 90:23

**shower** 11:5

**showing** 74:20 76:23 77:3 88:15 94:8

**shown** 28:3,13 35:22 36:22 43:8, 21 46:11 47:6,9 49:9 59:13 62:16 69:3 70:19 75:10,20 79:9 88:2,9,24 94:9,17 95:6 107:23 108:8 110:3 119:13,15,24 121:9, 21

**shows** 67:23 87:7

**Shrine** 8:21

**shut** 39:14

**sic** 9:21

**side** 31:25 32:1 37:7 63:12 114:13,14,16

**sides** 114:14

**sign** 50:4 65:23

**signal** 109:16 110:15

**signature** 14:3 15:10

**signatures** 13:25

**signify** 14:4

**silence** 128:10

**similar** 20:5 25:24 44:10 111:6, 19

**sir** 4:16,17,25 5:4,19,25 6:8,15, 22 7:1,9 8:9,23 9:8,21 11:5,8,12 12:2,22 14:6,9 15:5 16:24 17:3, 19 18:18 19:10,21 20:4,15,18,23 21:17,20,24 22:21 23:9,13 24:4, 17,24 25:6 26:15 28:23 29:16 30:4,17,23 31:9,14,19 32:4,7,10, 18 33:3,12 35:11 36:5,9 37:2,10, 14,20 38:6,16 40:17 41:7,19 42:17 44:20 46:2,5 49:18,22,24 50:17 51:2,25 52:4,19,23 55:1,8, 11,22 56:1,13 57:11,19 58:1,22 62:10 63:2 64:4,21 65:2,9,17 68:7,23 69:12,19,24 70:4 71:6 72:3 73:18 75:15,19 76:14 78:10,14 79:11,13 81:3 82:6,10 84:5,8 85:4,22 86:23 87:5 88:23 91:5,11 92:6,9,14,23 93:13,18 94:2 95:14 96:1 97:13,19,25 98:5,13,19 99:23 102:10 103:17 106:2,15 107:20 108:24 109:6 111:2,22 112:3,10 113:2 114:1 115:4 116:2,21 117:19 118:4,7, 11 119:4,25 120:20 121:7 122:2, 6,20 124:22 125:10,22 127:12 128:5,9 129:8,15,24 130:8,19 131:11 132:3 133:4

**siren** 21:2

**sirens** 20:21 21:12 134:12

**sit** 58:6,25 85:1

**situation** 88:20 102:23 128:2

**skid** 24:3

**skin** 74:14

**slicktop** 23:12

**small** 69:22

**smell** 29:14,15 30:17 61:20 73:12,13,18,21 79:1,14,21 80:6 82:7 103:6 129:7

**smelled** 26:20 31:5,11 74:8 82:8 103:3 106:4

**smelling** 74:3

**smells** 80:24 82:3

**sobriety** 32:5 65:9

**SOCCIT** 13:1 22:13 125:24 126:1

**somebody's** 29:3

**Someone's** 28:25

**son** 89:7,12 93:22 98:15

**sort** 74:13

**sought** 126:11

**sound** 28:9 35:5,16,21 54:18 93:15 114:18,19

**sounds** 11:24 49:12,13 60:1 95:11

**South** 24:13

**space** 26:4

**span** 95:9

**speak** 19:2,4 22:15,20 24:19 25:13,15 26:14 37:17 41:25 56:11 83:7 97:10 101:18 116:14 127:9

**speaking** 24:12,17,23 25:11 41:10 46:20 50:12 56:19 57:12 60:8 65:3 94:22 97:15 126:15 127:6

**speaks** 30:8 39:2

**specific** 7:16 14:14 39:7 80:22

**specifically** 6:11 15:1 59:1 100:23 109:11 112:13 117:10

**speculation** 110:22

**speed** 21:22 134:3

**speeding** 131:23 132:5,6,17 133:1 134:7,12

**split** 71:23 72:2 89:8

**spoke** 18:4 32:15 83:25 84:6 118:23 126:24

**spoken** 31:7 32:11 90:6

**stamp** 79:5 93:8

**stand** 61:11 73:19

**standard** 39:7

**standing** 37:5 60:15

**standpoint** 22:5

**start** 7:2 27:22 33:10 54:7 59:9 78:3,4 94:16 106:24 108:6 109:22,24 113:10 114:8 123:18

**started** 44:1 47:14 75:8,21 76:11

**starting** 28:10 42:24 49:7 54:11 69:1,9 70:17 75:5 77:2 79:10 87:24 88:1 94:7

**starts** 43:6 109:3

**state** 97:8

**stated** 98:14

**statement** 30:25 40:24,25 41:1 49:11 123:19 124:9 128:13 130:3

**statements** 41:4 53:1 71:2 90:5

**stating** 48:7

**station** 15:24 84:3,7,13,15,21 85:3,12,17 86:4 113:25 114:2 119:1

**status** 21:1,12 38:9

**stays** 46:1

**stemming** 126:13

**step** 125:4

**Stephenson** 22:24 36:3 46:4 93:12 98:11

**steward** 38:22 39:7,21 41:4

**stop** 51:23 52:14,17 75:12,23 108:7 109:25 110:1 115:2,15 116:14 121:17,22

**stopped** 43:17 48:9,19 54:16 62:6 104:25 105:6 116:5,23,24 120:1 130:11

**stopping** 94:24 119:14

**stops** 37:11 52:2,8 76:11 91:6

**straight** 78:23

**street** 68:4,16 97:24 98:3,7 102:7

**stuff** 117:15

**subconscious** 89:14,17

**suffer** 17:14

**suit** 24:13

**supervisors** 22:10

**supposed** 19:8 115:19

**suspect** 65:15

**sustained** 22:17

**swap** 45:22

**sworn** 4:6

**System** 131:15

**Szczesny** 4:21 16:23 17:2,21 24:25 25:11,14,15,18,25 26:9, 12,14 30:11 31:8,10,21 32:3,6,9, 12 48:8 57:21 59:2 60:18 61:4 66:12 67:4,11 70:3,8 71:5 72:25 73:3,5,10 74:4,8,21 75:1 76:2 77:25 78:17 79:20 80:9 89:6,10 93:21 97:20 104:24 105:6 106:4, 7,10,18 123:11,21 128:8,25

**Szczesny's** 21:19 74:14 78:21 127:15

**T**

**taking** 5:14

**talk** 24:10 39:15 77:1 83:12 90:8 92:4 102:5 107:7,8

**talked** 86:15 127:24

**talking** 48:4 50:19,22 64:7 73:15, 17 83:6 88:18,19 89:21 91:6 92:8 104:3 105:14

**task** 134:3

**tasks** 22:1

**teach** 10:13

**team** 10:21 13:1 125:25 126:1

**technical** 35:10

**technology** 45:17

**telling** 86:10 92:4

**tells** 77:11 95:12

**ten** 75:16,21 80:9

**term** 18:23 23:12,14 48:21 70:12 73:10 87:8 130:3 133:5

**terms** 58:19

**test** 32:8 65:9 125:17

**tested** 126:5

**testified** 4:8 14:19 30:8 78:25 100:24

**testifying** 89:19 100:22

**testimony** 6:24 23:10 66:17 78:12 101:4 117:17

**testing** 32:5

**thing** 34:5 76:15 103:13 115:16 119:18 130:19

**things** 5:15 29:13 102:16 103:5 116:18 128:4

**thinking** 45:18 123:7 124:7

**thinks** 134:2

**Thirty-second** 35:21

**Thomas** 4:21

**thought** 48:8,19 94:14 115:14 125:1

**thousands** 90:7

**thumbnail** 34:15

**ticket** 133:3

**Tigers** 127:24

**time** 4:10 6:1,3,9,17,20 11:13 15:23 16:5,8 17:20,25 18:5,15, 19,22 20:23,24 21:4,14 23:7 24:10,25 25:7,10,13 26:8 27:18 30:11 31:10 36:10,13 37:4 38:16 39:18 40:6 41:18 43:25 44:21 45:11,21 46:14,25 49:6,16 50:2 54:11 55:4 57:2 59:7,19,25 60:3 61:22 62:20 64:6 65:14,18 66:22 69:17,25 70:7,12,25 71:4 72:7, 19 73:8 74:7,12 75:8 76:20 77:18 79:5 80:1,16 81:9 83:5,15 84:13 85:2 86:6,22 89:5,9,11 90:13 91:12,24 92:7,17 93:19,25 94:4,11,13 95:18 96:9 100:1 103:14 105:22 107:10 110:11 111:13 113:15 117:20 118:4,18

120:25 121:3,4,6,8 122:3,22 123:2 124:2,9,23 127:13 128:7 130:12 132:9,17 133:18 134:9

**timeline** 32:20 58:5,6 84:4

**times** 5:10,11 67:6 79:24 80:13 81:22 95:9 101:5,6 130:11

**timestamp** 42:24 43:16 47:12 77:12 88:6,16 122:8

**tire** 24:5

**title** 53:12

**titled** 53:25

**today** 5:3,13,16 6:10,25 11:2,7, 12 13:17 26:25 58:4,7 61:13 78:12,25 85:1 89:20 99:14 100:22 101:8 107:2,10 116:4 117:17

**told** 17:15 40:13 48:8 57:20 59:1 84:22,24 86:16 111:10 112:19 132:24

**Tom** 48:15 71:5,7,10 72:7,25 73:3,5 105:25 106:18 123:11 127:15

**Tom's** 105:23

**top** 23:21 24:14 33:17 42:24 45:9 100:11

**tops** 61:23

**torso** 78:21

**totality** 67:20,25

**Tracker** 134:7

**Tracking** 131:1,15 132:25

**traditional** 23:18,20

**traffic** 17:23 19:21,22 20:9 23:2, 4,6,7 84:25 85:2,21 121:11

**train** 10:19,20

**trained** 10:2 65:6

**training** 9:13,15,17 10:10,12,15, 18,22,25 12:1,6,15 19:11 20:8 64:13,25 65:7 79:18 80:21 81:12,25 82:12 89:16 90:2 105:5,11,16,17,19 112:10,13 115:5 132:13,14,18

**trainings** 11:20

**trains** 112:12

**trans** 135:4,6

**transpired** 22:3

**transported** 70:11

**traumatic** 128:1

**travel** 19:25

**traveling** 20:11

**treated** 70:10

**treating** 25:7

**trigger** 117:3

**triggered** 117:1

**trouble** 67:23

**Troy** 7:11,12,25 8:7 10:13,17,19, 23 12:4 19:7 39:3 51:3 86:6 98:2,17 100:10 105:17 112:11, 12 115:6 132:1,11 134:10

**truck** 62:3

**true** 14:7

**truth** 4:6,7

**truthful** 6:24 14:16 38:25

**Tuesday** 4:2

**turn** 21:19 37:15,18 38:18 40:7 51:16,18,19 52:14 117:4

**turned** 17:15 39:24 40:10 52:13, 18,19 117:13 127:4

**turning** 48:22 117:9

**TV** 114:17

**twelve** 8:2 27:19 119:7,10,11,12 121:1

**twenty** 30:18

**Twenty-nine** 8:6 78:16

**Twenty-two** 75:22

**two-lane** 20:5

**type** 13:15

**typed** 15:1

**typically** 113:3,10

## U

**Uh-huh** 43:4 53:21 75:6 107:25 110:9 119:20

**ultimately** 26:10 92:16 95:22 124:20

**unable** 6:24 100:13,19 101:6 133:9

**unbuttoned** 24:14

**uncertain** 95:18

**Undercover** 9:19

**undergone** 9:14

**underly** 83:3

**underneath** 113:1

**underscore** 54:1,2,3

**understand** 6:2,5 14:15 25:1 50:17 56:21 58:3 67:18 77:5,21 110:17 118:12 124:22,23

**understanding** 15:11 17:17 20:19 39:3 51:3 89:5 90:15 98:6 114:15 115:5,20 131:14

**understood** 5:24 6:6,14 10:8 29:24 44:15 58:25 119:5 123:4 124:19

**undertake** 74:2

**uniform** 112:25 113:6 114:4

**union** 37:24 38:1,6,9,20,22 39:7, 21 41:4 116:15

**unit** 7:19 34:17 85:21

**upper** 54:12 78:21

**UPRS** 134:11

**upset** 57:10,11

**upward** 31:18

**urine** 125:17

V

**vantage** 46:24 63:24 78:24

**vehicle** 4:22 16:11 17:20 18:15 19:23,24 20:11 23:11,15,18,19, 20,23 36:8,10,19 68:9 132:6,7,8

**vehicles** 20:11 61:24

**verbal** 5:16,17,18,23

**verbally** 111:14

**verbatim** 5:15 127:23

**Vermont** 98:3,7

**version** 48:4

**versus** 52:8 65:6 66:13 67:12 90:19

**vest** 112:25 113:1 114:3

**vicinity** 18:11 73:11

**victim** 16:14 57:14 90:5

**video** 27:9,10 28:3,5,13,16,18 33:11,17 34:15 35:22 36:2,22 37:7,11,15 42:23,25 43:2,6,8,20, 21,25 44:8,10,19 46:11 47:5,6 49:8,9 50:2 52:2,8,17 53:15 54:2,6,10,12,15,16 55:1,21 56:2 58:4 59:7,9,13,15 62:14,16 66:6 68:6,25 69:1,3,5,8,10 70:16,17, 19,20,22 74:17,20 75:1,5,10,13, 20,23 77:4,19 78:20,22 79:9 80:8 83:11 88:1,2,8,9,24 91:2,15 93:14 94:9,17,23 95:6,7 99:14 107:23 108:8 110:3 114:21 116:4,5,12,23 117:5,8 119:13, 15,24 120:4,11,15 121:9,21

**videos** 34:17 35:18 45:7 115:24 130:11

**view** 108:15

**viewing** 54:23 65:14

**violation** 130:25

**voice** 44:23 45:4,5,19

**volume** 23:7 114:17

W

**wait** 35:19

**wake** 71:20 89:12 93:23 98:15

**Walk** 57:17

**walked** 26:11

**walking** 55:7

**wall** 35:2

**wanted** 37:22 121:12

**wanting** 83:7

**warrant** 29:10 86:2 124:20 125:13,14 126:12

**Waske** 12:23 18:9 21:6 22:6 24:15 26:1 27:14,19,22 28:2,7, 12,16 29:20 30:5,15 31:3,13,23 32:24 33:13,20,25 34:2,4,23 35:3,5,14,19,21 36:17 38:5,11, 13 39:9 40:2,11,21 41:8,12,21 42:13 43:3,5,18,23 44:3,12,22 45:3,13 47:14 48:10,16,23 49:7 50:14 51:10 52:6 53:7,12,14,18, 21,25 54:9,16 55:14,17 56:7 57:6,22 58:8,21 59:4,10,11,15 60:6,20 61:5,14,25 62:9,23 63:8, 18 64:1,9,14,17 65:24 66:14,19 67:14 69:1,5 70:17,22 71:15,21 72:4,9,16 73:22 74:15 75:3,6,12, 16,21 76:3,10,16,19,22 77:5,8, 17,24 78:4,8 79:4,15,22 80:1,10, 25 81:6,15 82:4,19 83:1,20 85:6, 10 86:12 87:3,10,12,17,23 88:5, 10,12 89:2,25 90:20 91:14,19,21 92:12,19 94:20 96:9,23 97:1 98:23 99:9 100:3 101:1,11,14 102:1,4 103:4,21 104:1,13,16 106:21,24 107:18,24 108:1,10 109:12,19,24 110:23 111:8 112:4,8,15 115:8 116:9 119:9, 14,18,20,23 120:1,9,17 121:18 122:4,23 123:12 124:3,14 125:6 127:22 128:15 129:2,4,14,22 130:5,7,13,22 132:22 133:7,15, 22 134:4,13,23 135:4

**watch** 28:7 57:19 58:2,22 59:7 68:7 75:1 76:5,24,25 84:22 86:14 87:5 101:23 114:17 121:7

**watched** 11:16,17 74:22 110:14 120:23 122:1

**watching** 121:20

**wear** 112:19,25 113:2

**wearing** 24:13 45:11

**weather** 127:25

**weeks** 11:18

**weigh** 66:7

**weird** 33:24

**whatsoever** 60:4

**whereabouts** 97:17

**whiff** 29:17

**whoever's** 84:25

**wipes** 74:13,14

**witnesses** 22:19 32:11 126:2

**woman** 24:19 57:2

**wondering** 59:23

**word** 86:25

**words** 32:22 38:15 115:2 120:14

**work** 118:1 133:14

**worked** 7:25 16:18

**working** 105:1

**worn** 113:3

**write** 12:3 95:24

**writing** 69:16,17 93:10,16

**written** 94:3 95:21 99:18

**wrong** 132:19

**wrote** 97:15 106:14

X

**X60a1575m** 34:18 42:24

Y

**years** 8:2,6,13 42:15 84:5 105:14